INSTITUTE FOR FREE SPEECH
Alan Gura, SBN 178221
        Designated counsel for service, LR 182(c)
        agura@ifs.org
Courtney Corbello, admitted pro hac vice+
        ccorbello@ifs.org
1150 Connecticut Avenue, N.W., Suite 801
Washington, DC 20036
Phone: 202.967.0007
Fax:    202.301.3399
+Admitted in Texas. Practice supervised by
D.C. Bar members, D.C. App. R. 49(c)(8)

Attorneys for Plaintiff Daymon Johnson

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAYMON JOHNSON, | Case No.: 1:23-cv-00848-CDB |
| *Plaintiff,* | FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| v. | |
| STEVE WATKIN, in his official capacity as Interim President, Bakersfield College; RICHARD McCROW, in his official capacity as Dean of Instruction, Bakersfield College; THOMAS BURKE, in his official capacity as Chancellor, Kern Community College District; SONYA CHRISTIAN, in her official capacity as Chancellor, California Community Colleges; ROMEO AGBALOG, in his official capacity as President, Kern Community College District Board of Trustees; JOHN S. CORKINS, in his official capacity as Vice President, Kern Community College District Board of Trustees; KAY S. MEEK, in her official capacity as Clerk, Kern Community College District Board of Trustees; KYLE CARTER, in his official capacity as Trustee, Kern Community College District; CHRISTINA SCRIVNER, in her official capacity as Trustee, Kern Community College District; NAN GOMEZ-HEITZEBERG, in her official capacity as Trustee, Kern Community College District; and YOVANI JIMENEZ, in his official capacity as Trustee, Kern Community College District, | |
| *Defendants.* | |

JURISDICTION

1. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as Plaintiff alleges that Defendants are violating 42 U.S.C. § 1983 by depriving him, under color of state law, of rights, privileges, and immunities secured by the First and Fourteenth Amendments to the United States Constitution.

VENUE

2. This Court is the proper venue for this action per 28 U.S.C. § 1391(b) as a substantial part of the events and omissions giving rise to the claim have occurred and are occurring in this judicial district.

INTRODUCTION

3. "They're in that five percent that we have to continue to cull. Got them in my livestock operation and that's why we put a rope on some of them and take them to the slaughterhouse. That's a fact of life with human nature and so forth, I don't know how to say it any clearer."[1]

4. The five percent that Defendant John Corkins referred to are faculty of Bakersfield College. They must be slaughtered, so to speak, for transgressions including the writing of op-eds in the local newspaper, appearances on radio programs, and the failure to censor their colleagues' Facebook posts, all in opposition to the school's official ideology. The first "cullee," Professor Matthew Garrett, has just been fired for these forms of pure political speech.

5. Unlike Corkins's livestock, the faculty he oversees as Vice President of the Kern Community College District's Board of Trustees understand the sort of operations he and his Defendant colleagues run. They know what happened to their friend who is no longer there, and why.

6. Plaintiff Daymon Johnson has special reason to be concerned about his future as a Bakersfield College professor should he continue to express his views. Johnson is Garrett's successor as the Faculty Lead for the Renegade Institute for Liberty ("RIFL"), the dissident group villainized by the school administration. The new leader of the "five percent," Professor Johnson

---

[1] John Corkins, *December 2022 Board of Trustees Meeting (12/13/2022)*, YouTube, https://perma.cc/L7JY-4HJR (last visited July 1, 2023).

1  also authored several Facebook posts whose non-deletion by Garrett featured in the charges of

2  wrongthink for which the latter was fired.

3      7.   Indeed, Bakersfield College has already subjected Professor Johnson to a lengthy and

4  intrusive investigation merely for criticizing and questioning a colleague's views on RIFL's

5  Facebook page. Although it ultimately cleared Professor Johnson of violating any actual rules, the

6  process was the punishment. The investigation forced Professor Johnson to retain counsel, and the

7  school's ten-page single-spaced findings sustained or found plausible various "allegations" that

8  Professor Johnson had expressed himself, perhaps motivated by political disagreement.

9      8.   Moreover, then-Bakersfield College President Zav Dadabhoy called out Professor

10  Johnson's institute as "a small group promoting exclusion," contrary to the school's official state-

11  mandated ideology holding that school personnel "must intentionally practice" and "understand" the

12  tenets of "anti-racism," 5 Cal. Code Regs. § 51201(b). Professor Johnson, however, believes it is the

13  school's official ideology, not his, that promotes exclusion.

14      9.   Given school officials' various ideological proclamations, his experience of being

15  investigated for pure political speech, and the example Defendants made of his colleague and direct

16  predecessor as RIFL Faculty Lead, whom they fired for dissent, Professor Johnson refrains from

17  expressing himself on political matters for fear of being subjected to further investigations and

18  termination.

19      10.   But Johnson's experience is just a microcosm of a greater problem impacting all

20  faculty in California's community college system. The state has recently doubled-down on its

21  commitment to the "diversity" and "anti-racist" ideologies by adopting a set of regulations that

22  command faculty to adhere to and implement these ideologies, in their very concepts of self and in

23  every facet of their existence on campus, including in their curriculum and pedagogy. Obedience to

24  the state's pervasive, all-encompassing political cult is now required "to teach, work, or lead within

25  California's community colleges." Cal. Code of Regs. tit. 5, § 53602(b). "Faculty members shall

26  employ teaching, learning, and professional practices that reflect DEIA and anti-racist principles . . .

27  ." *Id.* § 53605(a). And the regulations make clear that commitment to this radical political ideology

28  is now a "significant" factor in evaluating faculty performance. *Id.* § 53602(c)(4).

11.    Pursuant to this new regime of ideological indoctrination, the Chancellor of the California Community College system has adopted criteria that local community college districts must consider in implementing mandatory ideological qualifications. Under these guidelines, a professor can remain employed if he or she "[a]dvocates for and advances DEI and anti-racist goals and initiatives," Exh. A at 4, "contributes to DEI and anti-racism research and scholarship," *id.*, continuously engages in "self-assessment of one's growth and commitment to DEI," *id.*, "[d]evelops and implements a pedagogy and/or curriculum that promotes a race-conscious and intersectional lens," *id.* at 5, and even "[i]ntroduces new employees to the institution and system's focus on DEI and anti-racism and the expectations for their contributions," *id.* at 6.

12.    And the new Chancellor of California's community college system is none other than Sonya Christian, who just came to this position from her Chancellorship of the Kern Community College District, where her last significant act was triggering Professor Garrett's termination for his infidelity to these concepts.

13.    Professor Johnson must now not only watch his words to avoid saying the many wrong things he would like to say—he must promote the state's preferred political ideology and incorporate it into his teaching. But Johnson's courses present the antithesis of DEIA-compliance.

14.    The First Amendment guarantees Professor Johnson's right to express himself, and it forbids the state from mandating that he subscribe to or promote any official ideology. Professor Johnson is entitled to declaratory and injunctive relief securing his First Amendment rights against being "culled" like a disruptive animal for disagreeing with or failing to demonstrate sufficient enthusiasm for "DEIA" and "anti-racist" political ideologies.

THE PARTIES

15.    Plaintiff Daymon Johnson is employed by the Kern Community College District as a full-time Professor of History at Bakersfield College, a school operated by the Kern Community College District ("KCCD").

16.    Defendant Steve Watkin serves as Interim President of Bakersfield College. As such, he is Bakersfield College's chief executive officer, responsible for its administration and policymaking, including the conduct alleged herein. He is sued in his official capacity.

17.   Defendant Richard McCrow is the Dean of Instruction at Bakersfield College, and Administrative Co-Chair of the school's Equal Opportunity & Diversity Advisory Committee ("EODAC"). He is sued in his official capacity.

18.   Defendant Sonya Christian is the Chancellor of California Community Colleges, California's community college system which consists of 116 schools operated by 73 community college districts. She is sued in her official capacity. Before entering this position, Christian served as Chancellor of the Kern Community College District.

19.   Defendant Thomas Burke is the Chancellor of the Kern Community College District. As such, he is the district's chief executive officer, responsible for its administration and policymaking. Burke is sued in his official capacity.

20.   Defendant Romeo Agbalog is the President of the Kern Community College District Board of Trustees. He is sued in his official capacity.

21.   Defendant John S. Corkins is the Vice President of the Kern Community College District Board of Trustees. He is sued in his official capacity.

22.   Defendant Kay S. Meek is the Clerk of the Kern Community College District Board of Trustees. She is sued in her official capacity.

23.   Defendant Kyle Carter is a member of the Kern Community College District Board of Trustees. He is sued in his official capacity.

24.   Defendant Christina Scrivner is a member of the Kern Community College District Board of Trustees. She is sued in her official capacity.

25.   Defendant Nan Gomez-Heitzenberg is a member of the Kern Community College District Board of Trustees. She is sued in her official capacity.

26.   Defendant Yovani Jimenez is a member of the Kern Community College District Board of Trustees. He is sued in his official capacity.

STATEMENT OF FACTS

*The regulatory regime*

27.   California Education Code § 87732 provides that "[n]o regular employee or academic employee shall be dismissed except for one or more of the following causes: (a) Immoral or

1 unprofessional conduct; (b) Dishonesty; (c) Unsatisfactory performance; (d) Evident unfitness for

2 service; . . . (f) Persistent violation of, or refusal to obey, the school laws of the state or reasonable

3 regulations prescribed for the government of the community colleges by the board of governors or

4 by the governing board of the community college district employing him or her."

5       28.   The governing board of a community college district may terminate an employee for

6 "unprofessional conduct" or "unsatisfactory performance" upon 90 days' notice, if the employee

7 does not reform his or her alleged deficiencies. Cal. Educ. Code § 87734.

8       29.   The governing board of a community college district may also immediately suspend an

9 employee and terminate that employee within 30 days, unless the employee requests a hearing,

10 upon the board's receipt or formulation of charges alleging "immoral conduct" or "willful refusal to

11 perform regular assignments without reasonable cause, as prescribed by reasonable rules and

12 regulations of the employing district." Cal. Educ. Code § 87735.

13       30.   The KCCD trustees will not penalize or dismiss an employee without receiving a

14 recommendation from the Chancellor. KCCD Board Policy 7360.

15       31.   KCCD Board Policy 3050 ("BP 3050") provides that "[t]he inherent dignity of all

16 persons requires that we conduct ourselves with civility in all circumstances of our professional

17 lives. This means that we do not participate in or accept, condone, or tolerate physical or verbal

18 forms of aggression, threat, harassment, ridicule, or intimidation." BP 3050 further provides that

19 while the Board "encourages" free expression, "we expect all expressions of content to be

20 conducted in a manner respectful of persons." The policy's terms are undefined.

21       32.   California's community college system, of which KCCD is a constituent part, is

22 committed to "embracing diversity:" "[T]he California Community Colleges embrace diversity

23 among students, faculty, staff and the communities we serve as . . . a call to action for a better

24 future." Cal. Code Regs. tit. 5, § 51201(a). This commitment "guide[s] the administration of all

25 programs in the California Community Colleges, consistent with all applicable state and federal

26 laws and regulations." *Id.* § 51200.

27       33.   Accordingly, "anti-racism" is an official operative ideology of the district: "Embracing

28 diversity means that *we must intentionally practice* acceptance, *anti-racism*, and respect towards

one another and understand that racism, discrimination, and prejudices create and sustain privileges

for some while creating and sustaining disadvantages for others." *Id.* § 51201(b) (emphasis added).

34.    The California Community Colleges define an "anti-racist" as one who "understand[s]

that racism is pervasive and has been embedded into all societal structures." *Diversity, Equity and

Inclusion Glossary of Terms*, California Community Colleges Chancellor's Office,

https://perma.cc/T22V-V866 at 1 (last visited July 1, 2023). Anti-racists "challenge[] the values,

structures, policies, and behaviors that perpetuate systemic racism" and are "also willing to admit

the times in which they have been racist." *Id.* Anti-racism holds that "[p]ersons that say they are

'not a racist' are in denial of the inequities and racial problems that exist." *Id.*

35.    "Practicing antiracism requires constantly identifying, challenging, and upending

existing racist policies to replace them with antiracist policies that foster equity between racial

groups." *Id.*

36.    Moreover, "embracing diversity" requires "acknowledg[ment] that institutional racism,

discrimination, and biases exist," and a commitment to "eradicat[ing] these from our system," to

"strive to eliminate those barriers to equity." Cal. Code of Regs. tit. 5, § 51201(c). It requires "that

we act deliberately to create a safe, inclusive, and anti-racist environment . . . ." *Id.*

37.    Advancing these goals "requires that we develop and implement policies and

procedures, encourage individual and systemic change, continually reflect on our efforts, and hold

ourselves accountable for the results of our efforts in accomplishing our goals. In service of these

goals, the California Community Colleges are committed to fostering an anti-racist environment

that offers equal opportunity for all." *Id.* § 51201(d).

38.    Effective April 16, 2023, California Community Colleges adapted new "minimum

qualifications for employment in a community college district as an administrator, a faculty

member, or a member of the classified staff." *Id.* § 53400. Among these, "all district employees

shall demonstrate the ability to work with and serve individuals within a diverse community college

campus environment as required by local policies regarding DEIA competencies." *Id.* § 53425.

"'DEIA' is an acronym for the terms 'diversity, equity, inclusion, and accessibility.'" *Id.* § 52510(i).

39.   The Chancellor of the California Community Colleges "shall adopt and publish guidance describing DEIA competencies and criteria in collaboration with system stakeholder groups. The DEIA guidance shall be maintained to include current and emerging evidence-based practices developed within the California Community Colleges, or described in DEIA-related scholarship." *Id.* § 53601(a). "The DEIA competencies and criteria identified by the Chancellor shall be used as a reference for locally developed minimum standards in community college district performance evaluations of employees and faculty tenure reviews." *Id.* § 53601(b).

40.   Cal. Code of Regs. tit. 5, § 53602, now provides:

(a)   District governing boards shall adopt policies for the evaluation of employee performance, including tenure reviews, that requires demonstrated, or progress toward, proficiency in the locally-developed DEIA competencies or those published by the Chancellor pursuant to section 53601.

(b)   The evaluation of district employees must include consideration of an employee's demonstrated, or progress toward, proficiency in diversity, equity, inclusion, and accessibility DEIA-related competencies that enable work with diverse communities, as required by section 53425. District employees must have or establish proficiency in DEIA-related performance to teach, work, or lead within California community colleges.

(c)   To advance DEIA principles in community college employment, districts shall:

(1) include DEIA competencies and criteria as a minimum standard for evaluating the performance of all employees;

(2) ensure that evaluators have a consistent understanding of how to evaluate employees on DEIA competencies and criteria;

(3) set clear expectations regarding employee performance related to DEIA principles, appropriately tailored to the employee's classification;

(4) place significant emphasis on DEIA competencies in employee evaluation and tenure review processes to support employee growth, development, and career advancement;

(5) ensure professional development opportunities support employee development of DEIA competencies that contribute to an inclusive campus and classroom culture and equitable student outcomes;

(6) ensure an evaluation process that provides employees an opportunity to demonstrate their understanding of DEIA and anti-racist competencies.

(7) include proposed or active implementation goals to integrate DEIA principles as a part of the district's Equal Employment Opportunity Plan required by section 53003.

41.   Cal. Code Regs. tit. 5 § 53605, now provides:

(a) Faculty members shall employ teaching, learning, and professional practices that reflect DEIA and anti-racist principles, and in particular, respect for, and acknowledgment of the diverse backgrounds of students and colleagues to improve equitable student outcomes and course completion.

(b) Educational and other Administrators shall include DEIA and anti-racist principles into existing policies and practices, funding allocations, decision-making, planning, and program review processes. These processes shall take into account the experience and performance of students and colleagues of diverse backgrounds, and work to close equity gaps in student outcomes and hiring.

(c) Staff members shall promote and incorporate culturally affirming DEIA and anti-racist principles to nurture and create a respectful, inclusive, and equitable learning and work environment. In conducting their duties, staff members shall respect and acknowledge the diversity of students and colleagues.

42.   On May 5, 2023, the California Community Colleges' Chancellor's Office issued "Diversity, Equity and Inclusion Competencies and Criteria" as required by Cal. Code Regs. tit. 5, § 53601(a), which, per that section, "shall be used as a reference" for KCCD's "minimum standards in community college district performance evaluations of employees and faculty tenure reviews," *id.* § 53601(b).

43.   On May 18, 2023, the Academic Senate for California Community Colleges distributed these guidelines and their accompanying memorandum to Bakersfield College Professor Erica Menchaca, the Articulation Officer and President of the Academic Senate at Bakersfield College. Professor Menchaca, in turn, distributed these documents to Bakersfield College faculty the same day. Exhibit A is a true and correct copy of the DEI "Competencies and Criteria." Exhibit B is a true and correct copy of the Memorandum from the Chancellor's Office accompanying the distribution of the "Competencies and Criteria."

44.   The "Competencies and Criteria" are "in alignment" with calls for "the incorporation of 'equity-centered practices into teaching and learning, grading, annual evaluations, and faculty review/tenure processes.'" Exh. A at 1 (citations omitted). "The DEI competencies provided in this document are meant to define the skills, knowledge, and behaviors that all California Community College (CCC) employees must demonstrate to work, teach, and lead in a diverse environment that celebrates and is inclusive of diversity. During the evaluation and tenure review process, employees

will be able to demonstrate they have met the DEI competencies using concrete examples based on DEI criteria provided in this document" *Id.* at 2 (citing tables).

45.   A professor who satisfies the "cultural competency" theme

- Acknowledges that cultural and social identities are diverse, fluid, and intersectional.

- Demonstrates an ongoing awareness and recognition of racial, social, and cultural identities with fluency regarding their relevance in creating structures of oppression and marginalization.

- Demonstrates an understanding of the lived experiences of culturally diverse students, employees, and communities in the District and uses that understanding to contribute to student success, equity, and inclusion.

- Seeks DEI and anti-racist perspectives and applies knowledge to problem solving, policies, and processes to create respectful, DEI-affirming environments (e.g., campus and classroom environments that are inclusive, promotes equity, and affirms diversity).

Exh. A at 2-3.

46.   A professor who satisfies the "self-reflection" theme "[e]ngages in self-assessment of one's own commitment to DEI and internal biases, and seeks opportunities for growth to acknowledge and address the harm caused by internal biases and behavior." *Id.* at 3.

47.   A professor who satisfies the "self-improvement" theme "demonstrates a commitment to continuous improvement as it relates to one's DEI and anti-racism knowledge, skills, and behaviors to mitigate any harm caused (whether intentional or not) to minoritized communities." *Id.*

48.   A professor who satisfies the "Diversity, Equity and Inclusion Pedagogy & Curriculum" theme

- Promotes and incorporates DEI and anti-racist pedagogy.

- Accommodates for diverse learning styles and utilizes holistic assessment methods.

- Participates in training to incorporate culturally affirming pedagogy.

*Id.*

49.   A professor who satisfies the "data" theme "[u]ses data to uncover inequitable outcomes measured through equity-mindedness that calls out racialized patterns in the data, policies, and practices to inform strategies to improve equitable student outcomes and success." *Id.*

50.     A professor who satisfies the "Diversity, Equity and Inclusion & Mission" theme "[a]rticulates the importance and impact of DEI and anti-racism as part of the institution's greater mission." *Id.*

51.     A professor who satisfies the "service" theme

• Advocates for and advances DEI and anti-racist goals and initiatives.

• Leads DEI and anti-racist efforts by participating in DEI groups, committees, or community activities that promote systemic and cultural change to close equity gaps and support minoritized groups.

• Contributes to student life on campus and supports diverse students beyond the classroom.

• Includes a DEI and race-conscious pedagogy and/or curriculum in campus activities for students, faculty, and/or staff.

• Understands and applies asset-based student-centered practices and activities that recognize students' lived experiences, strengths, and capabilities and empowers students to take ownership of their learning experience (e.g., Competency Based Education, Credit for Prior Learning, etc.).

• Commits to the success of minoritized students by providing specific opportunities to access educational pathways and opportunities for academic and career success (including academic and non-academic advising, mentorship).

• Develops and implements student programs and activities that incorporate a race-conscious and intersectional lens and equips students to engage with the world as scholars and citizens.

• Creates an inclusive learning and working environment by valuing differences among colleagues and students and recognizing the ideological disproportionate impacts on historically minoritized racial groups.

• Contributes to DEI and anti-racism research and scholarship.

*Id.* at 4.

52.     A professor who satisfies the "self-assessment" theme

• Participates in a continuous cycle of self-assessment of one's growth and commitment to DEI and acknowledgement of any internalized personal biases and racial superiority or inferiority.

• Demonstrates the implementation of DEI and anti-racism practices in teaching and/or service in the evaluation process.

• Assesses student outcomes and progress to close equity gaps as outlined in the *Vision for Success*.

*Id.*

53.   A professor who satisfies the "Diversity, Equity and Inclusion Environment" theme "[p]romotes and contributes to a diverse, inclusive, and anti-racist environment for students, colleagues, and community members." *Id.* at 5.

54.   A professor who satisfies the "Pedagogy/Curriculum" theme

• Develops and implements a pedagogy and/or curriculum that promotes a race-conscious and intersectional lens and equips students to engage with the world as scholars and citizens.

• Develops and implements a pedagogy that promotes equitable access.

• Develops and implements a pedagogy that fosters an anti-racist and inclusive environment for minoritized students.

• Demonstrates an ability to teach culturally affirming pedagogy.

*Id.*

55.   A professor who satisfies the "professional development" theme

• Commits to a continuous cycle of self-growth and progress by participating in DEI professional development and learning opportunities.

• Provides professional development and learning opportunities for students, faculty, and staff to participate in and advance DEI and anti-racist strategies.

*Id.*

56.   A professor who satisfies the "connected to mission" theme "[a]rticulates the connection of DEI and anti-racist efforts to the institution's mission and the *Vision for Success*." *Id.*

57.   And among other behaviors, a professor who satisfies the "employee interactions" theme

• Recruits, hires, and retains diverse faculty and staff from minoritized communities and diverse backgrounds, especially those adversely impacted.

• Introduces new employees to the institution and system's focus on DEI and anti-racism and the expectations for their contribution.

• Promotes and contributes to a respectful, diverse, and equitable campus and work environment.

*Id.* at 5-6.

58.   Bakersfield College maintains customs, policies, and practices that are in compliance with the "Diversity, Equity and Inclusion Competencies and Criteria," Exh. A, set out by the preceding Chancellor of California Community Colleges.

*The ideological divide at Bakersfield College*

59.   Professor Johnson began his employment with Bakersfield College in its Department of History in 1993. His duties in this position involve teaching various history classes to community college students and participating in shared governance on campus.

60.   In addition to his role as a faculty member, Professor Johnson is also the Faculty Lead for the Renegade Institute for Liberty ("RIFL"), a group in which he has long been active. RIFL is a sanctioned organization within Bakersfield College comprised of faculty members dedicated to the pursuit of free speech, open inquiry and critical thinking. RIFL aims to promote and preserve freedom of thought and intellectual literacy through the open discourse of diverse political ideas with an emphasis on American ideals and western historical values.

61.   RIFL represents a minority position on campus. Its members' outlook and ideals stand in general opposition to those espoused by many faculty members and members of the school administration, which is aligned with Section 51201(a)'s mandate to "embrace diversity" by, among things, "intentionally practic[ing] . . . anti-racism," Section 51201(b).

62.   Defendants have made clear their ideological orientation and seek to impose it on faculty. On December 8, 2022, then-Bakersfield College President Zav Dadabhoy emailed employees of Bakersfield College what began as a holiday greeting, but which quickly devolved into a political declaration attacking RIFL. A true and correct copy of this email is attached hereto as Exhibit C.

63.   President Dadabhoy claimed that unidentified "members of BC's communities of color, and LGBTQ community, have shared that many do not feel peace on our own campus. It has been disheartening to see attacks on members of our campus, especially those who already feel marginalized." Exh. C. Dadabhoy did not `describe the "attacks" that he saw, but he nonetheless declared, "I am reinforcing my commitment to the College's core values." *Id.*

64.   Dadabhoy declared that "while there may be a small group promoting exclusion, that is not a value of this institution." *Id.* He then declared that Cal. Code Regs. tit. 5, § 51201 "provides us with direction on diversity, equity and inclusion," and in particular, "[w]hat really resonates with me is subsection (b)," which he proceeded to quote in full. *Id.*

65.   Dadabhoy added, "We must not allow the discontent or views of a few to supersede *what we are required* to provide at our college and the work that we have *intentionally developed* to support all members of the community. This is reminder that *we are all tasked* with this work." *Id.* (emphasis added).

66.   Four days later, on December 12, 2022, the topic of RIFL and its members arose at the Kern Community College District Board of Trustees' meeting. At that meeting, Defendant Corkins termed faculty holding minority political views "abusive," and made the aforementioned statement comparing them to defective livestock "that we have to continue to cull" by "put[ting] a rope on some of them and tak[ing] them to the slaughterhouse." He added, "We've got to get the bad actors out of the room. It really bothers me the bad actors are paid staff and faculty."

67.   None of the other Defendant trustees disavowed Corkins' call to take RIFL members to the "slaughterhouse." Defendant Nan Gomez-Heitzeberg chuckled heartily at the suggestion.

68.   Bakersfield College occasionally forms screening committees for new faculty hires. Recently, it has adopted a requirement that faculty who wish to serve on such committees must complete a training session to assure that their committee service would comply with the school's DEIA policies. On June 5, 2023, Bakersfield College Human Resources Technician Karla Quintero emailed the faculty, advising that the college had established a new DEIA training session. Quintero advised that "[y]ou will need to have this training completed prior to the first meeting of any recruitment," and referred to the training as an "obligation." A true and correct copy of this email is attached hereto as Exhibit D.

69.   In this atmosphere, ideologically fueled controversies between RIFL members and their opponents are common. Professor Johnson is no stranger to these controversies.

*Bakersfield College investigates and threatens Professor Johnson*
*for disagreeing with a colleague on Facebook*

70.   On August 22, 2019, Bakersfield College Professor Andrew Bond posted the following on his personal Facebook page:

> Maybe Trump's comment about shithole countries was a statement of projection because honestly, the US is a fucking piece of shit nation. Go ahead and quote me, conservatives. This country has yet to live up to the ideals of its founding documents.

71.    Around May 2021, Professor Johnson reposted Bond's post on RIFL's Facebook page, and added, "Here's what one critical race theorists at BC sounds like. Do you agree with this radical SJW from BC's English Department? Thoughts?"

72.    A follower of RIFL's Facebook page then commented on Professor Johnson's reposting of Bond's post:

> Maybe he should move to China, and post this about the PRC in general or
> the Chinese Communist Party and see how much mileage it gets him. I
> wonder, do they still send the family the bill for the spent round?

73.    In the course of pursuing an administrative complaint against RIFL's then-Faculty Lead, Professor Matthew Garrett, Professor Bond learned that Professor Johnson had reposted Bond's post on RIFL's Facebook page. Accordingly, on September 24, 2021, Professor Bond filed an administrative complaint against Professor Johnson for harassment and bullying over the Facebook post and commentary. Professor Johnson was not allowed to see a copy of the complaint.

74.    Rather than dismiss Bond's complaint out of hand, the Kern Community College District subjected Professor Johnson to an investigation that necessitated his retention of counsel. Finally, on February 23, 2022, five months after Bond's complaint, President Dadabhoy sent Professor Johnson the district's administrative determination of Bond's complaint against him.

75.    Dadabhoy communicated the district's determination that Professor Johnson's conduct presented no cause for discipline. In doing so, however, the district saw fit to pass judgment on each of 29 separate allegations raised in the dispute, including that Professor Garrett "liked" the China comment (allegation 2, sustained), that Professor Johnson's posting doxed Bond (allegation 3, "not sustained but plausible"), and that "Professor Bond was offended that Professor Johnson described his personal views incorrectly. Professor Johnson admitted he would also be offended in a similar situation" (allegation 14, sustained). A true and correct copy of that determination is attached hereto as Exhibit E.

76.    Notably, although the investigation "revealed no evidence that Dr. Johnson took any of these actions in his role as a Kern Community College District employee," Exh. E at 8, KCCD also determined that it "will investigate any further complaints of harassment and bullying and, if

1  applicable, will take appropriate remedial action including but not limited to any discipline

2  determined to be appropriate." *Id.* at 9.

3  *Bakersfield College punishes professors*
   *for lecturing about free speech*

4

5  77.    On September 12, 2019, Professor Garrett delivered a public lecture on the Bakersfield

6  College campus entitled, "The Tale of Two Protests: Free Speech and the Intellectual Origins of BC

7  Campus Censorship," at which he was introduced by fellow Professor Erin Miller.

8  78.    On information and belief, Professors Bond and Oliver Rosales filed administrative

9  complaints against Garrett and Miller over the September 12, 2019 lecture. The school subsequently

10  made an administrative determination that Garrett and Miller's speech at the lecture constituted

11  "unprofessional conduct," and threatened further discipline against them. This prompted Garrett and

12  Miller to sue school officials for violating their First Amendment rights. *Garrett v. Hine*, U.S. Dist.

13  Ct., Eastern District of California, No. 1:21-cv-00845.

14  *Bakersfield College terminates RIFL's previous*
    *Faculty Lead for expressing disapproved political views*

15  79.    On November 21, 2022, Defendant McCrow issued Professor Garrett a 90-day notice

16  pursuant to Cal. Educ. Code § 87734 "to correct your performance deficiencies involving

17  unprofessional conduct," which would enable the Kern Community College District to "initiat[e]

18  formal disciplinary proceeding for dismissal on the grounds of unprofessional conduct." The notice

19  further provided that Garrett could be charged with "unsatisfactory performance," and violation of

20  BP 3050. A true and correct copy of the notice (home address redacted) is attached hereto as

21  Exhibit F.

22  80.    Per Defendant McCrow, Professor Garrett's alleged acts of "unprofessional conduct,"

23  "unsatisfactory performance," and violations of BP 3050 warranting termination, included:

24        a.    "Disregard[ing] the impact of [an] attack" consisting of the posting of political

25              stickers and "[taking] issue with BC's characterization of the stickers as 'hate

26              speech' and 'vandalism'" when he authored an op-ed piece in the *Bakersfield*

27              *Californian*. Exh. F at 1, ¶ 1. The op-ed was grounds for termination because of its

28              characterization of the sticker protestors, and the fact that Garret was "critical of

BC's characterization of the stickers and suggested that their content was protected by the First Amendment." Garrett even "went further to suggest that certain terms like 'Cultural Marxism' weren't 'hate speech' but instead speech that challenges a dominant agenda on campus, i.e. the social justice movement," *id.*;

b. Opining that Bakersfield College's Equal Opportunity & Diversity Advisory Committee (EODAC) "has been consistently staffed by the administration with faculty who hold one particular point of view," *id.* at 2, ¶ 4c (quoting Garrett);

c. Criticizing the EODAC Chair's conduct at a meeting, *id.* at 2-3, ¶ 5;

d. Providing a public comment on the Bakersfield College's Curriculum Committee proposal of two history courses stating, in opposition, that the courses were the equivalent of a "high school field trip" and "openly partisan training for children," *id.* at 3, ¶ 6;

e. Causing "very real harm" to students based on three student allegations: first, an unexplained assertion that Garrett was a racist who would fail students based on their skin color; second, the fact that a different professor whispered something in Garrett's ear; and third, that Garrett allegedly "insult[ed] [another professor] and her way of teaching," which purportedly made the student feel unsafe, *id.* at 4-5, ¶ 11;

f. Expressing opinions on a local radio show including that sociology, ethnic studies, anthropology are producing bad information and poor narratives grounded in history; that diversity trainings are just ways to figure out how to legally discriminate; and "[c]laim[ing] that Bakersfield College staff are trying to quiet [Garrett]," *id.* at 5, ¶ 12;

g. "[R]epeatedly fail[ing], as the Faculty Lead for the Renegade Institute for Liberty, to restrict" criticism of the District and faculty "on RIFL's social media" that McCrow alleged to be "baseless," *id.* at 6, ¶ 13; and

h.  Using his social media account to express critical opinions of the school and faculty, including statements such as, "[a]s a public institution their financials should be open to public criticism," *id*. ¶ 14 (quoting Garrett).

81.  For each example of "unprofessional conduct," Defendant McCrow asserted that Professor Garrett's opinions and statements were "demonstrably false." But neither the 90-day notice letter nor its attachments contained any actual demonstration of falsehood.

82.  In summing up his accusations against Professor Garrett, Defendant McCrow stated, "Importantly, you caused students to feel unwelcome and unsafe by belittling the community's valid concerns." *Id.* at 7. In other words, per Defendant McCrow, students at Bakersfield are unable to tolerate speech with which they disagree, and faculty should be terminated if they criticize views that "the community" deems "valid." "Invalid" views that contradict the community are punishable.

83.  Defendant McCrow went on to stress that Garrett's speech harmed the school's reputation, and that Garrett should not have expressed his concerns about the school publicly. "These actions demonstrated a lack of professional judgment by making your accusations loudly and improperly, instead of determining the proper channels for grievances. Consequently, your public accusations invited outrage from your colleagues and the community at large." *Id.*

84.  Defendant McCrow also asserted that Garrett's criticism of staff serving on committees "has caused many employees to cease their committee work" for fear of being criticized. And Garrett's "attacks on the Curriculum Committee, its members, and its important work, meant that many pieces of curriculum were in danger of not being approved." *Id.*

85.  McCrow therefore commanded Professor Garrett, apparently with respect to his public political and ideological speech, "You will not substitute your own judgment for the judgment of your supervisor or other administrators." *Id.*

86.  McCrow also directed Professor Garrett, "You will address grievances and complaints to appropriate college administrators," meaning that he should refrain from publicly airing his grievances and complaints. *Id.* at 8.

87.  McCrow also removed Professor Garrett from the Equal Opportunity and Diversity Advisory Committee. *Id.*

88.   Upon receiving the 90-day notice letter, Professor Garrett resigned as Faculty Lead for RIFL. Professor Johnson immediately succeeded him in that role.

89.   On April 11, 2023, President Dadabhoy formally recommended to Defendant Trustees Agbalog, Corkins, Meek, Carter, Scrivner, Gomez-Heitzberg, and Jimenez that they terminate Professor Garrett's employment by issuing a "Statement of Charges and Recommendation for Statement of Decision to Terminate." Defendant Burke's predecessor in office, then-KCCD Chancellor Sonya Christian, concurred in Dadabhoy's recommendation.

90.   On April 13, 2023, the Defendant Trustees found cause for Garrett's termination as set out by President Dadabhoy and then-KCCD Chancellor Christian, and fired Professor Garrett.

91.   On April 14, 2023, Dadabhoy sent Professor Garrett a letter notifying him of his termination, which included the "Statement of Charges and Recommendation for Statement of Decision to Terminate." A true and correct copy of that letter (home address redacted) and the accompanying statement of charges and recommendation is attached hereto as Exhibit G.

92.   The "Statement of Charges" recounted the allegations of the 90-day notice letter, and declared that Garrett failed to follow that notice's directives to cure his allegedly "deficient job performance." Exh. G at 13, ¶ 7. In recounting the prior allegations against Garrett, the "Statement of Charges" added some detail. For example, with respect to a dispute concerning whether a pandemic-era RIFL event could be held in-person or online, the Statement alleged that Garrett filed a "knowingly false" grievance against Defendant McCrow for viewpoint discrimination. *Id.* at 7, ¶ 2(b)(iii).

93.   The "Statement of Charges" then added that Garrett:

    a.   "[D]eliberately mischaracterized a Bakersfield College student housing initiative as 'not student dorms' and as 'low income housing,'" and "printed and distributed a flyer" criticizing the project "as threatening the neighborhood with loud parties, safety issues, crime, crowded daily parking issues, overflow of parking for events, and decrease in property values." *Id.* at 13, ¶ 8 (internal punctuation omitted);

    b.   Alleged that the District failed to explain why his conduct was unprofessional, *id.* at 14, ¶ 9;

c.   Asked Dean McCrow for clarification of the 90-day notice allegations, but did not make his request "in good faith and [thereby] again demonstrate[d] unprofessionalism," *id*. ¶ 10;

d.   Provided an interview for *Fox News Digital* in which he criticized Bakersfield College's "affirmative action-type behavior," "allegations [that] demeaned, demoralized, and disrespected the College's employees and its students," *id*. ¶ 11a;

e.   "Prompted" − merely by virtue of the interview he gave – third-party comments on social media that were critical of Bakersfield College and its students, *id*.;

f.   Posted a link to his *Fox News Digital* interview on the RIFL Facebook page, and "continued to permit the RIFL Facebook page to post" criticism of the school and its faculty, which Dadabhoy and Christian asserted were "false and baseless attacks," *id*. at 15, ¶ 11b;

g.   Emailed a *Daily Wire* article about the school to another person, *id*. ¶ 11c, and shared the article on his social media, *id*. at 16, ¶ 11e;

h.   Criticized a faculty member for inciting students against him in an interview with *Inside Higher Ed*, *id*. at 15, ¶ 11d; and

i.   Engaged in "ongoing public attacks [that] demonstrate[d] Garrett's continued refusal to engage in civil, honest discourse or to direct complaints to the appropriate college administrator as directed by the 90-day notice." *Id*. at 16.

94.   President Dadabhoy and then-KCCD Chancellor Christian further charged Garrett with publishing an open letter to the Defendant Trustees in which he criticized them without sufficient rationale or evidence. For example, Garrett criticized Defendant Corkins's equation of dissenting faculty to defective cattle by alleging that "Trustee Corkins may not be familiar with administrative 'extrajudicial punishments' because the Trustee is a 'rural cattle guy.'" *Id*. at 17, ¶ 14e.

95.   Indeed, President Dadabhoy and then-KCCD Chancellor Christian charged Garrett with a number of additional offenses comprising of political speech. For example, Garrett "attacked his colleagues through the RIFL Facebook post: 'Can you count how many times BC's Communication Dept professors imply accusations of racism, sexism, and classism to advance their

agenda in the recent Feb 15 Academic Senate meeting?'" *id.* at 19, ¶ 19; posted a link to an article in *Just the News* critical of the school on the RIFL Facebook page, *id.* ¶ 20; and also, on RIFL's Facebook page, "accused the KCCD district of financial mismanagement," *id.* ¶ 21.

96.   Per Defendants, Garrett's political speech amounted to:

   a.  Immoral or unprofessional conduct (Cal. Educ. Code, § 87732, subd. (a), Cal. Educ. Code, § 87735);

   b.  Dishonesty (Cal. Educ. Code, § 87732, subd. (b));

   c.  Unsatisfactory performance (Cal. Educ. Code, § 87732, subd. (c));

   d.  Evident unfitness for service (Cal. Educ. Code, § 87732, subd. (d));

   e.  Persistent violation of, or refusal to obey, the school laws of the state or reasonable regulations prescribed for the government of the community colleges by the board of governors or by the governing board of the community college district employing him or her (Cal. Educ. Code, § 87732, subd. (f)); and

   f.  Willful refusal to perform regular assignments without reasonable cause, as prescribed by reasonable rules and regulations of the employing district. (Cal. Educ. Code, § 87735).

Exh. G at 21.

*Defendants' adoption and enforcement of an official ideology*
*chills and compels Professor Johnson's speech*

97.   Considering his experience of being investigated by Defendants over his Facebook posts, Defendants' adoption of an official political ideology that he rejects, Defendants' treatment of his colleague and predecessor in the position of Faculty Lead for RIFL, and indeed, his responsibility for some of the speech for which Professor Garrett was fired, Professor Johnson refrains from expressing his political views and from freely participating in the intellectual life of the college for fear that the KCCD Defendants would investigate, discipline, and ultimately terminate his employment on the basis of his viewpoints.

98.   It was very clear to Professor Johnson, upon reading President Dadabhoy's December 8 email, that Dadabhoy's reference to "a small group promoting exclusion" was directed at RIFL

1    members, of which he was the Faculty Lead. RIFL members' speech, including Professor

2    Johnson's, had consistently been the target of suppression, intimidation, and censorship by other

3    Bakersfield College faculty members. These attempts were always made under the guise of

4    pursuing "diversity," with RIFL's detractors typically labelling any speech they disagreed with as

5    "racist" or "homophobic." President Dadabhoy's email followed upon this pattern.

6        99.    Defendants' administrative determination of Professor Bond's complaint about

7    Professor Johnson's Facebook posts confirmed to Johnson that Bond, or others who disagree with

8    him, can easily trigger formal investigations of his political speech, which can cause him to be

9    disciplined and ultimately terminated.

10       100.  Professor Johnson shares many of Professor Garrett's conservative political views and

11   social values, which Defendants have already proven they will censor and punish. For instance,

12   Professor Johnson, like Professor Garrett, does not agree with Bakersfield College's apparent

13   definition of "hate speech," and believes that what is often considered "hate speech" by some is

14   nonetheless speech protected by the First Amendment.

15       101.  Recalling that Defendants terminated Professor Garrett in part for his defense of the

16   term "cultural Marxism," Professor Johnson can identify 18 posts on RIFL's Facebook page that

17   reference the phrase. Professor Johnson posted 15 of these himself. In every instance "cultural

18   Marxism" refers to the present-day social justice agenda, is in no way defending or promoting "hate

19   speech" as Professor Johnson understands it, and, in any event, is speech protected by the First

20   Amendment that communicates Professor Johnson's viewpoints. Several of these posts, in fact,

21   connected the phrase "Cultural Marxism" to Bakersfield College's social justice agenda, which

22   Professor Johnson opposes.

23       102.  After Professor Johnson learned that publicly disagreeing with Defendants' anti-racist

24   definition of the term "cultural Marxism" was a fireable offense, he cancelled a RIFL community

25   event scheduled for July 7, 2023, at which RIFL's guest speaker, theologian Voddie Baucham, had

26   been invited to speak on cultural Marxism, academia, and its impact on churches. Professor Johnson

27   feared that allowing this speech to go forward – and having to defend cultural Marxism as a speaker

28   topic – would lead to his discipline or termination, just as Professor Garrett's use of the term in a

1  Bakersfield Californian op-ed let to his termination. Professor Johnson also cannot recommend

2  books that have the term "Cultural Marxism" in the title out of fear that the school might fire him

3  (e.g. Ted Cruz's soon-to-be-published book, *Unwoke: How to Defeat Cultural Marxism in America*

4  or Jeffrey D. Breashears' *American Crisis: Cultural Marxism and the Culture War: A Christian*

5  *Response*).

6      103.  Professor Johnson is currently in charge of arranging speakers for the next school year

7  (Fall 2023). Each of the speakers Johnson was planning to invite on behalf of RIFL would present

8  viewpoints that Defendants have already condemned, including in the course of disciplining Garrett.

9  As such, Professor Johnson has refrained from finalizing agreements with the speakers for fear of

10  discipline and termination.

11      104.  Professor Johnson agrees with Professor Garrett's charge that Defendant McCrow

12  discriminated against RIFL on the basis of viewpoint in barring the group from holding an event in-

13  person. That Defendants cited Garrett's complaint against McCrow as a basis for his termination

14  because they disagreed with the charge chills Johnson from filing any internal complaints about

15  school administrators, staff, or fellow faculty members.

16      105.  Professor Johnson also wrote a letter to the Curriculum Committee for Public

17  Comment regarding the same two history courses Professor Garrett criticized, a type of speech he is

18  reticent to engage in again. In fact, the very RIFL Facebook posts that Defendants attributed to

19  Professor Garrett, and for which they terminated him, were actually posted by Professor Johnson.

20      106.  Indeed, multiple post-November 2022 RIFL Facebook postings that Defendants cite to

21  as examples of Professor Garrett's unprofessional conduct were, in fact, made by Professor

22  Johnson, who had already taken over as Faculty Lead at that time and was the Facebook page's

23  administrator.

24      107.  As a result of Professor Garrett's discipline and termination for these posts, Professor

25  Johnson has since refrained from making posts or expressing opinions similar to Professor

26  Garrett's, via the RIFL Facebook page or his own personal social media accounts. Instead,

27  Professor Johnson has assigned the task of posting on RIFL's Facebook page to two retired

28  professors who cannot be disciplined by Defendants for their speech. But this has not alleviated the

1  threat to Johnson. Mindful that Defendants charged Garrett for not censoring the RIFL Facebook

2  page—"Garrett, the [purported] RIFL Facebook page administrator, continued] to permit the RIFL

3  Facebook page to post false and baseless attacks on the District and his colleagues," Exh. G at 15, ¶

4  11b—Johnson is concerned that another professor, John Harte, has now filed a complaint with the

5  college administration seeking to hold him accountable for others' posting material on RIFL's

6  Facebook page to which Harte objects.

7      108.  Considering that Professor Garrett was terminated in part because students

8  disapproved of his speech, and even of speech that another professor spoke to him, Johnson must

9  endeavor not to offend students' sensitivities if he wishes to keep his job. Specifically, Professor

10  Johnson must now refrain from expressing viewpoints – similar to Garrett's – that students are

11  being weaponized by the EODAC to push DEI ideology agendas so, that he can avoid termination.

12      109.  Although he replaced Professor Garrett on the EODAC, Professor Johnson has stopped

13  attending EODAC meetings. He, like Professor Garrett, has concerns about "reverse" racism and

14  deceptive ways the committee was pushing affirmative action. Because his expression of those

15  concerns could be characterized as "demonstrably false" and form a basis for termination, Professor

16  Johnson avoids expressing those concerns altogether.

17      110.  Professor Johnson also refrains from offering other viewpoints that he believes would

18  not be well-received by Defendants, based on their prior conduct, threats, and commitments to

19  DEIA ideology. Insomuch as DEI relates to LGBTQ issues, Professor Johnson does not wish to

20  refer to transgender students by their preferred pronouns, as he believes that gender ideology is

21  harmful. He also refrains from protesting the participation of biological males in female sports

22  competitions and the holding of "drag queen story hours" at Bakersfield College's daycare facility.

23      111.  Defendants' use of Professor Garrett's commentary in media interviews as a reason for

24  discipline also chills Professor Johnson's speech. Professor Johnson was recently asked to appear

25  on the same radio show as Professor Garrett, but he turned down the offer for fear of making a

26  statement that Defendants would claim to be "unprofessional" and grounds for termination. He

27  declines to give comments to national news organizations for the same reason.

28

112.  Professor Johnson has previously served on screening committees and participated in the process for hiring faculty, and wishes to continue doing so. However, he can no longer serve on screening committees without completing the mandatory DEIA training, which he cannot successfully complete because he does not agree with the ideology mandated by that training. Johnson refuses to affirm the DEIA political ideals and refuses to perpetuate them and practice what they teach. Johnson is committed to evaluating faculty based on their merit, not based on their membership in a particular race-based group. And he will not introduce "new employees to the institution and system's focus on DEI and anti-racism and the expectations for their contribution," because he does not believe in DEI and anti-racism, nor will he "promote," "celebrate," or otherwise advocate for Bakersfield College's view of "equity."

113.  Bakersfield College evaluates Professor Johnson's performance every three years. An unsatisfactory evaluation will lead to remediation and, eventually, termination. Johnson has just successfully completed an evaluation period, and intends to keep working as a professor at Bakersfield College, so his performance moving forward will be evaluated under the new DEIA standards and rules.

114.  The DEIA requirements thus chill Professor Johnson's speech, today, including his academic speech. Moreover, the DEIA requirements compel Professor Johnson to affirm, promote, and celebrate political ideologies that he rejects and even finds abhorrent, and to alter his curriculum and pedagogy in service of these same political ideologies.

115.  Professor Johnson understands that it is now a minimum qualification for employment at Bakersfield College that he comply with KCCD's "policies regarding DEIA competencies." Cal. Code of Regs. tit. 5, § 53425.

116.  Professor Johnson understands that under Cal. Code of Regs. tit. 5, § 53602(a), Defendants must evaluate his performance based on whether he has "demonstrated, or progress[ed] toward, proficiency in the locally-developed DEIA competencies" that must use the Chancellor's guidance as a reference, "or those published by the Chancellor pursuant to section 53601." And his evaluation "must include consideration of [his] demonstrated, or progress toward, proficiency in

1   diversity, equity, inclusion, and accessibility DEIA-related competencies . . . as required by section

2   53425." *Id.* § 53602(b).

3        117.   Indeed, Professor Johnson well understands that he "must have or establish proficiency

4   in DEIA-related performance to teach, work, or lead within California community colleges," *id.*,

5   that there are now "clear expectations regarding [his] performance related to DEIA principles," *id.* §

6   53602(c)(3), and that Defendants will "place significant emphasis on DEIA competencies in [his]

7   evaluation," *id.* § 53602(c)(4). He understands that the "evaluation process" will now be geared

8   toward letting him "demonstrate [his] understanding of DEIA and anti-racist competencies." *Id.* §

9   53602(c)(6).

10        118.   Accordingly, because Professor Johnson wants to keep his job, he feels compelled to

11  "demonstrate" or at least "progress toward proficiency" in applying and fulfilling, by word and

12  deed, a political ideology that he opposes and which contravenes his conscience. Likewise, he fears

13  that if he actually expresses his objections to this ideology, which he very much wants to do, he will

14  be either disciplined or terminated.

15        119.   Professor Johnson also understands that Defendants will discipline or fire him, for

16  unsatisfactory performance, if he does not comply with Cal. Code Regs., tit. 5 § 53605(a), which

17  provides that "[f]aculty members shall employ teaching, learning, and professional practices that

18  reflect DEIA and anti-racist principles, and in particular, respect for, and acknowledgement of the

19  diverse backgrounds of students and colleagues to improve equitable student outcomes and course

20  completion." But Johnson objects strongly to applying Defendants' DEIA and anti-racist ideologies

21  in his teaching and professional practices.

22

23        120.   Professor Johnson cannot satisfy DEIA standards based on the state Chancellor's

24  DEIA competencies without violating his conscience and surrending his academic freedom. For

25  example, he does not wish to "[a]cknowledge[] that cultural and social identities are diverse, fluid,

26  and intersectional," or "[d]emonstrate[] an ongoing awareness and recognition of racial, social, and

27  cultural identities with fluency regarding their relevance in creating structures of oppression and

28  marginalization." Exh. A at 2, because he does not believe these ideals that he characterizes as neo-

Marxian. He does not want to "[s]eek[] DEI and anti-racist perspectives and appl[y] knowledge to problem solving, policies, and processes to create respectful, DEI-affirming environments (e.g., campus and classroom environments that are inclusive, promotes equity, and affirms diversity)," *id.* at 3, because he objects to DEI and anti-racist perspectives, and believes they are harmful when implemented.

121. Professor Johnson does not wish to engage in any DEIA "self-reflection." *Id.* He does not want to "[e]ngage[] in self-assessment of [his] own commitment to DEI and internal biases," *id.*, because he rejects DEI and the concept of internal bias, and he does not wish to "seek[] opportunities for growth to acknowledge and address the harm caused by internal biases and behavior," *id.*, because he objects to these demands, which he views as religious-like and little more than neo-Marxist re-education on race.

122. Professor Johnson does not wish to "demonstrate[] a commitment to continuous improvement as it relates to [his] DEI and anti-racism knowledge, skills, and behaviors to mitigate any harm caused (whether intentional or not) to minoritized communities," *id.*, because he believes that the only way increasing knowledge of DEI and anti-racism helps "minoritized communities" is if these concepts are studied for the purpose of exposing and resisting them.

123. Professor Johnson does not wish to "[p]romote[] and incorporate[] DEI and anti-racist pedagogy," *id.*, because he objects to these concepts impacting his classical pedagogy that stresses the study of "truth, goodness, and beauty" and the correspondence theory of knowledge rather than merely the subjectivism of "lived experience" and "feelings."

124. Professor Johnson does not wish to "[u]se[] data to uncover inequitable outcomes measured through equity-mindedness that calls out racialized patterns in the data, policies, and practices to inform strategies to improve equitable student outcomes and success," *id.*, because he fundamentally disagree with "equity-mindedness" and the Defendants' vision of what is "equitable."

125. Professor Johnson does not wish to "[a]rticulate[] the importance and impact of DEI and anti-racism as part of the institution's greater mission," *id.* at 4, as he believes that DEI and

anti-racism are antithetical to Bakersfield College's mission and the American national ideal not to discriminate and provide equal opportunity for all regardless of the melanin in a person's skin.

126. Professor Johnson does not wish to "[a]dvocate[] for and advance[] DEI and anti-racist goals and initiatives," or "[l]ead[] DEI and anti-racist efforts by participating in DEI groups, committees, or community activities that promote systemic and cultural change to close equity gaps and support minoritized groups," *id.*, because he opposes DEI and anti-racist goals and initiatives, and does not want to promote the kind of systemic and cultural change that Defendants have in mind.

127. Professor Johnson does not wish to "support[] diverse students beyond the classroom," *id.*, any more than he would show favoritism to so-called "non-diverse" students.

128. Professor Johnson does not wish to "[i]nclude[] a DEI and race-conscious pedagogy and/or curriculum in campus activities for students, faculty, and/or staff," as he opposes DEI and race-conscious pedagogy and curricula.

129. Professor Johnson does not wish to "[u]nderstand[] and appl[y] asset-based student-centered practices and activities that recognize students' lived experiences, strengths, and capabilities and empowers students to take ownership of their learning experience (e.g., Competency Based Education, Credit for Prior Learning, etc.)," *id.*, because he understands that this language perpetuates victimhood and contradicts rewarding merit and virtue ethics that stresses the striving for excellence, which he believes is the key to human flourish and overcoming hardships.

130. Professor Johnson does not wish to "[c]ommit[] to the success of minoritized students by providing specific opportunities to access educational pathways and opportunities for academic and career success (including academic and non-academic advising, mentorship)," *id.*, because he does not believe in granting special preferences to "minoritized students."

131. Professor Johnson does not wish to "[d]evelop[] and implement[] student programs and activities that incorporate a race-conscious and intersectional lens and equips students to engage with the world as scholars and citizens," *id.*, because he opposes so-called "race-conscious" and "intersectional" "lenses" as coded terms for neo-Marxism.

132.  Professor Johnson does not wish to "recogniz[e] the ideological disproportionate impacts on historically minoritized racial groups," *id.*, because he believes these impacts are often overstated, contrived, or based in outright statistical propaganda.

133.  Professor Johnson does not wish to "[c]ontribute[] to DEI and anti-racism research and scholarship," *id.*, because he does not agree with DEI and anti-racist ideologies.

134.  Professor Johnson does not wish to "[p]articipate[] in a continuous cycle of self-assessment of [his] growth and commitment to DEI and acknowledgement of any internalized personal biases and racial superiority or inferiority," *id.*, because he rejects the DEI ideology and rejects the notion that he has any internalized personal biases or feelings of racial superiority or inferiority.

135.  Professor Johnson does not wish to "[d]emonstrate[] the implementation of DEI and anti-racism practices in teaching and/or service in the evaluation process," *id.*, because he rejects these practices and the ideology behind them.

136.  Professor Johnson does not wish to "[a]ssess[] student outcomes and progress to close equity gaps as outlined in the *Vision for Success*," *id.*, because he rejects Defendants' concept of "equity gaps" that he believes reduces all explanations to racial explanations without ever attempting to test or falsify race as the sole explanation for disparities.

137.  Professor Johnson does not wish to "[p]romote[] and contribute[] to a diverse, inclusive, and anti-racist environment for students, colleagues, and community members," *id.* at 5, because he rejects Defendants' anti-racism ideology which he believes is based on demagoguery and sheer ignorance of empirical data.

138.  Professor Johnson does not wish to "[d]evelop[] and implement[] a pedagogy and/or curriculum that promotes a race- conscious and intersectional lens," *id.*, because he opposes so-called "race-conscious" and "intersectional" "lenses."

139.  Professor Johnson does not wish to "[d]evelop[] and implement[] a pedagogy that promotes equitable access," because he does not agree with Defendants' equity ideology.

140.  Professor Johnson does not wish to "[d]evelop[] and implement[] a pedagogy that fosters an anti-racist and inclusive environment for minoritized students," *id.*, because he rejects the Defendants' anti-racist ideology, and believes that the environment should be inclusive of everyone.

141.  Professor Johnson does not wish to "[d]emonstrates an ability to teach culturally affirming pedagogy," *id.*, because he does not agree with "culturally affirming pedagogy," which he believes typically amounts to hagiography.

142.  Professor Johnson does not wish to "[c]omit[] to a continuous cycle of self-growth and progress by participating in DEI professional development and learning opportunities," *id.*, because he rejects the DEI ideology.

143.  Professor Johnson does not wish to "[p]rovide[] professional development and learning opportunities for students, faculty, and staff to participate in and advance DEI and anti-racist strategies," *id.*, because he rejects the DEI and anti-racist ideologies.

144.  Professor Johnson does not wish to "[a]rticulate[] the connection of DEI and anti-racist efforts to the institution's mission and the *Vision for Success*," *id.*, because he opposes DEI and anti-racist efforts.

145.  Professor Johnson does not wish to "[r]ecruit[], hire[], and retain[] diverse faculty and staff from minoritized communities and diverse backgrounds," *id.* at 6, because he believes that the school should recruit, hire, and retain faculty and staff based on merit.

146.  Professor Johnson does not wish to "[i]ntroduce[] new employees to the institution and system's focus on DEI and anti-racism and the expectations for their contribution," *id.*, because he opposes the focus on DEI and anti-racism ideology and does not expect that anyone would contribute to this focus.

147.  Professor Johnson does not wish to "[p]romote[] and contribute[] to a respectful, diverse, and equitable campus and work environment," *id.*, as Defendants understand these terms, though he always strives to be respectful of others, values viewpoint diversity, and endorses and affirms equal opportunity.

148.  Almost everything Professor Johnson teaches violates the new DEIA requirements-not just by failing to advance the DEIA and anti-racist ideologies, but also by criticizing them. Johnson

1  fears that if he continues teaching his courses as he has designed them, he will surely fail his

2  upcoming evaluations.

3      149.  In the upcoming semester, Professor Johnson is set to teach HISTORY B17A, a course

4  on U.S. History from the colonial era through the Civil War. In this class, Professor Johnson

5  requires that students evaluate two books by Mary Grabar: *Debunking Howard Zinn: Exposing the*

6  *Fake History That Turned a Generation against America*, and *Debunking the 1619 Project:*

7  *Exposing the Plan to Divide America*. Per Johnson, Grabar's books are an assault on the DEI

8  narrative of U.S. History. She debunks the anti-Columbus narrative; pan-Indianism, the notion that

9  all Native Americans share the values of peace, harmony and respect for nature (Johnson's thesis

10  for one-third of the course); the notion that the founding fathers founded a nation based on racism;

11  and the claim that the Civil War wasn't about ending slavery. Johnson's course critiques Derrick

12  Bell's "interest convergent principle" which lies at the heart of how DEI/historian-activists analyze

13  U.S. History.

14      150.  Also in the upcoming semester, Professor Johnson will teach HISTORY B4A, a course

15  on European civilization from the dawn of civilization through the Reformation. In this class,

16  Johnson explains Greek and Roman imperialism rather than frames them as a morality tale of good

17  versus evil. He explains that Greek homosexuality bears little resemblance to modern LGBTQ-

18  movement claims. He speaks of the positive contributions of the ancient Israelites, classical Greeks

19  and Romans, and offers that Roman Catholics built Western Civilization. He introduces students to

20  how the ancients practiced virtue ethics and were metaphysical Realists, and how they accepted a

21  correspondence theory of knowledge and Aristotlean logic. Johnson compares these ideas with

22  modern DEI and LGBTQ presuppositions and argues that both worldviews cannot be right. And in

23  this class, Professor Johnson also proposes as fallacy that what is modern or contemporary must be

24  truer than that which is older and traditional.

25      151.  Also in the upcoming semester, Professor Johnson will teach HISTORY 15, "Middle

26  East Civilization." In this class, Johnson requires that students evaluate two of the following three

27  works: Raymond Ibrahim's book, *Sword and Scimitar: Fourteen Centuries of Warfare Between*

28  *Islam and the West*; Rodney Stark's *God's Battalions: The Case for the Crusades*; and Douglas

Murray's *The Strange Death of Europe: Immigration, Identity, and Islam*. Johnson is aware that DEI advocates have censored Ibrahim, causing the "postponement" of his address at The United States War College because of this book's anti-DEI narrative about jihad and Islam, and DEI advocates' view of Cultural Affirming Pedagogy.

152.  Paige Atkinson, a writer for *Kern Sol News*, a youth-led media outlet with strong ties to the DEI activists at Bakersfield College, said Professor Johnson should be fired for recommending Stark's books, and that the kind of hate perpetuated in the books Johnson assigns was responsible for the mass shooting and murder of Muslims in New Zealand. Murray has been called a racist by the DEI crowd in England and America for his moderate-conservative explanations of and concerns over Middle East immigration into Europe.

153.  In the Spring semester, Professor Johnson will teach courses on modern U.S. History, covering the post-Civil War period to the present, and modern European Civilization, from post-Reformation to the present. Similar problems arise for Johnson in these courses in light of the new DEI mandates and prohibitions. The material Johnson will use, his pedagogy, and the views he will teach are utterly contrary to the DEIA dictates of the California Code of Regulations and the Chancellor's DEIA competency standards. If Professor Johnson teaches his classes, he will not be "demonstrating" or "progressing" toward compliance with these standards.

154.  Professor Johnson's conscience does not allow him to believe in and practice the "antiracism" ideology as required by Cal. Code of Regs. tit. 5, § 51201, et seq. He does not believe that racism is pervasive and systemically embedded into all societal structures – particularly Bakersfield College – and thus he does not wish to challenge the values, structures, policies, and behaviors that, according to others, allegedly perpetuate systemic racism. Johnson does not believe he is racist, and he is not in denial of anything in asserting that. He does not wish to constantly identify, challenge, upend, and replace existing policies.

155.  Not only does Professor Johnson disagree with the tenets of antiracism that the ideology requires one to uphold and affirm, but Johnson also believes that his political viewpoints, which he would like to express, are inconsistent with and even defiant of anti-racist ideology.

156.  But considering Defendants' expressed commitment to the mandate of Cal. Code of Regs. tit. 5, § 51201, et seq., Dadabhoy's connection of Section 51201 to his opposition to RIFL, and Defendants' subsequent termination of Garrett for expressing views that are at least incompatible with antiracism, Professor Johnson curtails his own speech so as not to run afoul of Section 51201, et seq., and thereby risk discipline and termination. And Professor Johnson also believes that he must express and teach ideas he opposes, and would not otherwise express or teach, in order "to teach, work, or lead within California's community colleges." Cal. Code of Regs. tit. 5, § 53602(b).

COUNT I
VIEWPOINT DISCRIMINATION
FIRST AMENDMENT RIGHTS OF FREE SPEECH AND PETITION, 42 U.S.C. § 1983
AS-APPLIED CHALLENGE TO CAL. EDUC. CODE §§ 87732 AND 87735
AGAINST DEFENDANTS WATKIN, MCCROW, BURKE, AGBALOG, CORKINS,
MEEK, CARTER, SCRIVNER, GOMEZ-HEITZEBERG, AND JIMENEZ

157.  Plaintiff realleges and incorporates paragraphs 1 through 156 of this complaint.

158.  Professor Johnson's speech regarding political and social issues, including his speech about Bakersfield College and its preferred ideologies, criticism of other faculty and administrators, and his advocacy and expression related to RIFL, all constitutes speech on matters of public concern and petition protected by the First Amendment from viewpoint discrimination. And to the extent that Professor Johnson speaks about academic affairs on campus, his doing so is part and parcel of his traditional role as a community college professor.

159.  The First Amendment also secures Professor Johnson's right to present his views in the ways that he chooses, including his choice of words and images, regardless of whether others would find his speech disagreeable or offensive.

160.  In addition, or in the alternative, Professor Johnson also has a First Amendment right to express his views, including views that are incompatible with Defendants' DEIA and anti-racist ideologies, as an aspect of his right to academic freedom and as a participant in the dialogue about university affairs.

161.  Defendants consider the expression of political and social viewpoints that they reject to constitute grounds for investigation, discipline, and termination as "immoral or unprofessional

conduct," "dishonesty," "unsatisfactory performance," "evident unfitness for service," "persistent violation of, or refusal to obey" laws or regulations, under Cal. Educ. Code § 87732; and "willful refusal to perform regular assignments" under Cal. Educ. Code § 87735.

162.  Professor Johnson intends to continue speaking on political and social issues, but considering that Defendants have already investigated him for such speech, stated that they would conduct such investigations in the future, declared their hostility to Johnson's viewpoints, committed to the implementation of Cal. Code of Regs. tit. 5, § 51201, and terminated Johnson's RIFL predecessor for expressing the same and similar views, Johnson refrains from speaking and has altered his speech for fear of further investigation, discipline, and termination by Defendants under Cal. Educ. Code §§ 87732 and 87735.

163.  By applying Cal. Educ. Code §§ 87732 and 87735 against the expression of protected speech on the basis of viewpoint, Defendants, under color of law, violated and continue to violate Professor Johnson's rights of free speech and petition under the First and Fourteenth Amendments to the United States Constitution.

164.  Accordingly, Defendants injured and continue to injure Professor Johnson in violation of 42 U.S.C. § 1983, and Professor Johnson is entitled to declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies; and attorney fees and expenses under 42 U.S.C. § 1988.

COUNT II
VIEWPOINT DISCRIMINATION
FIRST AMENDMENT RIGHTS OF FREE SPEECH AND PETITION, 42 U.S.C. § 1983
AS-APPLIED CHALLENGE TO KCCD BOARD POLICY 3050
AGAINST DEFENDANTS WATKIN, MCCROW, BURKE, AGBALOG, CORKINS,
MEEK, CARTER, SCRIVNER, GOMEZ-HEITZEBERG, AND JIMENEZ

165.  Plaintiff realleges and incorporates paragraphs 1 through 156 of this complaint.

166.  Professor Johnson's speech regarding political and social issues, including his speech about Bakersfield College and its preferred ideologies, criticism of other faculty and administrators, and his advocacy and expression related to RIFL, all constitutes speech on matters of public concern and petition protected by the First Amendment from viewpoint discrimination. And to the

1 extent that Professor Johnson speaks about academic affairs on campus, his doing so is part and

2 parcel of his traditional role as a community college professor.

3    167.  The First Amendment also secures Professor Johnson's right to present his views in

4 the ways that he chooses, including his choice of words and images, regardless of whether others

5 would find his speech disagreeable or offensive.

6    168.  In addition, or in the alternative, Professor Johnson also has a First Amendment right

7 to express his views, including views that are incompatible with Defendants' DEIA and anti-racist

8 ideologies, as an aspect of his right to academic freedom and as a participant in the dialogue about

9 university affairs.

10    169.  Defendants consider the expression of political and social viewpoints that they reject to

11 constitute grounds for investigation, discipline, and termination as violations of KCCD Board

12 Policy 3050, in that the expression of such viewpoints is uncivil, disrespectful, and constitutes

13 "verbal forms of aggression, threat, harassment, ridicule, or intimidation."

14    170.  Professor Johnson intends to continue speaking on political and social issues, but

15 considering that Defendants have already investigated him for such speech, stated that they would

16 conduct such investigations in the future, declared their hostility to Johnson's viewpoints,

17 committed to the implementation of Cal. Code of Regs. tit. 5, § 51201, and terminated Johnson's

18 RIFL predecessor for expressing the same and similar views, Johnson refrains from speaking and

19 has altered his speech for fear of further investigation, discipline, and termination by Defendants

20 under KCCD Board Policy 3050.

21    171.  By applying KCCD Board Policy 3050 against the expression of protected speech on

22 the basis of viewpoint, Defendants, under color of law, violated and continue to violate Professor

23 Johnson's rights of free speech and petition under the First and Fourteenth Amendments to the

24 United States Constitution.

25    172.  Accordingly, Defendants injured and continue to injure Professor Johnson in violation

26 of 42 U.S.C. § 1983, and Professor Johnson is entitled to declaratory and preliminary and

27 permanent injunctive relief against continued enforcement and maintenance of Defendants'

28 unconstitutional customs, policies; and attorney fees and expenses under 42 U.S.C. § 1988.

COUNT III
VAGUENESS
FIRST AND FOURTEENTH AMENDMENTS, 42 U.S.C. § 1983
CHALLENGE TO KCCD BOARD POLICY 3050
AGAINST DEFENDANTS WATKIN, MCCROW, BURKE, AGBALOG, CORKINS,
MEEK, CARTER, SCRIVNER, GOMEZ-HEITZEBERG, AND JIMENEZ

173. Plaintiff realleges and incorporates paragraphs 1 through 156 of this complaint.

174. As notice is the first element of due process, the Fourteenth Amendment guarantee of Due Process prohibits the enforcement of vague laws. The First Amendment likewise forbids the enforcement of laws that, however valid their application may be in some instances, are so vague as to chill protected speech.

175. KCCD Board Policy 3050 is unduly vague. It is unclear what is meant by "civility," or "verbal forms of aggression, threat, harassment, ridicule, or intimidation," or expression that is "conducted in a manner respectful of persons." These undefined terms serve to authorize Defendants' censorship of speech they dislike, including ordinary political disagreement and dissent, and therefore chill protected speech.

176. By maintaining KCCD Board Policy 3050, and having demonstrated its application against political speech, Defendants, under color of law, violated and continue to violate Professor Johnson's rights of free speech, petition, and due process under the First and Fourteenth Amendments to the United States Constitution.

177. Accordingly, Defendants injured and continue to injure Professor Johnson in violation of 42 U.S.C. § 1983, and Professor Johnson is entitled to declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies; and attorney fees and expenses under 42 U.S.C. § 1988.

COUNT IV
OFFICIAL IDEOLOGY – VIEWPOINT DISCRIMINATION
FIRST AMENDMENT RIGHTS OF FREE SPEECH AND PETITION, 42 U.S.C. § 1983
CHALLENGE TO CAL. CODE OF REGS. TIT. 5, §§ 51200, 51201, 53425, 53601, 53602, 53605,
AND THE "DEI COMPETENCIES AND CRITERIA" ISSUED PER CAL. CODE OF REGS. TIT. 5, § 53601
AGAINST ALL DEFENDANTS

178. Plaintiff realleges and incorporates paragraphs 1 through 156 of this complaint.

179. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of

1  opinion or force citizens to confess by word or act their faith therein." *West Virginia Bd. of Ed. v.*

2  *Barnette*, 319 U.S. 624, 642 (1943). However, Cal. Code of Regs. tit. 5, §§ 51200, 51201, 53425,

3  53601, 52602, and 53605, and the official guidelines implementing their program, impose an

4  official political ideology on the faculty of all California community colleges. These provisions bar

5  faculty from expressing views that contradict the state's preferred political ideology if they wish "to

6  teach, work, or lead within California's community colleges." Cal. Code of Regs. tit. 5, § 53602(b).

7      180.   These demands that faculty subscribe to and advance a particular creed or political

8  ideology as a condition of maintaining their employment and ability to fully participate in school

9  affairs are inconsistent with the mission of a public college. These demands are unconstitutional on

10  their face and as applied against Professor Johnson, as they contradict the First Amendment's

11  guarantees of free speech and petition by punishing the expression of dissenting viewpoints and

12  trampling over faculty's right of academic freedom. The First Amendment guarantees Professor

13  Johnson's right to express himself in opposition to Defendants' goal of advancing "diversity, equity,

14  inclusion, and accessibility" and anti-racism ideologies.

15      181.   Defendants consider the expression of political and social viewpoints that they reject to

16  constitute grounds for investigation, discipline, and termination. In light of Dadabhoy's public calls

17  for compliance with Section 51201 alongside his condemnation of RIFL faculty; and the fact that

18  Defendants have investigated, disciplined, and terminated faculty for expressing views that are

19  incompatible with anti-racism and Defendants' vision of "embracing diversity," Professor Johnson

20  refrains from speaking and is altering his speech for fear of being investigated, disciplined, and

21  terminated for violation of Sections 51200, et seq. Professor Johnson also fears that he will receive

22  poor performance evaluations and eventually be denied opportunities to teach, lead, and work at

23  Bakersfield College, and that he will be disciplined and eventually terminated, if he continues

24  teaching his courses as he has designed them, and in doing so, expresses viewpoints that are

25  inconsistent with Defendants' DEIA and anti-racism ideologies.

26      182.   By directing compliance with Cal. Code Regs. tit. 5, §§ 51200, 51201, 53425, 53601,

27  53602, 53605, and the "DEI Competencies and Criteria" issued per Cal. Code Regs. tit. 5, § 53601,

28  and applying them to bar the expression of protected speech on the basis of viewpoint, Defendants,

1 under color of law, violated and continue to violate Professor Johnson's rights of free speech and

2 petition under the First and Fourteenth Amendments to the United States Constitution.

3     183. Accordingly, Defendants injured and continue to injure Professor Johnson in violation

4 of 42 U.S.C. § 1983, and Professor Johnson is entitled to declaratory and preliminary and

5 permanent injunctive relief against continued enforcement and maintenance of Defendants'

6 unconstitutional customs, policies; and attorney fees and expenses under 42 U.S.C. § 1988.

COUNT V
OFFICIAL IDEOLOGY – COMPELLED SPEECH
FIRST AMENDMENT RIGHT OF FREE SPEECH, 42 U.S.C. § 1983
CHALLENGE TO CAL. CODE OF REGS. TIT. 5, §§ 51200, 51201, 53425, 53601, 53602, 53605,
AND THE "DEI COMPETENCIES AND CRITERIA" ISSUED PER CAL. CODE OF REG. TIT. 5, § 53601
AGAINST ALL DEFENDANTS

    179. Plaintiff realleges and incorporates paragraphs 1 through 156 of this complaint.

    180. Cal. Code of Regs. tit. 5, §§ 51200, 51201, 53425, 53601, 52602, and 53605, and the official guidelines implementing their program, compel faculty to express views that contradict the state's preferred political ideology if they wish "to teach, work, or lead within California's community colleges." Cal. Code of Regs. tit. 5, § 53602(b).

    181. Indeed, the state's reference competencies and criteria for minimum DEIA compliance standards bear the hallmarks of a cult, in calling for faculty to practice "self-reflection" by "[e]ngag[ing] in self-assessment of one's own commitment to DEI and internal biases, and seek[ing] opportunities for growth to acknowledge and address the harm caused by internal biases and behavior," Exh. A at 3; seek "self-improvement" by "demonstrat[ing] a commitment to continuous improvement as it relates to one's DEI and anti-racism knowledge, skills, and behaviors," *id*.; "[p]articipate[] in a continuous cycle of self-assessment of one's growth and commitment to DEI and acknowledgement of any internalized personal biases and racial superiority or inferiority," *id*. at 4; and "introduce" newcomers to "expectations for their contribution" to the DEI and anti-racism "focus," *id*. at 6.

    182. These demands that faculty advance a particular creed or political ideology as a condition of maintaining their employment and ability to fully participate in school affairs are inconsistent with the mission of a public college. These demands are unconstitutional on their face and as applied against Professor Johnson, as they contradict the First Amendment's guarantees of

free speech and petition by compelling the expression of viewpoints and trampling over faculty's right of academic freedom. The First Amendment guarantees Professor Johnson's right to reject Defendants' vision of "embracing diversity," including the tenets of anti-racist ideology—without fear of official retribution, and without having his performance evaluated based on the degree to which he advances Defendants' preferred ideology. Professor Johnson is entitled to refrain from practicing, promoting or advocating these concepts in any way whatsoever, including in his teaching at Bakersfield College. Professor Johnson is entitled to refuse the incorporation of Defendants' DEIA and anti-racism ideologies into his pedagogy and curriculum.

183.   Defendants consider the failure to advance their preferred political and social viewpoints to constitute grounds for investigation, discipline, and termination. In light of Dadabhoy's public calls for compliance with Section 51201 alongside his condemnation of RIFL faculty, and the fact that Defendants have investigated, disciplined, and terminated faculty for expressing views that are incompatible with anti-racism and Defendants' vision of "embracing diversity," Professor Johnson fears that he will receive poor performance evaluations and eventually be denied opportunities to teach, lead, and work at Bakersfield College, and that he will be disciplined and eventually terminated, if he does not express, promote, and advance Defendants' DEIA and anti-racism ideologies, which contradict his conscience and which he would not otherwise express, promote, or advance.

184.   By directing compliance with these Cal. Code Regs. tit. 5, §§ 51200, 51201, 53425, 53601, 53602, 53605, and the "DEI Competencies and Criteria" issued per Cal. Code Regs. tit. 5, § 53601, and applying them compel ideological speech that Professor Johnson opposes, Defendants, under color of law, violated and continue to violate Professor Johnson's right of free speech under the First and Fourteenth Amendments to the United States Constitution.

185.   Accordingly, Defendants injured and continue to injure Professor Johnson in violation of 42 U.S.C. § 1983, and Professor Johnson is entitled to declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies; and attorney fees and expenses under 42 U.S.C. § 1988.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff Daymon Johnson requests that judgment be entered in his favor as follows:

A.   Orders preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from investigating, disciplining, or terminating Professor Johnson by applying Cal. Educ. Code §§ 87732 or 87735, or Kern Community College District Board Policy 3050, based on the content or viewpoint of his social or political speech;

B.   Orders preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Cal. Code of Regs. tit. 5, §§ 51200, 51201, 53425, 53601, 53602, and 53605, and the customs, policies, and practices adopted on their bases, including the requirement of DEIA compliance as a condition of serving on a screening committee and the use of DEIA criteria in evaluating faculty performance, on their face and against Professor Johnson;

C.   Declaratory relief consistent with the injunction, to the effect that investigating, disciplining, or terminating Professor Johnson by applying Cal. Educ. Code §§ 87732 or 87735, or Kern Community College District Board Policy 3050, based on the content or viewpoint of his social or political speech, violates his First Amendment rights of free speech and petition;

D.   Declaratory relief consistent with the injunction, to the effect that Cal. Code of Regs. tit. 5, §§ 51200, 51201, 53425, 53601, 53602, and 53605, and the customs, policies, and practices adopted on their bases, violate the First Amendment rights to free speech and petition;

E.   Costs of suit;

F.   Attorney's fees and expenses pursuant to 42 U.S.C. § 1988; and

G.   Any other relief as the Court deems just and appropriate.

1    Dated: July 6, 2023                    Respectfully submitted,

2                                  By:    /s/ Alan Gura
                                         Alan Gura (SBN 178221)
3                                            agura@ifs.org
                                         Courtney Corbello, admitted pro hac vice+
4                                            ccorbello@ifs.org
                                         INSTITUTE FOR FREE SPEECH
5                                        1150 Connecticut Avenue, N.W., Suite 801
                                         Washington, DC 20036
6                                        Phone: 202.967.0007
                                         Fax:    202.301.3399
7                                        +Admitted in Texas. Practice supervised by
                                         D.C. Bar members, D.C. App. R. 49(c)(8)

8

9                                        Attorneys for Plaintiff Daymon Johnson

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28