INSTITUTE FOR FREE SPEECH
Alan Gura, SBN 178221
        agura@ifs.org
Courtney Corbello, admitted pro hac vice+
        ccorbello@ifs.org
1150 Connecticut Avenue, N.W., Suite 801
Washington, DC 20036
Phone: 202.967.0007
Fax:    202.301.3399
+Admitted in Texas. Practice supervised by
D.C. Bar members, D.C. App. R. 49(c)(8)

Attorneys for Plaintiff Daymon Johnson

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

DAYMON JOHNSON,

*Plaintiff,*

v.

STEVE WATKIN, et al.,

*Defendants.*

Case No. 1:23-cv-00848-CDB

DECLARATION OF PROFESSOR DAYMON JOHNSON

I, Daymon Johnson, declare the following based on my personal knowledge:

1.      I am employed as a full-time, tenured professor in the Department of History at Bakersfield College. My primary duties in this position involve teaching various history classes to community college students and participating in shared governance on campus. Specifically, I teach U.S. History, European Civilization, and Middle East Civilization, and have served on various committees including screening committees for new faculty, Equal Opportunity & Diversity Advisory Committee (EODAC), the Norman Levan Faculty Colloquium, the Critical Thinking Committee, and the Levan Summer Grant Committee. I have been a Professor of History at Bakersfield College since 1993.

2.     In addition to my job as a professor, I serve as the Faculty Lead for the Renegade Institute for Liberty (RIFL), of which I am a founding member. RIFL is a sanctioned organization within Bakersfield College composed of two dozen faculty members dedicated to the pursuit of free speech, open inquiry and critical thinking. RIFL aims to promote and preserve freedom of thought and intellectual literacy through the open discourse of diverse political ideas with an emphasis on American ideals and western historical values. RIFL also gives expression to conservative, libertarian, traditional, and Judeo-Christian viewpoints that are often less represented in modern academia. RIFL represents a minority position on campus standing in general opposition to political viewpoints espoused by many faculty members and school administrators who are aligned with Cal. Code Regs., tit. 5 § 51201's mandate to "embrace diversity" by, among other things, "intentionally practice. . . anti-racism."

3.     My duties as RIFL's Faculty Lead include creating, scheduling, and promoting events on behalf of RIFL, acting as administrator of RIFL's Facebook page, and serving as Director of the RIFL's Student Scholars program.

4.     In addition to my teaching duties, I was an alternate member of Bakersfield College's Equal Opportunity & Diversity Advisory Committee (EODAC). My primary duties on this committee included attending committee meetings, voting on EODAC proposals, and working on a new charge stating the purpose of the EODAC. The new charge, which I was not involved in creating but voted on (I abstained for fear of retribution if I were to vote "no"), calls for the end of systemic racism at Bakersfield College by promoting racial diversity, equity and inclusion. EODAC also seeks to promote DEI faculty hiring practices—and advise the President on those ends.

5.     On November 21, 2022, I became RIFL Faculty Lead and a member of EODAC when my colleague and then RIFL Faculty Lead, Professor Matthew Garrett, was threatened with termination and banned from EODAC.

*The Ideological Divide at Bakersfield College*

6.     On December 8, 2022, then-Bakersfield College President Zav Dadabhoy sent an email to employees of Bakersfield College. A true and correct copy of that email is attached as Exhibit C.

7.      Although the email began as a banal holiday greeting, it quickly shifted to attacking RIFL members and their expression of non-majority viewpoints. President Dadabhoy claimed unidentified "members of BC's communities of color and LGBTQ community, have shared that many do not feel peace on our own campus. It has been disheartening to see attacks on members of our campus, especially those who already feel marginalized." Exh. C. Dadabhoy did not describe the "attacks" that he saw, but he nonetheless declared, "I am reinforcing my commitment to the College's core values." *Id.*

8.      Dadabhoy decried that "while there may be a small group promoting exclusion, that is not a value of this institution." He then declared that Cal. Code Regs. tit. 5, § 51201 "provides us with direction on diversity, equity and inclusion," and in particular, "[w]hat really resonates with me is subsection (b)," which he proceeded to quote in full. Exh. C. Dadabhoy then added, "We must not allow the discontent or views of a few to supersede what we are required to provide at our college and the work that we have intentionally developed to support all members of the community. This is reminder that we are all tasked with this work." *Id.*

9.      It was very clear to me, upon reading this email, that President Dadabhoy's comments were directed at myself, Garrett and the other RIFL members. At the time of this email, RIFL members' speech − mine and Garrett's included − had consistently been the target of suppression, intimidation, and censorship by other faculty members of Bakersfield College. These attempts were always made under the guise of pursuing "diversity, equity and inclusion" (DEI) policies and labelling any speech they did not agree with as "racist" or "homophobic." President Dadabhoy's email followed upon this nasty pattern of ad hominem attacks and attempts to censor. I understood Dadabhoy's exhortation to follow Section 51201 as an instruction that I curtail my non-compliant, dissenting speech and instead speak more consistently with "anti-racism" ideology.

10.     On December 12, 2022, the trustees of the Kern Community College District ("KCCD"), which operates Bakersfield College, held a meeting at which Trustee John Corkins, the board vice president, called RIFL faculty's minority political views "abusive." He declared that RIFL faculty are "in that five percent that we have to continue to cull. Got them in my livestock operation and that's why we put a rope on some of them and take them to the slaughterhouse. That's

a fact of life with human nature and so forth, and I don't know how to say it any clearer." He added, "I don't think we're that way, if we are, we've got to get the bad actors out of the room. It just bothers me when the bad actors are paid staff and faculty and if that's where it is we really got a problem. And we know better than all you know how it's hard to get rid of some of these people."

11.     None of the members of the Board of Trustees disavowed Corkins' call to take RIFL members, myself included, to the "slaughterhouse." Nan Gomez-Heitzeberg chuckled heartily at the suggestion.

12.     The Board of Trustees have the authority to discipline and terminate me. Corkins's statements in this December 12th meeting make it clear to me that, if I continue to hold and express opposing views on DEI issues, the Board of Trustees will deem me a "bad actor" and seek my removal from the Bakersfield College faculty.

13.     Bakersfield College, moreover, has created new requirements for new-hire screening committee members. Faculty who wish to serve on such committees must complete a training session to assure that their committee service complies with the school's Diversity, Equity, Inclusion, and Accessibility (DEIA) policies.

14.     On June 5, 2023, Bakersfield College Human Resources Technician Karla Quintero emailed the faculty, including me, advising that the college had established a new DEIA training session for service eligibility on any upcoming screening committees. Quintero advised that "[y]ou will need to have this training completed prior to the first meeting of any recruitment," and referred to the training as an "obligation." A true and correct copy of this email is attached hereto as Exhibit D.

*Bakersfield College Investigates and Threatens Me*
*for Disagreeing with A Colleague on Facebook*

15.     On August 22, 2019, Bakersfield College Professor Andrew Bond posted the following on his personal Facebook page:

> Maybe Trump's comment about shithole countries was a statement of projection because honestly, the US is a fucking piece of shit nation. Go ahead and quote me, conservatives. This country has yet to live up to the ideals of its founding documents.

16.     Around May 2021, I reposted Bond's post on RIFL's Facebook page, and added, "Here's what one critical race theorists at BC sounds like. Do you agree with this radical SJW from BC's English Department? Thoughts?"

17.     Bond filed an administrative complaint against me for harassment and bullying over the Facebook post and commentary.

18.     Professor Bond's complaint apparently attributed the following quote falsely to me: "Maybe he should move to China, and post this about the PRC in general or the Chinese Communist Party and see how much mileage it gets him. I wonder, do they still send the family the bill for the spent round?" Although this sounds like a comment I would make, a follower of the page, a Mr. James Allen, made the quote. Professor Bond was offended that Professor Garrett liked the "offensive" comment by Mr. Allen. The fact that the administration would hire an investigator to cross examine me for a quote I didn't make and over a colleague liking a politically protected comment is chilling.

19.     Rather than dismiss Bond's complaint out of hand, the Kern Community College District subjected me to an emotionally draining investigation that made it necessary for me to seek counsel. Finally, on February 23, 2022, five months after Bond's complaint was filed—a complaint I was denied ever getting to read after multiple requests from my lawyer—Dadabhoy sent me the district's administrative determination of Bond's complaint against me. A true and correct copy of that administrative determination is attached as Exhibit E.

20.     Although the district determined that my conduct presented no cause for discipline, it saw fit to pass judgment on each of 29 separate allegations raised in the dispute, including that Garrett "liked" the China comment (allegation 2, sustained), that my posting doxed Bond (allegation 3, "not sustained but plausible"), and that "Professor Bond was offended" that I described his views incorrectly (allegation 14, sustained), though I never had the opportunity to read how I allegedly misquoted or incorrectly described him as a "Critical Race Theorist and Social Justice Warrior." The school even went so far as to say, "Professor Johnson admitted he would also be offended in a similar situation," but left out that I told the investigator I believe offensive speech is protected speech.

21.     And although the district's investigation "revealed no evidence that that [I] took any of these actions in [my] role as a Kern Community College District employee," Exh. E at 8, the district also made sure to inform me that it "will investigate any further complaints of harassment and bullying and, if applicable, will take appropriate remedial action including but not limited to any discipline determined to be appropriate," *id.* at 9.

*Bakersfield College Punishes Professors for Speaking*

22.     On September 12, 2019, Professor Garrett delivered a public lecture on the Bakersfield College campus entitled, "The Tale of Two Protests: Free Speech and the Intellectual Origins of BC Campus Censorship," at which he was introduced by fellow professor Erin Miller. I understand that Professors Bond and Oliver Rosales filed administrative complaints against Garrett and Miller over the lecture. The school subsequently determined that Garrett and Miller's lecture constituted "unprofessional conduct," and threatened further discipline against them, prompting Garrett and Miller to sue school officials for violating their First Amendment rights.

23.     On November 21, 2022, Dean of Instruction Richard McCrow charged Garrett with "unprofessional conduct," and advised further that Garrett could be charged with "unsatisfactory performance" and violation of BP 3050. He was given 90 days to cure his alleged deficiencies. Exhibit F is a true and correct copy of the letter, with Garrett's home address redacted, which I learned of the day after it was sent and which I had carefully reviewed in its entirety for the first time on or about April 1, 2023.

24.     After reciting a litany of charges against Garrett, largely attacking him for expressing his political views, McCrow added, "Importantly, you caused students to feel unwelcome and unsafe by belittling the community's valid concerns." *Id*. at 7. I understand from reading this that "invalid views," or criticism of views that "the community" deems "valid," are punishable.

25.     McCrow also removed Garrett from the Equal Opportunity and Diversity Advisory Committee, and I was appointed to fill that position as a faculty representative. Because of the threatening nature of McCrow's letter, Garrett resigned as RIFL Faculty Lead, and I succeeded him in that role immediately.

26.     On March 22, 2023, Dadabhoy sent Garrett a Notice of Decision to Terminate. That same day, I was made aware that KCCD and Bakersfield College had begun formal disciplinary proceedings against Garrett.

27.     On April 11, 2023, with then-KCCD Chancellor Sonya Christian's concurrence, Defendant Dadabhoy formally recommended to Trustees Agbalog, Corkins, Meek, Carter, Scrivner, Gomez- Heitzberg, and Jimenez that they terminate Garrett's employment by issuing a "Statement of Charges and Recommendation for Statement of Decision to Terminate." Two days later, the Trustees found cause for Garrett's termination as set out by Dadabhoy and Christian and fired Garrett. The next day, Dadabhoy notified Garrett of his termination, enclosing the "Statement of Charges and Recommendation for Statement of Decision to Terminate." Exhibit G is a true and correct copy of that letter and the accompanying statement of charges and recommendation, with Garrett's address redacted.

28.     Because of my friendship with Garrett, my active role with RIFL and its Facebook page as well as my current role as RIFL Faculty Lead, I was intimately aware in real time of the events that both notices reference.

*The Impact of Defendants' Actions on My Speech*

29.     Considering 1) my experience of being investigated by Defendants over my RIFL Facebook posts; 2) Defendants' adoption of an official political ideology–that I reject–and their exhortations that their ideology must be affirmed and followed; 3) Defendants' threats and punishment of Professor Garrett, my colleague and predecessor in the position of Faculty Lead for RIFL; and 4) the fact that I had authored or did not think to censor some of the speech on RIFL's Facebook page for which Professor Garrett was fired, I refrain from expressing my political views and from freely participating in the intellectual life of the college for fear that Defendants will investigate, discipline, and ultimately terminate my employment on the basis of my political views.

30.     I understand that the commitment to "embrace diversity," Cal. Code Regs. Tit. 5, § 51201(a), "guide[s] the administration of all programs in the California Community Colleges," *Id.* § 51200. I also understand that Cal. Code Regs. Tit. 5, § 51201(b) provides that "[e]mbracing diversity means that we must intentionally practice . . . anti-racism."

31.     My understanding is that the California Community Colleges define an "anti-racist" as one who "understand[s] that racism is pervasive and has been embedded into all societal structures." Diversity, Equity and Inclusion Glossary of Terms, California Community Colleges Chancellor's Office, https://perma.cc/T22V-V866 at 1. Anti-racists "challenge the values, structures, policies, and behaviors that perpetuate systemic racism" and are "also willing to admit the times in which they have been racist." *Id*. Anti-racism holds that "[p]ersons that say they are 'not a racist' are in denial of the inequities and racial problems that exist." *Id*.

32.     "Practicing antiracism requires constantly identifying, challenging, and upending existing racist policies to replace them with antiracist policies that foster equity between racial groups." *Id*.

33.     Moreover, "embracing diversity" requires "acknowledg[ment] that institutional racism, discrimination, and biases exist," and a commitment to "eradicate these from our system," to "strive to eliminate those barriers to equity." Cal. Code of Regs. tit. 5, § 51201(c). It requires "that we act deliberately to create a safe, inclusive, and anti-racist environment . . . ." *Id*.

34.     Advancing these goals "requires that we develop and implement policies and procedures, encourage individual and systemic change, continually reflect on our efforts, and hold ourselves accountable for the results of our efforts in accomplishing our goals. In service of these goals, the California Community Colleges are committed to fostering an antiracist environment that offers equal opportunity for all." *Id*. § 51201(d).

35.     Thus, Defendant Dadabhoy's email providing that "we are *required*" to follow Section 51201 − intentionally practicing antiracism − demands fealty to a specific ideological viewpoint. Or put another way, he demands I pass his political litmus test by forcing me to adhere to an unconstitutional state law that unlawfully infringes on my right to free speech that is protected by the First Amendment of the U.S. Constitution.

36.     EODAC, furthermore, requires adherence to Section 51201(b), and is designed to ensure that the school complies with its mandate. This is evidenced by EODAC's citation to Section

1  51201(b) as a regulation that "provides us with direction,"[1] as well as statements by the proponents

2  of EODAC's new charge that it is "very much in line with the expectations of Title V," by which

3  they mean (as demonstrated by a hyperlink in the same paragraph) Section 51201.[2]

4       37.    EODAC's representations, Corkins' statements, Defendants' treatment of Garrett,

5  and Dadabhoy's December 8th email all make clear that I am required to comply with Section

6  51201, and Defendants' interpretation of such. The only way to do so is to curtail my own speech

7  and viewpoints, which do not comport with Defendants' DEI ideology, and to express viewpoints

8  that I reject. The political and social viewpoints which I would like to express are inconsistent with

9  and even defiant of so-called "antiracist" ideology that I view as racist ideology in itself. I am being

10  forced to practice their anti-racist/racist ideology or engage in self-censorship if I want to avoid the

11  same fate as Professor Garrett.

12       38.    To reiterate, I do not share the "embracing diversity" ideology as defined in the

13  California Code of Regulations and enforced by Bakersfield College. For example, I do not agree

14  that racism is pervasive and embedded into all societal structures – particularly Bakersfield College

15  – and I do not wish to challenge values, structures, policies, and behaviors that, according to others,

16  allegedly perpetuate systemic racism. As a faculty member of nearly 30 years, I am happy to report

17  that I have never had reason to view Bakersfield College as a systemically racist institution

18  dominated and ruled by white supremacists ignorant of their own racism. For many years I served

19  on the EODAC at a time when committee members were appointed to each and every hiring

20  committee. During that time, I served on a plethora of selection committees for the president.

21  Again, I am happy to report that not once did I find my colleagues behaving as fragile and ignorant

22  racists. The committees were diverse, and the process full of checks and balances, with our human

23  resource department going up and beyond to seek out minority applicants. I can even testify that the

24  colleagues that I served with were willing to recommend minorities for hire if such candidates

25  demonstrated excellent teaching skills and indicated they understood the challenges of teaching at a

26

27

28  [1] Equal Opportunity & Diversity Advisory Committee, https://perma.cc/BWR6-2U79 (last visited June 16, 2023).
[2] *Ballot Statement*, Equal Opportunity & Diversity Advisory Committee, https://perma.cc/LQJ2-Z9RE (last visited June 16, 2023).

1  community college--namely, educating and developing the critical thinking skills of a variety of

2  students from different socio-economic backgrounds, experiences, and grade levels, all the while

3  maintaining rigorous academic standards. In recent years, however, I have witnessed the climate at

4  Bakersfield College change, with accusations of racism being thrown around for not going along

5  with the program in a post-George Floyd world of racial sensitivity. However, I am not racist or any

6  other ugly epithet in asserting that I do not wish to constantly identify, challenge, upend, and

7  replace existing policies because I do not view them as racist—and I say that as a Person of Color.

8        39.    I generally identify with the viewpoints espoused by many members of RIFL and, in

9  fact, share many of Professor Garrett's conservative political views and social values, which

10  Defendants have already proven they will attempt to censor and punish when such public criticism

11  might undermine their social justice agenda. I have counted 18 RIFL Facebook posts that reference

12  Cultural Marxism—and I posted 15 of them. In every instance "Cultural Marxism" refers to the

13  present-day social justice agenda and the current leftwing agenda that dominates college campuses

14  today. In no way were my posts defending or promoting hate speech. Like Garrett, I do not agree

15  with Bakersfield College's apparent definition of what constitutes "hate speech." On the contrary, I

16  believe what is often considered hate speech by some is, in reality, speech protected by the First

17  Amendment.

18        40.    Fearing retribution by Bakersfield College officials should I speak my mind on

19  social and political matters, I self-censor. For example, after I learned that publicly disagreeing with

20  the Administration's "anti-racist" definition of the term "Cultural Marxism" was a fireable offense,

21  I have not posted anything involving the term on either RIFL's Facebook page or my own. Several

22  of my prior posts, in fact, connected the phrase "Cultural Marxism" to Bakersfield College's social

23  justice agenda, and I would continue declaring this view if I could. But my speech has been chilled

24  because posts I would, and *have*, made are no longer posts I am able to make. I must avoid

25  discussing "Cultural Marxism" both on Facebook and elsewhere so that my speech is not labelled

26  "hateful" and used as one of the reasons to discipline me.

27        41.    I also cancelled RIFL's sponsorship of a community event scheduled for July 7,

28  2023. I did so because our guest speaker--theologian Voddie Baucham--had been invited to speak

on Cultural Marxism and Critical Race Theory in academia and its impact on college students in general and evangelical churches in particular. I feared that Defendants would discipline or terminate me if I approved with RIFL's endorsement a speaker who would discuss "Cultural Marxism" and connect the term to the social justice agenda coming out of colleges, with the clear implication that Bakersfield College was indoctrinating students and furthering a neo-Marxist agenda.

42.     Moreover, I cannot make book recommendations that have the term "Cultural Marxism" in the title out of fear that the school might fight fire me (e.g., Ted Cruz's soon to be published book, *Unwoke: How to Defeat Cultural Marxism in America* or Jeffrey D. Breshears' *American Crisis: Cultural Marxism and The Culture War: A Christian Response*). Bakersfield College does not practice what it preaches—diversity—it censors political phrases and perfectly acceptable academic terms that shed critical light on DEI initiatives.

43.     I am also currently in charge of arranging speakers for the next school year (Fall 2023). Each of the speakers I have considered inviting on behalf of RIFL would present viewpoints that Defendants have already condemned in the course of disciplining Garrett. Given the pattern of punishing viewpoints that are critical of the school's official DEI ideology, I have decided to refrain from finalizing agreements with the speakers for fear of discipline and termination.

44.     Another reason Defendants provided for terminating Garrett was that he "filed an EthicsPoint grievance against his Dean . . . alleg[ing] that Dean McCrow discriminated against him by denying authorization for the in-person speaker event on campus." Exh. G at 7.

45.     It is chilling that a Faculty Lead of RIFL could be fired for making a complaint against his dean for discrimination based on what certainly appeared to be political bias and partisanship regarding Covid restrictions on campus. It's chilling that the Statement of Charges distorts the context of the complaint Garrett made and leaves out key information such as how Rudy Salas, a liberal politician, was allowed to speak on campus—twice. Or how the Football Boosters were allowed to officially meet off campus, while RIFL was denied these accommodations. Had I been the Faculty Lead for RIFL at the time that Defendant McCrow denied authorization for RIFL's in-person speaker events while showing favoritism to others, I, too, would have made a EthicsPoint

grievance against him. I now feel chilled at blowing the whistle on campus officials' political bias for fear of retaliation, especially when Dadabhoy has not only distorted the events surrounding this exchange between Garrett and Dean McCrow, but also left out key facts to mislead others into believing that Dr. Garrett is fundamentally a "dishonest" person.

46. Defendants also claimed Garrett acted "unprofessionally" by submitting a public comment opposing two proposed history classes for a Cesar Chavez Leadership Certificate for Delano High School students on Chicano leadership and race activism in Kern County. I also wrote a letter to the Curriculum Committee for Public Comment regarding the same courses Garrett criticized. In fact, the very criticisms made on RIFL's Facebook page that Defendants attributed to Garrett about the courses were actually, unbeknownst to Dadabhoy, posted by *me*. If Garrett can be fired for my opinions, then the school can punish me for my Public Comment letter and social media posts. This is chilling my speech and academic freedom to address or criticize matters dealing with Bakersfield College history curriculum.

47. Indeed, *all* of Defendants' allegations against Garrett regarding postings on RIFL's Facebook page are chilling my speech.

48. First, Defendants claimed Garrett acted unprofessionally by not restricting, on RIFL's Facebook page, speech by *others* that was critical of Defendants. Exh. F at 6, ¶ 13; Exh. G at 11. Censorship is anathema to the RIFL. As current Faculty Lead, I do not want to censor the critical speech of others commenting or posting on RIFL's page, but believe I must do so if I want to avoid discipline or termination. Before turning RIFL's Facebook page over to two retired professors, I deleted a few third-party posts from the RIFL Facebook page fearing that Defendants would hold me accountable, as they did Garrett, for allowing others to respond with disapproved speech. Although Defendants have not yet disciplined me for running RIFL's Facebook page, I live in fear that they will do so in the future just to be consistent with how the Administration punished my predecessor.

49. Other professors understand that the Defendants might punish me, as RIFL Faculty Lead, for speech that I do not remove from RIFL's Facebook page, and seek to trigger such punishment. On May 24, 2023, adjunct professor John Harte filed an informal complaint with

1    Human Resources at Kern Community College District (KCCD) and with Suzanne Galindo,

2    Executive Assistant to General Counsel for KCCD. Professor Harte complained about a RIFL

3    Facebook post, written by a retired faculty member, calling out by name five professors who had

4    trolled our page over the last few years. The RIFL post that Harte complained about stated:

> Citizens of Kern County love Bakersfield College. They also love liberty. In the build up to firing Matthew Garrett, founder of The Renegade Institute for Liberty at Bakersfield College, the administrators of this site have endured endless attacks on their integrity, honesty, judgment, and scholarship by faculty members of Bakersfield College whom most people would describe as woke. The screenshot below is representative of these attacks. These faculty are relatively small in number, but highly motivated. They include the following, part time and full-time: Nick Strobel, Andrew Bond, Susanne Langham, Justin Bell, John Harte, and Peter Legrant.

> While we welcome debate and discussion on issues of public interest, these professors make the administrators of this site their focus. They sling accusations which they never defend; because they cannot. And when they try, they end up looking rather ridiculous. But we are quite sure that they are engaged in this task to give cover to the administration's lies about Matthew Garrett.

> Now that Matthew Garrett has been forbidden from administering or commenting on any issue, we intend to keep this issue in the forefront.

14    50.    In the comment section in his post, one of Harte's friends encouraged him: "you

15    could always sue and hope you get a dumb judge. Recent rulings have caused me to believe there

16    may be more of them than I suspected." Harte wrote: "I think the greater question is how would I

17    prove damage to my reputation? This group is a joke, could anything they say about me really

18    damage my reputation?" Although I had nothing to do with this post nor did I encourage it, on June

19    20, Harte announced to his Facebook friends that he has made his complaint formal. He wants me

20    held accountable for a retired professor's opinions because I'm the Faculty Lead of RIFL. But

21    instead of seeking to legally punish me for a colleague's political opinion by finding a "dumb

22    judge," he seeks to have the school punish me. Given that Bakersfield College administrators

23    threatened to punish me before and have fired Professor Garett for posts that I allowed, the frivolous

24    complaint takes on chilling significance.

25    51.    Second, many of the RIFL Facebook postings that the Defendants attribute to Garrett

26    and use to justify his discipline and termination were, in fact, authored directly by me as noted

27    above. One of the Facebook posts that Defendants charged Garrett for not censoring was a post that

28    I wrote (about the participation certificates). Others were postings made with my approval as the

1   actual RIFL Facebook page administrator. In other words, the very actions Garrett was punished for

2   were either *my* actions or actions that I sanctioned. This chills my ability to speak as RIFL Faculty

3   Lead because it leads me to have to censor my own speech and participation on the RIFL Facebook

4   page to avoid the same retaliation Garrett received.

5        52.    Moreover, Defendants' administrative determination of Bond's complaint about my

6   Facebook posts, with its threat of further investigations and potential discipline, confirmed to me

7   that Bond, or others who disagree with me, can easily trigger formal investigations of my political

8   speech, which can cause me to be disciplined and ultimately terminated.

9        53.    I thus refrain from expressing any potentially controversial opinions related to

10  Bakersfield College and DEI ideology, both on the RIFL Facebook page and my personal social

11  media accounts. Rather than post my own political viewpoints, I have chosen, as noted above, to

12  assign the task of posting on RIFL's Facebook page to two retired professors who cannot be

13  disciplined by Defendants for their speech, and I pray that I will not be held accountable for not

14  censoring their political posts on matters of public concern related to Bakersfield College, Cultural

15  Marxism, Critical Race Theory, and the politics of "Diversity, Equity, and Inclusion."

16       54.    It is also chilling that Defendants terminated Garrett for appearing several times on a

17  conservative talk radio show ("Terry Maxwell's Radio Show") and giving his opinion on the

18  current state of affairs in academia and on the Bakersfield College campus. I share similar concerns

19  and criticisms of Bakersfield College and the policies it implements. That Defendants could pick

20  out a few statements they did not like from Garrett's interview and then *summarize* them to fit the

21  narrative that Garrett acted unprofessionally is frightening.

22       55.    Defendants' use of these radio show appearances as a justification for punitive action

23  has led me to the logical conclusion that going on a conservative television or radio show, and

24  criticizing school policy, funding, and even making comments in a professor's area of expertise,

25  will get me fired. In fact, I was recently asked to appear on Terry Maxwell's Radio Show and to

26  make comments to Fox News and The Daily Caller. I turned down these opportunities because

27  Defendants punished Garrett for offering his viewpoints, and specifically objected to his radio

28  appearances.

56.     Defendants also fired Garrett because three students allegedly "fe[lt] a mixture of confusion and concern" after hearing Professor Catherine Jones whisper to Professor Garrett a profane opposition to these students being weaponized in EODAC. These activist students charged racism. Exh. G at 10. To Defendants, feeling offended by *someone else's* whisper was justification enough to selectively discipline and fire *Garrett* who just listened to his colleague.

57.     I serve the same student body of Bakersfield College that Garrett did before his termination. What this means is if I am having a private conversation and a colleague uses profanity while expressing opposition to race politics and Critical Race Theory solutions on campus, then I can be penalized for "listening," if the subjective "feelings" of a few students is one of racism. My speech, as a result, has been chilled by Defendants' clear policy that a small number of students who feel "hurt" while eavesdropping (without knowing the context) can justify disciplining me or even firing me—for merely listening. This is insanely chilling.

58.     I interact with students every day. I share Garrett's concerns about racial issues at Bakersfield College, including how EODAC pushes a hidden affirmative-action agenda, engages in reverse racism, and weaponizes students in order to push their DEI agenda. Since I found out about this "listening" allegation against Garrett, and how two other conservatives were intimidated off the committee, I have stopped attending EODAC meetings to completely avoid having to give my conservative views on race, diversity, equity, and inclusion that EODAC addresses. I find myself once again put into a position of self-censorship out of fear of punishment.

59.     I also refrain from offering other viewpoints that I believe would not be well-received by Defendants, based on their prior conduct, threats, and commitments to DEIA ideology. Insomuch as President Dadabhoy linked DEI to LGBTQ issues, this is chilling to my speech. I don't want to be punished because I do not refer to transgender students by their preferred pronouns. I don't want to be punished because I believe, until I can be convinced otherwise, that transgender ideology can cause irreversible damage. Moreover, I don't want to be punished because I protest the participation of biological males in female sports competitions. I would not want to be punished for protesting against the holding of a "drag queen story hours" at Bakersfield College's daycare facility. The point is that I don't want to be punished for my conservative view on LGBTQ politics

any more than I want to be punished for not wanting to celebrate special pre-graduations for approved ethnic groups. I would like to speak out on these issues, but find my speech chilled given President Dadabhoy's warning and apparent linking of DEI mandates and LGBTQ issues, which is linked in the academic literature on race written by neo-Marxist Barabara Applebaum. President Dadabhoy and Professor Applebaum aren't the only academics who feel this way: Nicky Damania, the Dean of Students, and English Professors Andrew Bond and Paula Parks have affirmed the link between DEI and the LGBTQ community: all argued that there is no place for so-called anti-LGBTQ hate speech on our campus. They appear to have used the DEI mandate as a Trojan Horse to silence speech surrounding gender and sexuality, which is consistent with intersectionality. These threats from the President and his faculty supporters are chilling on my speech and my right to dissent on sexual ideologies.

60.     Considering that I have already been investigated over my RIFL Facebook posts, and seeing how Defendants have used Sections 87732 and 87735 of the Education Code, and Board Policy 3050, to justify their discipline and termination of Garrett is incredibly chilling on my speech. I now self-censor by refraining from publicly expressing my political and social viewpoints so I can avoid Defendants tallying up those "offenses" in an unofficial personnel file (like they did with Garrett) only to have them pulled out in the future and listed one by one as examples of "unprofessional conduct, unsatisfactory performance and violation of KCCD Board Policy 3050" (Exh. F) in order to intimidate, punish or even fire me.

61.     In addition, and as noted above, I have previously served on numerous screening committees and participated in the process of hiring faculty, and I wish to continue doing so. However, I understand that I can no longer serve on screening committees unless I successfully complete the mandatory DEIA training. Exh. D. And I cannot successfully complete the DEIA training because I do not agree with the ideology mandated by that training. I do not wish to affirm these political ideals, and I do not desire to perpetuate them and practice what they teach. I will evaluate junior faculty based on their merit, not based on their membership in some racial identity group. And I will not introduce "new employees to the institution and system's focus on DEI and anti-racism and the expectations for their contribution," because I do not believe in DEI and what

they mean by "anti-racism," nor do I want to be forced to "promote," "celebrate," or otherwise advocate for Bakersfield College's view of "equity." As such, I refrain from applying to serve on a screening committee or doing the required DEI training.

62.     Bakersfield College also evaluates my performance every three years. An unsatisfactory evaluation will lead to remediation and, eventually, termination if the school sees it fit. I have just successfully completed an evaluation period and intend to keep working as a professor at Bakersfield College, so my performance moving forward will be evaluated under the new DEIA standards and rules.

63.     The DEIA requirements chill my speech, including my academic freedom in the classroom and as the Faculty Lead of RIFL, and compel me to affirm, promote, and celebrate political ideology that I reject and even find abhorrent.

64.     I understand that it is now a minimum qualification for employment at Bakersfield College that I comply with KCCD's "policies regarding DEIA competencies," Cal. Code of Regs. tit. 5, § 53425.

65.     I understand that under Cal. Code of Regs., tit. 5, § 53602(a), Defendants must evaluate my performance based on whether I have "demonstrated, or progress[ed] toward, proficiency in the locally-developed DEIA competencies" that must use the Chancellor's guidance as a reference, "or those [DEIA competencies] published by the Chancellor pursuant to section 53601." And my evaluation "must include consideration of [my] demonstrated, or progress toward, proficiency in diversity, equity, inclusion, and accessibility DEIA-related competencies . . . as required by section 53425." *Id.* § 53602(b).

66.     Indeed, the law makes clear that I "must have or establish proficiency in DEIA-related performance to teach, work, or lead within California community colleges." *Id.* There are now "clear expectations regarding [my] performance related to DEIA principles," *id.* § 53602(c)(3), and the Defendants "place significant emphasis on DEIA competencies in [my] evaluation," *id.* § 53602(c)(4). The "evaluation process" will now be geared toward letting me "demonstrate [my] understanding of DEIA and anti-racist competencies." *Id.* § 53602(c)(6).

67.     Accordingly, because I want to keep my job, I am feeling compelled to "demonstrate" or at least "progress toward proficiency" in applying and fulfilling, by word and deed, a political ideology that I oppose and which contravenes my conscience. Likewise, I fear that if I actually express my objections to DEI ideology, which I very much want to do, I will be either disciplined or terminated.

68.     I also understand that Defendants will discipline or fire me, for unsatisfactory performance, if I do not comply with Cal. Code Regs., tit. 5 § 53605, which provides that "[f]aculty members shall employ teaching, learning, and professional practices that reflect DEIA and anti-racist principles, and in particular, respect for, and acknowledgement of the diverse backgrounds of students and colleagues to improve equitable student outcomes and course completion."

69.     However, I object strongly to applying Defendants' DEIA and anti-racist/racist ideology in my teaching and professional practices. I respect everyone regardless of their background—and it is precisely because I object to invidious discrimination that my conscience does not accept Defendants' view of "equity." Requiring me to "employ teaching, learning, and professional practices that reflect DEIA and anti-racist principles" violates my right to academic freedom, which includes the freedom to reject these principles in considering how I function as an academic.

70.     I have reviewed the "Diversity, Equity and Inclusion Competencies and Criteria" that the California Community Colleges Chancellor has distributed, which "shall be used as a reference" by KCCD in setting "minimum standards in community college district performance evaluations of employees and faculty tenure reviews," Cal. Code Regs., tit. 5 § 53601(b). On May 18, 2023, Bakersfield College Professor Erica Menchaca, the Articulation Officer and President of the Academic Senate at Bakersfield College, forwarded the "Competencies and Criteria" and their accompanying memorandum from the California Community Colleges Chancellor's Office to me and the other Bakersfield College faculty. Exhibit A is a true and correct copy of the DEI "Competencies and Criteria." Exhibit B is a true and correct copy of the Memorandum from the Chancellor's Office accompanying the distribution of the "Competencies and Criteria."

71.     What's troubling is that I cannot meet the standards set out in the Chancellor's "Competencies and Criteria" without expressing beliefs and viewpoints that I reject, and without stifling my own viewpoints on political and social topics. I understand that these "Competencies and Criteria" are "in alignment" with calls for "the incorporation of equity-centered practices into teaching and learning, grading, annual evaluations, and faculty review/tenure processes," Exh. A at 1, which I find highly objectionable.

72.     Many of the "themes" set out in the "Competencies and Criteria" contradict my beliefs and values. I do not want to show fealty to them, express them, or advance them. In fact, I want to speak out against them because they are all neo-Marxist in nature. For example: I do not wish to "[a]cknowledge[] that cultural and social identities are diverse, fluid, and intersectional," or "[d]emonstrate[] an ongoing awareness and recognition of racial, social, and cultural identities with fluency regarding their relevance in creating structures of oppression and marginalization," Exh. A at 2, because I do not believe in these neo-Marxian ideals. I do not want to "[s]eek[] DEI and anti-racist perspectives and appl[y] knowledge to problem solving, policies, and processes to create respectful, DEI-affirming environments (e.g., campus and classroom environments that are inclusive, promotes equity, and affirms diversity)," *id.* at 3, because I object to DEI and its hidden racist perspectives that are harmful when implemented.

73.     I do not wish to engage in any DEIA "self-reflection." I do not want to "[e]ngage[] in self-assessment of [my] own commitment to DEI and internal biases," because I reject DEI and the concept of internal racial bias. As such, I do not wish to "seek[] opportunities for growth to acknowledge and address the harm caused by internal biases and behavior," *id.*,  because this psychology is rooted in the "reverse cognitive behavioral therapy" of Derald Wing Sue that leads to "the coddling the American mind" (Greg Lukianoff and Jonathan Haidt); at worse, these are religious-like demands that are, in reality, little more than neo-Marxist re-education techniques. I do not want to be investigated, culled, and taken to the slaughterhouse because I do not participate in the Orwellian world of DEI self-assessment.

74.     I do not wish to "demonstrate [] a commitment to continuous improvement as it relates to [my] DEI and anti-racism knowledge, skills, and behaviors to mitigate any harm caused

1   (whether intentional or not) to minoritized communities," *id.*, because I believe that the only way

2   that increasing knowledge of DEI and anti-racism helps "minoritized communities" is if neo-

3   Marxist concepts on race are studied for the purpose of exposing their hidden socialist connection,

4   revolutionary agenda, and racist nature--concepts that fail to rightly explain disparities. I do not

5   want to be investigated, culled, and taken to the slaughterhouse because I don't believe in my

6   college's social justice initiatives, however well intentioned.

7          75.    I do not wish to "[p]romote[] and incorporate [] DEI and anti-racist pedagogy," *id.*,

8   because I object to these concepts impacting my classical pedagogy that stresses the study of "truth,

9   goodness, and beauty." DEI pedagogy undermines the social science that it is founded upon, which

10  includes the correspondence theory of knowledge, that is, the ideas of the mind must correspond

11  with empirical reality. I do not want to be investigated, culled, and taken to the slaughterhouse

12  because I believe DEI pedagogy is not based on empirical evidence but rather on the subjectivism

13  of "lived experiences" and "woke feelings" that determine oppression. I do not wish to "[u]se[] data

14  to uncover inequitable outcomes measured through equity-mindedness that calls out racialized

15  patterns in the data, policies, and practices to inform strategies to improve equitable student

16  outcomes and success," *id.*, because I fundamentally disagree with "equity-mindedness" and

17  Defendants' vision of what is "equitable." I do not want to be investigated, culled, and taken to the

18  slaughterhouse because I believe DEI data has proved to be artificial equity "benefiting" some

19  "marginalized" groups while discriminating against other groups such as Asian Americans (as

20  Kenny Xu demonstrates in his book, *An Inconvenient Minority: The Harvard Admissions Case and*

21  *the Attack on Asian American Excellence*).

22         76.    I do not wish to "[a]rticulate[] the importance and impact of DEI and anti-

23  racism/racism as part of the institution's greater mission," *id.*, as I believe that DEI and anti-racism

24  are antithetical to what Bakersfield College's mission ought to be. I do not want to be investigated,

25  culled, and taken to the slaughterhouse because I believe Bakersfield College's mission ought to

26  align with our national ideal not to discriminate based on color, but rather to provide equal

27  opportunity for all regardless of the melanin in a person's skin.

28

77.     I do not wish to "[a]dvocate[] for and advance[] DEI and anti-racist goals and initiatives," or "[l]ead[] DEI and anti-racist efforts by participating in DEI groups, committees, or community activities that promote systemic and cultural change to close equity gaps and support minoritized groups," *id.* at 4, because I oppose DEI and anti-racist/racist goals and initiatives. As such, I do not want to be investigated, culled, and taken to the slaughterhouse because I cannot in good conscience promote the kind of systemic and cultural change Defendants have in mind.

78.     I do not wish to "support[] diverse students beyond the classroom," *id.*, because I do not wish to show favoritism and will support all students beyond the classroom. I do not want to be investigated, culled, or taken to the slaughterhouse for holding this conviction.

79.     I do not wish to "[i]nclude[] a DEI and race-conscious pedagogy and/or curriculum in campus activities for students, faculty, and/or staff," as I am opposed to DEI and race-conscious pedagogy and curricula which is rooted in Cultural Marxism (Antonio Gramsci), Critical Theory (Hungarian Marxist, Gyorgy Lukacs), Critical Legal Theory (Derrick Bell and Alan David Freeman), Critical Race Theory (Richard Delgado and Gloria Ladson-Billing), Critical Pedagogy (Paulo Freire), and Cultural Affirming Pedagogy (aka Culturally Relevant Pedagogy, Gloria Ladson-Billing). All these self-proclaimed neo-Marxists teach how to overcome "false consciousness" and transform culture in "the long march through the institution." I do not want to be investigated, culled, and taken to the slaughterhouse because I find DEI and race-conscious pedagogy and curriculum wanting and do not wish to teach and lead from a neo-Marxist perspective—but failing to do so will get me disciplined or fired.

80.     I do not wish to "[u]nderstand[] and appl[y] asset-based student-centered practices and activities that recognize students' lived experiences, strengths, and capabilities and empowers students to take ownership of their learning experience (e.g., Competency Based Education, Credit for Prior Learning, etc.)," *id.*, because this language perpetuates victimhood and undermines merit and a classical virtue ethic. I do not want to be investigated, culled, and taken to the slaughterhouse because I believe my students are better served learning classical virtue ethics that stress what the Greeks called, *erete*, the striving for excellence--which is the key to human flourishing, overcoming hardships, and bettering communities at all levels of society.

81.     I do not wish to "[c]ommit[] to the success of minoritized students by providing specific opportunities to access educational pathways and opportunities for academic and career success (including academic and non-academic advising, mentorship)," *id.*, because I do not believe in granting special preferences to "minoritized students," especially on the threat of being disciplined. I do not want to be investigated, culled, and taken to the slaughterhouse because I believe each student should not be judged according to the color of one's skin, but by one's academic achievements and the content of one's character.

82.     I do not wish to "[d]evelop[] and implement[] student programs and activities that incorporate a race-conscious and intersectional lens and equips students to engage with the world as scholars and citizens," *id.*, because I oppose so-called "race-conscious" and "intersectional lenses"—coded terms coming from neo-Marxists Kimberle Williams Crenshaw and Charles Mills. I do not want to be investigated, culled, and taken to the slaughterhouse because I won't "map the margins" (Crenshaw) and sign "the racial contract" (Mills).

83.     I do not wish to "recogniz[e] the ideological disproportionate impacts on historically minoritized racial groups," *id.*, because I believe these impacts are often overstated, contrived, or based in outright statistical propaganda as Bakersfield College administrators engaged in before and after the vote on Proposition 16. I don't want to be investigated, culled, and taken to the slaughterhouse because I argue the Administration is engaged in hidden Affirmative Action (AA) and that their statistical arguments were fallacious and therefore shredded and rejected in our Academic Senate, and would not want to be punished for exposing that our social justice advocates continued to press forward to pass their AA agenda that Californians rejected on November 3, 2020.

84.     I do not wish to "[c]ontribute[] to DEI and anti-racism research and scholarship," *id.,* because I do not agree with DEI and anti-racist/racist ideology that stresses the neo-Marxist abolition of property—namely the abolition of Whiteness because Whiteness is Property—ideals put forth in the infamous essay by the same title by noted neo-Marxist scholar, Cherly I. Harris, a concept developed by neo-Marxist Barbara Applebaum in *Being White, Being Good: White Complicity, White Moral Responsibility and Social Justice Pedagogy*, and finally popularized by Robin DiAngelo in books such as *White Fragility*, *What Does It Mean to Be White?: Developing*

*White Racial Literacy*, and *Nice Racism: How Progressives White People Perpetuate Racial Harm*. I do not want to be investigated, culled, and taken to the slaughterhouse because I believe DEI's anti-racism is racism against whites and minorities like me who are white adjacent.

85.    I do not wish to "[p]articipate[] in a continuous cycle of self-assessment of [my] growth and commitment to DEI and acknowledgement of any internalized personal biases and racial superiority or inferiority," *id.*, because I reject the DEI ideology. And I don't want to be investigated, culled, and taken to the slaughterhouse because I don't want to search my soul to identify my racial sins, show contrition, and make confession, as if "In DEI we trust."

86.    I do not wish to "[d]emonstrate[] the implementation of DEI and anti-racism practices in teaching and/or service in the evaluation process," *id.*, because I reject these practices and the ideology that foments white guilt, divides people along racial lines, and destroys the promise of the civil rights era (like Shelby Steele).

87.    I do not wish to "[a]ssess[] student outcomes and progress to close equity gaps as outlined in the *Vision for Success*," *id.*, because I reject Defendants' concept of "equity gaps" that reduces all explanations to racial explanations without ever attempting to test or falsify race as the best explanation for racial disparities; it is not (like Thomas Sowell).

88.    I do not wish to "[p]romote[] and contribute[] to a diverse, inclusive, and anti-racist environment for students, colleagues, and community members," *id.* at 5, because I reject Defendants' anti-racism ideology based on demagoguery and sheer ignorance of empirical data (Walter E. Williams).

89.    I do not wish to "[d]evelop[] and implement[] a pedagogy and/or curriculum that promotes a race-conscious and intersectional lens," *id.*, because I oppose so-called "race-conscious" and "intersectional lenses." I don't want to be investigated, culled, and taken to the slaughterhouse because I see the world through different lenses.

90.    I do not wish to "[d]evelop[] and implement[] a pedagogy that promotes equitable access," because I do not agree with Defendants' equity ideology which, as already noted, is neo-Marxist in nature. I don't want to be investigated, culled, and taken to the slaughterhouse because I

1  have a classical and Enlightenment-based pedagogy that is deemed racist in the DEI/Critical Race

2  Theory literature (Kimberly Crenshaw, Neil Gotanda, Gary Peller, and Kendall Thomas).

3       91.    I do not wish to "[d]evelop[] and implement[] a pedagogy that fosters an anti-racist

4  and inclusive environment for minoritized students," *id.*, because I reject the Defendants' anti-racist

5  ideology, and I believe that the learning environment should be inclusive of everyone. I don't want

6  to be investigated, culled, and taken to the slaughterhouse because I want to argue that Defendants'

7  anti-racist ideology is racist and breeds unhealthy self-loathing and a victimhood mentality for

8  whites.

9       92.    I do not wish to "[d]emonstrate[] an ability to teach culturally affirming pedagogy,"

10  *id.*, because "culturally affirming pedagogy" is just another term the neo-Marxist pedagogy of Paulo

11  Freire (*Pedagogy of the Oppressed* and *The Politics of Education: Culture, Power, and Liberation*)

12  and Gloria Ladson-Billings's *Cultural Relevant Pedagogy*. In other words, "culturally affirming

13  pedagogy" is another term for Cultural Relevant Pedagogy that leads to hagiographical and

14  politicized outcomes when applied to teaching college-level history courses. I do not want to be

15  investigated, culled, and taken to the slaughterhouse because I don't wish to teach hagiography or

16  politicize my classroom, which is what "cultural relevant" historians have done with connecting

17  students' "lived experiences" (especially "Latinx" Americans, Black Americans, Native American,

18  and Asian/Pacific Islander Americans) to the "lived experiences" of Marx, W.E.B. DuBois, Gandhi,

19  Mao, Fidel Castro, Che Guevara, etc.

20       93.    At Bakersfield College, this pedagogy has been used to connect Latino student with

21  the "lived experience" of Cesar Chavez and the MEChA movement, but without any critical

22  analysis as evident in the recent Jess Nieto Memorial Conference, held May 4-6, 2023. Activist

23  historians who have engaged in this type of pedagogy end up politicizing history and teaching

24  hagiography at best or engaged in hero worship that cover up serious flaws at worse. What one also

25  discovers lurking behind this sweet-sounding pedagogy (that is meant to make the social science

26  and history relevant and exciting for students, especially marginalized students) is a commitment to

27  a hard-left critique of capitalism. Cultural Affirming Pedagogy is also the method used in the Cesar

28  Chavez Leadership Certificate program that I have criticized. I made my criticisms of the Cesar

1   Chavez Leadership Certificate public in a written letter to the B.C. Curriculum Committee and on
2   The Renegade for Institute Facebook page. These Facebook posts were falsely attributed to
3   Professor Garrett, and Defendants claimed these posts were grounds to fire him. And they did. But I
4   don't wish to be an activist historian, advocate a leftist critique of capitalism, or lose sight of the
5   work of a social scientist, which is not to politicize history or teach hagiography, which is what
6   "cultural affirming pedagogy" leads to. There's a plethora of this methodology going on at
7   Bakersfield College, and I don't want to be a part of it. As such, I don't want to be investigated,
8   culled, and taken to the slaughterhouse on the basis of whether or not I teach, advocate, and
9   celebrate neo-Marxist "cultural affirming pedagogy" in praxis. I do not.

10          94.     I do not wish to "[c]ommit[] to a continuous cycle of self-growth and progress by
11   participating in DEI professional development and learning opportunities," *id.*, because I reject the
12   secular, religious nature of DEI ideology and view it, as Professor John McWhorter does, as "Woke
13   Religion." I have a religion and worship a triune God, and DEI isn't it. I don't want to be
14   investigated, culled, or taken to the slaughterhouse because I will not bend my knee to DEI as the
15   State of California and Bakersfield College has commanded me.

16          95.     I do not wish to "[p]rovide[] professional development and learning opportunities for
17   students, faculty, and staff to participate in and advance DEI and anti-racist strategies," *id.*, because
18   I reject the DEI and anti-racist ideology as neo-Marxist and racist. This is a thesis I ought to be able
19   to maintain and defend without being declared unworthy to teach and lead. I don't want to be
20   investigated, culled, and taken to the slaughterhouse because I consider all this theorizing about
21   anti-racism as intimately linked to Marxism and Critical Race Theories, which it is (*Theorizing*
22   *Anti-Racism: Linkages in Marxism and Critical Race Theories,* edited by Abigail B. Bakan and
23   Enakshi Dua).

24          96.     I do not wish to "[a]rticulate[] the connection of DEI and anti-racist efforts to the
25   institution's mission and the Vision for Success," *id.*, because I oppose DEI and anti-racist/racist
26   efforts. I don't want to be investigated, culled, and taken to the slaughterhouse for this conviction.

27          97.     I do not wish to "[r]ecruit[], hire[], and retain[] diverse faculty and staff from
28   minoritized communities and diverse backgrounds," *id.* at 6, because I believe we should recruit,

hire, and retain faculty and staff based on merit. I don't want to be investigated, culled, and taken to the slaughterhouse for believing in meritocracy, a concept that DEI/Critical Race Theory advocates and literature say is systemically racist (Kimberly Crenshaw, Neil Gotanda, Gary Peller, and Kendall Thomas).

98.     I do not wish to "[i]ntroduce[] new employees to the institution and system's focus on DEI and anti-racism and the expectations for their contribution," *id.*, because I oppose the focus on DEI and anti-racism ideology. I don't want to be investigated, culled, and taken to the slaughterhouse because I do not expect that anyone should affirm, advocate, celebrate, and now "contribute" to this focus.

99.     I do not wish to "[p]romote[] and contribute[] to a respectful, diverse, and equitable campus and work environment," *id.*, as Defendants understand these terms, though I always strive to be respectful of others, I value viewpoint diversity, and I endorse and affirm equal opportunity, not neo-Marxist style indoctrination. I don't want to be investigated, culled, and taken to the slaughterhouse for being perceived as "disrespectful" of my superiors and colleagues, and for wanting to debate DEI ideas and encourage students to challenge faculty who teach, and sometimes preach, DEI orthodoxy. Colleges and universities ought to be a marketplace where ideas compete with other ideas, not neo-Marxist indoctrination camps.

100.     Almost everything I teach violates the new DEIA requirements—not just by failing to advance the DEIA and anti-racist/racist ideology, but also by criticizing it. I fear that if I continue teaching my courses as I have designed them, I will surely be deemed "unsatisfactory" in my upcoming evaluations.

101.     In the upcoming semester, I am set to teach HISTORY B17A, a course on U.S. history from the colonial era through the Civil War. In this class, I require students evaluate two books by Mary Grabar: *Debunking Howard Zinn: Exposing the Fake History That Turned a Generation against America*, and *Debunking the 1619 Project: Exposing the Plan to Divide America*. Grabar's books are an assault on the DEI narrative of U.S. History. She debunks 1) the anti-Columbus narrative; 2) pan Indianism, the notion that all Native Americans share the same values of peace, harmony, respect for nature, and were proto-socialists (a thesis that I spend one-

1   third of the course undermining); 3) the idea that the Founding Fathers founded a nation in order to

2   engage in capitalist exploitation and racism; and 4) the claim that the Civil War wasn't about ending

3   slavery, but defending a capitalist empire and white economic interests. My course critiques Derrick

4   Bell's "interest convergent principle" which lies at the heart of how DEI/historian-activists analyze

5   U.S. History.

6   102.   Also in the upcoming semester, I will teach HISTORY B4A, a course on European

7   civilization from the dawn of civilization through the Reformation. In this class, I explain Greek and

8   Roman imperialism rather than frame territorial expansion and group conflicts as a morality tale of

9   good versus evil. I also explain that Greek homosexuality bears little resemblance to the modern

10  LGBTQ-movement's claims. I speak of the largely positive contributions of the ancient Israelites,

11  classical Greeks and Romans, and I contend that Roman Catholics built Western Civilization. I

12  introduce students to how the ancients practiced virtue ethics, were metaphysical Realists, and

13  explain why they accepted a correspondence theory of knowledge and Aristotelian logic, both of

14  which contributed to the rise of early modern science. I compare these ideas with modern DEI and

15  LGBTQ presuppositions, and point out that both worldviews cannot be right at the same time.

16  Finally, I discuss the fallacy that what is modern or contemporary must be truer than that which is

17  older and traditional.

18  103.   Also in the upcoming semester, I will teach HISTORY 15, "Middle East

19  Civilization." In this class, I require students evaluate two of the following three works: Raymond

20  Ibrahim's book, *Sword and Scimitar: Fourteen Centuries of Warfare Between Islam and the West*;

21  Rodney Stark's *God's Battalions: The Case for the Crusades*; and Douglas Murray's *The Strange*

22  *Death of Europe: Immigration, Identity, and Islam*. DEI advocates have censored Ibrahim, causing

23  the "postponement" of his address to The United States War College because of this book's anti-

24  DEI narrative about jihad and Islam and how DEI advocates want Cultural Affirming Pedagogy to

25  work.

26  104.   Paige Atkinson, a writer for *Kern Sol News*, a youth-led media outlet with strong ties

27  to the DEI activists at Bakersfield College, said I should be fired for recommending Stark's books

28  and that the kind of hate perpetuated in the books I assign was responsible for the mass shooting

and murder of Muslims in New Zealand. Murray has been called a racist by the DEI crowd in England and America for his moderate-conservative explanations and concerns over Middle East immigration into Europe.

105. In the Spring semester, 2024, I will teach courses on modern U.S. History, covering the post-Civil War period to the present; and modern European Civilization, from post-Reformation to the present. Similar DEI problems arise for me in these courses in light of the new DEI mandates and prohibitions. The material I will use, my pedagogy, and the views I will teach are utterly contrary to the DEIA dictates of the California Code of Regulations and the Chancellor's DEIA competency standards. If I teach my classes as I normally would and always have, I will not be "demonstrating" or "progressing" toward compliance with the new DEI standards.

106. In sum, and in all due respect, Defendants' commitment to implementing DEI criteria does not respect my academic freedoms. Their actions deprive me of both scholarly autonomy as well as the freedom to dissent from prevailing consensus on issues of public concern. I am truly in fear of being "culled" and "taken to the slaughterhouse"—meaning if I don't conform, I will be culled and taken to the slaughterhouse, i.e., investigated, deemed unfit, and fired like Professor Matthew Garrett. The State of California, the President, Bakersfield College, and the Chancellor's Office have made it clear: I cannot "teach, work, or lead" if I don't advocate and celebrate DEI mandates. I will lose my job if I do not refrain from 1) expressing my viewpoints in Facebook posts and media interviews, 2) writing op-ed articles, 3) speaking at EODAC meetings, 4) filing discrimination grievances against any of the Defendants, 5) listening to others to express their minority viewpoints to me, 6) hosting speakers for RIFL events, 7) submitting public comment that opposes Bakersfield College's actions by criticizing Bakersfield College's DEI policies and practices as neo-Marxist indoctrination and the long march of cultural Marxism through my educational institution, and 8) altering my curriculum, teaching methods, and conscience to their beliefs.

107. Given how the school has dealt with dissent and viewpoint diversity, reason dictates that I should fear official retribution, poor evaluations, discipline and termination since it will be hard for me to affirm and promote their DEI and anti-racist/racist ideology, including in my

1  teaching, as required by Title V and by Defendants' customs, policies and practices implementing

2  its requirements and the California Community Colleges Chancellor's guidance.

3     I declare under penalty of perjury that the foregoing is true and correct.

4     Executed on July 13, 2023.

6  _____
   Daymon Johnson