Institute for Free Speech
Alan Gura, SBN 178221
       agura@ifs.org
Courtney Corbello, admitted pro hac vice+
       ccorbello@ifs.org
1150 Connecticut Avenue, N.W., Suite 801
Washington, DC 20036
Phone: 202.967.0007
Fax:    202.301.3399
+Admitted in Texas. Practice supervised by
D.C. Bar members, D.C. App. R. 49(c)(8)

Attorneys for Plaintiff Daymon Johnson

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

DAYMON JOHNSON,

      *Plaintiff,*

    v.

STEVE WATKIN, et al.,

      *Defendants.*

Case No. 1:23-cv-00848-CDB

Memorandum of Points and Authorities in Support of
Plaintiff's Motion for Preliminary Injunction

TABLE OF CONTENTS

Table of Authorities ........................................................................................................ iii

Local Rule 231(d)(3) Information ...................................................................................... 1

Introduction ...................................................................................................................... 1

Statement of Facts ............................................................................................................ 2

Argument ......................................................................................................................... 12

    I.     Defendants cannot compel Professor Johnson to conform his
         speech on matters of public concern, or his academic speech,
         to their political dogmas ..................................................................................... 12

        A.  Defendants cannot punish Johnson for expressing his
            political and social views ............................................................................ 13

        B.  Defendants' "civility" policy is vague ......................................................... 16

        C.  Defendants cannot compel Professor Johnson to think
            and speak in accordance with their preferred ideology ................................ 17

    II.    Johnson will suffer irreparable harm in the absence of injunctive relief ................... 18

    III.   The balance of equities and the public interest favor Johnson ................................. 19

    IV.   This Court should forego the bond requirement ...................................................... 19

Conclusion ....................................................................................................................... 20

TABLE OF AUTHORITIES

<u>Cases</u>

*303 Creative LLC v. Elenis*,
No. 21-476, 2023 U.S. LEXIS 2794 (June 30, 2023) ................................................ 13, 17

*Assoc. Press v. Otter*,
682 F.3d 821 (9th Cir. 2012) ........................................................................................ 19

*Ariz. Dream Act Coal. v. Brewer*,
855 F.3d 957 (9th Cir. 2017). ....................................................................................... 19

*Baca v. Moreno*,
936 F. Supp. 719 (C.D. Cal. 1996) ............................................................................... 19

*Boardman v. Inslee*,
978 F.3d 1092 (9th Cir. 2020) ...................................................................................... 18

*Borough of Duryea v. Guarnieri*,
564 U.S. 379 (2011) ...................................................................................................... 13

*BSA v. Dale*,
530 U.S. 640 (2000) ...................................................................................................... 13

*CTIA - The Wireless Ass'n v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019) .................................................................................. 18, 19

*Demers v. Austin*,
746 F.3d 402 (9th Cir. 2014) ............................................................................ 13, 14, 15

*Doe v. Trump*,
984 F.3d 848 (9th Cir. 2020) ........................................................................................ 12

*East Bay Sanctuary Covenant v. Garland*,
994 F.3d 962 (9th Cir. 2021) ........................................................................................ 12

*Elrod v. Burns*,
427 U.S. 347 (1976) ...................................................................................................... 19

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ...................................................................................................... 13

*Garrett v. Hine*,
No. 1:21-cv-00845 (E.D. Cal. 2021) .............................................................................. 7

*Gay Lesbian Bisexual All. v. Pryor*,
110 F.3d 1543 (11th Cir. 1997) .................................................................................... 15

*Green v. Miss USA, LLC*,
52 F.4th 773 (9th Cir. 2022) ......................................................................................... 12

*Hernandez v. City of Phx.*,
43 F.4th 966 (9th Cir. 2022) .................................................................................. 14, 16

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) ........................................................................................ 19

*Janus v. AFSCME, Council 31,*
    138 S. Ct. 2448 (2018) ............................................................................................... 13, 18

*Johnson v. Couturier,*
    572 F.3d 1067 (9th Cir. 2009) ........................................................................................ 19

*Keyishian v. Bd. of Regents,*
    385 U.S. 589 (1967) ........................................................................................................ 15

*Koontz v. St. Johns River Water Mgmt. Dist.,*
    570 U.S. 595 (2013) ........................................................................................................ 17

*Lane v. Franks,*
    573 U.S. 228 (2014) ........................................................................................................ 13

*Minnesota Voters All. v. Mansky,*
    138 S. Ct. 1876 (2018) .................................................................................................... 15

*Rodriguez v. Maricopa Cnty. Cmty. College Dist.,*
    605 F.3d 703 (9th Cir. 2009) .......................................................................................... 15

*Rodriguez v. Robbins,*
    715 F.3d 1127 (9th Cir. 2013) ........................................................................................ 19

*Short v. Brown,*
    893 F.3d 671 (9th Cir. 2018) .......................................................................................... 12

*Speech First, Inc. v. Cartwright,*
    32 F.4th 1110 (11th Cir. 2022) ....................................................................................... 15

*Sweezy v. New Hampshire,*
    354 U.S. 234 (1957) ........................................................................................................ 15

*Tex. v. Johnson,*
    491 U.S. 397 (1989) ........................................................................................................ 14

*TGP Communs., LLC v. Sellers,*
    No. 22-16826, 2022 U.S. App. LEXIS 33641 (9th Cir. Dec. 5, 2022) ................................... 14, 15

*W. Va. State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943) ........................................................................................................ 12

*Waln v. Dysart Sch. Dist.,*
    54 F.4th 1152 (9th Cir. 2022) ................................................................................... 13, 14

*Wooley v. Maynard,*
    430 U.S. 705 (1977) ........................................................................................................ 17

Statutes

Cal. Code Regs. tit. 5, § 51200 .......................................................................................... 3, 18

Cal. Code Regs. tit. 5, § 51201 ....................................................................................... 4, 5, 18

Cal. Code Regs. tit. 5, § 51201(a) .......................................................................................... 2

Cal. Code Regs. tit. 5, § 51201(b) ...................................................................................... 3, 5

Cal. Code Regs. tit. 5, § 51201(c) ........................................................................................ 3

Cal. Code Regs. tit. 5, § 53425 ...................................................................................... 3, 18

Cal. Code Regs. tit. 5, § 53601 ............................................................................................ 18

Cal. Code Regs. tit. 5, § 53601(a) ......................................................................................... 3

Cal. Code Regs. tit. 5, § 53601(b) ......................................................................................... 3

Cal. Code Regs. tit. 5, § 53602 ............................................................................................ 18

Cal. Code Regs. tit. 5, § 53602(b) ......................................................................................... 3

Cal. Code Regs. tit. 5, § 53602(c) ......................................................................................... 4

Cal. Code Regs. tit. 5, § 53605 ............................................................................................ 18

Cal. Code Regs. tit. 5, § 53605(a) ......................................................................................... 4

Cal. Educ. Code § 87732 ............................................................................................... 2, 13

Cal. Educ. Code § 87732(a) ............................................................................................ 2, 9

Cal. Educ. Code § 87732(b) ............................................................................................ 2, 9

Cal. Educ. Code § 87732(c) ............................................................................................ 2, 9

Cal. Educ. Code § 87732(d) ............................................................................................ 2, 9

Cal. Educ. Code § 87732(f) ............................................................................................ 2, 9

Cal. Educ. Code § 87734 .................................................................................................... 2

Cal. Educ. Code § 87735 ......................................................................................... 2, 9, 13

Rules

Fed. R. Civ. P. 65 ............................................................................................................. 19

E.D. Cal. R. 231 ................................................................................................................. 1

KCCD Board Policy 3050 ...................................................................................... 2, 15, 16, 17

KCCD Board Policy 7360 ................................................................................................... 2

Other Authorities

Bakersfield College,
    Equal Opportunity & Diversity Advisory Committee, https://perma.cc/BWR6-2U79 .............. 4, 5

December 2022 Board of Trustees Meeting (12/13/2022),
    YouTube, https://perma.cc/L7JY-4HJR ......................................................................... 5

Diversity, Equity and Inclusion Glossary of Terms,
    California Community Colleges Chancellor's Office, https://perma.cc/T22V-V866 ................... 3

Education Law of the People's Republic of China,
   ch. 1, art. 3 (Sept. 1, 1995), https://perma.cc/8GHT-B45L ........................................................ 14

LOCAL RULE 231(D)(3) INFORMATION

Plaintiff does not intend to present oral testimony at the preliminary injunction hearing, though he would be available to do so if needed. He anticipates the hearing will require approximately one hour of argument time.

INTRODUCTION

California's community college system maintains an official, operational political ideology. And Kern Community College District ("KCCD") officials expect faculty to conform their personal and academic speech to this ideology—or else. Minority viewpoints, especially those that dissent from state orthodoxy relating to concepts of diversity, equality, inclusion and accessibility (DEIA), have no place at Bakersfield College. Their expression, per Defendants, qualifies as professional incompetence warranting termination under California's Education Code and KCCD policy. Accordingly, Defendants have already terminated one professor for advancing unauthorized views by writing a newspaper op-ed, posting on Facebook, giving an interview to a radio station, failing to censor others' social media posts, and criticizing the school's policies. So insulated from ideological challenge are KCCD trustees that at their public board meeting, the board's vice president felt comfortable comparing dissenting faculty to defective cattle that must be "culled" by those in power, who would "put a rope on some of them and take them to the slaughterhouse."

This type of language, familiar coming from regimes that demand total ideological conformity, cannot rule a government-run college in the United States. But Defendants have already investigated Professor Daymon Johnson for a political Facebook post, and he remains in their line of fire as Faculty Lead of a dissident professors' group—a position Johnson holds because Defendants fired his predecessor due to his political expression, including his failure to censor Johnson's speech. And now, the law makes clear that Defendants will evaluate Johnson's performance based on the degree to which he advances their political ideology, which he is now required not only to teach, but to commit to personally.

Defendants' enforcement of ideological conformity constrains Johnson to self-censor. He refrains from writing op-eds, throttles his social media use, refuses media interviews, avoids committee meetings, and has withheld speaking invitations. Moreover, Professor Johnson's

1   upcoming classes guarantee that he will fail the new political litmus test, as his teaching questions

2   rather than advances the state's mandatory political narrative. Johnson is entitled to an injunction

3   barring Defendants from treating his political speech as a manifestation of professional

4   incompetence. He is also entitled to relief from Defendants' requirements that he teach, promote,

5   and subscribe to the state's official political ideology.

6                                   STATEMENT OF FACTS

7                                   *The regulatory regime*

8          California Education Code § 87732 provides that "[n]o regular employee or academic

9   employee shall be dismissed except for one or more of the following causes: (a) Immoral or

10  unprofessional conduct; (b) Dishonesty; (c) Unsatisfactory performance; (d) Evident unfitness for

11  service; . . . (f) Persistent violation of, or refusal to obey, the school laws of the state or reasonable

12  regulations prescribed for the government of the community colleges by the board of governors or

13  by the governing board of the community college district employing him or her."

14         A community college district's governing board may terminate an employee for

15  "unprofessional conduct" or "unsatisfactory performance" upon 90 days' notice, if the employee

16  does not reform his or her alleged deficiencies. Cal. Educ. Code § 87734. It may also immediately

17  suspend and terminate an employee within 30 days, unless the employee requests a hearing, upon its

18  receipt or formulation of charges alleging "immoral conduct" or "willful refusal to perform regular

19  assignments without reasonable cause, as prescribed by reasonable rules and regulations of the

20  employing district." Cal. Educ. Code § 87735. The KCCD trustees will not penalize or dismiss an

21  employee absent the Chancellor's recommendation. *See* KCCD Board Policy 7360.

22         KCCD Board Policy 3050 ("BP 3050") "requires that [faculty] conduct [them]selves with

23  civility in all circumstances of [their] professional lives." KCCD "encourages" free expression, but

24  "expect[s] all expressions of content to be conducted in a manner respectful of persons." BP 3050

25  also claims that KCCD "do[es] not participate in or accept, condone, or tolerate physical or verbal

26  forms of aggression, threat, harassment, ridicule, or intimidation." These terms are undefined.

27         California's community college system, of which the Kern Community College District is a

28  constituent part, "embrace[s] diversity." Cal. Code Regs. tit. 5, § 51201(a). This commitment

1  "guide[s] the administration of all programs in the California Community Colleges, consistent with

2  all applicable state and federal laws and regulations." *Id.* § 51200. "Embracing diversity means that

3  *we must intentionally practice* acceptance, *anti-racism*, and respect towards one another and

4  understand that racism, discrimination, and prejudices create and sustain privileges for some while

5  creating and sustaining disadvantages for others." *Id.* § 51201(b) (emphasis added). An "anti-racist"

6  is defined as one who "understand[s] that racism is pervasive and has been embedded into all

7  societal structures." *Diversity, Equity and Inclusion Glossary of Terms*, California Community

8  Colleges Chancellor's Office, https://perma.cc/T22V-V866 at 1 (last visited July 12, 2023). Anti-

9  racists "challenge the values, structures, policies, and behaviors that perpetuate systemic racism"

10 and are "also willing to admit the times in which they have been racist." *Id.* "Practicing antiracism

11 requires constantly identifying, challenging, and upending existing racist policies to replace them

12 with antiracist policies that foster equity between racial groups." *Id.* Moreover, "embracing

13 diversity" requires "acknowledg[ment] that institutional racism, discrimination, and biases exist,"

14 and a commitment to "eradicat[ing] these from our system," to "strive to eliminate those barriers to

15 equity." Cal. Code Regs. tit. 5, § 51201(c). It requires "that we act deliberately to create a safe,

16 inclusive, and anti-racist environment . . . ." *Id.*

17      "District employees must have or establish proficiency in DEIA-related [diversity, equity,

18 inclusion, accessibility] performance to teach, work, or lead within California community colleges."

19 Cal. Code of Regs. tit. 5, § 53602(b). Faculty must comply with local DEIA policies to maintain

20 employment. *Id.* § 53425. The California Community Colleges Chancellor "shall adopt and publish

21 guidance describing DEIA competencies and criteria," *id.* § 53601(a), which "shall be used as a

22 reference for locally developed minimum standards in community college district performance

23 evaluations of employees and faculty tenure reviews." *Id.* § 53601(b). "To advance DEIA principles

24 in community college employment, districts shall: (1) include DEIA competencies and criteria as a

25 minimum standard for evaluating the performance of all employees; (2) ensure that evaluators have

26 a consistent understanding of how to evaluate employees on DEIA competencies and criteria; (3)

27 set clear expectations regarding employee performance related to DEIA principles . . . (4) place

28 significant emphasis on DEIA competencies in employee evaluation and tenure review processes,"

1  and "(6) ensure an evaluation process that provides employees an opportunity to demonstrate their

2  understanding of DEIA and anti-racist competencies." *Id.* § 53602(c).

3          The Chancellor's DEIA guidance and criteria comprehensively call for faculty to

4  acknowledge, understand, and apply the state's political ideology; engage in self-reflection and self-

5  assessment of their own personal commitment to the ideology; commit themselves to "continuous

6  improvement" of their "DEI and anti-racism knowledge, skills, and behaviors;" promote and

7  incorporate DEI and anti-racist pedagogy; analyze data to find support for the ideology; articulate

8  the importance of the state's ideology; engage in "service" on behalf of the ideology, including by

9  leading "DEI and anti-racist efforts by participating in DEI groups, committees, or community

10  activities;" develop curriculum and pedagogy that promote the ideology; participate in professional

11  development along ideological lines; and instruct new employees on the "expectations for their

12  contribution" to the state's DEI and anti-racist ideology. *See* Exh. A.

13          "Faculty members shall employ teaching, learning, and professional practices that reflect

14  DEIA and anti-racist principles, and in particular, respect for, and acknowledgement of the diverse

15  backgrounds of students and colleagues to improve equitable student outcomes and course

16  completion." Cal. Code Regs. tit. 5, § 53605(a).

17                          *The ideological divide at Bakersfield College*

18          Bakersfield College history professor Daymon Johnson serves as the Faculty Lead for the

19  Renegade Institute for Liberty (RIFL), of which he is a founding member. Johnson Decl. ¶¶ 1, 2.

20  RIFL is a sanctioned Bakersfield College organization consisting of faculty members dedicated to

21  the pursuit of free speech, open inquiry and critical thinking. RIFL represents a minority position on

22  campus standing in general opposition to political viewpoints espoused by many faculty members

23  and members of the school administration, which is aligned with Section 51201's mandate to

24  "embrace diversity" by, among things, "intentionally practic[ing] . . . anti-racism." *Id.* ¶ 2.

25          Defendants make clear their ideological orientation and seek to impose it on faculty. The

26  "primary purpose" of Bakersfield College's Equal Opportunity and Diversity Advisory Committee

27  (EODAC) "is to actively assist/facilitate" the school's "cultural and institutional policies and

28  practices that demonstrate a commitment to greater diversity and inclusion." Bakersfield College,

1  Equal Opportunity & Diversity Advisory Committee, https://perma.cc/BWR6-2U79 (last visited

2  July 12, 2023). EODAC's website provides, "Section 51201 provides us with direction on diversity,

3  equity and inclusion," and recites Section 51201(b)'s mandatory language. *Id.*

4        On December 8, 2022, then-Bakersfield College President Zav Dadabhoy emailed

5  employees what began as a holiday greeting, but which quickly devolved into a political declaration

6  attacking RIFL. Johnson Decl. ¶¶ 6, 7; Exh. C. Referencing RIFL, Dadabhoy decried "a small

7  group promoting exclusion," which he blamed for unspecified "attacks" on "members of BC's

8  communities of color, and LGBTQ community," but explained that such exclusion "is not a value

9  of this institution." Exh. C. He then declared that Cal. Code Regs. tit. 5, § 51201 "provides us with

10 direction on diversity, equity and inclusion," and in particular, "[w]hat really resonates with me is

11 subsection (b)," which he proceeded to quote in full. *Id.* Dadabhoy then added, "We must not allow

12 the discontent or views of a few to supersede *what we are required* to provide at our college and the

13 work that we have *intentionally developed* to support all members of the community. This is

14 reminder that *we are all tasked with this work.*" *Id.* (emphasis added). Johnson understood the

15 "attacks" to reference RIFL faculty's political speech, and Dadabhoy's exhortation to follow

16 Section 51201 as an instruction to curtail his own non-compliant, dissenting speech and instead

17 speak more consistently with anti-racism ideology. Johnson Decl. ¶ 9.

18       At a December 12, 2022, KCCD Board of Trustees' meeting, Defendant Corkins termed

19 RIFL faculty's minority political views "abusive," declaring that RIFL faculty are "in that five

20 percent that we have to continue to cull. Got them in my livestock operation and that's why we put

21 a rope on some of them and take them to the slaughterhouse. That's a fact of life with human nature

22 and so forth, and I don't know how to say it any clearer." *December 2022 Board of Trustees*

23 *Meeting (12/13/2022)*, YouTube, https://perma.cc/L7JY-4HJR (last visited July 12, 2023). "I don't

24 think we're that way, if we are we've got to get the bad actors out of the room. It just bothers me

25 when the bad actors are paid staff and faculty and if that's where it is we really got a problem." *Id.*;

26 Johnson Decl. ¶ 10. None of the other Defendant trustees disavowed Corkins' call to take RIFL

27 members to the "slaughterhouse." Defendant Nan Gomez-Heitzeberg chuckled at the suggestion. *Id.*

28

¶ 11. Johnson recognized the explicit threat against him if he continued to express political viewpoints that did not comport with the majority DEI ideologies on campus. *Id*. ¶ 12.

Bakersfield College has adopted a requirement that faculty who wish to serve on committees that screen potential new hires must complete a training session to assure that their committee service would comply with the school's DEIA policies. *Id.* ¶¶ 13, 14; Exh. D.

*Bakersfield College investigates and threatens Professor Johnson*
*for disagreeing with a colleague on Facebook*

On August 22, 2019, Bakersfield College Professor Andrew Bond posted on his personal Facebook page, "Maybe Trump's comment about shithole countries was a statement of projection because honestly, the US is a fucking piece of shit nation. Go ahead and quote me, conservatives. This country has yet to live up to the ideals of its founding documents." Exh. E at 2; Johnson Decl. ¶ 15.

In May 2021, Professor Johnson reposted Bond's post on RIFL's Facebook page, and added, "Here's what one critical race theorists at BC sounds like. Do you agree with this radical SJW from BC's English Department? Thoughts?" Exh. E at 2; Johnson Decl. ¶ 16. Bond filed an administrative complaint against Johnson for harassment and bullying over the Facebook post and commentary. *Id.* ¶ 17. But rather than dismiss Bond's complaint out of hand, Dadabhoy subjected Johnson to an investigation that necessitated Johnson's retention of counsel. *See* Exh. E; Johnson Decl. ¶ 19. Finally, on February 23, 2022, five months after Bond's complaint, Dadabhoy sent Johnson KCCD's administrative determination that his conduct presented no cause for discipline. Exh. E at 9; Johnson Decl. ¶ 20. In doing so, however, the district saw fit to pass judgment on each of 29 separate allegations raised in the dispute, including that another professor "liked" a negative comment about Bond (allegation 2, sustained), that Johnson's posting doxed Bond (allegation 3, "not sustained but plausible"), and that "Professor Bond was offended that Professor Johnson described his personal views incorrectly. Professor Johnson admitted he would also be offended in a similar situation" (allegation 14, sustained). Exh. E; Johnson Decl. ¶ 20.

Although the inquiry "revealed no evidence that Dr. Johnson took any of these actions in his role as a [KCCD] employee," Exh. E at 8, KCCD warned it "will investigate any further complaints

of harassment and bullying and, if applicable, will take appropriate remedial action including but not limited to any discipline determined to be appropriate.*" Id.* at 9; Johnson Decl. ¶ 21.

*Bakersfield College punishes professors for speaking*

Bakersfield College determined that a public lecture given by then-RIFL Faculty Lead Professor Matthew Garrett entitled "The Tale of Two Protests: Free Speech and the Intellectual Origins of BC Campus Censorship," at which Professor Erin Miller introduced him, constituted "unprofessional conduct." When the school threatened the professors with further discipline, Garrett and Miller sued school officials for violating their First Amendment rights. Johnson Decl. ¶ 22; *Garrett v. Hine*, No. 1:21-cv-00845 (E.D. Cal. 2021).

Subsequently, Defendant McCrow charged Garrett with "unprofessional conduct," and advised that Garrett could be charged with "unsatisfactory performance" and violation of BP 3050. Johnson Decl. ¶ 23; Exh. F. Garrett's transgressions included:

- Authoring an op-ed piece in the *Bakersfield Californian* that "disregarded the impact of [an] attack" consisting of the posting of political stickers, "took issue with BC's characterization of the stickers as 'hate speech' and 'vandalism,'" "suggested that their content was protected by the First Amendment," and even "went further to suggest that certain terms like 'Cultural Marxism' weren't 'hate speech' but instead speech that challenges a dominant agenda on campus, i.e. the social justice movement," Exh. F at 1;

- Opining that the EODAC committee "has been consistently staffed by the administration with faculty who hold one particular point of view," *id*. at 2, ¶ 4c, and criticizing the committee chair's conduct at a meeting, *id*. at 2-3, ¶ 5;

- Providing a public comment on the Bakersfield College's Curriculum Committee proposal of two history courses stating, in opposition, that the courses were the equivalent of a "high school field trip" and "openly partisan training for children," *id*. at 3, ¶ 6;

- Causing "very real harm" to students based on three student allegations: first, an unexplained assertion that Garrett was a racist who would fail students based on their skin color; second, the fact that a different professor whispered something in Garrett's ear; and third, that Garrett allegedly "insult[ed] [another professor] and her way of teaching," which purportedly made the student feel unsafe, *id*. at 4-5, ¶ 11;

- Expressing opinions on a local radio show including that "sociology, ethnic studies, [and] anthropology are producing bad information and poor narratives grounded in history;" that diversity trainings are just ways to figure out how to legally discriminate; and "[c]laim[ing] that Bakersfield College staff are trying to quiet [Garrett]," *id*. at 5, ¶ 12;

- "[R]epeatedly fail[ing], as the Faculty Lead for the Renegade Institute for Liberty, to restrict" criticism of KCCD and faculty "on RIFL's social media" that McCrow alleged to be "baseless," *id*. at 6, ¶ 13; and

- Using his social media account to express critical opinions of the school and faculty, including statements such as, "'[a]s a public institution their financials should be open to public criticism,'" *id*. ¶ 14.

McCrow added, "Importantly, you caused students to feel unwelcome and unsafe by belittling the community's valid concerns." *Id*. at 7. Johnson understands that "invalid views," or criticism of views that "the community" deems "valid," are punishable. Johnson Decl. ¶ 24.

McCrow stressed that Garrett's speech harmed the school's reputation, and that Garrett should not have expressed his concerns about the school publicly. Exh. F at 7. He asserted that Garrett's speech dissuaded others from committee work and risked causing disapproval of proposed curriculum. McCrow commanded Garrett, apparently with respect to his public political and ideological speech, "You will not substitute your own judgment for the judgment of your supervisor or other administrators," and directed Garrett to refrain from publicly airing his grievances and complaints. *Id*. at 8. Finally, McCrow also removed Professor Garrett from the Equal Opportunity and Diversity Advisory Committee. *Id*. Upon receiving McCrow's letter, Garrett resigned as RIFL Faculty Lead. Johnson succeeded him in that position, and on the committee. Johnson Decl. ¶ 25.

On April 11, 2023, Dadabhoy formally recommended to Defendant Trustees, with the concurrence of Defendant Chancellor Burke's predecessor, Defendant Christian, that they terminate Garrett's employment. Two days later, Defendant Trustees found cause for Garrett's termination as set out by the President and Chancellor and fired Professor Garrett. The "Statement of Charges and Recommendation for Statement of Decision to Terminate" upon which Defendants fired Garrett recounted McCrow's allegations, and declared that Garrett failed to follow that notice's directives to cure his allegedly deficient job performance by:

- "[D]eliberately mischaracterizing a Bakersfield College student housing initiative as 'not student dorms' and as 'low income housing,'" and by "print[ing] and distribut[ing] a flyer" criticizing the project "as threatening the neighborhood with loud parties, safety issues, crime, crowded daily parking issues, overflow of parking for events, and decrease in property values." Exh. G at 13, ¶ 8 (internal punctuation omitted);

- Alleging that KCCD failed to explain why his conduct was unprofessional, *id*. 14 ¶ 9, and sending McCrow a request for clarification that was not "made in good faith," *id*. ¶ 10;

- Providing an interview for *Fox News Digital* in which he criticized Bakersfield College's "affirmative action-type behavior"—"allegations [that] demeaned, demoralized, and disrespected the College's employees and its students;" and "[p]rompting," merely by virtue of being interviewed, third-party comments on social media that were critical of Bakersfield College and its students, *id*. ¶ 11a;

- Linking to his *Fox News Digital* interview on the RIFL Facebook page, and "continu[ing] to permit the RIFL Facebook page to post" criticism of the school and its faculty, which the President and Chancellor asserted were "false and baseless attacks," *id*. at 15, ¶ 11b;

- Emailing a Daily Wire article about the school to another person, *id*. at ¶ 11c, and sharing the article on his social media, *id*. at ¶ 11e;

- Criticizing a faculty member for inciting students against him in an interview with *Inside Higher Ed*, *id*. at 15, ¶ 11d; and

- Engaging in "ongoing public attacks [that] demonstrate[d] Garrett's continued refusal to engage in civil, honest discourse or to direct complaints to the appropriate college administrator as directed by the 90-day notice," *id*. at 16.

Defendants charged Garrett with other offenses consisting of political speech, including the publication of an open letter criticizing Defendant Trustees, *id*. at 17, ¶ 14e; criticizing other professors on Facebook for excessive claims of racism, sexism, and classism, *id*. at 19, ¶ 19; linking to a *Just the News* article critical of the school on RIFL's Facebook page, *id*. ¶ 20; and "accus[ing]" KCCD "of financial mismanagement," *id*. ¶ 21.

Defendants alleged that Garrett's speech amounted to immoral or unprofessional conduct per Cal. Educ. Code §§ 87732(a), 87735; dishonesty, *id*. § 87732(b); unsatisfactory performance, *id*. § 87732(c); evident unfitness for service, *id*. § 87732(d); persistent violation of, or refusal to obey, the school laws of the state or reasonable community college regulations, *id*. § 87732(f); and willful refusal to perform regular assignments without reasonable cause, as prescribed by reasonable rules and regulations of the employing district, *id*. § 87735. Exh. G at 17.

*Defendants' adoption and enforcement of an official ideology chills*
*Professor Johnson's speech, and compels him to speak contrary to his conscience*

Considering his experience of being investigated by Defendants over his Facebook posts, Defendants' adoption of an official political ideology that he rejects, Defendants' exhortations that their ideology must be affirmed and followed, Defendants' application of the termination standards to disfavored speech, and Johnson's responsibility for some of the speech for which Professor Garrett was fired, Professor Johnson refrains from expressing his political views and from freely participating in the intellectual life of the college for fear that Defendants would investigate and discipline him, and terminate his employment based on his viewpoints. Johnson Decl. ¶ 29.

1    Johnson's conscience does not allow him to believe in and practice the state's "embracing

2    diversity" ideology. He does not believe that racism is pervasive and embedded into all societal

3    structures—particularly at Bakersfield College—and thus he does not wish to challenge the values,

4    structures, policies, and behaviors that, according to others, allegedly perpetuate systemic racism.

5    Johnson does not believe he is racist, and he does not wish to constantly identify, challenge, upend,

6    and replace existing policies. Professor Johnson not only disagrees with the ideology Defendants

7    require him to affirm, but Johnson also believes that his political viewpoints, which he would like to

8    express, are inconsistent with and even defiant of that ideology. Johnson Decl. ¶¶ 37, 38.

9    Johnson identifies generally with the viewpoints espoused by RIFL, and shares many of

10   Garrett's conservative political views and social values the expression of which Defendants censor

11   and punish. *Id*. ¶ 39. For example, Johnson posted 15 of the 18 RIFL Facebook posts that reference

12   the phrase "cultural Marxism," a term which Garrett was fired for defending. Johnson, like Garrett,

13   does not agree with Bakersfield College's apparent definition of what constitutes "hate speech" and

14   believes that what is often considered "hate speech" by some is nonetheless speech protected by the

15   First Amendment. *Id*. But Johnson now refrains from mentioning "Cultural Marxism." *Id*. ¶ 40. He

16   canceled a speech addressing the topic, and refrains from recommending books that discuss the

17   subject. *Id*. ¶¶ 41, 42. Indeed, mindful of Garrett's experience, Johnson refrains from inviting

18   speakers on behalf of RIFL, as they would explore similar views. *Id*. ¶ 43.

19   Johnson's speech is also chilled by the fact that Garrett was disciplined for filing an ethics

20   complaint about Defendant McCrow, in circumstances that Johnson, too, would have complained.

21   *Id*. ¶¶ 44, 45. And Johnson refrains from speaking further about his department's curriculum

22   considering Defendants fired Garrett for opposing proposed history courses, and Johnson likewise

23   commented about the same courses to the same committee. *Id*. ¶ 46.

24   Johnson refrains from offering any potentially controversial political views on social media,

25   owing to Defendants' behavior. *Id*. ¶ 53. He opposes censorship, but mindful that Garrett was fired

26   for not censoring comments on RIFL's Facebook page, Johnson deleted posts that he believed

27   Defendants would find objectionable and turned over the page's management to two retired

28   professors. *Id*. ¶¶ 47, 53. Nonetheless, another professor has now filed a complaint against Johnson

over commentary that others posted on RIFL's Facebook page. *Id.* ¶¶ 49-50. Given his experience being investigated by Defendants over Bond's complaint, Johnson understands that any of his critics can trigger investigations and potential discipline over his social media use. *Id.* ¶ 52. Indeed, Johnson authored and was responsible for some of the Facebook posts that Defendants attributed to Garrett and used to justify his termination. *Id.* ¶ 51.

Defendants' citation of Garrett's media appearances as cause for his discipline and termination have also prompted Johnson to turn down invitations to speak to the same media outlets. *Id.* ¶¶ 54-55. Johnson has also stopped attending committee meetings where he would share his views on race, diversity, equity, and inclusion, considering that Garrett was fired for just listening to another professor's comment to him while sitting on that committee. *Id.* ¶¶ 56-57. Johnson also refrains from offering conservative views about LGBTQ issues, as Defendants and various progressive professors have linked these topics to DEI. *Id.* ¶ 59.

Johnson has previously served on numerous screening committees for new hires, and wishes to continue doing so, but he refrains from taking the DEIA training now required to continue such service and will not apply to serve on screening committees because he does not wish to promote DEIA ideology, and will not evaluate faculty based on their DEIA adherence or instruct them on DEIA compliance. *Id.* ¶ 61.

Bakersfield College evaluates Johnson's performance every three years. An unsatisfactory evaluation will lead to remediation and potentially termination. Johnson has just successfully completed an evaluation period and intends to keep working as a professor at Bakersfield College, so his performance moving forward will be evaluated under the new DEIA standards and rules. *Id*. ¶ 62. The DEIA requirements chill his speech, including his academic freedom in the classroom and as the Faculty Lead of RIFL, and compel him to affirm, promote, and celebrate a political ideology that he rejects and even finds abhorrent. *Id.* ¶¶ 63-67. Johnson cannot meet the standards set out in the Chancellor's "Competencies and Criteria," which will guide KCCD's evaluation of his teaching, without expressing beliefs and viewpoints that he rejects and without stifling his own viewpoints on political and social topics. *Id.* ¶ 71. As detailed in his declaration, *id.* ¶¶ 72-99, Johnson is

1  profoundly opposed to the ideology that Defendants would have him promote rather than criticize,

2  as he is dissuaded from doing for fear of official retribution and loss of employment.

3      Almost everything Johnson teaches violates the new DEIA requirements—not just by failing

4  to advance the DEIA and "anti-racist" ideology, but also by criticizing it. Johnson fears that if he

5  continues teaching his courses as he has designed them, he will surely be deemed "unsatisfactory"

6  in his upcoming evaluations. *Id.* ¶ 100. Johnson is set to teach three courses in the upcoming

7  semester which challenge DEI historical narratives and present views incompatible with DEI. In

8  these courses, Johnson assigns books critical of DEI, written by authors who have been targeted by

9  DEI adherents. *Id.* ¶¶ 101-104. Indeed, one DEI sympathizer has already called for Johnson to be

10  fired for recommending and assigning books used in these courses. *Id.* ¶ 104. In the following

11  semester, Johnson will teach history courses that raise the same problems under Defendants'

12  ideological mandates. The material Johnson will use, his pedagogy, and the views he will teach are

13  utterly contrary to the state's DEIA and the Chancellor's DEIA competency standards. If Johnson

14  teaches his classes as he normally would and always has, he will not be "demonstrating" or

15  "progressing" toward compliance with the new DEI standards. *Id.* ¶ 105.

16                                  ARGUMENT

17      Johnson is entitled to a preliminary injunction because (1) he is likely to succeed on the

18  merits, (2) he will suffer irreparable harm absent preliminary relief, (3) the balance of equities tips

19  in his favor, and (4) an injunction is in the public interest. *Short v. Brown*, 893 F.3d 671, 675 (9th

20  Cir. 2018) (citation omitted). "When the government is a party, these last two factors merge." *East*

21  *Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 975 (9th Cir. 2021) (citations omitted). "[A]

22  stronger showing of one element may offset a weaker showing of another." *Doe v. Trump*, 984 F.3d

23  848, 870 (9th Cir. 2020) (internal quotation marks omitted).

24  I.   DEFENDANTS CANNOT COMPEL PROFESSOR JOHNSON TO CONFORM HIS SPEECH ON MATTERS
         OF PUBLIC CONCERN, OR HIS ACADEMIC SPEECH, TO THEIR POLITICAL DOGMAS.

25      Professor Johnson will win this case. "If there is any fixed star in our constitutional

26  constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics,

27  nationalism, religion, or other matters of opinion or force citizens to confess by word or act their

28  faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). "The framers

1 designed the Free Speech Clause of the First Amendment to protect the 'freedom to think as you

2 will and to speak as you think.'" *303 Creative LLC v. Elenis*, No. 21-476, 2023 U.S. LEXIS 2794,

3 at *19 (June 30, 2023) (quoting *BSA v. Dale*, 530 U.S. 640, 660-61 (2000)).

4       Defendants' demands that faculty adhere to and incorporate "DEIA" and "anti-racism"

5 ideology in their expression, thought, and teaching violates two cardinal First Amendment

6 principles—that the "government must abstain from regulating speech when the specific motivating

7 ideology or the opinion or perspective of the speaker is the rationale for the restriction," *Waln v.*

8 *Dysart Sch. Dist.*, 54 F.4th 1152, 1162 (9th Cir. 2022) (quoting *Rosenberger v. Record & Visitors of*

9 *Univ. of Virginia*, 515 U.S. 819, 829 (1995)), and that "'[c]ompelling individuals to mouth support

10 for views they find objectionable violates' core First Amendment protections," *Green v. Miss USA,*

11 *LLC*, 52 F.4th 773, 783 (9th Cir. 2022) (quoting *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448,

12 2463 (2018)). Defendants' civility policy is also impermissibly vague.

13       A.  Defendants cannot punish Johnson for expressing his political and social views.

14       No one questions that the state may fire college professors for "unprofessional conduct,"

15 "dishonesty," "unsatisfactory performance," and the like. Cal. Educ. Code §§ 87732, 87735. But the

16 First Amendment bars Defendants from applying these labels to the expression of conservative

17 political viewpoints, or dissent from the new "DEIA" dogma sweeping through various institutions

18 today (no matter how fashionable it may be in some circles). And although the state may fire

19 professors who refuse to follow the rules or do their jobs, *id.*, those rules, and those job descriptions,

20 cannot demand ideological conformity.

21       "[C]itizens do not surrender their First Amendment rights by accepting public employment."

22 *Lane v. Franks*, 573 U.S. 228, 231 (2014). "Just as the public has a right to hear the views of public

23 employees, the public has a right to the benefit of those employees' participation in petitioning

24 activity." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 397 (2011). And while the First

25 Amendment does not protect "statements made by public employees pursuant to their official

26 duties," *Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014) (internal quotation marks omitted)

27 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)), *Garcetti*'s rule denying First Amendment

28 protection for on-the-job speech "does not—indeed, consistent with the First Amendment, cannot—

apply to teaching and academic writing that are performed 'pursuant to the official duties' of a teacher and professor." *Demers*, 746 F.3d at 412.

Much of Johnson's speech at issue here—posting on Facebook, writing editorials, inviting and sponsoring speakers, and appearing in media—is speech Johnson would make in his personal capacity. Indeed, Defendants have already admitted that when Johnson posts on RIFL's Facebook page, he does not do so "in his role as a [KCCD] employee," Exh. E at 8; *cf. Hernandez v. City of Phx.*, 43 F.4th 966, 978 (9th Cir. 2022) ("publicly posting on social media suggests an intent to communicate to the public or to advance a political or social point of view beyond the employment context") (internal quotation marks omitted). To the extent that Johnson's speech here is that which he would make pursuant to his official duties as a professor, it either plainly relates to teaching and scholarship, *e.g.*, speech Johnson would make in the course of his hiring and EODAC committee service, or actually *is* teaching and scholarship.

To be sure, a university must make judgments about what is "both necessary and appropriate to teach." *Demers*, 746 F.3d at 411. State medical schools, for example, may decline to teach faith-healing. But having established a Department of History, Bakersfield College has no interest in ensuring that Johnson teach history through its official ideological lens or use its politically inspired pedagogy. Additionally, state schools may, if not must, ask their professors to refrain from demanding ideological, political, or religious conformity from their students, whose First Amendment rights the state must respect. Professors in mainland China might be required to conform their classroom speech to "Mao Zedong Thought," *see* Education Law of the People's Republic of China, ch. 1, art. 3 (Sept. 1, 1995), https://perma.cc/8GHT-B45L (last visited July 12, 2023), but the same constitutional rule that bars such mandates in California also bars Defendants' imposition of "DEIA thought."

 "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea offensive or disagreeable." *Tex. v. Johnson*, 491 U.S. 397, 414 (1989). "The Free Speech Clause generally prohibits suppressing speech 'because of its message.'" *Waln*, 54 F.4th at 1161 (quoting *Rosenberger*, 515 U.S. at 828-29). Content-based restrictions are subject to strict scrutiny. *TGP*

1  *Communs., LLC v. Sellers*, No. 22-16826, 2022 U.S. App. LEXIS 33641, at *10 (9th Cir. Dec. 5,

2  2022). "And the First Amendment provides even stronger protection against viewpoint

3  discrimination, which is an egregious form of content discrimination and occurs when the specific

4  motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction

5  on speech." *Id.* (internal quotation marks omitted). "A restriction on speech is unconstitutional if it

6  is an effort to suppress expression merely because public officials oppose the speaker's view." *Id.*;

7  *cf. Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) ("restrictions based on content

8  must satisfy strict scrutiny, and those based on viewpoints are prohibited").

9       "[T]he dangers of viewpoint discrimination are *heightened* in the university setting," *Speech*

10  *First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022) (quoting *Gay Lesbian Bisexual*

11  *All. v. Pryor*, 110 F.3d 1543, 1550 (11th Cir. 1997)), as "teaching and [academic] writing are 'a

12  special concern of the First Amendment.'" *Demers*, 746 F.3d at 411 (quoting *Keyishian v. Bd. of*

13  *Regents*, 385 U.S. 589, 603 (1967)). "The Supreme Court has repeatedly stressed the importance of

14  protecting academic freedom under the First Amendment," which "does not tolerate laws that cast a

15  pall of orthodoxy over the classroom." *Id.* (quoting *Keyishian*, 385 U.S. at 603). "[A]cademic

16  freedom and political expression [are] areas in which government should be extremely reticent to

17  tread." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

18       Given this state of the law, Johnson is entitled to injunctive relief against Defendants' use of

19  of performance standards and policies to punish his viewpoints, and against Defendants'

20  implementation of an official state political ideology.

21       The First Amendment does not tolerate Defendants' application of the Education Code's

22  faculty performance standards, and of their "civility" policy, BP 3050, to bar disfavored political

23  viewpoints. Though the faculty lounge may dislike Johnson's speech, "[t]he desire to maintain a

24  sedate academic environment . . . [does not] justify limitations on a teacher's freedom to express

25  himself on political issues in vigorous, argumentative, unmeasured, and even distinctly unpleasant

26  terms." *Rodriguez v. Maricopa Cnty. Cmty. College Dist.*, 605 F.3d 703, 708-09 (9th Cir. 2009)

27  (internal quotation marks omitted). Yet the first charge upon which Defendants fired Johnson's

28  predecessor as RIFL lead is that he wrote an op-ed in the local newspaper that "took issue with

1  BC's characterization" of a sticker protest, argued for First Amendment protection of speech

2  Defendants hate, and even "went further" to criticize cultural Marxism in academia. Exh. F at 1.

3  Professor Bond properly suffered no official consequence for politically criticizing the President

4  and the country on Facebook, with the challenge, "Go ahead and quote me, conservatives." Exh. E

5  at 2. But when Johnson quoted Bond, and added, "Do you agree with this radical SJW from BC's

6  English Department? Thoughts?" *id.*, he ended up needing to hire a lawyer. Appearing on a radio

7  talk show to criticize the scholarship of academic departments, Exh. F at 5, is also verboten. And so

8  on. The examples noted *supra* of out-and-out unlawful viewpoint discrimination in Defendants'

9  administration of faculty performance standards are extensive, and speak for themselves in

10  demonstrating shocking disregard for, if not outright hostility to First Amendment rights.

11  The state's codification of an official ideology only makes matters worse. One cannot

12  "embrace diversity" or be an "anti-racist" while expressing conservative views, or even hitherto

13  universal American political ideals such as a commitment to colorblindness. That the college

14  president would point to disapproved faculty views as being inconsistent with the state's ideological

15  mandate is an ominous sign of what's to come when Defendants evaluate Johnson's performance

16  for DEIA compliance, as now pervasively mandated in the state's regulatory code. The DEIA

17  mandates of Cal. Code of Regs. Title V, and the guidelines issued pursuant to them, call upon

18  Defendants to punish faculty on the basis of viewpoint. On their face and as applied against

19  Johnson, these provisions cannot be reconciled with the First Amendment's prohibition of

20  viewpoint discrimination.

21  B.  Defendants' "civility" policy is vague.

22  Defendants' policies are unconstitutionally vague if they "fail to afford employees a

23  reasonable opportunity to understand what conduct [they] prohibit, or that the provisions permit

24  arbitrary and discriminatory enforcement." *Hernandez*, 43 F.4th at 982 (internal quotation marks

25  omitted). KCCD's civility policy, BP 3050, fails on both grounds. It is unclear what this policy

26  proscribes in the vast majority of its intended applications, or even what these intended applications

27  might be. It is, however, clear that Defendants invoke this policy to terminate faculty whose

28  political views offend the dominant faction.

What constitutes "civility" varies from speaker to speaker, and from listener to listener. Some speech, however well-intentioned, falls flat. Some people are unusually sensitive. And others are deliberately sensitive, to justify silencing their critics. Terms like "threat" and "harassment" might have common, more objective understandings, but who determines whether a person speaks in a "respectful manner," or even, the level of respect that might be due in a given circumstance? Physical aggression is an obvious concept, but what is "verbal aggression?" BP 3050 cannot be applied to ban "ridicule," which is a protected viewpoint—whatever might be deemed "ridicule" in a given situation.

What is clear, however, is that some KCCD professors and officials view other people's political expressions as moral failings and personal affronts, and one professor has already been disciplined for political speech deemed to violate BP 3050. Professor Johnson can only watch his words and hope that nothing he says is deemed to lack "civility." This policy is hopelessly vague.

C.      Defendants cannot compel Professor Johnson to think and speak in accordance with their preferred ideology.

"[W]here the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." *Wooley v. Maynard*, 430 U.S. 705, 717 (1977) (footnote omitted). It does not "matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include. All that offends the First Amendment just the same." *303 Creative*, 2023 U.S. LEXIS 2794, at *22-*23 (citations omitted).

And just as Defendants may not compel people to mouth support for DEIA and "anti-racism," or demand that others commit themselves to such ideology, they cannot compel faculty to do so as a condition of employment. "[T]he unconstitutional conditions doctrine . . . vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). "In the First Amendment context, this doctrine provides that the Government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no

1  entitlement to that benefit." *Boardman v. Inslee*, 978 F.3d 1092, 1109 (9th Cir. 2020) (internal

2  quotation marks omitted).

3      California's DEIA directives are plainly unconstitutional. If a state "required all residents to

4  sign a document expressing support for a particular set of positions on controversial public issues—

5  say, the platform of one of the major political parties[,] [n]o one, we trust, would seriously argue

6  that the First Amendment permits this." *Janus*, 138 S. Ct. at 2464. The Supreme Court might be too

7  trusting, as Defendants will doubtless argue in all seriousness they can not only compel Professor

8  Johnson to conform his curriculum and pedagogy to their politics in direct contravention of his First

9  Amendment academic freedom rights, but to *be* their type of ideologue—to practice "self-

10  reflection" by "[e]ngag[ing] in self-assessment of [his] own commitment to DEI and internal biases,

11  and seek[] opportunities for growth to acknowledge and address the harm caused by internal biases

12  and behavior," Exh. A at 3; seek "self-improvement" by "demonstrat[ing] a commitment to

13  continuous improvement as it relates to [his] DEI and anti-racism knowledge, skills, and

14  behaviors," *id*.; "[p]articipate[] in a continuous cycle of self-assessment of [his] growth and

15  commitment to DEI and acknowledgement of any internalized personal biases and racial superiority

16  or inferiority," *id.* at 4; and "introduce" newcomers to "expectations for their contribution" to the

17  school's DEI and anti-racism "focus," *id.*

18      But there is no point in further belaboring the fact that "such compulsion so plainly violates

19  the Constitution." *Janus*, 138 S. Ct. at 2464. Defendants take DEIA and anti-racism ideology very

20  seriously, and in their personal capacities the First Amendment guarantees their right to do so. In

21  their official capacities, the First Amendment forbids them from imposing their ideology on

22  everyone else. It would forbid this imposition even if Defendants' ideology were not, as it is,

23  extremely controversial. California's imposition of a DEIA ideological mandate, root and branch, is

24  unconstitutional. The challenged provisions, Cal. Code of Regs., tit. 5, §§ 51200, 51201, 53425,

25  53601, 53602, and 53605, and the guidelines implementing them, must be enjoined.

26  II.   Johnson will suffer irreparable harm in the absence of injunctive relief.

27      "Irreparable harm is relatively easy to establish in a First Amendment case," as a party need

28  only "demonstrate[] the existence of a colorable First Amendment claim." *CTIA - The Wireless*

*Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019) (quotation marks omitted). That is because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *accord CTIA*, 928 F.3d at 851. Professor Johnson is self-censoring, withdrawing from campus activities, and facing pressure to advocate for an ideology he rejects as a condition of maintaining his employment. He is irreparably harmed in the absence of injunctive relief.

III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR JOHNSON.

"Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Assoc. Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (internal quotation marks omitted). "Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (internal quotation marks omitted); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (noting that the government "cannot suffer harm from an injunction that merely ends an unlawful" or unconstitutional practice). Accordingly, "[t]he public interest and the balance of the equities favor preventing the violation of [Plaintiffs'] constitutional rights." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017) (quotation marks omitted).

IV.    THIS COURT SHOULD FOREGO THE BOND REQUIREMENT.

"Despite the seemingly mandatory language, Rule 65(c) [of the Federal Rules of Civil Procedure] invests the district court with discretion as to the amount of security required, *if any*," when issuing a preliminary injunction. *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation remarks omitted). "In particular, the district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.* (internal quotation marks omitted). As an injunction requiring Defendants to respect the First Amendment would not harm them, and considering a bond requirement's "negative impact on plaintiff's constitutional rights, as well as the constitutional rights of other members of the public affected by the [challenged policy and provisions]," *Baca v. Moreno*, 936 F. Supp. 719, 738 (C.D. Cal. 1996), no bond should be required here.

1

CONCLUSION

2

This Court should grant Professor Johnson's motion for preliminary injunction.

3

Dated: July 13, 2023                    Respectfully submitted.

4

5

By:    /s/ Alan Gura

Alan Gura (SBN 178221)
   agura@ifs.org
Courtney Corbello, admitted pro hac vice+
   ccorbello@ifs.org
INSTITUTE FOR FREE SPEECH
1150 Connecticut Avenue, N.W., Suite 801
Washington, DC 20036
Phone: 202.967.0007
Fax:    202.301.3399
+Admitted in Texas. Practice supervised by
D.C. Bar members, D.C. App. R. 49(c)(8)

6

7

8

9

10

11

Attorneys for Plaintiff Daymon Johnson

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28