INSTITUTE FOR FREE SPEECH
Alan Gura, SBN 178221
　　agura@ifs.org
Courtney Corbello, admitted pro hac vice
　　ccorbello@ifs.org
Del Kolde, admitted pro hac vice
　　dkolde@ifs.org
1150 Connecticut Avenue, N.W., Suite 801
Washington, DC 20036
Phone: 202.967.0007
Fax:　　202.301.3399

Attorneys for Plaintiff Daymon Johnson

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAYMON JOHNSON, | Case No. 1:23-cv-00848-ADA-CDB |
| *Plaintiff*, | |
| v. | Date:　　　　September 7, 2023<br>Time:　　　　10:30 a.m.<br>Dept:　　　　200 |
| STEVE WATKIN, et al., | Judge:　　　Hon. Christopher D. Baker<br>Trial Date:　Not Scheduled |
| *Defendants*. | Action filed: June 1, 2023 |

REPLY TO DEFENDANT CHRISTIAN'S OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

TABLE OF CONTENTS

Table of Authorities ................................................................................................................. iii

Introduction ............................................................................................................................... 1

Argument .................................................................................................................................. 1

    I.    Johnson has standing to challenge the regulation and compulsion of his speech .................................................................................................................. 1

        A.  The DEIA regulations, and Christian's "Competencies and Criteria," injure Johnson ................................................................................................ 2

        B.  Christian is part of the problem, playing a critical role in enforcing the state's ideology ..................................................................................... 3

    II.   The DEIA regulations, and Christian's Competencies and Criteria, are neither government speech nor antidiscrimination laws ............................................................ 5

    III.  The state has no valid interest in violating fundamental First Amendment rights, the protection of which is inherently in the public interest ............................. 8

    IV.  There is no status quo concern here that should prevent an injunction ................... 10

Conclusion .............................................................................................................................. 10

# TABLE OF AUTHORITIES

Cases

*Adarand Constructors v. Pena*,
   515 U.S. 200 (1995) ........................................................................................................... 7

*Alpha Delta Chi-Delta Chapter v. Reed*,
   648 F.3d 790 (9th Cir. 2011) ........................................................................................ 7, 8

*Arnold v. IBM Corp.*,
   637 F.2d 1350 (9th Cir. 1981) .......................................................................................... 3

*Bair v. Shippensburg Univ.*,
   280 F. Supp. 2d 357 (M.D. Pa. 2003) ............................................................................... 6

*Barke v. Bankes*,
   25 F.4th 714 (9th Cir. 2022) ............................................................................................. 3

*Barnum Timber Co. v. United States EPA*,
   633 F.3d 894 (9th Cir. 2011) ............................................................................................ 2

*Boy Scouts of Am. v. Dale*,
   530 U.S. 640 (2000) ......................................................................................................... 8

*Bridenbaugh v. Freeman-Wilson*,
   227 F.3d 848 (7th Cir. 2000). ........................................................................................... 2

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ............................................................................................ 2

*Doe v. Trump*,
   957 F.3d 1050 (9th Cir. 2020) ........................................................................................ 10

*Downs v. Los Angeles Unified Sch. Dist.*,
   228 F.3d 1003 (9th Cir. 2000) .......................................................................................... 6

*Falls v. Desantis*,
   No. 4:22cv166-MW/MJF, 2022 U.S. Dist. LEXIS 240663 (N.D. Fla. July 8, 2022) ...... 3

*First Interstate Bank of California v. State of California*,
   197 Cal. App. 3d 627 (1987) ............................................................................................ 4

*Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*,
   512 F.3d 1112 (9th Cir. 2008) ........................................................................................ 10

*Gordon v. Holder*,
   721 F.3d 638, 653 (D.C. Cir. 2013) .................................................................................. 9

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston*,
   515 U.S. 557 (1995) ......................................................................................................... 8

*Keyishian v. Bd. of Regents*,
   385 U.S. 589 (1967) ......................................................................................................... 9

*Lopez v. Candaele*,
   630 F.3d 775 (9th Cir. 2010) ............................................................................................ 2

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .......................................................................................................... 2

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) ............................................................................................ 9

*Merritt v. Mackey*,
   827 F.2d 1368 (9th Cir. 1987) .......................................................................................... 4

*NRA of Am. v. BATFE*,
   700 F.3d 185 (5th Cir. 2012) ............................................................................................ 2

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   142 S. Ct. 2111 (2022) ...................................................................................................... 2

*Project Veritas v. Schmidt*,
   72 F.4th 1043 (9th Cir. 2023) ........................................................................................... 2

*Riley's Am. Heritage Farms v. Elsasser,*
   32 F.4th 707 (9th Cir. 2022) ............................................................................................. 9

*Roberts v. United States Jaycees*,
   468 U.S. 609 (1984) .......................................................................................................... 8

*S.B. v. Cal. Dep't of Ed*,
   327 F. Supp. 3d 1218 (E.D. Cal. 2018) ............................................................................ 4

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*,
   143 S. Ct. 2141 (2023). ..................................................................................................... 9

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
   425 U.S. 748 (1976) .......................................................................................................... 2

Statutes

Cal. Code Regs. tit. 5, § 51201 .................................................................................................. 3

Cal. Code Regs. tit. 5, § 51201(b) ......................................................................................... 1, 5

Cal. Code Regs. tit. 5, § 53024.2 ............................................................................................... 4

Cal. Code Regs., tit. 5, § 53400 ............................................................................................. 3, 5

Cal. Code Regs. tit. 5, § 53425 .................................................................................................. 3

Cal. Code Regs. tit. 5, § 53601 .................................................................................................. 1

Cal. Code Regs. tit. 5, § 53601(a) ............................................................................................. 1

Cal. Code Regs. tit. 5, § 53601(b) ............................................................................................. 5

Cal. Code Regs. tit. 5, § 53602(a) ............................................................................................. 3

Cal. Code Regs. tit. 5, § 53602(b) .......................................................................................... 3, 5

Cal. Code Regs. tit. 5, § 53602(c)(4) ................................................................................................ 6

Cal. Code Regs. tit. 5, § 53602(c)(7) ................................................................................................ 4

Cal. Code Regs. tit. 5, § 53605(a) ................................................................................................ 3, 5

Cal. Code Regs. tit. 5 § 59300 ......................................................................................................... 7

Cal. Educ. Code § 70902(b)(4) ........................................................................................................ 4

Other Authorities

Kendi, Ibram X., How To Be An Antiracist (2023) .................................................................... 7, 8

INTRODUCTION

Professor Johnson is not suing Chancellor Christian for expressing views about discrimination, disconnected from KCCD's actions. Johnson sues Christian to enjoin her from directing the violation of his First Amendment rights, a role that Cal. Code of Regs. tit. 5, § 53601(a)-(b) assigns Christian by commanding her to "adopt and publish guidance," which "shall be maintained" based on "current and emerging" practices or scholarship, that "shall be used" in setting standards Johnson must meet—or be fired. In a system that punishes faculty for contradicting or failing to teach the state's political ideology, the Chancellor is the CIO—Chief Ideological Officer. She cannot wash her hands of what district officials do with her "guidance."

If Christian refused to perform the tasks assigned her by § 53601, she might disclaim any connection to KCCD's enforcement of the state's ideological mandate. But nothing in Christian's response suggests that she is anything other than enthusiastic about her role in dictating the beliefs, behaviors, and expression to which Johnson must conform. Professor Johnson has standing to challenge Christian's conduct, and he is entitled to a preliminary injunction.

ARGUMENT

I. JOHNSON HAS STANDING TO CHALLENGE THE REGULATION AND COMPULSION OF HIS SPEECH.

"In a pre-enforcement challenge, plaintiffs can show injury in fact by establishing that (1) they intend to violate the law; and (2) have shown a reasonable likelihood that the government will enforce the statute against them." *Project Veritas v. Schmidt*, 72 F.4th 1043, 1053 (9th Cir. 2023). The injury here is plain enough. Johnson has been investigated over his political speech. He intends to continue his non-compliant speech and refuses to advance DEIA and anti-racism ideology. KCCD Defendants have not only fired and disciplined professors for political speech—they fired Garrett, in part, for not censoring Johnson—but have taken the view that § 51201(b)'s adoption of DEIA and anti-racism ideology controls speech even before the newer, more specific regulations issued. Christian's predecessor promulgated DEIA competencies and criteria controlling Johnson pursuant to § 53601, which Christian maintains. DEIA mandates already bar Johnson from serving on screening committees. It is quite reasonable for Johnson to expect additional injuries, ending in termination, if he expresses his views and doesn't start singing a different ideological tune.

*A. The DEIA regulations, and Christian's "Competencies and Criteria," injure Johnson.*

Christian errs in claiming that Title 5's DEIA regulations allegedly "do not apply to Johnson directly." Dkt. 42 at 7. First, "the plaintiff's intended speech" need only "arguably fall[ ] within the statute's reach" in order to afford him standing for a pre-enforcement challenge. *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010) (internal quotation marks omitted). The regulations directly concern Johnson's speech and silence, mandating that he be evaluated based on his commitment to the state's ideology and that he incorporate that ideology in his teaching. Yet Johnson's speech is antithetical to the state's ideology. *See, generally,* Johnson Decl., Doc. 10-2.

Moreover, for standing purposes, whether the regulations "operate upon community college districts, not upon [faculty]," Dkt. 42 at 8, is irrelevant. "Plaintiffs need not be the immediate target of a statute to challenge it." *Bridenbaugh v. Freeman-Wilson*, 227 F.3d 848, 850 (7th Cir. 2000) (citations omitted). "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded," even if it may be more difficult to establish. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992). For example, the Supreme Court upheld a First Amendment challenge to a law barring the publication of drug prices, where the "attack on the statute [was] one made not by one directly subject to its prohibition, that is, a pharmacist, but by prescription drug consumers who claim[ed] that they would greatly benefit if the prohibition were lifted and advertising freely allowed." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 753 (1976); *cf. NRA of Am. v. BATFE*, 700 F.3d 185, 191-92 (5th Cir. 2012), *overruled in part on other grounds, N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2127 n.4 (2022) (consumers have standing to challenge law barring dealers from selling them guns). Indeed, the Ninth Circuit upheld California's standing to challenge insurance regulations based on its claim of economic harm should women lose contraceptive coverage. "A causal chain does not fail simply because it has several 'links,' provided those links are not hypothetical or tenuous." *California v. Azar*, 911 F.3d 558, 571-72 (9th Cir. 2018) (internal quotation marks omitted).

There is nothing hypothetical or tenuous about Johnson being punished for his speech or silence that does not comport with standards guided by Christian, who need not be "the sole source of the [injury]." *Barnum Timber Co. v. United States EPA*, 633 F.3d 894, 901 (9th Cir. 2011).

Christian's reliance on *Barke v. Bankes*, 25 F.4th 714 (9th Cir. 2022) (per curiam), is misplaced. *Barke* plaintiffs feared that the state would "erroneously attribute" their protected anti-union speech, made in their individual capacities, to their employers, leading to charges under a provision barring their employers from deterring or discouraging union membership. *Id.* at 716. But "particularly in light of [the state's] concessions" that it would not misattribute plaintiffs' individual speech to their employers, *id.*; *id.* at 720, plaintiffs' fear was unfounded. Here, in contrast, the DEIA regulations address Johnson's "minimum qualifications for employment as . . . a faculty member." Cal. Code Regs., tit. 5, § 53400. They dictate what he must teach, and how. *Id.* § 53605(a). Johnson must satisfy the DEIA mandates "to teach, work, or lead within California community colleges." *Id.* § 53602(b). The policies Christian shapes are those by which Johnson is evaluated. *Id.* § 53602(a). They apply to "all district employees." *Id*. § 53425. The college President emailed faculty, including Johnson, quoting Section 51201 for the proposition that "we must intentionally practice . . . anti-racism." Exh. C. Indeed, Christian's challenged Competencies and Criteria "are meant to define the skills, knowledge, and behaviors that all California Community College (CCC) employees must demonstrate[]," Exh. A at 3, and each of its 13 themes "applies to faculty" or to "both faculty and staff." *Id.* at 3-7.

As the memorandum introducing the Chancellor's competencies and criteria helpfully explains, "**These regulations impact all the employees of the educational ecosystem.**" Exh. B at 6 (emphasis in the original). As a noun, another term for "impact" is "injury-in-fact."

    B.  *Christian is part of the problem, playing a critical role in enforcing the state's ideology.*

It does not matter that Christian will not be the one who "take[s] any action against Johnson concerning his speech." Doc. 42 at 10. Defendants can be held liable under Section 1983 not only if they "personally participated in a deprivation of the plaintiff's rights" but also if they "caused such a deprivation to occur." *Arnold v. IBM Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981); *see also Falls v. Desantis*, No. 4:22cv166-MW/MJF, 2022 U.S. Dist. LEXIS 240663, at *14 (N.D. Fla. July 8, 2022) (holding the "lack of authority to *directly* punish is hardly decisive."). "[T]he requisite causal connection can be established not only by some kind of direct personal participation in the deprivation but also by setting in motion a series of acts by others which the actor knows or

reasonably should know would cause others to inflict the constitutional injury." *Merritt v. Mackey*, 827 F.2d 1368, 1371 (9th Cir. 1987) (internal quotation marks omitted) (government agents liable for causing termination from private employment).

As Christian admits, the DEIA regulations, as "regulations adopted through the formal regulatory process[,] are *binding* on districts" Dkt. 42 at 8 n. 2. KCCD Defendants understand that to be the case as well. Doc. 43 at 16 ("Defendants here have no choice but to follow the regulations"); *see also* Cal. Educ. Code § 70902(b)(4) (districts must "[e]mploy and assign all personnel not inconsistent with the minimum standards adopted by the board of governors"). Districts are required to "include proposed or active implementation goals to integrate DEIA principles as part of" their required EEO plans, Cal. Code Regs. tit. 5, § 53602(c)(7), over which Christian has enforcement authority. Cal. Code Regs. tit. 5, § 53024.2. If she is dissatisfied with their DEIA efforts, Christian can direct a college district to redraft an EEO plan and also "implement specific strategies" beyond the district's own to guarantee an EEO plan she approves of. *Id*. This is quite different from the situation presented in *First Interstate Bank of California v. State of California*, 197 Cal. App. 3d 627 (1987), upon which Christian relies. In *First Interstate*, a bank had no recourse against the state to recover a community college district's debt, because under California law, "no liability is created in the state for the acts or omissions of [an] agency," and a community college district "is liable for its own obligations." *Id*. at 634. This statutory scheme is quite different than the one that charges Christian with ensuring that KCCD implements the DEIA regulations.

More instructive is *S.B. v. Cal. Dep't of Ed,* 327 F. Supp. 3d 1218 (E.D. Cal. 2018), in which plaintiffs sued California's Superintendent of Public Instruction over the Education Code's implementation. Code. *Id.* at 1235. The Superintendent claimed, like Christian, that the plaintiffs lacked standing because he was not involved in applying the code to the plaintiff child. *Id*. at 1238. This Court disagreed. The Superintendent's "specific enforcement obligations" "to administer and enforce all state laws applicable to schools under the California Education Code" established "a sufficient causal connection to state an official capacity § 1983 claim." *Id*. The same holds here.

Moreover, Christian is not only empowered to ensure that KCCD implements the DEIA regulations. She is specifically charged with maintaining the "competencies and criteria" that guide the DEIA regime under Cal. Code of Regs. tit. 5, § 53601(b). Christian need not come down to Bakersfield College and personally hand Johnson a 90-day notice or sign off on his termination, because she dictates what standards KCCD must meet—including what ideologies they must require Johnson to express to if he wants to keep his job. She plays an *on-going, direct* role in determining what Professor Johnson must and cannot say, what he must and cannot teach.

II.   THE DEIA REGULATIONS, AND CHRISTIAN'S COMPETENCIES AND CRITERIA, ARE NEITHER GOVERNMENT SPEECH NOR ANTIDISCRIMINATION LAWS.

Christian asserts the DEIA regulations are constitutional for two contradictory reasons. First, she claims the DEIA regulations simply express the Board's ideals. Second, she claims the DEIA regulations actually *are* laws, but are either benign aspirational diversity goals or perhaps constitutional "antidiscrimination laws intended to ensure equal access." Doc. 42 at 13 (internal quotation marks omitted). Neither claim has merit.

The DEIA Regulations do not merely "affirm the Board's 'official position' to 'embrace diversity' . . . and direct the State's community college districts to create their own employment policies consistent with that goal," Doc. 42 at 12 (citations omitted), as though none of this has the slightest influence on faculty. The goal of these "employment policies," which local districts are commanded by regulation to adopt, and which they must implement with an eye toward Christian's competencies and criteria, is to fire faculty that do not become "anti-racists."

Section 51201(b)'s admonition, repeated at the faculty by district officials, is that "we must intentionally practice . . . anti-racism." Exh. C. If this is insufficiently mandatory, the other regulations, and Christian's competencies and criteria, leave no doubt: faculty must internalize the state's ideology, and they must advance it, celebrate it, teach it, and live it in order "to teach, work, or lead within California community colleges." Cal. Code Regs. tit. 5, § 53602(b). The "minimum qualifications for employment" now require Johnson to "employ teaching, learning, and professional practices that reflect DEIA and anti-racist principles." *Id.* §§ 53400, 53605(a).

Johnson's commitment to the state's ideology is now a "significant" factor in evaluating his performance. *Id.* § 53602(c)(4). And Christian's competencies and criteria asks whether Johnson

"[a]dvocates for and advances DEI and anti-racist goals and initiatives," Exh. A at 4, "contributes to DEI and anti-racism research and scholarship," *id*., continuously engages in "self-assessment of one's growth and commitment to DEI," *id*., "[d]evelops and implements a pedagogy and/or curriculum that promotes a race-conscious and intersectional lens," *id*. at 5, and even "[i]ntroduces new employees to the institution and system's focus on DEI and anti-racism and the expectations for their contributions," *id*. at 6. These are not guidelines for the state's expression of its views on diversity. These are guidelines for Johnson's ideological expression and conscience. They violate Johnson's First Amendment rights by compelling his speech, punishing his dissent, and trampling on his academic freedom.

The situation presented here is quite unlike that found in *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003 (9th Cir. 2000), upon which Christian relies. *Downs* concerned a true case of government speech—a school set up bulletin boards "as an expressive vehicle for the school board's policy of 'Educating for Diversity.'" *Id*. at 1012. "[A]ll speech that occurred on the bulletin boards was the school board's and LAUSD's speech," *id.*, and so plaintiff teacher had no First Amendment right to establish his own bulletin board. But the school did not compel Downs to believe or express its views, did not suggest that Downs would be punished for rejecting its views, and did not trample on Downs's academic freedom to teach a different perspective (a right that, while enjoyed by college professors, may not extend to high school teachers).

The other case Christian cites in support of her government speech argument, *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357 (M.D. Pa. 2003), presents a useful contrast between government speech and an impermissible speech code, standing for the proposition that "[s]imply utilizing buzzwords applicable to anti-discrimination legislation does not cure [a First Amendment] deficiency." *Id.* at 372. The court agreed that "one of the challenged sentences within the Preamble to the University Catalog does not implicate First Amendment concerns," as it "seeks to advise the student body of the University's ideals and is therefore aspirational rather than restrictive." *Id.* at 370. And it found that another challenged provision was, in part, "merely aspirational" before concluding that, overall, the provision was unconstitutionally overbroad. *Id.* at 371. Overall, the court chided the college for using aspirational language as a fig leaf to cover unlawful restrictions.

"Time and again in this case, Defendant has asserted that the challenged provisions of the Code are merely aspirational and precatory, and therefore not subject to First Amendment scrutiny. This argument fails because it is obvious that violations of the express provisions of the Code subject Shippensburg students to the disciplinary process set forth therein." *Id.* at 373. Likewise here, whatever sentiments the state might mean to express do not wash away the express provisions commanding Johnson's ideological compliance in violation of the First Amendment.

Christian's description of the DEIA regulations as mere antidiscrimination policies akin to those at issue in *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790 (9th Cir. 2011) likewise fails. The policy at issue in *Alpha Delta Chi* prohibited discriminatory *conduct*, withholding school recognition of any school organization that "discriminate[d] on the basis of race, religion, national origin, ethnicity, color, age, gender, marital status, citizenship, sexual orientation, or disability." *Id*. at 796. California applies a similar law to community colleges, Cal. Code Regs. tit. 5 § 59300, and Johnson does not challenge it, because he does not seek to unlawfully discriminate. Johnson wishes to express his views, to refrain from advancing ideologies he rejects, and to pursue free academic inquiry. The state cannot silence Johnson by labeling his views as discriminatory conduct.

Indeed, the DEIA regulations compel *anti-racist* speech, not antidiscrimination. Initially, "antiracism" may sound harmless. After all, who wants to be against being against racism? But antiracism is not synonymous with "antidiscrimination;" in fact, it *requires* discrimination based on race, and the Constitution does not countenance so-called benign discrimination. *Adarand Constructors v. Pena*, 515 U.S. 200, 227 (1995). To quote the racial-theorist Ibram X. Kendi: "To be antiracist is a *radical* choice in the face of this history, requiring a radical reorientation of our consciousness." Kendi, Ibram X., How To Be An Antiracist 29 (2023) (emphasis added). Antiracism demands the *presence*, not the absence, of discrimination to obtain equity. *Id*. at 24 ("The only remedy to negative racist discrimination that produces inequity is *positive antiracist discrimination* that produces equity") (emphasis added).

Anti-racism further posits that unequal outcomes based on race are always the product of racist policies and that colorblindness is itself a form of white supremacy. *Id*. at 11.2 ("The language of color blindness—like the language of 'not racist'—is a mask to hide when someone is

being racist . . . . A colorblind Constitution for a White-supremacist America."). To put a finer point on it, Kendi explicitly declares that not being racist is itself racist.

Antiracism is also a totalizing ideology, because it requires adherents to make race-conscious decisions in all aspects of their lives. The DEIA regulations and Competencies and Criteria codify this Kendian antiracism ideology into an employment requirement, and that is why they are unlike the *Alpha Delta Chi* policy or any other law that prohibits discriminatory conduct. Christian's demand that Johnson "intentionally practice . . . anti-racism" through the minimum standards of employment she set is not unlike the State telling employees to practice patriotism (by reciting the Pledge of Allegiance) or Christianity (by praying). It is not a prohibition of discrimination, it is compulsion to express a particular ideology.

Officials can certainly debate the merits of race-conscious decision-making, but they cannot enforce DEIA regulations that force Johnson and his colleagues to take a position on the topic—and to conform their teaching and expression to it. State officials are free to advocate for changing legal norms on their own time and on their own dime. But the First Amendment bars them from abusing their offices to coerce others into affirming and promoting their politics.

III. THE STATE HAS NO VALID INTEREST IN VIOLATING FUNDAMENTAL FIRST AMENDMENT RIGHTS, THE PROTECTION OF WHICH IS INHERENTLY IN THE PUBLIC INTEREST.

California may have an interest in eliminating discriminatory conduct and providing for equal access to opportunities, *Roberts v. United States Jaycees*, 468 U.S. 609, 624 (1984), but mandating an official state ideology for faculty does not advance those interests. The Supreme Court has made it clear that antidiscrimination regulations may not be applied to expressive conduct with the purpose of either suppressing or promoting a particular ideology. "While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Boy Scouts of Am. v. Dale,* 530 U.S. 640, 661 (2000) (quoting *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston*, 515 U.S. 557, 579 (1995)).

The DEIA regulations and the Competencies and Criteria do not limit themselves to, or even much concern, the elimination of discrimination or promotion of equal opportunity. They impose a political litmus test for faculty, demanding that professors demonstrate fealty to a radical ideology and teach the same to their students. That is hardly consistent with *advancing* any rights. Christian asserts that firing faculty for not "practicing antiracism" or engaging in DEIA self-reflection somehow "serve[s] the important public interest of promoting rights that are embodied in the United States and California Constitutions and the Americans with Disabilities Act," Doc. 42 at 17, but she does not explain this theory. If anything, the opposite is true, considering that antiracism *rejects* the Fourteenth Amendment's underlying principles—and Professor Johnson would not enjoy qualified immunity if he discriminated against his students to make things a little more "equitable." *See Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 143 S. Ct. 2141 (2023). Vague and unexplained assertions about the importance of educational diversity interests cannot override fundamental rights. When the Supreme Court asked Harvard and the University of North Carolina to clarify how the asserted governmental interest in maintaining a diverse student body justified racial discrimination, "[t]he universities' main response [was], essentially, 'trust us.'" *Id*. at 2168. That answer was insufficient there, and it is insufficient here. Christian does not come close to explaining how the challenges rules advance other rights, let alone how they may override the clear public interest in securing fundamental First Amendment rights.

Christian also errs in suggesting that her alleged interests in mandating ideological conformity trump Johnson's allegedly private interest in his First Amendment rights. Doc. 42 at 16-17. While public interests do outweigh private ones, "it is *always* in the public interest to prevent the violation of a party's constitutional rights." *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)) (emphasis added). Johnson's motion does not so much advance a private interest as it performs a public service. Indeed, "it may be assumed that the Constitution is the ultimate expression of the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (internal quotation marks omitted). And the academic freedom secured by an injunction "is of transcendent value to all of us and not merely to the teachers concerned." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

IV. THERE IS NO STATUS QUO CONCERN HERE THAT SHOULD PREVENT AN INJUNCTION.

Finally, Christian's drive-by argument asserting that so-called mandatory injunctions disrupting the status quo are more difficult to obtain, Doc. 42 at 5, lacks merit. Johnson's case does not seek mandatory relief compelling defendants to perform some specific task, he seeks to enjoin their operation of a legal regime that violates his rights. With respect to Christian, specifically, he asks that she cease maintaining the competencies and criteria, and refrain from doing anything else that might compel the DEIA regulations' implementation.

In any event, the Ninth Circuit has questioned and limited the relevance of status quo considerations and the artificial mandatory/prohibitory distinction. "The purpose of a preliminary injunction is always to prevent irreparable injury . . . It often happens that this purpose is furthered by the status quo, but not always." *Doe v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020) (quoting *Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008)). "Maintaining the status quo is not a talisman." *Golden Gate*, 512 F.3d at 1116. "If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury." *Id*. (quotation omitted). To the extent that mandatory ideological conformity is the status quo within California Community Colleges, it is time for the First Amendment's enforcement.

CONCLUSION

This Court should grant Professor Johnson's motion for preliminary injunction.

Dated: August 30, 2023        Respectfully submitted.

By:    /s/ Alan Gura
       Alan Gura (SBN 178221)
           agura@ifs.org
       Courtney Corbello, admitted pro hac vice
       Endel Kolde, admitted pro hac vice
       INSTITUTE FOR FREE SPEECH
       1150 Connecticut Avenue, N.W., Suite 801
       Washington, DC 20036
       Phone: 202.967.0007 / Fax: 202.301.3399

       Attorneys for Plaintiff Daymon Johnson

CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2023, I electronically filed the foregoing with the Clerk using the Court's CM/ECF system, and that all participants in this case are registered CM/ECF users who have thereby been electronically served.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 30, 2023.


      /s/ Alan Gura
      Alan Gura