1   INSTITUTE FOR FREE SPEECH
    Alan Gura, SBN 178221
2           agura@ifs.org
    Courtney Corbello, admitted pro hac vice
3           ccorbello@ifs.org
    Del Kolde, admitted pro hac vice
4           dkolde@ifs.org
5   1150 Connecticut Avenue, N.W., Suite 801
    Washington, DC 20036
6   Phone: 202.967.0007
    Fax:    202.301.3399
7

8   Attorneys for Plaintiff Daymon Johnson

9              UNITED STATES DISTRICT COURT
10          FOR THE EASTERN DISTRICT OF CALIFORNIA

11
    DAYMON JOHNSON,                      Case No. 1:23-cv-00848-ADA-CDB
12
              *Plaintiff*,
13                                       Date:        N/A
              v.                         Time:        N/A
14                                       Dept:        N/A
    STEVE WATKIN, et al.,                Judge:       Hon. Ana de Alba
15                                       Trial Date:  Not Scheduled
              *Defendants*.              Action filed: June 1, 2023
16

17

18

19
              MEMORANDUM OF POINTS AND AUTHORITIES
20    IN OPPOSITION TO KCCD DEFENDANTS' MOTION TO DISMISS [DOC. 46][1]

21

22

23

24

25

26

27

28
    ---
    [1] KCCD Defendants are all Defendants other than Sonya Christian.

TABLE OF CONTENTS

Table of Authorities ................................................................................................................. iii

Introduction .......................................................................................................................... 1

Statement of Facts ............................................................................................................... 1

Summary of Arguments ...................................................................................................... 11

Argument ............................................................................................................................ 12

    I.      Johnson does not bring a retaliation claim ................................................. 12

    II.     Johnson has standing to sue KCCD Defendants ....................................... 13

          A.  Johnson has provided clear evidence of speech he reasonably
             refrains from uttering or feels compelled to utter ................................. 14

          B.  Defendants have threatened Johnson and demonstrated their
             intent to enforce the laws against him, placing him at risk
             of imminent harm ................................................................................ 15

    III.    Defendants are subject to injunction because they are the relevant
          state officials who are enforcing the challenged state laws and regulations ............ 18

    IV.    The State Board of Governors is irrelevant ................................................ 19

Conclusion .......................................................................................................................... 20

1

TABLE OF AUTHORITIES

2

Cases

3
Babbitt v. UFW Nat'l Union,
    442 U.S. 289, 298 (1979).................................................................................................... 13

4

Bessard v. Cal. Cmty. Coll.,
5
    867 F. Supp. 1454, 1464 (E.D. Cal. 1994)......................................................................... 19

6
Canatella v. California,
    304 F.3d 843, 855 (9th Cir. 2002) ...................................................................................... 17

7
Culinary Workers Union, Local 226 v. Del Papa,
8
    200 F.3d 614, 617 (9th Cir. 1999) ...................................................................................... 17

9
Evers v. Cnty. of Custer,
    745 F.2d 1196, 1203 (9th Cir. 1984) .............................................................................. 19, 20
10

Ex Parte Young,
11
    209 U.S. 123 (1908).......................................................................................................... 18, 19

12
Garrett v. Hine,
    No. 1:21-cv-00845 (E.D. Cal. 2021)..................................................................................... 6
13

G Berry v. Yosemite Cmty. Coll. Dist.,
14
    No. 1:18-cv-00172-LJO-SAB, 2018 U.S. Dist. LEXIS 64732 (E.D. Cal. Apr. 17, 2018)............ 18

15
Greisen v. Hanken,
    925 F.3d 1097, 1110 (9th Cir. 2019) .................................................................................. 15
16

Little v. Windermere Relocation, Inc.,
17
    301 F.3d 958, 970 (9th Cir. 2002) ...................................................................................... 12

18
Lopez v. Candaele,
    630 F.3d 775 (9th Cir. 2010) ......................................................................................... 13, 17
19

LSO, Ltd. v. Stroh,
20
    205 F.3d 1146, 1155 (9th Cir. 2000) .................................................................................. 13

21
Mitchell v. Los Angeles Cmty. Coll. Dist.,
    861 F.2d 198, 201 (9th Cir. 1988) ...................................................................................... 18
22

Monell v. Dep't of Soc. Servs. of City of New York,
23
    436 U.S. 658 (1978).......................................................................................... 12, 18, 19

24
Norsworthy v. Beard,
    87 F. Supp. 3d 1104 (N.D. Cal. 2015) ................................................................................ 18
25

Project Veritas v. Schmidt,
26
    72 F.4th 1043, 1053 (9th Cir. 2023) ................................................................................... 13

27
Thomas v. Anchorage Equal Rights Comm'n,
    220 F.3d 1134, 1139 (9th Cir. 2000) .............................................................................. 13, 16
28

Unified Data Servs., LLC v. FTC,
    39 F.4th 1200, 1210 (9th Cir. 2022) ................................................................................... 13

*Virginia v. Am. Booksellers Ass'n, Inc.*,
   484 U.S. 383 (1988) ........................................................................................................ 13

*Wolfson v. Brammer*,
   616 F.3d 1045, 1059 (9th Cir. 2010) ............................................................. 13, 20

<u>Statutes</u>

Cal. Code Regs. tit. 5, § 51200 ....................................................................................... 2

Cal. Code Regs. tit. 5, § 51201 ................................................................................... 4, 15

Cal. Code Regs. tit. 5, § 51201(a) ................................................................................. 2

Cal. Code Regs. tit. 5, § 51201(b) ......................................................................... 2, 4, 15

Cal. Code Regs. tit. 5, § 51201(c) ................................................................................. 2

Cal. Code Regs. tit. 5, § 53425 ................................................................................ 2, 16

Cal. Code Regs. tit. 5, § 53425 ................................................................................ 2, 16

Cal. Code Regs. tit. 5, § 53462 .................................................................................... 16

Cal. Code Regs. tit. 5, § 53601(a) ................................................................................. 2

Cal. Code Regs. tit. 5, § 53601(b) ............................................................................ 3, 19

Cal. Code Regs. tit. 5, § 53602 ............................................................................... 14, 19

Cal. Code Regs. tit. 5, § 53602(b) ................................................................................. 2

Cal. Code Regs. tit. 5, § 53602(c) ................................................................................. 3

Cal. Code Regs. tit. 5, § 53605 ........................................................................ 14, 16, 19

Cal. Code Regs. tit. 5, § 53605(a) ................................................................................. 3

Cal. Educ. Code § 87732 ........................................................................................... 1, 15

Cal. Educ. Code § 87732(a) ....................................................................................... 8, 16

Cal. Educ. Code § 87732(b) ....................................................................................... 8, 16

Cal. Educ. Code § 87732(c) ....................................................................................... 8, 16

Cal. Educ. Code § 87732(d) ....................................................................................... 8, 16

Cal. Educ. Code § 87732(f) ................................................................................. 8, 14, 16

Cal. Educ. Code § 87734 ................................................................................................ 1

Cal. Educ. Code § 87735 ....................................................................................... 1, 8, 15

1

Other Authorities

*Diversity, Equity and Inclusion Glossary of Terms*,
   California Community Colleges Chancellor's Office, https://perma.cc/T22V-V866 ..................... 2

*December 2022 Board of Trustees Meeting* (12/13/2022),
   YouTube, https://perma.cc/L7JY-4HJR ........................................................................ 5

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INTRODUCTION

Defendants are empowered to discipline and fire Professor Johnson for violating the Education Code, which, among other things, allows for the dismissal of community college faculty who will not comply with state regulations. They have previously investigated him for his political speech, and applied the Code to *terminate* faculty for expressing political views they oppose. They have demanded that faculty practice DEIA and "anti-racism" ideology and felt no shame in publicly declaring that dissident faculty should be "culled" like defective cattle. They are now charged with evaluating Johnson's performance under regulations and guidelines that demand he extoll and conform to the state's political ideology or face termination. Reasonably fearing for his job should he continue expressing his views and fail to spout Defendants' views, Johnson seeks injunctive relief against Defendants' application of the Education Code and their "civility" policy to punish disfavored views, and against their enforcement of the state's ideological mandates.

Johnson plainly has standing to bring this action, and his complaint states valid claims for relief. Defendants' motion to dismiss attacks the sufficiency of claims that are absent from the complaint, denies the factual assertions, and seriously misstates the law. It should be denied.

STATEMENT OF FACTS

*The regulatory regime*

California Education Code § 87732 provides that "[n]o regular employee or academic employee shall be dismissed except for one or more of the following causes: (a) Immoral or unprofessional conduct; (b) Dishonesty; (c) Unsatisfactory performance; (d) Evident unfitness for service; . . . (f) Persistent violation of, or refusal to obey, the school laws of the state or reasonable regulations prescribed for the government of the community colleges by the board of governors or by the governing board of the community college district employing him or her." A community college district's governing board may also terminate an employee for "unprofessional conduct" or "unsatisfactory performance" per Cal. Educ. Code § 87734, and may suspend and terminate an employee within 30 days for "immoral conduct" or "willful refusal to perform regular assignments without reasonable cause, as prescribed by reasonable rules and regulations of the employing district," per Cal. Educ. Code § 87735.

1    KCCD Board Policy 3050 ("BP 3050") "requires that [faculty] conduct [them]selves with

2    civility in all circumstances of [their] professional lives." KCCD "encourages" free expression, but

3    "expect[s] all expressions of content to be conducted in a manner respectful of persons." BP 3050

4    also claims that KCCD "do[es] not participate in or accept, condone, or tolerate physical or verbal

5    forms of aggression, threat, harassment, ridicule, or intimidation." These terms are undefined.

6    California's community college system, of which the Kern Community College District is a

7    constituent part, "embrace[s] diversity." Cal. Code Regs. tit. 5, § 51201(a). This commitment

8    "guide[s] the administration of all programs in the California Community Colleges, consistent with

9    all applicable state and federal laws and regulations." *Id.* § 51200. "Embracing diversity means that

10   *we must intentionally practice* acceptance, *anti-racism*, and respect towards one another and

11   understand that racism, discrimination, and prejudices create and sustain privileges for some while

12   creating and sustaining disadvantages for others." *Id.* § 51201(b) (emphasis added). An "anti-racist"

13   is defined as one who "understand[s] that racism is pervasive and has been embedded into all

14   societal structures." *Diversity, Equity and Inclusion Glossary of Terms*, California Community

15   Colleges Chancellor's Office, https://perma.cc/T22V-V866 at 1 (last visited Sept. 11, 2023). Anti-

16   racists "challenge the values, structures, policies, and behaviors that perpetuate systemic racism"

17   and are "also willing to admit the times in which they have been racist." *Id.* "Practicing antiracism

18   requires constantly identifying, challenging, and upending existing racist policies to replace them

19   with antiracist policies that foster equity between racial groups." *Id.* Moreover, "embracing

20   diversity" requires "acknowledg[ment] that institutional racism, discrimination, and biases exist,"

21   and a commitment to "eradicat[ing] these from our system," to "strive to eliminate those barriers to

22   equity." Cal. Code Regs. tit. 5, § 51201(c). It requires "that we act deliberately to create a safe,

23   inclusive, and anti-racist environment . . . ." *Id.*

24   "District employees must have or establish proficiency in DEIA-related [diversity, equity,

25   inclusion, accessibility] performance to teach, work, or lead within California community colleges."

26   Cal. Code of Regs. tit. 5, § 53602(b). Faculty must comply with local DEIA policies to maintain

27   employment. *Id.* § 53425. The California Community Colleges Chancellor "shall adopt and publish

28   guidance describing DEIA competencies and criteria," *id.* § 53601(a), which "shall be used as a

reference for locally developed minimum standards in community college district performance evaluations of employees and faculty tenure reviews." *Id.* § 53601(b). "To advance DEIA principles in community college employment, districts shall: (1) include DEIA competencies and criteria as a minimum standard for evaluating the performance of all employees; (2) ensure that evaluators have a consistent understanding of how to evaluate employees on DEIA competencies and criteria; (3) set clear expectations regarding employee performance related to DEIA principles . . . (4) place significant emphasis on DEIA competencies in employee evaluation and tenure review processes," and "(6) ensure an evaluation process that provides employees an opportunity to demonstrate their understanding of DEIA and anti-racist competencies." *Id.* § 53602(c).

The Chancellor's DEIA guidance and criteria comprehensively call for faculty to acknowledge, understand, and apply the state's political ideology; engage in self-reflection and self-assessment of their own personal commitment to the ideology; commit themselves to "continuous improvement" of their "DEI and anti-racism knowledge, skills, and behaviors;" promote and incorporate DEI and anti-racist pedagogy; analyze data to find support for the ideology; articulate the importance of the state's ideology; engage in "service" on behalf of the ideology, including by leading "DEI and anti-racist efforts by participating in DEI groups, committees, or community activities;" develop curriculum and pedagogy that promote the ideology; participate in professional development along ideological lines; and instruct new employees on the "expectations for their contribution" to the state's DEI and anti-racist ideology. *See* Exh. A.

"Faculty members shall employ teaching, learning, and professional practices that reflect DEIA and anti-racist principles, and in particular, respect for, and acknowledgement of the diverse backgrounds of students and colleagues to improve equitable student outcomes and course completion." Cal. Code Regs. tit. 5, § 53605(a).

*The ideological divide at Bakersfield College*

Bakersfield College history professor Daymon Johnson serves as the Faculty Lead for the Renegade Institute for Liberty (RIFL), of which he is a founding member. Doc. 8 at ¶ 60. RIFL is a sanctioned Bakersfield College organization consisting of faculty members dedicated to the pursuit of free speech, open inquiry and critical thinking. *Id.* RIFL represents a minority position on

1  campus standing in general opposition to political viewpoints espoused by many faculty members

2  and members of the school administration, which is aligned with Section 51201's mandate to

3  "embrace diversity" by, among things, "intentionally practic[ing] . . . anti-racism." *Id.* at ¶ 61.

4  　　　Defendants make clear their ideological orientation and seek to impose it on faculty. The

5  "primary purpose" of Bakersfield College's Equal Opportunity and Diversity Advisory Committee

6  (EODAC) "is to actively assist/facilitate" the school's "cultural and institutional policies and

7  practices that demonstrate a commitment to greater diversity and inclusion." Bakersfield College,

8  *Equal Opportunity & Diversity Advisory Committee*, https://perma.cc/BWR6-2U79 (last visited

9  Sept. 12, 2023). EODAC's website provides, "Section 51201 provides us with direction on

10  diversity, equity and inclusion," and recites Section 51201(b)'s mandatory language. *Id.*

11  　　　On December 8, 2022, then-Bakersfield College President Zav Dadabhoy emailed

12  employees what began as a holiday greeting, but which quickly devolved into a political declaration

13  attacking RIFL. Doc. 8 at ¶ 62; Exh. C. Referencing RIFL, Dadabhoy decried "a small group

14  promoting exclusion," which he blamed for unspecified "attacks" on "members of BC's

15  communities of color, and LGBTQ community," but explained that such exclusion "is not a value

16  of this institution." Exh. C. He then declared that Cal. Code Regs. tit. 5, § 51201 "provides us with

17  direction on diversity, equity and inclusion," and in particular, "[w]hat really resonates with me is

18  subsection (b)," which he proceeded to quote in full. *Id*. Dadabhoy then added, "We must not allow

19  the discontent or views of a few to supersede *what we are required* to provide at our college and the

20  work that we have *intentionally developed* to support all members of the community. This is

21  reminder that *we are all tasked with this work*." *Id*. (emphasis added). Johnson understood the

22  "attacks" to reference RIFL faculty's political speech, and Dadabhoy's exhortation to follow

23  Section 51201 as an instruction to curtail his own non-compliant, dissenting speech and instead

24  speak more consistently with anti-racism ideology. Doc. 8 at ¶ 98.

25  　　　At a December 12, 2022, KCCD Board of Trustees' meeting, Defendant Corkins termed

26  RIFL faculty's minority political views "abusive," declaring that RIFL faculty are "in that five

27  percent that we have to continue to cull. Got them in my livestock operation and that's why we put

28  a rope on some of them and take them to the slaughterhouse. That's a fact of life with human nature

1   and so forth, and I don't know how to say it any clearer." *December 2022 Board of Trustees*

2   *Meeting (12/13/2022)*, YouTube, https://perma.cc/L7JY-4HJR (last visited Sept. 12, 2023). "I don't

3   think we're that way, if we are we've got to get the bad actors out of the room. It just bothers me

4   when the bad actors are paid staff and faculty and if that's where it is we really got a problem." *Id.*;

5   Doc. 8 at ¶ 66. None of the other Defendant trustees disavowed Corkins' call to take RIFL members

6   to the "slaughterhouse." Doc. 8 at ¶ 67. Defendant Nan Gomez-Heitzeberg chuckled at the

7   suggestion. *Id.* Johnson recognized the explicit threat against him if he continued to express

8   political viewpoints that did not comport with the majority DEI ideologies on campus. *Id.* at ¶ 98.

9        Bakersfield College has adopted a requirement that faculty who wish to serve on committees

10  that screen potential new hires must complete a training session to assure that their committee

11  service would comply with the school's DEIA policies. *Id.* at ¶ 68; Exh. D.

12                    *Bakersfield College investigates and threatens Professor Johnson*
                        *for disagreeing with a colleague on Facebook*
13

14       On August 22, 2019, Bakersfield College Professor Andrew Bond posted on his personal

15  Facebook page, "Maybe Trump's comment about shithole countries was a statement of projection

16  because honestly, the US is a fucking piece of shit nation. Go ahead and quote me, conservatives.

17  This country has yet to live up to the ideals of its founding documents." Exh. E at 2; Doc. 8 at ¶ 70.

18       In May 2021, Professor Johnson reposted Bond's post on RIFL's Facebook page, and added,

19  "Here's what one critical race theorists at BC sounds like. Do you agree with this radical SJW from

20  BC's English Department? Thoughts?" Exh. E at 2; Doc. 8 at ¶ 71. Bond filed an administrative

21  complaint against Johnson for harassment and bullying over the Facebook post and commentary. *Id.*

22  at ¶ 17. But rather than dismiss Bond's complaint out of hand, Dadabhoy subjected Johnson to an

23  investigation that necessitated Johnson's retention of counsel. *See* Exh. E; Doc. 8 at ¶ 74. Finally,

24  on February 23, 2022, five months after Bond's complaint, Dadabhoy sent Johnson KCCD's

25  administrative determination that his conduct presented no cause for discipline. Exh. E at 9; Doc. 8

26  at ¶¶ 74-75. In doing so, however, the district saw fit to pass judgment on each of 29 separate

27  allegations raised in the dispute, including that another professor "liked" a negative comment about

28  Bond (allegation 2, sustained), that Johnson's posting doxed Bond (allegation 3, "not sustained but

    plausible"), and that "Professor Bond was offended that Professor Johnson described his personal

1   views incorrectly. Professor Johnson admitted he would also be offended in a similar situation"

2   (allegation 14, sustained). Exh. E; Doc. 8 at ¶ 75.

3         Although the inquiry "revealed no evidence that Dr. Johnson took any of these actions in his

4   role as a [KCCD] employee," Exh. E at 8, KCCD warned it "will investigate any further complaints

5   of harassment and bullying and, if applicable, will take appropriate remedial action including but

6   not limited to any discipline determined to be appropriate." *Id.* at 9; Doc. 8 at ¶ 76.

7                     *Bakersfield College punishes professors for speaking*

8         Bakersfield College determined that a public lecture given by then-RIFL Faculty Lead

9   Professor Matthew Garrett entitled "The Tale of Two Protests: Free Speech and the Intellectual

10  Origins of BC Campus Censorship," at which Professor Erin Miller introduced him, constituted

11  "unprofessional conduct." When the school threatened the professors with further discipline, Garrett

12  and Miller sued school officials for violating their First Amendment rights. Doc. 8 at ¶ 78; *Garrett*

13  *v. Hine*, No. 1:21-cv-00845 (E.D. Cal. 2021).

14        Subsequently, Defendant McCrow charged Garrett with "unprofessional conduct," and

15  advised that Garrett could be charged with "unsatisfactory performance" and violation of BP 3050.

16  Doc. 8 at ¶ 79; Exh. F. Garrett's transgressions included:

17  - Authoring an op-ed piece in the *Bakersfield Californian* that "disregarded the impact of [an]
18    attack" consisting of the posting of political stickers, "took issue with BC's characterization
      of the stickers as 'hate speech' and 'vandalism,'" "suggested that their content was protected
19    by the First Amendment," and even "went further to suggest that certain terms like 'Cultural
      Marxism' weren't 'hate speech' but instead speech that challenges a dominant agenda on
20    campus, i.e. the social justice movement," Exh. F at 1;

21  - Opining that the EODAC committee "has been consistently staffed by the administration
      with faculty who hold one particular point of view," *id.* at 2, ¶ 4c, and criticizing the
22    committee chair's conduct at a meeting, *id.* at 2-3, ¶ 5;

23  - Providing a public comment on the Bakersfield College's Curriculum Committee proposal
      of two history courses stating, in opposition, that the courses were the equivalent of a "high
24    school field trip" and "openly partisan training for children," *id.* at 3, ¶ 6;

25  - Causing "very real harm" to students based on three student allegations: first, an
      unexplained assertion that Garrett was a racist who would fail students based on their skin
26    color; second, the fact that a different professor whispered something in Garrett's ear; and
      third, that Garrett allegedly "insult[ed] [another professor] and her way of teaching," which
27    purportedly made the student feel unsafe, *id.* at 4-5, ¶ 11;

28  - Expressing opinions on a local radio show including that "sociology, ethnic studies, [and]
      anthropology are producing bad information and poor narratives grounded in history;" that
      diversity trainings are just ways to figure out how to legally discriminate; and "[c]laim[ing]
      that Bakersfield College staff are trying to quiet [Garrett]," *id.* at 5, ¶ 12;

1
2

- "[R]epeatedly fail[ing]," as the Faculty Lead for the Renegade Institute for Liberty, to "restrict" criticism of KCCD and faculty "on RIFL's social media" that McCrow alleged to be "baseless," *id*. at 6, ¶ 13; and

3
4

- Using his social media account to express critical opinions of the school and faculty, including statements such as, "'[a]s a public institution their financials should be open to public criticism,'" *id*. ¶ 14.

5    McCrow added, "Importantly, you caused students to feel unwelcome and unsafe by belittling the

6    community's valid concerns." *Id*. at 7. Johnson understands that "invalid views," or criticism of

7    views that "the community" deems "valid," are punishable. Doc. 8 at ¶ 82.

8        McCrow stressed that Garrett's speech harmed the school's reputation, and that Garrett

9    should not have expressed his concerns about the school publicly. Exh. F at 7. He asserted that

10   Garrett's speech dissuaded others from committee work and risked causing disapproval of proposed

11   curriculum. McCrow commanded Garrett, apparently with respect to his public political and

12   ideological speech, "You will not substitute your own judgment for the judgment of your supervisor

13   or other administrators," and directed Garrett to refrain from publicly airing his grievances and

14   complaints. *Id*. at 8. Finally, McCrow also removed Professor Garrett from the Equal Opportunity

15   and Diversity Advisory Committee. *Id*. Upon receiving McCrow's letter, Garrett resigned as RIFL

16   Faculty Lead. Johnson succeeded him in that position, and on the committee. Doc. 8 at ¶ 88.

17       On April 11, 2023, Dadabhoy formally recommended to Defendant Trustees, with the

18   concurrence of Defendant Chancellor Burke's predecessor, Defendant Christian, that they terminate

19   Garrett's employment. Two days later, Defendant Trustees found cause for Garrett's termination as

20   set out by the President and Chancellor and fired Professor Garrett. The "Statement of Charges and

21   Recommendation for Statement of Decision to Terminate" upon which Defendants fired Garrett

22   recounted McCrow's allegations, and declared that Garrett failed to follow that notice's directives

23   to cure his allegedly deficient job performance by:

24
25
26

- "[D]eliberately mischaracterizing a Bakersfield College student housing initiative as 'not student dorms' and as 'low income housing,'" and by "print[ing] and distribut[ing] a flyer" criticizing the project "as threatening the neighborhood with loud parties, safety issues, crime, crowded daily parking issues, overflow of parking for events, and decrease in property values." Exh. G at 13, ¶ 8 (internal punctuation omitted);

27
28

- Alleging that KCCD failed to explain why his conduct was unprofessional, *id*. 14 ¶ 9, and sending McCrow a request for clarification that was not "made in good faith," *id*. ¶ 10;

- Providing an interview for *Fox News Digital* in which he criticized Bakersfield College's "affirmative action-type behavior"—"allegations [that] demeaned, demoralized, and disrespected the College's employees and its students;" and "[p]rompting," merely by virtue of being interviewed, third-party comments on social media that were critical of Bakersfield College and its students, *id.* ¶ 11a;

- Linking to his *Fox News Digital* interview on the RIFL Facebook page, and "continu[ing] to permit the RIFL Facebook page to post" criticism of the school and its faculty, which the President and Chancellor asserted were "false and baseless attacks," *id.* at 15, ¶ 11b;

- Emailing a Daily Wire article about the school to another person, *id.* at ¶ 11c, and sharing the article on his social media, *id.* at ¶ 11e;

- Criticizing a faculty member for inciting students against him in an interview with *Inside Higher Ed*, *id.* at 15, ¶ 11d; and

- Engaging in "ongoing public attacks [that] demonstrate[d] Garrett's continued refusal to engage in civil, honest discourse or to direct complaints to the appropriate college administrator as directed by the 90-day notice," *id.* at 16.

Defendants charged Garrett with other offenses consisting of political speech, including the publication of an open letter criticizing Defendant Trustees, *id.* at 17, ¶ 14e; criticizing other professors on Facebook for excessive claims of racism, sexism, and classism, *id.* at 19, ¶ 19; linking to a *Just the News* article critical of the school on RIFL's Facebook page, *id.* ¶ 20; and "accus[ing]" KCCD "of financial mismanagement," *id.* ¶ 21.

Defendants alleged that Garrett's speech amounted to immoral or unprofessional conduct per Cal. Educ. Code §§ 87732(a), 87735; dishonesty, *id.* § 87732(b); unsatisfactory performance, *id.* § 87732(c); evident unfitness for service, *id.* § 87732(d); persistent violation of, or refusal to obey, the school laws of the state or reasonable community college regulations, *id.* § 87732(f); and willful refusal to perform regular assignments without reasonable cause, as prescribed by reasonable rules and regulations of the employing district, *id.* § 87735. Exh. G at 17.

*Defendants' adoption and enforcement of an official ideology chills*
*Professor Johnson's speech, and compels him to speak contrary to his conscience*

Considering his experience of being investigated by Defendants over his Facebook posts, Defendants' adoption of an official political ideology that he rejects, Defendants' exhortations that their ideology must be affirmed and followed, Defendants' application of the termination standards to disfavored speech, and Johnson's responsibility for some of the speech for which Professor Garrett was fired, Professor Johnson refrains from expressing his political views and from freely

1    participating in the intellectual life of the college for fear that Defendants would investigate and

2    discipline him, and terminate his employment based on his viewpoints. Doc. 8 at ¶ 97.

3          Johnson's conscience does not allow him to believe in and practice the state's "embracing

4    diversity" ideology. He does not believe that racism is pervasive and embedded into all societal

5    structures—particularly at Bakersfield College—and thus he does not wish to challenge the values,

6    structures, policies, and behaviors that, according to others, allegedly perpetuate systemic racism.

7    Johnson does not believe he is racist, and he does not wish to constantly identify, challenge, upend,

8    and replace existing policies. Professor Johnson not only disagrees with the ideology Defendants

9    require him to affirm, but Johnson also believes that his political viewpoints, which he would like to

10   express, are inconsistent with and even defiant of that ideology. Doc. 8 at ¶¶ 154-155.

11         Johnson identifies generally with the viewpoints espoused by RIFL, and shares many of

12   Garrett's conservative political views and social values the expression of which Defendants censor

13   and punish. *Id.* at ¶ 100. For example, Johnson posted 15 of the 18 RIFL Facebook posts that

14   reference the phrase "cultural Marxism," a term which Garrett was fired for defending. *Id.* at ¶ 101.

15   Johnson, like Garrett, does not agree with Bakersfield College's apparent definition of what

16   constitutes "hate speech" and believes that what is often considered "hate speech" by some is

17   nonetheless speech protected by the First Amendment. *Id.* at ¶ 100. But Johnson now refrains from

18   mentioning "Cultural Marxism." *Id.* at ¶¶ 101-102. He canceled a speech addressing the topic, and

19   refrains from recommending books that discuss the subject. *Id.* Indeed, mindful of Garrett's

20   experience, Johnson refrains from inviting speakers on behalf of RIFL, as they would explore

21   similar views. *Id.* at ¶ 103.

22         Johnson's speech is also chilled by the fact that Garrett was disciplined for filing an ethics

23   complaint about Defendant McCrow, in circumstances that Johnson, too, would have complained.

24   *Id.* at ¶ 104. And Johnson refrains from speaking further about his department's curriculum

25   considering Defendants fired Garrett for opposing proposed history courses, and Johnson likewise

26   commented about the same courses to the same committee. *Id.* at ¶ 105.

27         Johnson refrains from offering any potentially controversial political views on social media,

28   owing to Defendants' behavior. *Id.* at ¶ 107. He opposes censorship, but mindful that Garrett was

1   fired for not censoring comments on RIFL's Facebook page, Johnson deleted posts that he believed

2   Defendants would find objectionable and turned over the page's management to two retired

3   professors. *Id.* Nonetheless, another professor has now filed a complaint against Johnson over

4   commentary that others posted on RIFL's Facebook page. *Id.* Given his experience being

5   investigated by Defendants over Bond's complaint, Johnson understands that any of his critics can

6   trigger investigations and potential discipline over his social media use. *Id.* at ¶ 99. Indeed,

7   Johnson authored and was responsible for some of the Facebook posts that Defendants attributed to

8   Garrett and used to justify his termination. *Id.* at ¶ 105.

9        Defendants' citation of Garrett's media appearances as cause for his discipline and

10   termination have also prompted Johnson to turn down invitations to speak to the same media

11   outlets. *Id.* at ¶ 111. Johnson has also stopped attending committee meetings where he would share

12   his views on race, diversity, equity, and inclusion, considering that Garrett was fired for just

13   listening to another professor's comment to him while sitting on that committee. *Id.* at ¶ 108.

14   Johnson also refrains from offering conservative views about LGBTQ issues, as Defendants and

15   various progressive professors have linked these topics to DEI. *Id.* at ¶¶ 108-110.

16        Johnson has previously served on numerous screening committees for new hires, and wishes

17   to continue doing so, but he refrains from taking the DEIA training now required to continue such

18   service and will not apply to serve on screening committees because he does not wish to promote

19   DEIA ideology, and will not evaluate faculty based on their DEIA adherence or instruct them on

20   DEIA compliance. *Id.* at ¶ 112.

21        Bakersfield College evaluates Johnson's performance every three years. An unsatisfactory

22   evaluation will lead to remediation and potentially termination. Johnson has just successfully

23   completed an evaluation period and intends to keep working as a professor at Bakersfield College,

24   so his performance moving forward will be evaluated under the new DEIA standards and rules. *Id.*

25   at ¶ 113. The DEIA requirements chill his speech, including his academic freedom in the classroom

26   and as the Faculty Lead of RIFL, and compel him to affirm, promote, and celebrate a political

27   ideology that he rejects and even finds abhorrent. *Id.* at ¶ 112. Johnson cannot meet the standards

28   set out in the Chancellor's "Competencies and Criteria," which will guide KCCD's evaluation of his

1   teaching, without expressing beliefs and viewpoints that he rejects and without stifling his own

2   viewpoints on political and social topics. *Id.* at ¶ 120. Johnson is profoundly opposed to the

3   ideology that Defendants would have him promote rather than criticize, as he is dissuaded from

4   doing for fear of official retribution and loss of employment. *Id.* at ¶¶ 114-147.

5        Almost everything Johnson teaches violates the new DEIA requirements—not just by failing

6   to advance the DEIA and "anti-racist" ideology, but also by criticizing it. Johnson fears that if he

7   continues teaching his courses as he has designed them, he will surely be deemed "unsatisfactory"

8   in his upcoming evaluations. *Id.* at ¶ 119. Johnson is set to teach three courses in the upcoming

9   semester which challenge DEI historical narratives and present views incompatible with DEI. In

10  these courses, Johnson assigns books critical of DEI, written by authors who have been targeted by

11  DEI adherents. *Id*. at ¶¶ 149-151. Indeed, one DEI sympathizer has already called for Johnson to be

12  fired for recommending and assigning books used in these courses. *Id.* at ¶ 152. In the following

13  semester, Johnson will teach history courses that raise the same problems under Defendants'

14  ideological mandates. The material Johnson will use, his pedagogy, and the views he will teach are

15  utterly contrary to the state's DEIA and the Chancellor's DEIA competency standards. If Johnson

16  teaches his classes as he normally would and always has, he will not be "demonstrating" or

17  "progressing" toward compliance with the new DEI standards. *Id.* at ¶ 148.

18                            SUMMARY OF THE ARGUMENT

19       Perhaps Defendants meant to file their brief, or a portion of it, in another case. Page after

20  page, they repeat the term "adverse employment action"—23 times in all—in support of the

21  proposition that "[w]ithout an adverse employment action, Johnson has not stated a valid First

22  Amendment retaliation claim." Doc. 46 at 16. True. Johnson has not stated a retaliation claim. He

23  has stated *pre-enforcement* claims. The words "adverse employment action" and "retaliation" might

24  be all over Defendants' brief, but they appear nowhere in Johnson's Complaint.

25       Defendants misstate the law of standing, erroneously asserting that the communication of an

26  actual enforcement threat is a prerequisite to any pre-enforcement claims. It is not. While an

27  official's formal enforcement threat obviously establishes standing, the government cannot "pocket

28  veto" First Amendment claims by withholding formal threats. The question is whether the

1  plaintiff's fear of enforcement is reasonable. On this record, the answer is not in any doubt. And on

2  a motion to dismiss, that answer does not change merely because Defendants deny the allegations.

3          Defendants next assert that they are municipal officers enforcing a state law for which they

4  are not responsible. And Johnson, goes their argument, not having identified a municipal custom,

5  policy, or practice, cannot sue them under 42 U.S.C. § 1983 per *Monell v. Dep't of Soc. Servs. of*

6  *City of New York*, 436 U.S. 658 (1978). But KCCD is not a municipality and Defendants are not

7  municipal officers. As Defendants should know, KCCD is an arm of the State of California. It is not

8  a municipality. This is a lawsuit against *state officials* for their enforcement of *state law* in

9  contravention of the Constitution. Plaintiffs are allowed to bring facial and as-applied constitutional

10  challenges against the enforcement of state laws and regulations by the state officials who enforce

11  them. And just as *Monell* allows for lawsuits over the enforcement of a municipal policy reflected in

12  an ordinance, the state's laws and regulations reflect the state's duly adopted policies. It is absurd to

13  suggest that plaintiffs cannot challenge an unconstitutional law or regulation, or the unconstitutional

14  application of a law or regulation, unless they *also* challenge some unwritten, uncodified custom,

15  practice, or policy. Similarly, because constitutional challenges are brought against those who

16  participate in the violation, there is no suing the legislature or administrative body for enacting the

17  laws or regulations. And because they have discretion as to how they enforce the state's laws and

18  regulations, Defendants would be subject to injunctive relief under Section 1983 even if they were

19  municipal officers.

20                                          ARGUMENT

21  I.   JOHNSON DOES NOT BRING A RETALIATION CLAIM.

22          Defendants argue that Johnson cannot sustain a retaliation claim because has not alleged that

23  he sustained an "adverse employment action." But the complaint does not contain the word

24  "retaliation." Johnson makes no such claim.[2] Johnson's complaint sounds in pre-enforcement.

25  Retaliation is what Johnson fears and seeks to enjoin, not a past event for which he seeks redress.

26

27

28  [2] To be sure, Defendants' investigation into Johnson's Facebook post would be an "adverse employment action," defined as "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in a protected activity," *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 970 (9th Cir. 2002) (internal quotation marks omitted), were that a relevant question.

1    II.   JOHNSON HAS STANDING TO SUE KCCD DEFENDANTS.

2          "In a pre-enforcement challenge, plaintiffs can show injury in fact by establishing that (1)

3    they intend to violate the law; and (2) have shown a reasonable likelihood that the government will

4    enforce the statute against them." *Project Veritas v. Schmidt*, 72 F.4th 1043, 1053 (9th Cir. 2023).

5    "Reasonable likelihood" does not require a formal promise of prosecution. Article III requires only

6    that "the threat of enforcement must at least be 'credible,' not simply 'imaginary or speculative.'"

7    *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc)

8    (quoting *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979)).

9          "[A] government's preliminary efforts to enforce a speech restriction or its past enforcement

10   of a restriction [is] strong evidence (although not dispositive) that pre-enforcement plaintiffs face a

11   credible threat of adverse state action." *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010)

12   (citation omitted). A credible threat exists where "prosecuting authorities have communicated a

13   specific warning or threat to initiate proceedings under the challenged speech restriction," or if there

14   is "a history of past prosecution or enforcement under the challenged statute." *Thomas*, 220 F.3d at

15   1139. But even that much is often not required, as when the state enacts a new speech-restricting

16   law. *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) (citing *Virginia v. Am. Booksellers

17   Ass'n, Inc.*, 484 U.S. 383 (1988)). "[T]he tendency to find standing absent actual, impending

18   enforcement against the plaintiff is stronger in First Amendment cases." *Id.* (internal quotations

19   omitted).

20         Defendants misread the Ninth Circuit's three-factor test for pre-enforcement standing, in

21   which the communication of a specific warning or threat is the second factor. These factors are

22   "weigh[ed]." *Unified Data Servs., LLC v. FTC*, 39 F.4th 1200, 1210 (9th Cir. 2022). The nature of

23   plaintiffs' plans to violate the law, and enforcement history, also count. *Id.* More to the point, "[i]n

24   the context of First Amendment speech, a threat of enforcement may be inherent in the challenged

25   statute, sufficient to meet the constitutional component of the ripeness inquiry." *Wolfson v.

26   Brammer*, 616 F.3d 1045, 1059 (9th Cir. 2010) (citations omitted). The Ninth Circuit has not

27   overruled the Supreme Court's pre-enforcement standing doctrine, or the numerous pre-

28   enforcement cases sustaining pre-enforcement standing in the absence of a specific, explicit threat.

Johnson is not vague about what he wants to say and not say. Nor is he imagining the very real risk to his employment if he continues on his intended path.

### A. *Johnson has provided clear evidence of speech he reasonably refrains from uttering or feels compelled to utter.*

Johnson has painstakingly detailed his "concrete plan" to speak or refrain from speaking in ways that Defendants would punish. Many of his plans involve speech that Defendants have already punished. For example, Johnson is currently refraining from discussing "Cultural Marxism" or defending it as a speaker topic, FAC, Doc. 8, at ¶ 102; recommending books, *id.* at ¶ 102; posting on the RIFL Facebook page or his own social media, *id.* at ¶ 107; finalizing speaker agreements, *id.* at ¶ 103; filing internal complaints about fellow school staff or faculty, *id.* at ¶ 104; addressing or criticizing Bakersfield College history curriculum, *id.* at 105; expressing the viewpoints that students are being weaponized by the EODAC to push DEI ideology agendas, *id.* at ¶ 108; attending EODAC meetings where, if he attended, he would express concerns about "reverse" racism and deceptive ways the committee was pushing affirmative action, *id.* at ¶ 109; interviewing with the media and providing commentary similar to Garrett's, *id.* at ¶ 111; serving on screening committees so as not to have to espouse views mandated in the school's DEIA training, *id.* at ¶ 112; protesting against the participation of males in female sports competitions, *id.* at ¶ 110; protesting against "drag queen story hours," *id.*; and expressing his objections to anti-racist ideology, *id.* at ¶ 118.

Johnson has also explained how Defendants compel him to speak. Defendants evaluate Johnson, *id.* at ¶¶ 113-14, and will terminate him for not following the rules, *id.* at ¶¶ 27-29; Cal. Educ. Code § 87732(f). They must and will evaluate him based on his DEIA compliance. FAC at ¶¶ 39-41; Cal. Code of Regs. tit. 5, §§ 53601, 53602, 53605. Accordingly, Johnson is now compelled, against his will, to "[a]dvocate[] for and advance[] DEI and anti-racist goals and initiatives," FAC at ¶ 126; "[l]ead[] DEI and anti-racist efforts" *id.*; "constantly identify, challenge, upend, and replace existing policies," *id.* at ¶ 154; "introduce 'new employees to the institution and system's focus on DEI and anti-racism and the expectations for their contribution,'" *id.* at ¶ 112; "'[s]eek[] DEI and anti-racist perspectives and appl[y] knowledge to problem solving, policies, and processes to create respectful, DEI-affirming environments (e.g., campus and classroom environments that are inclusive, promotes equity, and affirms diversity),'" *id.* at ¶ 120; "'demonstrate[] a commitment to

continuous improvement as it relates to [his] DEI and anti-racism knowledge, skills, and behaviors[,]"" *id*. at ¶ 122; ""[p]romote[] and incorporate[] DEI and anti-racist pedagogy,"" *id*. at ¶ 123; ""[a]rticulate[] the importance and impact of DEI and anti-racism"" *id*. at ¶ 125 and ""seek[] opportunities for growth to acknowledge and address the harm caused by internal biases and behavior,"" *id*. at ¶ 121. The record contains much more. But Johnson "need not provide transcriptions of the conversations" to prove "content, form and context of speech." *Greisen v. Hanken*, 925 F.3d 1097, 1110 (9th Cir. 2019). His complaint more than suffices.

### B. Defendants have threatened Johnson and demonstrated their intent to enforce the laws against him, placing him at risk of imminent harm.

Defendants have plainly communicated their intent to enforce the DEIA regulations and initiate proceedings under Cal. Educ. Code §§ 87732 and 87735, and BP 3050, if Johnson engages in speech that does not comport with "intentionally practic[ing] . . . antiracism." Cal. Code Regs. tit. 5, § 51201(b). Defendant Corkins thinks the RIFL members' views are "abusive," and has threatened to "cull" Johnson and "take [him] to the slaughterhouse" for expressing those views. Defendant Watkin's predecessor referred to those same views as "attacks" on minorities that violate § 51201, Exh. C, and said Garrett's views, which Johnson shares, are inconsistent with the school's DEIA ideologies and "make[ ] his colleagues and the District's students feel unsafe." Exh. G at 12, 22. Defendant McCrow issued a disciplinary notice to Garrett threatening further action for speech that is contrary to KCCD's preferred DEIA ideology. Exh. F. And Defendants have already investigated Johnson for posting dissident political speech on Facebook. Exh. E.

These acts suffice, as "informal measures, such as the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation, can violate the First Amendment also." *Mulligan v. Nichols*, 835 F.3d 983, 989 n.5 (9th Cir. 2016) (citations omitted). Defendants posit this Court should simply disregard them all as, for example, "the off-hand remark of only one Trustee" (John Corkins) or a mere email about "aspirational community goals." (Watkin's predecessor). Doc. 46 at 19. But in evaluating a motion to dismiss, court must draw inferences in favor of the plaintiff, not the defendants. These statements do not sound benign to a reasonable KCCD faculty member. They are part of an escalating pattern that has already led to one professor's termination—Johnson's predecessor as RIFL lead—in part for not censoring Johnson's speech.

1    It is implausible that that Defendants hold such dim views of Johnson's ideas, but would not
2    label them "immoral or unprofessional," Cal. Educ. Code § 87732(a), "[e]viden[ce] [of] unfitness
3    for service," *id*. § 87732(b), evidence of refusal to obey DEIA regulations, *id*. § 87732(f); lacking in
4    "civility," BP 3050, or "aggressi[ive], threat[ening], harass[ing], ridicul[ing], or intimidat[ing]," *id*.
5    And Johnson should not be required to teach for the next three years, only to meet that same fate
6    and find out his "abusive" views and failure to incorporate DEIA into his teaching have cost him his
7    job, as Defendants take his failure to satisfy Cal. Code Regs. tit. 5, §§ 53425, 53462, and 53605 as
8    "unsatisfactory performance," Cal. Educ. Code § 87732(c); "[e]vident unfitness for service," *id*. §
9    87732(d), or "[p]ersistent violation of, or refusal to obey" state regulations, *id.* § 87732(f).

10   Defendants have also demonstrated a "history of past prosecution or enforcement under the
11   challenged statute[s]" by disciplining and terminating Garrett. *Thomas*, 220 F.3d at 1139.
12   Defendants assert that Garrett was terminated for "*conduct*" that BP 3050 prohibits. Doc. 46 at 20
13   (emphasis in the original). But BP 3050 expressly prohibits "*verbal forms*" of aggression, threat,
14   harassment, ridicule or intimidation." And there is no denying that the bulk of Garrett's alleged
15   transgressions were acts of pure political speech, the same speech from which Johnson refrains.

16   Defendants punished Garrett for opining that the phrase "Cultural Marxism" is not hate
17   speech and is protected by the First Amendment. Exh. F at 1. Johnson agrees and has posted that
18   same view on social media in the past; but he distances himself from referencing and supporting the
19   term in every possible way now. Doc. 8 at ¶¶ 101-102. Defendants punished Garrett for filing a
20   complaint against Defendant McCrow for viewpoint discrimination. Exh. F at 3, ¶ 2.d.ii. Johnson
21   has since refrained from filing internal complaints about school staff or faculty. Doc. 8 at ¶ 104.
22   Defendants punished Garrett for opining that the EODAC committee is staffed by faculty who
23   "hold one particular point of view," Exh. F at 2, ¶ 4c, and criticizing the committee chair's conduct
24   at a meeting, *id.* at 2-3, ¶ 5. Johnson has stopped attending EODAC meetings to completely avoid
25   having to give his conservative views on race, diversity, equity, and inclusion that EODAC
26   addresses. Doc. 8 at ¶¶ 108-109. Defendants punished Garrett for criticizing two proposed history
27   courses via public comment and posts on the RIFL Facebook page. Exh. F at 3, ¶ 6. Johnson also
28   wrote a critical public comment, and *he* authored the Facebook posts that Defendants attributed to

Garrett. Doc. 8 at ¶ 105. Defendants punished Garrett for giving interviews to the Terry Maxwell Show and Fox News Digital in which he criticized Bakersfield College's diversity practices. Exh. F at 5, ¶ 12; Exh. G at 13, ¶ 11a. Johnson turned down invitations to appear on the same media outlets to discuss similar topics, on which he shares Garrett's views. Doc. 8 at ¶ 111. Defendants punished Garrett for expressing critical opinions of the school and faculty - and allowing other third parties to do so – on RIFL's Facebook page. Exh. F ¶ 14; Exh. G ¶¶ 3(a)(vi), 11(b), 15, 19, 20. Johnson had actually been the one to author or sanction many of the posts that Garrett was disciplined for; he no longer posts on the RIFL Facebook page and or his own social media page. Doc. 8 at ¶¶ 106-107.

Defendants' history with Garrett is not "unrelated." Doc. 46 at 11. It demonstrates a clear "history of past enforcement against parties similarly situated to" Johnson, which "cuts in favor of a conclusion that a threat is specific and credible." *Lopez*, 630 F.3d at 786-87. Defendants cannot charge Garrett with mostly speech offenses, convict him of everything, and then cherry-pick the non-speech allegations to claim that *those* were the ones for which he was really fired. A reasonable professor looking at Garrett's experience would silence himself.

Defendants' assertion that Johnson faces no credible threat of discipline because he is not *currently* being disciplined is irrelevant. "To establish a dispute susceptible to resolution by a federal court," all a "plaintiff[ ] must allege [is] that they have been threatened with prosecution, that a prosecution is likely, or even that a prosecution is *remotely possible*." *Culinary Workers Union, Local 226 v. Del Papa*, 200 F.3d 614, 617 (9th Cir. 1999) (internal citations and quotations omitted) (emphasis added); *see, e.g., Canatella v. California*, 304 F.3d 843, 855 (9th Cir. 2002) ("While Canatella is not currently involved in disciplinary proceedings, it cannot be said that Canatella's fear of facing future disciplinary proceedings is 'imaginative and wholly speculative.'").

Finally, Defendants' claim that Johnson does not face a current threat of discipline because he "will not be evaluated for three more years" under the new DEIA regulations, Doc. 46 at 12, misses the point. Aside from the fact that Defendants could terminate Johnson tomorrow for his speech (they did not fire Garrett for failing a three-year review), Johnson's evaluation in three years will be based on his speech *today*.

III.   DEFENDANTS ARE SUBJECT TO INJUNCTION BECAUSE THEY ARE THE RELEVANT STATE
OFFICIALS WHO ARE ENFORCING THE CHALLENGED STATE LAWS AND REGULATIONS.

Defendants err in persisting with the theory that they are municipal officials who can only be

sued for enforcing municipal policies under *Monell*. Doc. 46 at 21-25; *see also* Doc. 43.

Simply put: Community college districts are *not municipalities*. They are not "persons"

under Section 1983. Defendants fail to cite one Ninth Circuit case that has ever treated community

college districts as *Monell* entities, or that has treated community college trustees as municipal

actors. To the contrary, "the Ninth Circuit has held that community college districts in California

are state entities that possess Eleventh Amendment immunity from 1983 claims[.]" *Berry v.*

*Yosemite Cmty. Coll. Dist*., No. 1:18-cv-00172-LJO-SAB, 2018 U.S. Dist. LEXIS 64732, at *7

(E.D. Cal. Apr. 17, 2018) (citing *Mitchell v. Los Angeles Cmty. Coll. Dist.*, 861 F.2d 198, 201 (9th

Cir. 1988)). KCCD is a *state* entity. Defendants are *state* officials who *can* be enjoined from

enforcing *state* laws when sued in their official capacities. *Ex Parte Young*, 209 U.S. 123 (1908).

Having been made aware of this basic defect in their argument, Defendants seek to fuse

*Monell* with *Ex parte Young* in a footnote asserting that even if they are state officials, "*Monell*'s

requirements apply," Doc. 46 at 23, n. 7 (citing *Norsworthy v. Beard*, 87 F. Supp. 3d 1104 (N.D.

Cal. 2015)), meaning Johnson must point to a custom or policy beyond the laws and regulations that

Defendants implement. But this would mean that nobody could challenge the constitutionality of a

state law or regulation unless he or she *also* challenged some uncodified "custom or practice." This

is not the law. And *Norsworthy* is irrelevant—an ordinary case where a plaintiff sued state officials

over an uncodified "policy or custom." The case does *not* stand for the proposition that state

officials cannot be sued for enforcing state laws and regulations.

Defendants also misread *Monell*, which does *not* establish that injunctions may only be

entered against uncodified policies, customs, and practices. Rather, *Monell* stands for the simple

proposition that "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary,

declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional

implements or executes a policy statement, *ordinance, regulation*, or decision *officially adopted and*

*promulgated* by that body's officers." *Monell*, 436 U.S. at 690 (footnote omitted) (emphasis added).

"[I]t is when execution of a [local] government's policy or custom, *whether made by its lawmakers*

1   or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that

2   the government as an entity is responsible under § 1983." *Id.* at 695 (emphasis added). If Johnson

3   sued Kern *County* officials, *Monell* would not require him to point to anything more than a duly

4   enacted county ordinance, or, absent that, to an uncodified policy or custom.

5          Here, Johnson sues *state* officials, and he can challenge their enforcement of state laws and

6   regulations—a basic feature of federal practice since *Ex parte Young*. Section 53601(b) directs

7   Defendants to formulate local DEIA standards. The Court can enjoin them from doing so. Section

8   53602 directs Defendants to adopt policies for evaluating Johnson's performance based on his

9   commitment to DEIA, evaluate him based on DEIA, and take a host of steps to implement DEIA

10  ideology. The Court can enjoin them from doing so. Section 53605 directs Johnson to incorporate

11  DEIA into his teaching. The Court can enjoin Defendants from firing Johnson under the Education

12  Code if he refuses to do so. And even absent the DEIA regulations, the Court can enjoin Defendants

13  from applying the Education Code to Johnson in the same manner that they applied against Garrett,

14  interpreting disapproved political thought as grounds for termination.

15         It is not a defense under *Ex Parte Young* for state officials to claim, as Defendants have, that

16  they have no choice but to enforce state law. The Constitution is supreme. U.S. Const. art. VI. This

17  Court's orders enforcing it—even against state law—are not optional. "Allowing state actors to

18  escape liability by claiming that they have a 'compelling state interest' in implementing a state law

19  that violates federal law would make the Supremacy Clause hollow indeed." *Bessard v. Cal. Cmty.*

20  *Coll.*, 867 F. Supp. 1454, 1464 (E.D. Cal. 1994) (footnote omitted).

21         And even if the Defendants were somehow municipal officers who find themselves in the

22  position of enforcing state law, they would *still* be subject to injunctive relief under Section 1983 as

23  they exercise discretion in employment decisions, and in crafting local DEIA policies. *Evers v.*

24  *Cnty. of Custer*, 745 F.2d 1196, 1203 (9th Cir. 1984); *see* FAC at ¶ 58.

25  IV.    THE STATE BOARD OF GOVERNORS IS IRRELEVANT.

26         Seeking to shift the blame elsewhere, Defendants suggest that the true defendants ought to

27  be the state community college system's Board of Governors who are "responsible for the

28  challenged regulations." Doc. 46 at 25. Defendant Christian, represented by the California Attorney

1    General's Office, has notably not advanced this argument, and it is unclear why the state governors

2    belong here.[3] Unlike Defendant Christian, the state governors have no role in maintaining the

3    "competencies and criteria." And while the state governors may have enacted the DEIA regulations,

4    they do not enforce them against Johnson, nor do they enforce the Education Code against Johnson,

5    nor do they enforce BP 3050 against Johnson. KCCD Defendants do.

6          Injunctions are not directed at legislators who enact challenged provisions. They are directed

7    at those who participate in the challenged provisions' enforcement. *Wolfson* stands directly on-

8    point. There, the plaintiff sued members of Arizona's Commission on Judicial Conduct, Arizona's

9    Supreme Court Disciplinary Committee, and Arizona's Chief Bar Counsel to enjoin enforcement of

10   judicial canons that he claimed violated his First Amendment rights. The Ninth Circuit rejected

11   Defendants' arguments that Wolfson lacked standing because they were powerless to repeal the

12   canons. "Wolfson need not obtain a Code revision . . . in order to obtain a measure of relief."

13   *Wolfson*, 616 F.3d at 1056. "These defendants have the power to discipline Wolfson and, if they are

14   enjoined from enforcing the challenged provisions, Wolfson will have obtained redress in the form

15   of freedom to engage in certain activities without fear of punishment." *Id.* "Without a possibility of

16   the challenged canons being enforced, those canons will no longer have a chilling effect on speech.

17   Wolfson will thus be able to engage in the political speech and campaign activities he desires." *Id.*

18   at 1057. The same holds here.[4]

19                                CONCLUSION

20          This Court should deny the KCCD Defendants motion to dismiss (Doc. 46).

21          Dated: September 12, 2023          Respectfully submitted.

22                                    By:    /s/ Alan Gura
                                             Alan Gura, SBN 178221
23                                              agura@ifs.org
                                             Courtney Corbello, admitted pro hac vice
24                                           Del Kolde, admitted pro hac vice
                                             1150 Connecticut Avenue, N.W., Suite 801
25                                           Washington, DC 20036
                                             Phone: 202.967.0007 / Fax:  202.301.3399
26

27   _____

28   [3] Defendants do not suggest suing the California legislators who are "responsible" for the Education Code.
     [4] Should this Court decide that the state governors are necessary parties for having promulgated the DEIA
     regulations, leave to amend should be granted to address this technical matter.

CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2023, I electronically filed the foregoing with the Clerk using the Court's CM/ECF system, and that all participants in this case are registered CM/ECF users who have thereby been electronically served.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 12, 2023.


/s/ Alan Gura
Alan Gura