INSTITUTE FOR FREE SPEECH
Alan Gura, SBN 178221
    agura@ifs.org
Courtney Corbello, admitted pro hac vice
    ccorbello@ifs.org
Del Kolde, admitted pro hac vice
    dkolde@ifs.org
1150 Connecticut Avenue, N.W., Suite 801
Washington, DC 20036
Phone: 202.967.0007
Fax:    202.301.3399

Attorneys for Plaintiff Daymon Johnson

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAYMON JOHNSON, | Case No. 1:23-cv-00848-ADA-CDB |
| *Plaintiff,* | |
| | Date:        N/A |
| v. | Time:        N/A |
| | Dept:        N/A |
| STEVE WATKIN, et al., | Judge:       Hon. Ana de Alba |
| | Trial Date:  Not Scheduled |
| *Defendants.* | Action filed: June 1, 2023 |

MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT CHRISTIAN'S MOTION TO DISMISS

1

TABLE OF CONTENTS

Table of Authorities .................................................................................................. iii

Introduction ............................................................................................................... 1

Statement of Facts ..................................................................................................... 1

Summary of Arguments ............................................................................................ 7

Argument ................................................................................................................... 8

    I.     Johnson has Standing to Challenge the Regulation and Compulsion
          of his Speech ............................................................................................... 8

         A.  The DEIA Regulations, and Christian's Competencies and Criteria,
            Injure Johnson ..................................................................................... 8

         B.  Christian is Part of the Imminent Problem, Playing a Critical Role in
            Enforcing the State's Ideology ............................................................ 10

    II.    Johnson States Valid Claims Against Christian .......................................... 12

         A.  The DEIA Regulations, and Christian's Competencies and Criteria,
            are Neither Government Speech nor Antidiscrimination Laws ......... 12

         B.  The Complaint Plainly States a Viewpoint Discrimination Claim
            Against Christian ................................................................................ 15

         C.  The DEIA Regulations Compel Specific Ideological Speech ............ 16

         D.  This Court Should Provide Leave to Amend Prior to Dismissing for Failure to
            State a Claim ....................................................................................... 18

Conclusion ................................................................................................................. 19

TABLE OF AUTHORITIES

<u>Cases</u>

*Adarand Constructors v. Pena,*
  515 U.S. 200 (1995)..................................................................................................... 14

*Alpha Delta Chi-Delta Chapter v. Reed,*
  648 F.3d 790 (9th Cir. 2011) ....................................................................................... 14

*Arnold v. IBM Corp.,*
  637 F.2d 1350 (9th Cir. 1981) ..................................................................................... 10

*Bair v. Shippensburg Univ.,*
  280 F. Supp. 2d 357 (M.D. Pa. 2003) ......................................................................... 13

*Barke v. Bankes,*
  25 F.4th 714 (9th Cir. 2022) ........................................................................................ 10

*Barnum Timber Co. v. United States EPA,*
  633 F.3d 894 (9th Cir. 2011) ......................................................................................... 9

*Bridenbaugh v. Freeman-Wilson,*
  227 F.3d 848 (7th Cir. 2000) ......................................................................................... 9

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) ......................................................................................... 9

*Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv.,*
  911 F.2d 242 (9th Cir. 1990) ....................................................................................... 18

*Demers v. Austin,*
  746 F.3d 402 (9th Cir. 2014). ...................................................................................... 17

*Downs v. Los Angeles Unified Sch. Dist.,*
  228 F.3d 1003 (9th Cir. 2000) ..................................................................................... 13

*Falls v. Desantis,*
  No. 4:22cv166-MW/MJF, 2022 U.S. Dist. LEXIS 240663 (N.D. Fla. July 8, 2022) ................. 10

*First Interstate Bank of California v. State of California,*
  197 Cal. App. 3d 627 (1987) ....................................................................................... 11

*Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31,*
  138 S. Ct. 2448 (2018).................................................................................................. 17

*Keyishian v. Bd. of Regents,*
  385 U.S. 589 (1967)...................................................................................................... 17

*Koala v. Khosla,*
  931 F.3d 887 (9th Cir. 2019) ....................................................................................... 12

*Lopez v. Candaele,*
  630 F.3d 775 (9th Cir. 2010) ......................................................................................... 8

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992)........................................................................................................ 9

*Merritt v. Mackey,*
   827 F.2d 1368 (9th Cir. 1987) ........................................................................... 11

*Minnesota Voters All. v. Mansky,*
   138 S. Ct. 1876 (2018) ..................................................................................... 15

*NRA of Am. v. BATFE,*
   700 F.3d 185 (5th Cir. 2012) .............................................................................. 9

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
   142 S. Ct. 2111 (2022) ....................................................................................... 9

*Project Veritas v. Schmidt,*
   72 F.4th 1043 (9th Cir. 2023) ............................................................................. 8

*Rosenberger v. Record & Visitors of Univ. of Virginia,*
   515 U.S. 819 (1995) ......................................................................................... 15

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,*
   547 U.S. 47 (2006) ........................................................................................... 17

*S.B. v. Cal. Dep't of Ed,*
   327 F. Supp. 3d 1218 (E.D. Cal. 2018) ............................................................ 11

*Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care,*
   968 F.3d 738 (9th Cir. 2020) ............................................................................ 10

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council,*
   425 U.S. 748 (1976) ........................................................................................... 9

*Waln v. Dysart Sch. Dist.,*
   54 F.4th 1152 (9th Cir. 2022). .......................................................................... 15

*Wolfson v. Brammer,*
   616 F.3d 1045 (9th Cir. 2010) ............................................................................ 8

<u>Statutes</u>

Cal. Code Regs. tit. 5, § 51200 .............................................................................. 2

Cal. Code Regs. tit. 5, § 51201 ............................................................................ 10

Cal. Code Regs. tit. 5, § 51201(a) ....................................................................... 2, 4

Cal. Code Regs. tit. 5, § 51201(b) ..................................................................... 2, 4, 8

Cal. Code Regs. tit. 5, § 51201(c) .......................................................................... 2

Cal. Code Regs. tit. 5, § 53024.2 ......................................................................... 11

Cal. Code Regs., tit. 5, § 53400 ........................................................................... 10

Cal. Code Regs. tit. 5, § 53425 .......................................................................... 3, 10

Cal. Code Regs. tit. 5, § 53601 ............................................................................. 8

Cal. Code Regs. tit. 5, § 53601(a) ...................................................................................... 3

Cal. Code Regs. tit. 5, § 53601(b) ................................................................................. 3, 12

Cal. Code Regs. tit. 5, § 53602 ...................................................................................... 7

Cal. Code Regs. tit. 5, § 53602(a) .................................................................................. 10

Cal. Code Regs. tit. 5, § 53602(b) ........................................................................ 3, 7, 10, 17

Cal. Code Regs. tit. 5, § 53602(c) ................................................................................ 3, 11

Cal. Code Regs. tit. 5, § 53605(a) ........................................................................... 3, 10, 17

Cal. Educ. Code § 70902(b)(4) ..................................................................................... 11

Cal. Educ. Code § 87732 ................................................................................................ 1

Cal. Educ. Code § 87732(f) ............................................................................................ 7

Cal. Educ. Code § 87734 ................................................................................................ 2

Cal. Educ. Code § 87734(f) ............................................................................................ 8

Cal. Educ. Code § 87735 ................................................................................................ 2

<u>Other Authorities</u>

*Diversity, Equity and Inclusion Glossary of Terms,*
    California Community Colleges Chancellor's Office, https://perma.cc/T22V-V866 ......... 2, 14, 16

Kendi, Ibram X., How To Be An Antiracist 24 (2023) ...................................................... 5

INTRODUCTION

Sonya Christian has a great deal to say when it comes to drafting the "competencies and criteria" by which Professor Johnson's fealty to the new state dogma will be measured. Six pages of single-spaced small print dictate to Johnson new ways of thinking, speaking, and teaching, grouped in "themes" from "self-reflection," "self-improvement," "service," and of course, "diversity, equity and inclusion pedagogy and curriculum." But in seeking to evade responsibility for her actions, and in disclaiming her role as the state's chief ideological enforcer, Christian's motion to dismiss offers a near-complete verbatim repetition of her arguments in opposition to Professor Johnson's motion for a preliminary injunction.

The fact, however, remains that Johnson has good reason to fear violating the standards set forth in the state's DEIA regulations, whose enforcement Christian is responsible for guiding and directing. As Johnson noted earlier, Christian's job is to "adopt and publish guidance," which "shall be maintained" based on "current and emerging" practices or scholarship, and that "shall be used" in setting standards Johnson must meet—or be fired. Christian's maintenance and enforcement of these regulations, as reflected in her office's "competencies and criteria," plainly injure Johnson. More to the point, they injure Johnson by violating his First Amendment rights—discriminating against his viewpoints and compelling him to express and endorse political views against his will. Christian's motion should be denied.

STATEMENT OF FACTS

Professor Johnson incorporates by reference the full factual exposition contained in his other brief opposing dismissal pending before this Court. *See* Doc. 56 at 1-11. Suffice it to say, under Defendant Christian's leadership at KCCD—and with her direct and necessary participation, *see* Doc. 8, ¶ 89—KCCD terminated faculty for expressing dissenting political viewpoints that are inconsistent with official DEIA ideology. Johnson now presents here only those facts directly relevant to Defendant Christian in her new role as Chancellor of California Community Colleges.

*The regulatory regime*

California Education Code § 87732 provides that "[n]o regular employee or academic employee shall be dismissed except for one or more of the following causes: (a) Immoral or

1   unprofessional conduct; (b) Dishonesty; (c) Unsatisfactory performance; (d) Evident unfitness for

2   service; . . . (f) Persistent violation of, or refusal to obey, the school laws of the state or reasonable

3   regulations prescribed for the government of the community colleges by the board of governors or

4   by the governing board of the community college district employing him or her." A community

5   college district's governing board may also terminate an employee for "unprofessional conduct" or

6   "unsatisfactory performance" per Cal. Educ. Code § 87734, and may suspend and terminate an

7   employee within 30 days for "immoral conduct" or "willful refusal to perform regular assignments

8   without reasonable cause, as prescribed by reasonable rules and regulations of the employing

9   district," per Cal. Educ. Code § 87735.

10          California's community college system, of which the Kern Community College District is a

11   constituent part, "embrace[s] diversity." Cal. Code Regs. tit. 5, § 51201(a). This commitment

12   "guide[s] the administration of all programs in the California Community Colleges, consistent with

13   all applicable state and federal laws and regulations." *Id.* § 51200. "Embracing diversity means that

14   *we must intentionally practice* acceptance, *anti-racism*, and respect towards one another and

15   understand that racism, discrimination, and prejudices create and sustain privileges for some while

16   creating and sustaining disadvantages for others." *Id.* § 51201(b) (emphasis added). An "anti-racist"

17   is defined as one who "understand[s] that racism is pervasive and has been embedded into all

18   societal structures." *Diversity, Equity and Inclusion Glossary of Terms*, California Community

19   Colleges Chancellor's Office, https://perma.cc/T22V-V866 at 1 (last visited Oct. 17, 2023)

20   (hereafter "*Glossary*"). Anti-racists "challenge the values, structures, policies, and behaviors that

21   perpetuate systemic racism" and are "also willing to admit the times in which they have been

22   racist." *Id*. "Practicing antiracism requires constantly identifying, challenging, and upending

23   existing racist policies to replace them with antiracist policies that foster equity between racial

24   groups." *Id.* Moreover, "embracing diversity" requires "acknowledg[ment] that institutional racism,

25   discrimination, and biases exist," and a commitment to "eradicat[ing] these from our system," to

26   "strive to eliminate those barriers to equity." Cal. Code Regs. tit. 5, § 51201(c). It requires "that we

27   act deliberately to create a safe, inclusive, and anti-racist environment . . . ." *Id.*

28

1   "District employees must have or establish proficiency in DEIA-related [diversity, equity,

2   inclusion, accessibility] performance to teach, work, or lead within California community colleges."

3   Cal. Code of Regs. tit. 5, § 53602(b). Faculty must comply with local DEIA policies to maintain

4   employment. *Id.* § 53425. The California Community Colleges Chancellor "shall adopt and publish

5   guidance describing DEIA competencies and criteria," *id.* § 53601(a), which "shall be used as a

6   reference for locally developed minimum standards in community college district performance

7   evaluations of employees and faculty tenure reviews." *Id.* § 53601(b). "To advance DEIA principles

8   in community college employment, districts shall: (1) include DEIA competencies and criteria as a

9   minimum standard for evaluating the performance of all employees; (2) ensure that evaluators have

10  a consistent understanding of how to evaluate employees on DEIA competencies and criteria; (3)

11  set clear expectations regarding employee performance related to DEIA principles . . . (4) place

12  significant emphasis on DEIA competencies in employee evaluation and tenure review processes,"

13  and "(6) ensure an evaluation process that provides employees an opportunity to demonstrate their

14  understanding of DEIA and anti-racist competencies." *Id.* § 53602(c).

15      The Chancellor's DEIA guidance and criteria comprehensively call for faculty to

16  acknowledge, understand, and apply the state's political ideology; engage in self-reflection and self-

17  assessment of their own personal commitment to the ideology; commit themselves to "continuous

18  improvement" of their "DEI and anti-racism knowledge, skills, and behaviors;" promote and

19  incorporate DEI and anti-racist pedagogy; analyze data to find support for the ideology; articulate

20  the importance of the state's ideology; engage in "service" on behalf of the ideology, including by

21  leading "DEI and anti-racist efforts by participating in DEI groups, committees, or community

22  activities;" develop curriculum and pedagogy that promote the ideology; participate in professional

23  development along ideological lines; and instruct new employees on the "expectations for their

24  contribution" to the state's DEI and anti-racist ideology. *See* Exh. A.

25      "Faculty members shall employ teaching, learning, and professional practices that reflect

26  DEIA and anti-racist principles, and in particular, respect for, and acknowledgement of the diverse

27  backgrounds of students and colleagues to improve equitable student outcomes and course

28  completion." Cal. Code Regs. tit. 5, § 53605(a).

*Defendants' adoption and enforcement of an official ideology chills*
*Professor Johnson's speech, and compels him to speak contrary to his conscience*

Plaintiff Daymon Johnson is a history professor at Bakersfield College, a California community college. Doc. 8 at ¶¶ 15, 59. He succeeded Professor Matthew Garrett as the Faculty Lead for the Renegade Institute for Liberty ("RIFL"), a group in which he has long been active, after Garrett was first disciplined for his political expression. *Id.* ¶¶ 60, 88. RIFL members' outlook and ideals stand in general opposition to those espoused by many faculty members and members of the school administration, which is aligned with Section 51201(a)'s mandate to "embrace diversity" by, among things, "intentionally practic[ing] . . . anti-racism," Section 51201(b). *Id.* ¶ 61.

Considering his experience of being investigated by KCCD Defendants over his Facebook posts, Defendants' adoption of an official political ideology that he rejects, Defendants' exhortations that their ideology must be affirmed and followed, KCCD Defendants' application of the termination standards to disfavored speech, and Johnson's responsibility for some of the speech for which Professor Garrett was fired, Professor Johnson refrains from expressing his political views and from freely participating in the intellectual life of the college for fear that Defendants would enforce state law, investigate and discipline him, and terminate his employment based on his viewpoints. *Id.* ¶ 97.

Johnson's conscience does not allow him to believe in and practice the state's "embracing diversity" ideology. He does not believe that racism is pervasive and embedded into all societal structures—particularly at Bakersfield College—and thus he does not wish to challenge the values, structures, policies, and behaviors that, according to others, allegedly perpetuate systemic racism. Johnson does not believe he is racist, and he does not wish to constantly identify, challenge, upend, and replace existing policies. Professor Johnson not only disagrees with the ideology Defendants require him to affirm, but Johnson also believes that his political viewpoints, which he would like to express, are inconsistent with and even defiant of that ideology. *Id.* ¶¶ 154-155.

Johnson identifies generally with the viewpoints espoused by RIFL, and shares many of Garrett's conservative political views and social values the expression of which Defendants censor and punish. *Id*. ¶ 100. For example, Johnson posted 15 of the 18 RIFL Facebook posts that reference

1 the phrase "cultural Marxism," a term which Garrett was fired for defending. *Id.* ¶ 101. Johnson,

2 like Garrett, does not agree with Bakersfield College's apparent definition of what constitutes "hate

3 speech" and believes that what is often considered "hate speech" by some is nonetheless speech

4 protected by the First Amendment. *Id.* ¶ 100. But Johnson now refrains from mentioning "Cultural

5 Marxism." *Id.* ¶ 101-102. He canceled a speech addressing the topic, and refrains from

6 recommending books that discuss the subject. *Id.* Indeed, mindful of Garrett's experience, Johnson

7 refrains from inviting speakers on behalf of RIFL, as they would explore similar views. *Id.* ¶ 103.

8      Johnson's speech is also chilled by the fact that Garrett was disciplined for filing an ethics

9 complaint about Defendant McCrow, in circumstances that Johnson, too, would have complained.

10 *Id.* ¶ 104. And Johnson refrains from speaking further about his department's curriculum

11 considering Defendants fired Garrett for opposing proposed history courses, and Johnson likewise

12 commented about the same courses to the same committee. *Id.* ¶ 105.

13      Johnson refrains from offering any potentially controversial political views on social media,

14 owing to Defendants' behavior. *Id.* ¶ 107. He opposes censorship, but mindful that Garrett was fired

15 for not censoring comments on RIFL's Facebook page, Johnson deleted posts that he believed

16 Defendants would find objectionable and turned over the page's management to two retired

17 professors. *Id.* Nonetheless, another professor has now filed a complaint against Johnson over

18 commentary that others posted on RIFL's Facebook page. *Id.* Given his experience being

19 investigated by Defendants over Bond's complaint, Johnson understands that any of his critics can

20 trigger investigations and potential discipline over his social media use. *Id.* ¶ 99. Indeed,

21 Johnson authored and was responsible for some of the Facebook posts that Defendants attributed to

22 Garrett and used to justify his termination. *Id.* ¶ 105.

23      Defendants' citation of Garrett's media appearances as cause for his discipline and

24 termination have also prompted Johnson to turn down invitations to speak to the same media

25 outlets. *Id.* ¶ 1111. Johnson has also stopped attending committee meetings where he would share

26 his views on race, diversity, equity, and inclusion, considering that Garrett was fired for just

27 listening to another professor's comment to him while sitting on that committee. *Id.* ¶ 108. Johnson

28 also refrains from offering conservative views about LGBTQ issues, as Defendants and various

1    progressive professors have linked these topics to DEI. *Id.* ¶ 108-110.

2        Johnson has previously served on numerous screening committees for new hires, and wishes

3    to continue doing so, but he refrains from taking the DEIA training now required to continue such

4    service and will not apply to serve on screening committees because he does not wish to promote

5    DEIA ideology, and will not evaluate faculty based on their DEIA adherence or instruct them on

6    DEIA compliance. *Id.* ¶ 112.

7        Bakersfield College evaluates Johnson's performance every three years. An unsatisfactory

8    evaluation will lead to remediation and potentially termination. Johnson has just successfully

9    completed an evaluation period and intends to keep working as a professor at Bakersfield College,

10   so his performance moving forward will be evaluated under the new DEIA standards and rules. *Id*. ¶

11   113. The DEIA requirements chill his speech, including his academic freedom in the classroom and

12   as the Faculty Lead of RIFL, and compel him to affirm, promote, and celebrate a political ideology

13   that he rejects and even finds abhorrent. *Id.* ¶¶ 112. Johnson cannot meet the standards set out in the

14   Chancellor's "Competencies and Criteria," which will guide KCCD's evaluation of his teaching,

15   without expressing beliefs and viewpoints that he rejects and without stifling his own viewpoints on

16   political and social topics. *Id.* ¶ 120. Johnson is profoundly opposed to the ideology that Defendants

17   would have him promote rather than criticize, as he is dissuaded from doing for fear of official

18   retribution and loss of employment. *Id.* ¶ 114-147.

19       Almost everything Johnson teaches violates the new DEIA requirements—not just by failing

20   to advance the DEIA and "anti-racist" ideology, but also by criticizing it. Johnson fears that if he

21   continues teaching his courses as he has designed them, he will surely be deemed "unsatisfactory"

22   in his upcoming evaluations. *Id.* ¶ 119. Johnson is set to teach three courses in the upcoming

23   semester which challenge DEI historical narratives and present views incompatible with DEI. In

24   these courses, Johnson assigns books critical of DEI, written by authors who have been targeted by

25   DEI adherents. *Id.* ¶¶ 149-151. Indeed, one DEI sympathizer has already called for Johnson to be

26   fired for recommending and assigning books used in these courses. *Id.* ¶ 152. In the following

27   semester, Johnson will teach history courses that raise the same problems under Defendants'

28   ideological mandates. *Id.* ¶ 149-151. The material Johnson will use, his pedagogy, and the views he

1  will teach are utterly contrary to the state's DEIA and the Chancellor's DEIA competency

2  standards. *Id.* If Johnson teaches his classes as he normally would and always has, he will not be

3  "demonstrating" or "progressing" toward compliance with the new DEI standards. *Id.* ¶ 148.

4                              SUMMARY OF ARGUMENT

5          Christian's attack on Johnson's standing to challenge the state's DEIA regulations, and her

6  continuing implementation of those regulations through her competencies and criteria, lack merit.

7  The challenged provisions clearly describe what Johnson must, and must not, do in order "to teach,

8  work, or lead within California community colleges." Cal. Code of Regs., tit. 5 § 53602(b). In any

9  event, courts have long rejected the notion that plaintiffs can only challenge regulations that directly

10  address their own conduct. The question with respect to standing is not whether a challenged

11  regulation purports to regulate a plaintiff, but whether it *injures* him. Courts routinely enjoin

12  regulations at the behest of plaintiffs who might not be the direct subjects of a regulation but are

13  nonetheless very much injured by them.

14          Johnson can be fired at any time for being out of compliance with state regulations, Cal.

15  Educ. Code § 87732(f), and his performance *will* be evaluated based on his compliance with these

16  regulations, as well as his adherence to Christian's competencies and criteria, Cal. Code of Regs. tit.

17  5, § 53602. It does not matter that Christian will not sign off on the termination papers, as she did as

18  KCCD's Chancellor in firing Garrett. What matters is that Johnson is injured because these

19  regulations are consequential for him.

20          Johnson's allegations, assumed true, readily demonstrate that the DEIA regulations and

21  Christians' competencies and criteria require adherence to, and expression of, the state's preferred

22  DEIA and antiracist ideology and the self-suppression of his opposing views. Antiracism is a

23  particularized viewpoint, demanding its adherents use a "race-conscious and intersectional lens" as

24  opposed to, for example, a color-blindness or an individualist lens. This viewpoint is what faculty

25  must practice, advance, and promote under the challenged regulations in order to meet their

26  minimum standards for employment and tenure retention. By discriminating based on viewpoint,

27  and compelling affirmance of beliefs that Johnson rejects, the DEIA regulations and Christian's

28  competencies and criteria violate the First Amendment. Christian's motion should be denied.

ARGUMENT

I.   JOHNSON HAS STANDING TO CHALLENGE THE REGULATION AND COMPULSION OF HIS SPEECH.

Christian concedes the three basic elements of standing: injury-in-fact, traceability, and redressability. Doc. 65-1 at 8. "In a pre-enforcement challenge, plaintiffs can show injury in fact by establishing that (1) they intend to violate the law; and (2) have shown a reasonable likelihood that the government will enforce the statute against them." *Project Veritas v. Schmidt*, 72 F.4th 1043, 1053 (9th Cir. 2023). And "[i]n the context of First Amendment speech, a threat of enforcement may be inherent in the challenged statute, sufficient to meet the constitutional component of the ripeness inquiry." *Wolfson v. Brammer*, 616 F.3d 1045, 1059 (9th Cir. 2010) (citations omitted).

The injury here is plain enough, not only with respect to the KCCD Defendants, but with respect to Christian. Johnson has been investigated over his political speech. He intends to continue his non-compliant speech and refuses to advance DEIA and anti-racism ideology. KCCD Defendants have not only fired and disciplined professors for political speech—they fired Garrett, in part, for not censoring Johnson—but have taken the view that § 51201(b)'s adoption of DEIA and anti-racism ideology controls speech even before the newer, more specific regulations issued.

Christian's predecessor promulgated DEIA competencies and criteria controlling Johnson pursuant to § 53601, which Christian maintains. Johnson has every reason to expect that, when his evaluation period is over, he will be negatively evaluated and suffer for not having complied with the state's DEIA regulations as implemented per Christian's vision. That is, should he even last that long, and is not fired earlier under Cal. Educ. Code § 87734(f) for not obeying the regulations.

*A.   The DEIA Regulations, and Christian's Competencies and Criteria, Injure Johnson.*

Christian errs in claiming that Title 5's DEIA regulations allegedly "do not apply to Johnson directly." Dkt. 65-1 at 9. First, "the plaintiff's intended speech" need only "arguably fall[ ] within the statute's reach" in order to afford him standing for a pre-enforcement challenge. *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010) (internal quotation marks omitted). The regulations directly concern Johnson's speech and silence, mandating that he be evaluated based on his commitment to the state's ideology and that he incorporates that ideology in his teaching. Yet Johnson's speech is antithetical to the state's ideology. *See* Doc. 8, ¶¶ 114-56.

Moreover, for standing purposes, whether the regulations "operate upon community college districts, not upon [faculty]," Dkt. 65-1 at 10, is irrelevant. "Plaintiffs need not be the immediate target of a statute to challenge it." *Bridenbaugh v. Freeman-Wilson*, 227 F.3d 848, 850 (7th Cir. 2000) (citations omitted). Article III requires only a "causal connection between [plaintiff's] injury and the conduct complained of." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). While such causation is most obvious when the government directly regulates a plaintiff, that does not mean that courts are powerless to address other government-inflicted injuries. "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded," even if it may be more difficult to establish. *Id.* at 562.

For example, the Supreme Court upheld a First Amendment challenge to a law barring the publication of drug prices, where the "attack on the statute [was] one made not by one directly subject to its prohibition, that is, a pharmacist, but by prescription drug consumers who claim[ed] that they would greatly benefit if the prohibition were lifted and advertising freely allowed." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 753 (1976); *cf. NRA of Am. v. BATFE*, 700 F.3d 185, 191-92 (5th Cir. 2012), *overruled in part on other grounds, N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2127 n.4 (2022) (consumers have standing to challenge law barring dealers from selling them guns). Indeed, the Ninth Circuit upheld California's standing to challenge insurance regulations based on its claim of economic harm should women lose contraceptive coverage. *California v. Azar*, 911 F.3d 558, 571-72 (9th Cir. 2018). "A causal chain does not fail simply because it has several 'links,' provided those links are not hypothetical or tenuous." *Id.* (internal quotation marks omitted).

There is nothing hypothetical or tenuous about Johnson being punished for his speech or silence that does not comport with standards guided by Christian, who need not be "the sole source of the [injury]." *Barnum Timber Co. v. United States EPA*, 633 F.3d 894, 901 (9th Cir. 2011). Johnson can sue Christian because her conduct has a "determinative or coercive effect upon the action of [KCCD Defendants]." *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 749 (9th Cir. 2020) (internal quotation marks omitted).

Christian's reliance on *Barke v. Bankes*, 25 F.4th 714 (9th Cir. 2022) (per curiam), is misplaced. Doc. 65-1 at 9-10. The *Barke* plaintiffs feared that the state would "erroneously attribute" their protected anti-union speech, made in their individual capacities, to their employers, leading to charges under a provision barring their employers from deterring or discouraging union membership. *Id.* at 716. But "particularly in light of [the state's] concessions" that it would not misattribute plaintiffs' individual speech to their employers, *id.*; *id.* at 720, plaintiffs' fear was unfounded. Here, in contrast, the DEIA regulations address Johnson's "minimum qualifications for employment as . . . a faculty member." Cal. Code Regs., tit. 5, § 53400. They dictate what he must teach, and how. *Id.* § 53605(a). Johnson must satisfy the DEIA mandates "to teach, work, or lead within California community colleges." *Id.* § 53602(b). The policies Christian shapes are those by which Johnson is evaluated. *Id.* § 53602(a). They apply to "all district employees." *Id.* § 53425. The college President emailed faculty, including Johnson, quoting Section 51201 for the proposition that "we must intentionally practice . . . anti-racism." Exh. C. Indeed, Christian's challenged Competencies and Criteria "are meant to define the skills, knowledge, and behaviors that all California Community College (CCC) employees must demonstrate[]," Exh. A at 3, and each of its 13 themes "applies to faculty" or to "both faculty and staff." *Id.* at 3-7.

As the memorandum introducing the Chancellor's competencies and criteria helpfully explains, "**These regulations impact all the employees of the educational ecosystem.**" Exh. B at 6 (emphasis in the original). As a noun, another term for "impact" is "injury-in-fact."

      B.   *Christian is Part of the Imminent Problem, Playing a Critical Role in Enforcing the State's Ideology.*

It does not matter that Christian will not be the one who "take[s] any action against Johnson concerning his speech." Doc. 65-1 at 12. Defendants can be held liable under Section 1983 not only if they "personally participated in a deprivation of the plaintiff's rights" but also if they "caused such a deprivation to occur." *Arnold v. IBM Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981); *see also Falls v. Desantis*, No. 4:22cv166-MW/MJF, 2022 U.S. Dist. LEXIS 240663, at *14 (N.D. Fla. July 8, 2022) (holding the "lack of authority to *directly* punish is hardly decisive."). "[T]he requisite causal connection can be established not only by some kind of direct personal participation in the deprivation but also by setting in motion a series of acts by others which the actor knows or

1  reasonably should know would cause others to inflict the constitutional injury." *Merritt v. Mackey*,

2  827 F.2d 1368, 1371 (9th Cir. 1987) (internal quotation marks omitted) (government agents liable

3  for causing termination from private employment).

4        As Christian admits, the DEIA regulations, as "regulations adopted through the formal

5  regulatory process[,] are *binding* on districts" Dkt. 65-1 at 10 n. 2 (emphasis added); *see also* Cal.

6  Educ. Code § 70902(b)(4) (districts must "[e]mploy and assign all personnel not inconsistent with

7  the minimum standards adopted by the board of governors"). And the DEI competencies articulate

8  how the regulations work in practice by providing definitions of "the skills, knowledge, and

9  behaviors that all California Community College (CCC) employees *must demonstrate* to work,

10  teach, and lead in a diverse environment that celebrates and is inclusive of diversity." Exh. A at 2

11  (emphasis added). The DEIA regulations require districts to "include proposed or active

12  implementation goals to integrate DEIA principles as part of" their required EEO plans, Cal. Code

13  Regs. tit. 5, § 53602(c)(7), over which Christian has enforcement authority. Cal. Code Regs. tit. 5, §

14  53024.2. If she is dissatisfied with their DEIA efforts, Christian can direct a college district to

15  redraft an EEO plan and also "implement specific strategies" beyond the district's own to guarantee

16  an EEO plan she approves of. *Id*.

17        This is quite different from the situation presented in *First Interstate Bank of California v.*

18  *State of California*, 197 Cal. App. 3d 627 (1987). In *First Interstate*, a bank had no recourse against

19  the state to recover a community college district's debt, because under California law, "no liability

20  is created in the state for the acts or omissions of [an] agency," and a community college district "is

21  liable for its own obligations." *Id*. at 634. This statutory scheme is quite different than the one that

22  charges Christian with ensuring that KCCD implements the DEIA regulations.

23        More instructive is *S.B. v. Cal. Dep't of Ed*, 327 F. Supp. 3d 1218 (E.D. Cal. 2018), in which

24  plaintiffs sued California's Superintendent of Public Instruction over the Education Code's

25  implementation. Code. *Id*. at 1235. The Superintendent claimed, like Christian, that the plaintiffs

26  lacked standing because he was not involved in applying the code to the plaintiff child. *Id*. at 1238.

27  This Court disagreed. The Superintendent's "specific enforcement obligations" "to administer and

28  enforce all state laws applicable to schools under the California Education Code" established "a

1    sufficient causal connection to state an official capacity § 1983 claim." *Id*. The same holds here.

2         Moreover, Christian is not only empowered to ensure that KCCD implements the DEIA

3    regulations. She is specifically charged with maintaining the "competencies and criteria" that guide

4    the DEIA regime under Cal. Code of Regs. tit. 5, § 53601(b). Christian need not come down to

5    Bakersfield College and personally hand Johnson a 90-day notice or sign off on his termination. She

6    dictates what standards KCCD must meet and has predetermined which ideologies Johnson must

7    demonstrate fealty to in order to keep his job. She plays an *on-going, direct* role in determining

8    what Professor Johnson must and cannot say, what he must and cannot teach.

9    II.    JOHNSON STATES VALID CLAIMS AGAINST CHRISTIAN.

10         "When evaluating the sufficiency of a pleading under Fed. R. Civ. P. 12(b)(6), we review

11   only the allegations in the complaint and any attachments or documents incorporated by reference."

12   *Koala v. Khosla*, 931 F.3d 887, 894 (9th Cir. 2019) (citation omitted). "We accept the complaint's

13   well-pleaded factual allegations as true, and construe all inferences in the plaintiff's favor." *Id.*

14   (internal quotation marks omitted). Johnson's complaint details the speech he refrains from

15   offering, and the speech he is compelled to express. Johnson also describes his fear—grounded in

16   Defendants' conduct, in their challenged regulations, and in their implementing competencies and

17   criteria—compelling him to remain silent and pressuring him to speak in ways that violate his

18   conscience. Johnson's complaint amply supports his claims against Christian.

19         A.   *The DEIA Regulations, and Christian's Competencies and Criteria, are Neither*
20              *Government Speech nor Antidiscrimination Laws.*

21        Christian asserts the DEIA regulations are constitutional for two contradictory reasons. First,

22   she claims the DEIA regulations simply "express [the Board's] ideals and principles concerning

23   diversity, equity, inclusion, and accessibility." Doc. 65-1 at 13. Second, she claims the DEIA

24   regulations actually *are* laws, but they are laws that simply put forth her "policy objective" that

25   districts' evaluation policies reflect these aspirational diversity goals. *Id*. Neither claim has merit.

26        The DEIA Regulations do not merely "affirm the Board's 'official position' to 'embrace

27   diversity' . . . and direct the State's community college districts to create their own employment

28   policies consistent with that goal," Doc. 65-1 at 14-15 (citations omitted), as though none of this has

1    the slightest influence on faculty. The goal of these "employment policies," which local districts are

2    commanded by regulation to adopt, and which they must implement with an eye toward Christian's

3    competencies and criteria, is to fire faculty that do not become "anti-racists."

4          The situation presented here is quite unlike that found in *Downs v. Los Angeles Unified Sch.*

5    *Dist.*, 228 F.3d 1003 (9th Cir. 2000), which concerned a true case of government speech. In *Downs*,

6    a school set up bulletin boards "as an expressive vehicle for the school board's policy of 'Educating

7    for Diversity.'" *Id*. at 1012. "[A]ll speech that occurred on the bulletin boards was the school

8    board's and LAUSD's speech," *id.*, and so plaintiff teacher had no First Amendment right to

9    establish his own bulletin board. But the school did not compel Downs to believe or express its

10   views, did not suggest that Downs would be punished for rejecting its views, and did not trample on

11   Downs's academic freedom to teach a different perspective (a right that, while enjoyed by college

12   professors, may not extend to high school teachers).

13         The other case Christian cites in support of her government speech argument, *Bair v.*

14   *Shippensburg Univ.*, 280 F. Supp. 2d 357 (M.D. Pa. 2003), presents a useful contrast between

15   government speech and an impermissible speech code, standing for the proposition that "[s]imply

16   utilizing buzzwords applicable to anti-discrimination legislation does not cure [a First Amendment]

17   deficiency." *Id.* at 372. The court agreed that "one of the challenged sentences within the Preamble

18   to the University Catalog does not implicate First Amendment concerns," as it "seeks to advise the

19   student body of the University's ideals and is therefore aspirational rather than restrictive." *Id.* at

20   370. And it found that another challenged provision was, in part, "merely aspirational" before

21   concluding that, overall, the provision was unconstitutionally overbroad. *Id.* at 371.

22         Overall, the court chided the college for using aspirational language as a fig leaf to cover

23   unlawful restrictions. "Time and again in this case, Defendant has asserted that the challenged

24   provisions of the Code are merely aspirational and precatory, and therefore not subject to First

25   Amendment scrutiny. This argument fails because it is obvious that violations of the express

26   provisions of the Code subject Shippensburg students to the disciplinary process set forth therein."

27   *Id.* at 373. Likewise here, whatever sentiments the state might mean to express do not wash away

28

1    the express provisions commanding Johnson's ideological compliance in violation of the First

2    Amendment.[1]

3          Indeed, the DEIA regulations compel *anti-racist* speech, not antidiscrimination. Initially,

4    "antiracism" may sound harmless. After all, who wants to be against being against racism? But

5    antiracism is not synonymous with "antidiscrimination;" in fact, it *requires* unlawful discrimination

6    based on race. The Constitution does not countenance so-called benign discrimination. *Adarand*

7    *Constructors v. Pena*, 515 U.S. 200, 227 (1995). But according to the anti-racism advocate upon

8    whom Christian relies, antiracism demands the *presence*, not the absence, of discrimination to

9    obtain equity: "The only remedy to negative racist discrimination that produces inequity is *positive*

10   *antiracist discrimination* that produces equity." Kendi, Ibram X., How To Be An Antiracist 24

11   (2023) (emphasis added).[2] "To be antiracist is a *radical* choice in the face of this history, requiring a

12   radical reorientation of our consciousness." *Id.* at 29 (emphasis added).

13         Anti-racism further posits that unequal outcomes based on race are always the product of

14   racist policies and that colorblindness is itself a form of white supremacy. *Id*. at 11 ("The language

15   of color blindness—like the language of 'not racist'—is a mask to hide when someone is being

16   racist . . . . A colorblind Constitution for a White-supremacist America."). As Kendi says it: "there

17   is no such thing as a nonracist or race-neutral policy. Every policy in every institution in every

18   community in every nation is producing or sustaining either racial inequity or equity between racial

19   groups." *Id*. at 21. To put a finer point on it, Kendi explicitly declares that claiming to not being

20   racist is itself racist. *Id*. at 29.

21         Antiracism is also a totalizing ideology, because it requires adherents to make race-

22   conscious decisions in all aspects of their lives. The DEIA regulations and Competencies and

23   Criteria codify this Kendian antiracism ideology into an employment requirement, and that is why

24   they are unlike any other law that prohibits discriminatory conduct. Christian's demand that

25   Johnson "intentionally practice . . . anti-racism" through the minimum standards of employment she

26   _____

27   [1] Despite Christian's insistence that the case has not been overruled, Doc. 62, *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790 (9th Cir. 2011) did not make the cut-and-paste from her previous brief.

28   [2] For example, the "Glossary of Terms" related to DEIA policies, which the Chancellor authored, cites to Kendi's book as the source of her definition of "anti-racist." *Glossary* at 1.

1   set is not unlike the State telling employees to practice patriotism (by reciting the Pledge of

2   Allegiance) or Christianity (by praying). It is not a prohibition of discrimination, it is compulsion to

3   express a particular ideology.

4          Officials can certainly debate the merits of race-conscious decision-making, but they cannot

5   enforce DEIA regulations that force Johnson and his colleagues to take a position on the topic —

6   and to conform their teaching and expression to it. State officials are free to advocate for changing

7   legal norms on their own time and on their own dime. But the First Amendment bars them from

8   abusing their offices to coerce others into affirming and promoting their politics.

9          *B.   The Complaint Plainly States a Viewpoint Discrimination Claim Against Christian.*

10         While Christian correctly points out that "'[v]iewpoint discrimination' occurs when the

11  government prohibits 'speech by particular speakers,' thereby suppressing a particular view about a

12  subject," Doc. 65-1 at 15 (quotation omitted), that is just one example of the First Amendment's

13  much broader, *complete* proscription of viewpoint discrimination. The "government must abstain

14  from regulating speech when the specific motivating ideology or the opinion or perspective of the

15  speaker is the rationale for the restriction." *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1162 (9th Cir.

16  2022) (quoting *Rosenberger v. Record & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995).

17  "[R]estrictions based on content must satisfy strict scrutiny, and those based on viewpoints are

18  prohibited." *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018). Thus, even if the DEIA

19  regulations and Christian's competencies and criteria only offered Johnson "extra credit" for

20  advancing the state's ideology, but did not punish him for failing to do so, they would be

21  unconstitutional for favoring the state's pet ideology and discriminating against other viewpoints.

22         There is nothing "conclusory" about Johnson's claim that the DEIA regulations, and the

23  competencies and criteria that Christian maintains under their guise, impose viewpoint

24  discrimination by mandating advancement of the state's ideology. As the complaint explains, the

25  language therein clearly requires faculty to endorse the government's views on DEIA. Professors

26  have no choice. They must affirm a "race-conscious and intersectional" viewpoint in their lessons

27  and course materials, even if they strongly support a "color blind" approach or, like Johnson, do not

28  believe systemic racism exists in all societal structures. Doc. 8 ¶¶ 51, 154. They must apply "anti-

1   racist perspectives" - "perspective" is arguably synonymous with "viewpoint" – to "problem

2   solving, policies and processes." *Id*. ¶ 45. And they must shift to "DEI and antiracist perspectives"

3   in all environments as well as "advocate" and "promote" those perspectives above any other point

4   of view on discrimination. *Id*. ¶¶ 41, 45, 51,

5          The DEIA regulations do not only tell professors what they *have* to say, they also govern

6   what professors *cannot* say. Professors must avoid expressing views that contradict the

7   government's, lest they be deemed to have failed to "demonstrate they have met the DEI

8   competencies using concrete examples based on DEI criteria provided in [the Competencies and

9   Criteria]." Exh. A at 2. For example, Professors cannot present arguments or assign materials

10  promoting a contrary "lens," like color-blindness, to one that is "race conscious and intersectional."

11  Doc. 8 ¶ 54. They cannot opine that racism is not "embedded into all societal structures." *Glossary*

12  at 1. They cannot state "I am not racist," because doing so means they are in "denial of the

13  inequities and racial problems that exist" and, therefore, they are not being antiracist. *Glossary* at 1.

14         The only "conclusory" claims before the Court are Christian's denial of the complaint's

15  plain text, and of the plain text of the DEIA regulations and her competencies and criteria. Indeed,

16  for the most part, her attacks on the sufficiency of the viewpoint discrimination claim merely

17  recycle her earlier arguments the challenged provisions "do not apply directly to Johnson, do not

18  regulate Johnson's speech or expressive activity, and do not contain any mechanism by which

19  Chancellor Christian or the Board may take any adverse action against Johnson if he expresses his

20  viewpoints." Doc. 65-1 at 16. As explained *supra*, none of this is correct. The regulations *do* apply

21  to Johnson, though that does not matter because in any event they plainly regulate his speech. If he

22  fails to comply, he can be fired, upon his three-year review or at any time. Christian is responsible

23  for maintaining the guidelines per which Johnson would be held to account for his ideology, and she

24  is a responsible participant in the constitutional deprivation. The operative complaint states a valid

25  viewpoint discrimination claim against Christian.

26         *C.  The DEIA Regulations Compel Specific Ideological Speech.*

27         Contrary to Christian's assertion, Johnson's complaint clearly states a claim for compelled

28  speech. Laws compel speech when they "[f]orc[e] free and independent individuals to endorse ideas

they find objectionable" and "coerce[] [them] into betraying their convictions." *Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018). The notion that "the challenged regulations do not force Johnson to accommodate any particular message in his own speech," Doc. 65-1 at 17, is risible. "Faculty members shall employ teaching, learning, and professional practices that reflect DEIA and anti-racist principles." Doc. 8 ¶ 41 (quoting Cal. Code of Regs. tit. 5, § 53605(a)). "District employees must have or establish proficiency in DEIA-related performance to teach, work, or lead within California community colleges." *Id.* ¶ 40 (quoting Cal. Code of Regs. tit. 5, § 53602(b)). Christian's competencies and criteria that help implement these regulations are rife with speech mandates. For example, faculty are evaluated based on whether they "[a]cknowledge[] that cultural and social identities are diverse, fluid, and intersectional," *id.* ¶ 45 (quoting Exh. A at 2-3); "demonstrate[] . . . awareness" and "understanding" of the state's ideology, *id.*; "[p]romote[] and incorporate[] DEI and anti-racist pedagogy," *id.* ¶ 48 (quoting Exh. A at 3); "[a]rticulate[] the importance and impact of DEI and anti-racism," *id.* ¶ 50 (quoting Exh. A at 3); "[a]dvocate[] for and advances DEI and anti-racist goals and initiatives," *id.* ¶ 51 (quoting Exh. A at 4); and "[a]rticulate[] the connection of DEI and anti-racist efforts to the institution's mission and the *Visions for Success*," *id.* at ¶ 56 (quoting Exh. A at 5). And this is just a sample.

The speech being compelled is very much Johnson's speech. Not all of it must take place in the classroom. And to the extent that it must, it is still not within the state's prerogative to dictate Johnson's expression of such speech because the First Amendment guarantees him a measure of academic freedom. "[T]eaching and [academic] writing are 'a special concern of the First Amendment.'" *Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014) (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). "The Supreme Court has repeatedly stressed the importance of protecting academic freedom under the First Amendment," which "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Id.* (quoting *Keyishian*, 385 U.S. at 603).

Christian's reliance on *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47 (2006), is misplaced. In *Rumsfeld*, the Supreme Court held that a federal law requiring law schools to afford equal campus access to military recruiters did not compel the schools' speech. "As a general matter, the Solomon Amendment regulates conduct, not speech. It affects what law schools

1   must *do*--afford equal access to military recruiters--not what they may or may not *say*." *Id.* at 60. To

2   the extent the statute compelled speech, such compulsion was "incidental to the [statute's]

3   regulation of conduct." *Id.* at 62. Because the statute required equal access, the law schools were

4   required to carry all recruiting announcements if they chose to carry any recruiting announcements.

5   And unlike the organization of a parade, "a law school's decision to allow recruiters on campus is

6   not inherently expressive." *Id.* at 64. Granting equal access to all recruiters did not dilute or alter the

7   schools' expression.

8         The challenged DEIA regulations and competencies and criteria do not merely regulate

9   conduct, nor do they regulate speech only incidentally to their regulation of conduct. They compel

10  Johnson to advocate particular messages—even to engage in "self-reflection" about his own

11  commitment to the state's ideology and "self-improvement" in conforming himself to the state's

12  model vision of an ideologue. Doc. 8 ¶¶ 46, 47 (quoting Exh. A at 3).

13        And again, these provisions are all quite enforceable against Prof. Johnson. If he fails to

14  measure up, he will be dismissed upon a poor evaluation, or directly under the Education Code for

15  not following state regulations. Chancellor Christian is a direct participant in this regime because

16  she maintains the overarching standards DEIA, and she oversees KCCD's EEO plan, which must

17  accommodate these regulations as she sees it.

18        D.  *This Court Should Provide Leave to Amend Prior to Dismissing for Failure to State
           a Claim.*

19

20        "[I]n dismissals for failure to state a claim, a district court should grant leave to amend even

21  if no request to amend the pleading was made, unless it determines that the pleading could not

22  possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection

23  Serv.*, 911 F.2d 242, 247 (9th Cir. 1990). Indeed, "it is of no consequence that [a plaintiff] d[oes]

24  not file a formal motion, accompanied by a proposed amendment, requesting leave to amend." *Id.*

25        Christian's Motion fails because she asks this Court to do what it cannot – refrain from

26  assuming Johnson's allegations as true – and rule in her favor by reading the challenged regulations

27  in a way that is unsupported by their plain language. However, to the extent this Court disagrees and

28  finds merit in Christian's 12(b)(6) arguments, Plaintiff requests leave to amend his complaint to

    correct any factual deficiencies the Court identifies.

1

CONCLUSION

2

This Court should deny Christian's motion to dismiss.

3

Dated: October 17, 2023                Respectfully submitted.

4

By:        /s/ Alan Gura_____
           Alan Gura, SBN 178221
5
                    agura@ifs.org
6          Courtney Corbello, admitted pro hac vice
           Del Kolde, admitted pro hac vice
7          1150 Connecticut Avenue, N.W., Suite 801
           Washington, DC 20036
8          Phone: 202.967.0007 / Fax:  202.301.3399

9          Attorneys for Plaintiff Daymon Johnson

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2023, I electronically filed the foregoing with the Clerk using the Court's CM/ECF system, and that all participants in this case are registered CM/ECF users who have thereby been electronically served.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 17, 2023.


/s/ Alan Gura
Alan Gura