1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAYMON JOHNSON, | Case No. 1:23-cv-00848-ADA-CDB |
| Plaintiff, | FINDINGS AND RECOMMENDATION THAT PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION BE GRANTED IN PART |
| v. | (Doc. 26) |
| STEVE WATKIN, *et al*. | |
| Defendants. | FINDINGS AND RECOMMENDATION THAT DEFENDANTS' MOTIONS TO DISMISS BE DENIED |
| | (Docs. 46, 65) |
| | **14-DAY DEADLINE** |

Pending before the Court is Plaintiff Daymon Johnson's ("Plaintiff") motion for preliminary injunction filed on July 20, 2023.  (Doc. 26).  On August 18, 2023, Defendant Sonya Christian ("Christian") and Defendants Romeo Agbalog, Thomas J. Burke, Kyle Carter, John S. Corkins, Nan Gomez-Heitzeberg, Yovani Jimenez, Richard McCrow, Kay S. Meek, Christina Scrivner, and Steve Watkin (collectively "District Defendants") filed oppositions to Plaintiff's motion.  (Docs. 42-43).  On August 30, 2023, Plaintiff filed replies to Defendants' oppositions.  (Docs. 48-49).  On September 7, 2023, the Undersigned heard oral argument on the parties' pleadings.  (Doc. 51).  Christian and the District Defendants separately moved to dismiss Plaintiff's first amended complaint ("FAC") – the

1

Court has considered those motions, Plaintiff's opposition to each, and the Defendants' replies.  (Docs. 46, 56, 64, 65, 67, 69).[1]

Although Defendants' aim of promoting diversity, equity, inclusion, and accessibility in California's system of community colleges undoubtedly is important and Defendants are entitled to *encourage* their employees to embrace these tenets, Plaintiff has shown a likelihood of success on the merits that the regulatory scheme Defendants have put in place to advance these interests is contrary to the First Amendment's guarantee of freedom of speech in the academic arena.  Accordingly, for the reasons that follow, the Undersigned will recommend Plaintiff's motion for preliminary injunction be granted in part and that Defendants' motions to dismiss be denied.

**Factual Background**

Plaintiff is employed by the Kern Community College District ("KCCD") as a full-time Professor of History at Bakersfield College.  (Doc. 8 at ¶¶ 15, 59).  Plaintiff began his employment with Bakersfield College in 1993.  *Id*. at ¶ 59.  Plaintiff states his primary duties in this position involve teaching various history classes to community college students and participating in shared governance on campus.  *Id*.

A. Governing Statutory and Regulatory Regime

Cal. Educ. Code § 87732 provides that "[n]o regular employee or academic employee shall be dismissed except for one or more of the following causes: (a) Immoral or unprofessional conduct; (b) Dishonesty; (c) Unsatisfactory performance; (d) Evident unfitness for service,..(f) Persistent violation of, or refusal to obey, the school laws of the state or reasonable regulations prescribed for the government of the community colleges by the board of governors or by the governing board of the community college district employing him or her…"  *Id*. at ¶ 27.  Cal. Educ. Code § 87735 provides a "permanent employee of the district" charged "with willful refusal to perform regular assignments without reasonable cause," may be immediately suspended from his or her duties.  The employee will

---

[1] Plaintiff's motion for preliminary injunction and Defendants' motions to dismiss were referred to the undersigned on August 16 and October 5, 2023, respectively, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302 (E.D. Cal. 2022).  (Docs. 38, 66).

1  be given notice of the suspension, and 30 days after service of the notice, will be dismissed unless the

2  employee demands a hearing.  *Id*.

3          Pursuant to Cal. Educ. Code § 87734, a community college district's governing board may

4  terminate an employee for "unprofessional conduct" or "unsatisfactory performance" upon 90 days'

5  notice if the employee does not reform his or her alleged deficiencies.  *Id*. at ¶ 28.

6          BP 3050 serves as the District's policy on "Institutional Code of Ethics."  (Docs. 42-1; 43 at 7).

7  BP 3050 provides that "all associates in the District, faculty, students, management, classified staff,

8  and trustees, as well as volunteers and vendors, each bear personal responsibility for their own ethical

9  behavior and for the ethical statute of our organization."  (Doc. 42-1 at 23).  BP 3050 requires "that

10  [the community] conduct [itself] with civility in all circumstances of [their] professional lives" and

11  does "not participate in or accept, condone, or tolerate physical or verbal forms of aggression, threat,

12  harassment, ridicule, or intimidation."  (Docs. 26-1 at 8; 42-1 at 23).  BP 3050 states it values a spirit

13  of free inquiry and free speech and "encourages the expression of a range of points of view, but

14  [expects] all expressions of content to be conducted in a manner respectful of persons."  (Doc. 42-1 at

15  23).

16  B. Plaintiff's Campus Activities and the College's Investigation of his Online Posts

17          At some point, Plaintiff helped found the Renegade Institute for Liberty ("RIFL"), a sanctioned

18  organization within Bakersfield College comprised of faculty members "dedicated to the pursuit of

19  free speech, open inquiry, and critical thinking."  (Doc. 26-2 at ¶ 2).  RIFL "aims to promote and

20  preserve freedom of thought and intellectual literacy through the open discourse of diverse political

21  ideas with an emphasis on American ideals and western historical values."  *Id*.  Plaintiff asserts RIFL

22  represents a minority position on campus standing in general opposition to political viewpoints

23  espoused by many faculty members and members of the school administration.  *Id*.  Following the

24  College's firing of Professor Garrett (*infra* at 6), Plaintiff took over as Faculty Lead for RIFL.  He also

25  was appointed to fill Garrett's position on the College's Equal Opportunity & Diversity Advisory

26  Committee ("EODAC").  *Id*. at ¶¶ 5, 25.  Plaintiff's duties as Faculty Lead for RIFL included creating,

27  scheduling, and promoting events on behalf of RIFL, acting as administrator of RIFL's Facebook

28  page, and serving as director of RIFL's Student Scholar program.  *Id*. at ¶ 3.  Plaintiff's primary duties

as a member of the EODAC included attending committee meetings, voting on EODAC proposals, and working on a new charge stating the purpose of the EODAC.  *Id*. at ¶ 4.

On August 22, 2019, Bakersfield College Professor Andrew Bond ("Bond") posted the following statement on his personal Facebook page: "Maybe Trump's comment about shithole countries was a statement of projection because honestly, the US is a fucking piece of shit nation.  Go ahead and quote me, conservatives.  This country has yet to live up to the ideals of its founding documents."  (Doc. 8 at ¶ 70).  Almost two years later, around May 2021, Plaintiff reposted Bond's post on RIFL's Facebook page, and added, "Here's what one critical race theorist at BC sounds like.  Do you agree with this radical SJW from BC's English Department?  Thoughts?"  *Id*. at ¶ 71.

On September 24, 2021, Bond filed an administrative complaint with KCCD against Plaintiff for harassment and bullying over Plaintiff's Facebook post and commentary.  *Id*. at ¶ 73; (Doc. 8-6 at 2).  Upon receipt of the complaint from Bond, KCCD had an outside investigator conduct an investigation into Bond's allegations.  (Doc. 8-6 at 2).  Plaintiff asserts the investigation "necessitated his retention of counsel" and he was not allowed to see a copy of the complaint.  (Doc. 8 at ¶ 74).

On February 23, 2022, Bakersfield College President Zav Dadabhoy ("Dadabhoy") sent Plaintiff the District's administrative determination of Bond's complaint against him.  *Id*. at ¶ 75; (Doc. 8-6).  The district considered 29 separate allegations raised in the dispute.  (Doc. 26-1 at 12); (Doc. 8-6 at 3-9).  The district held there were no findings to support a cause for discipline under the Education Code.  (Doc. 8-6 at 10).  The administrative determination noted, "[t]he District will investigate any further complaints of harassment and bullying and, if applicable, will take appropriate remedial action including but not limited to any discipline determined to be appropriate."  *Id*.

C. Professor Matthew Garrett's Employment is Terminated

On September 12, 2019, Professor Matthew Garrett ("Garrett") delivered a public lecture on Bakersfield College campus entitled, "The Tale of Two Protests: Free Speech and the Intellectual Origins of BC Campus Censorship."  (Doc. 8 at ¶ 77).  Garrett was employed as full-time faculty at KCCD and served as the Faculty Lead for RIFL.  (Doc. 26-3 at ¶ 3); (Doc. 26-2 at ¶¶ 5, 25).  Plaintiff claims Bond and Professor Oliver Rosales filed an administrative complaint against Garrett over his September 12, 2019, lecture.  (Doc. 26-2 at ¶ 22).  Plaintiff alleges the school "determined

that [Garrett's] lecture constituted 'unprofessional conduct,' and threatened further discipline against him."  *Id*.  In response, Garrett filed a lawsuit against school officials for violating his First Amendment rights.  (Doc. 8 at ¶ 78) (citing *Garrett v. Hine*, No. 1:21-cv-00845-ADA-CDB, (E.D. Cal. 2021)).

On November 21, 2022, Defendant Richard McCrow ("McCrow"), the Dean of Instruction at Bakersfield College, and Administrative Co-Chair of the School's Equal Opportunity & Diversity Advisory Committee ("EODAC") issued Garrett a 90-day notice pursuant to Cal. Educ. Code § 87734 to correct his performance deficiencies involving "unprofessional conduct."  *Id*. at ¶¶ 17, 79.  The notice provided Garret could be charged with "unsatisfactory performance," and violation of KCCD Board Policy 3050 ("BP 3050").  (Doc. 8 at ¶ 79).

In the notice to correct deficiencies, McCrow alleged Garrett's opinion/editorial in the Bakersfield Californian minimized the "White Supremacist group 'Hundred-Handers'" vandalization of Bakersfield College with stickers targeting vulnerable students.  (Doc. 26-9 at 2). McCrow asserted Garrett's critique of the college's characterization of the event and Garrett's suggestion "that certain terms like 'Cultural Marxism' weren't 'hate speech' but instead speech that challenges a dominant agenda on campus, i.e. the social justice movement," constituted "unprofessional conduct" in violation of BP 3050.  *Id*.

Next, McCrow found Garrett "repeatedly made demonstrably false and misleading claims to disrupt district and college work by submitting public accusations, frivolous complaints of misconduct without providing any factual basis."  *Id*. at 3-5, 7.  As an example, McCrow cited Garrett's filing of 36 complaints via the Ethics Point Management Incident Management System or email resulting in 23 complaints requiring a third-party investigation.  *Id*. at 5.  McCrow asserted Garrett's complaints wasted college and District resources and diminished the value of the District's reporting system.  *Id*. at 5, 8.  McCrow also cited Garrett's public accusations on public radio, through email, and his social media that "devalued the college and District's standing among its peers," invited outrage, and created "an environment of hostility and anger."  *Id*. at 4-8.  McCrow asserted the District received several student complaints caused by Garrett's conduct during an EODAC meeting.  *Id*. at 4-5.

McCrow also alleged Garrett "attempted to violate campus COVID-19 policies." *Id*. at 3. Specifically, McCrow asserted that Garret acknowledged that a guest speaker he scheduled was only approved for a Zoom event but attempted to unilaterally switch the event to a face-to-face format, in violation of COVID-19 policies. *Id*. McCrow claimed, thereafter, Garrett mischaracterized the situation as an attempt to censor his event. *Id*. Lastly, McCrow criticized Garrett for his repeated failure as the faculty lead for RIFL "to restrict baseless attacks on the District and [Garrett's] colleagues on RIFL's social media." *Id*. at 7.

McCrow informed Garrett that he would be removed from the EODAC and warned Garrett his failure to overcome "these deficiencies" immediately may result in his dismissal in accordance with the provisions of the Education Code. *Id*. at 9. That same day, Garrett resigned as Faculty Lead for RIFL and was replaced by Plaintiff. (Doc. 26-2 at ¶¶ 5, 25).

On March 22, 2023, Dadabhoy sent Garrett a notice of decision to terminate. (Doc. 26-2 at ¶ 26). On April 11, 2023, Dadabhoy formally recommended to Defendant Trustees Romeo Agbalog, Kay S. Meek, Kyle Carter, Christina Scrivner, Nan Gomez-Heitzeberg, Yovani Jimenez, and John S. Corkins (hereinafter collectively "Defendant Trustees"), that they terminate Garrett's employment by issuing a "Statement of Charges and Recommendation for Statement of Decision to Terminate." (Doc. 8 at ¶ 89). Christian, the Chancellor of KCCD at that time, concurred with Dadabhoy's recommendation. *Id*. at ¶¶ 18, 89.[2]

On April 13, 2023, the Defendant Trustees found cause for Garrett's termination as set out by Dadabhoy and Christian and fired Garrett. *Id*. at ¶ 90. On April 14, 2023, Dadabhoy sent Garrett a letter notifying him of his termination, which included the "Statement of Charges and Recommendation for Statement of Decision to Terminate." *Id*. at ¶ 91.

In the "Statement of Charges," Dadabhoy recounted the allegations in the notice to correct deficiencies letter (transmitted to Garrett in November 2022 in connection with the earlier allegation of unprofessional conduct) and asserted Garrett failed to follow the directives contained within the notice in violation of Cal. Educ. Code §§ 87732 and 87735. (Doc. 26-10 at 7-14). Dadabhoy alleged

---

[2] Pursuant to KCCD Board Policy 7360, the KCCD trustees will not penalize or dismiss an employee without receiving a recommendation from the Chancellor. (Doc. 8 at ¶ 30).

1   that from November 2022 through March 2023, Garrett continued to launch false accusations against

2   Bakersfield College programs, faculty, and students through email, flyers, an interview given to Fox

3   News Digital, an article published by Inside Higher Ed., a published open letter to the KCCD Board of

4   Trustees, his personal social media, and RIFL's Facebook page.  *Id*. at 14-21.  Dadabhoy asserted

5   these false accusations included misappropriation of District funds, criminal misconduct, and violation

6   of District Board Policy.  *Id*.

7        Dadabhoy claimed Garrett's false allegations "prompted" third-party comments on a Fox News

8   Article attacking Bakersfield College and its students by name.  *See id*. at 15-16 ("Students

9   LIE…These filthy lying students need to be held accountable…These students need to be put down.

10  A vet could do it…Funny, I want them to be running for their lives.").  Dadabhoy alleged Garrett, as

11  the RIFL Facebook page administrator, has continued to permit the RIFL Facebook page to post false

12  and baseless attacks on the District and his colleagues.  *Id*. at 16.

13       Next, Dadabhoy claimed Garrett refused to engage in civil, honest discourse and failed to

14  direct complaints to the appropriate college administrator as directed by the notice to correct

15  deficiencies letter.  *Id*. at 17.  Specifically, Dadabhoy found Garrett intimidated Matthew Jones, an

16  Academic Senate Executive Board member, and Dr. Nicky Damania, the Bakersfield College Dean of

17  Students, verbally attacked Debra Thorson, a part-time faculty member and member of the EODAC,

18  attacked his faculty colleagues through a RIFL Facebook post, and levied a "series of uncivil and

19  dishonest attacks" against KCCD trustees.  *Id*. at 17-19.

20       Dadabhoy also charged that on January 31, 2023, Garrett threatened Defendant Trustee John S.

21  Corkins ("Corkins").  *Id*. at 19.  According to Dadabhoy, Garrett claimed to possess documents

22  showing Corkins' "past indiscretions."  *See id*. ("[Garrett] claimed, 'I know more about you than you

23  think and more than I want.'").  While Garrett purported that he did not intend to release the alleged

24  documents, Dadabhoy determined "the clear implication was to intimidate [Corkins]" and constituted

25  "unprofessional conduct."  *Id*.

26       Dadabhoy concluded Garrett engaged in a pattern of immoral or unprofessional conduct,

27  dishonesty, unsatisfactory performance, evident unfitness for service, persistent violation of the

28  policies, procedures, rules, and regulations of the District, and willful refusal to perform regular

1  assignments without reasonable cause.  *Id*. at 22 (citing Cal. Educ. Code §§ 87732(a)-(d), (f); §
2  87735).

3  D. Other Relevant Conduct by Bakersfield College and District

4          On December 8, 2022, Dadabhoy sent a holiday greeting to employees of Bakersfield College
5  via email.  *See* (Docs. 26-2 at ¶¶ 6-9; 26-6).  Within this email, Dadabhoy stated, "members of BC's
6  communities of color, and LGBTQ community, have shared that many do not feel peace on our
7  campus."  *Id*. at 2.  Dadabhoy noted, "[w]hile there may be a small group promoting exclusion, that is
8  not a value of this institution."  *Id*.  Dadabhoy declared Cal. Code Regs. tit. 5 § 51201 "provides us
9  with direction on diversity, equity, and inclusion."  *Id*.  Dadabhoy asserted "[w]e must not allow the
10 discontent or views of a few to supersede what we are required to provide at our college and the work
11 that we have intentionally developed to support all members of the community."  *Id*.  Plaintiff
12 perceived Dadabhoy's comments were directed at himself, Garrett, and other RIFL members in an
13 effort to suppress, intimidate, and censor their speech.  (Doc. 26-2 at ¶ 8).

14         On December 12, 2022, the trustees of KCCD, held a meeting at which Defendant Trustee
15 Corkins, the board vice president, called RIFL faculty's minority political views "abusive."  (Doc. 8 at
16 ¶¶ 21, 66).  Corkins declared RIFL faculty are "in that five percent that we have to continue to cull.
17 Got them in my livestock operation and that's why we put a rope on some of them and take them to
18 the slaughterhouse.  That's a fact of life with human nature and so forth, and I don't know how to say
19 it any clearer."  (Doc. 26-2 at ¶ 10).  Further, Corkins added "we've got to get the bad actors out of the
20 room.  It just bothers me when the bad actors are paid staff and faculty and if that's where it is we
21 really got a problem.  And we know better than all you know how it's hard to get rid of some of these
22 people."  *Id*.  Plaintiff asserts none of the members of the Board of Trustees disavowed Corkins'
23 comments.  *Id*. at ¶ 11.

24 E. Defendants' Adoption and Implementation of DEIA Standards and Regulations

25         "The California Education Code provides that 'n[o] person shall be subjected to discrimination
26 on the basis of disability, gender, gender identity, gender expression, nationality, race or ethnicity,
27 religion, sexual orientation, or any [other constitutionally protected characteristic' in California's
28 community colleges."  (Doc. 42 at 8) (citing Cal. Educ. Code § 66270).  Consistent with this law, the

California Community Colleges, of which KCCD is a constituent part, "embrace[s] diversity among students, faculty, staff and the communities we serve as an integral part of our history, a recognition of the complexity of our present state, and a call to action for a better future."  (Doc. 8 at ¶ 32 (citing Cal. Code Regs. tit. 5, § 51201(a)).

"Embracing diversity means that we must intentionally practice acceptance, anti-racism, and respect towards one another and understand that racism, discrimination, and prejudice create and sustain privileges for some while creating and sustaining disadvantages for others."  § 51201(b).  In order to embrace diversity, "we also acknowledge that institutional racism, discrimination, and biases exist" and a commitment to diversity demands barriers to equity are eliminated and "that we act deliberately to create a safe, inclusive, and anti-racist environment…"  § 51201(c).  "To advance our goals of diversity, equity, inclusion, and social justice…requires that we develop and implement policies and procedures, encourage individual and systemic change, continually reflect on our efforts, and hold ourselves accountable for the results of our efforts in accomplishing our goals.  In service of these goals, the California Community Colleges are committed to fostering an anti-racist environment that offers equal opportunity for all."  § 51201(d).

This statement on Diversity, Equity, and Inclusion set forth in § 51201, is the official position of the Board of Governors of the California Community Colleges ("the Board").  Cal. Code Regs. tit. 5, § 51200.  Pursuant to Cal. Educ. Code § 70900, the Board "shall provide leadership and direction in the continuing development of the California Community Colleges."  The work of the Board "shall at all times be directed to maintaining and continuing, to the maximum degree permissible, local authority and control in the administration of the California Community Colleges."  *Id*.

§ 70901(b) provides the Board the authority to develop and implement standards for classes, student academic requirements, and employment of academic and administrative staff in line with the "official position" of the Board.  *See* Cal. Code Regs. tit. 5, § 53400 ("This subchapter implements provisions of the Education Code that govern the minimum qualifications for employment in a community college district as an administrator, a faculty member, or a member of the classified staff.").  Pursuant to § 70902(b)(4), the governing board of each community college district shall "[e]mploy and assign all personnel not inconsistent with the minimum standards adopted by [the

9

Board], and establish employment practices, salaries, and benefits for all employees not inconsistent with the laws of this state."  The Board appoints a chief executive officer – the Chancellor – who exercises the duties and responsibilities delegated to her by the Board.  Cal. Educ. Code § 71090.  Christian currently serves as the Chancellor of California's Community Colleges.  (Doc. 8 at ¶ 18).

On April 16, 2023, the Board adopted new "minimum qualifications for employment in a community college district as an administrator, a faculty member, or a member of the classified staff." *Id*. at ¶ 38 (citing Cal. Code of Regs. tit. 5, § 53400).  Pursuant to Cal. Code of Regs. tit. 5, § 53425, "all district employees shall demonstrate the ability to work with and serve individuals within a diverse community college campus environment as required by local policies regarding DEIA competencies."[3]  The Chancellor shall adopt and publish guidance describing DEIA competencies and criteria in collaboration with system stakeholder groups.  Tit. 5, § 53601(a).  The DEIA guidance shall be maintained to include current and emerging evidence-based practices developed within the California Community Colleges or described in DEIA-related scholarship.  *Id*.  The DEIA competencies and criteria identified by the Chancellor "shall be used as a reference for locally developed minimum standards in community college district performance evaluations of employees and faculty tenure reviews."  Tit. 5, § 53601(b).

Cal. Code of Regs. tit. 5, § 53602 requires:

(a) District governing boards shall adopt policies for the evaluation of employee performance, including tenure reviews, that requires demonstrated, or progress toward, proficiency in the locally-developed DEIA competencies or those published by the Chancellor pursuant to section 53601.

(b) The evaluation of district employees must include consideration of an employee's demonstrated, or progress toward, proficiency in diversity, equity, inclusion, and accessibility DEIA-related competencies that enable work with diverse communities, as required by section 53425. District employees must have or establish proficiency in DEIA-related performance to teach, work, or lead within California community colleges.

(c) To advance DEIA principles in community college employment, districts shall:

(1) include DEIA competencies and criteria as a minimum standard for evaluating the performance of all employees;

---

[3] "DEIA" is an acronym for the terms "diversity, equity, inclusion, and accessibility."  Cal. Code of Regs. tit. 5, § 52510(i).

(2) ensure that evaluators have a consistent understanding of how to evaluate employees on DEIA competencies and criteria;

(3) set clear expectations regarding employee performance related to DEIA principles, appropriately tailored to the employee's classification;

(4) place significant emphasis on DEIA competencies in employee evaluation and tenure review processes to support employee growth, development, and career advancement;

(5) ensure professional development opportunities support employee development of DEIA competencies that contribute to an inclusive campus and classroom culture and equitable student outcomes;

(6) ensure an evaluation process that provides employees an opportunity to demonstrate their understanding of DEIA and anti-racist competencies.

(7) include proposed or active implementation goals to integrate DEIA principles as a part of the district's Equal Employment Opportunity Plan required by section 53003.

Cal. Code of Regs. tit. 5, § 53605 requires:

(a) Faculty members shall employ teaching, learning, and professional practices that reflect DEIA and anti-racist principles, and in particular, respect for, and acknowledgement of the diverse backgrounds of students and colleagues to improve equitable student outcomes and course completion.

(b) Educational and other Administrators shall include DEIA and anti-racist principles into existing policies and practices, funding allocations, decision-making, planning, and program review processes. These processes shall take into account the experience and performance of students and colleagues of diverse backgrounds, and work to close equity gaps in student outcomes and hiring.

(c) Staff members shall promote and incorporate culturally affirming DEIA and anti-racist principles to nurture and create a respectful, inclusive, and equitable learning and work environment. In conducting their duties, staff members shall respect and acknowledge the diversity of students and colleagues.

On May 5, 2023, the California Community Colleges Chancellor's Office issued "Diversity, Equity and Inclusion Competencies and Criteria Recommendations."  (Docs. 8 at ¶ 42; 8-2).  On May 18, 2023, the Academic Senate for California Community Colleges distributed these "guidelines and their accompanying memorandum" to Bakersfield College Professor Erica Menchaca, the Articulation Officer and President of the Academic Senate at Bakersfield College.  (Doc. 8 at ¶ 43).  That same

11

day, Professor Menchaca distributed the guidelines and their accompanying memorandum to Bakersfield College faculty.  *Id*.

The memorandum states "[t]he DEI competencies provided in this document are meant to define the skills, knowledge, and behaviors that all California Community College (CCC) employees must demonstrate to work, teach, and lead in a diverse environment that celebrates and is inclusive of diversity.  During the evaluation and tenure review process, employees will be able to demonstrate they have met the DEI competencies using concrete examples based on DEI criteria provided in this document."  (Doc. 8-2 at 3) (internal citations omitted).

The "must demonstrate" competencies set forth in the memorandum include a "Cultural Competency" theme that provides a faculty member "seeks DEI and anti-racist perspectives and applies knowledge to problem solving, policies, and processes to create respectful, DEI-affirming environments."  *Id*. at 3-4.  Next, the memorandum provides that faculty demonstrate a commitment to continuous improvement as it relates to one's DEI and anti-racism knowledge, skills, and behaviors and engage in self-assessment of one's own commitment to DEI and internal biases.  *Id*. at 4.  The guidelines also provide faculty promote and incorporate DEI and anti-racist pedagogy, participate in training to incorporate culturally affirming pedagogy, use data to uncover inequitable outcomes, and articulate the importance and impact of DEI and anti-racism as part of the institution's greater mission.  *Id*.

Further, the memorandum provides that faculty advocate for and advance DEI and anti-racist goals and initiatives, lead DEI and anti-racist efforts by participating in DEI groups, include DEI and race-conscious pedagogy and/or curriculum and in campus activities, and introduce new employees to the institution and system's focus on DEI and anti-racism "and the expectations for their contribution."  *Id*. at 5-7.

The memorandum acknowledges the competencies and criteria listed are a "starting point" and are meant to serve as a reference for districts/colleges as they engage in their own local process to develop and adopt a personalized set of DEI competencies and criteria for their employee evaluation and tenure review processes.  Districts/colleges are "strongly recommended" to use the referenced DEI

1  competencies and criteria as a baseline to develop DEI competencies and criteria that strengthen the

2  integration of equity-centered practices "in local employee evaluation and tenure review." *Id.* at 2.

3        On June 5, 2023, Bakersfield College Human Resources Technician Karla Quintero emailed

4  the faculty, "advising that the college had established a new DEIA training session." (Doc. 8 at ¶ 68).

5  Quintero noted "[y]ou will need to have this training completed prior to the first meeting of any

6  recruitment" and "[f]ulfilling this obligation will certify employees for screening committee

7  participation for two years." *Id.* (citing Doc. 8-5).

8  F. <u>Plaintiff's Challenges to DEIA</u>

9        Plaintiff claims that because of his experience of being investigated by District Defendants

10  over his RIFL Facebook post, Defendants' adoption of DEIA, "an official political ideology—that I

11  reject," and District Defendants threats, punishment, and firing of Garrett, "I refrain from expressing

12  my political views and from freely participating in the intellectual life of the college for fear that

13  Defendants will investigate, discipline, and ultimately terminate my employment on the basis of my

14  political views." (Doc. 26-2 at ¶ 29).

15        Plaintiff attests he fears "retribution" by college officials and must "self-censor." *Id* at ¶ 40.

16  Plaintiff asserts he has not posted on RIFL's Facebook page or his personal social media anything

17  involving the term "Cultural Marxism" so his speech is not labeled "hateful." *Id.* Plaintiff claims he

18  canceled RIFL's sponsorship of a community event scheduled for July 3, 2023, because the speaker

19  would discuss "'Cultural Marxism' and connect the term to the social justice agenda coming out of

20  colleges" like Bakersfield College. *Id.* at ¶ 41. Additionally, Plaintiff asserts he has eschewed making

21  book recommendations that have the term "Cultural Marxism" in the title out of fear that the school

22  might fire him. *Id.* at ¶ 42.

23        Plaintiff claims Defendants' investigation of his political speech has caused him to abstain

24  from expressing his political viewpoints and "any potentially controversial opinions related to

25  Bakersfield College, DEI ideology," both on RIFL's Facebook page and his personal social media

26  accounts. *Id.* at ¶¶ 53, 59-60. Plaintiff declares he has stepped down as the administrator of RIFL's

27  Facebook page because he fears District Defendants will hold him accountable for speech by others

28  that is critical of Defendants. *Id.* at *Id.* at ¶¶ 43, 53. Plaintiff asserts he has turned down opportunities

1   to appear on the Terry Maxwell's Radio Show and abstained from making comments to Fox News and

2   The Daily Caller because he fears punishment from Defendants.  *Id.* at ¶¶ 54-55.  Plaintiff also claims

3   he has "stopped attending EODAC meetings to completely avoid having to give my conservative

4   views on race, diversity, equity and inclusion" and has refrained from applying to serve on a screening

5   committee because of his views.  *Id.* at ¶¶ 58, 61.

6       Plaintiff states he is currently in charge of arranging speakers on behalf of RIFL for this school

7   year.  *Id.* at ¶ 43.  Plaintiff avers these speakers would present viewpoints that are critical of the

8   "school's official DEI ideology" and viewpoints that District Defendants have already condemned in

9   the course of disciplining Garrett.  *Id.*  Plaintiff claims he has decided to refrain from finalizing

10  agreements with speakers for fear of discipline and termination.  *Id.*

11      Plaintiff notes Bakersfield College evaluates his performance every three years.  *Id.* at ¶ 62.

12  Plaintiff has "just successfully completed an evaluation period and intend[s] to keep working as a

13  professor at Bakersfield College."  *Id.*  Plaintiff is concerned his performance moving forward will be

14  evaluated under the new DEIA standards and an unsatisfactory evaluation will lead to remediation

15  and, eventually, termination.  *Id.*

16      Plaintiff attests: "[a]lmost everything I teach violates the new DEIA requirements—not just by

17  failing to advance the DEIA and anti-racist/racist ideology, but also by criticizing it."  *Id.* at ¶ 100.

18  Plaintiff asserts the materials, pedagogy, and views he will teach in courses for the 2023 Fall semester,

19  and 2024 Spring semester, "are utterly contrary" to DEIA.  *Id.* at ¶¶ 101-05.  Plaintiff fears if he

20  continues teaching his courses as he designed them, he will be deemed "unsatisfactory" in his

21  upcoming evaluations.  *Id.* at ¶ 100.

22  **Procedural Background**

23      On June 1, 2023, Plaintiff filed a complaint for declaratory and injunctive relief against District

24  Defendants.  (Doc. 1).  On July 6, 2023, Plaintiff filed a first amended complaint for declaratory and

25  injunctive relief, adding Christian as a named defendant.  (Doc. 8).  Plaintiff asserts District

26  Defendants violated his First Amendment rights of free speech and petition by engaging in viewpoint

27  discrimination in their application of Cal. Educ. Code §§ 87732, 87735, and BP 3050.  *Id.* at 33-35.

28  Plaintiff alleges BP 3050 is unconstitutionally vague in violation of the First and Fourteenth

14

Amendments. *Id*. at 36. Plaintiff also claims all Defendants violated his First Amendment rights of free speech and petition by engaging in viewpoint discrimination and compelled speech in their application of Cal. Code Regs. tit. 5, §§ 51200, 51201, 53425, 53601, 53602, 53605, and the "DEI Competencies and Criteria" issued pursuant to Cal. Code Regs. tit. 5, § 53601. *Id*. at 36-39.

On July 20, 2023, Plaintiff filed the instant motion for preliminary injunction. (Doc. 26). On August 18, 2023, Defendants filed oppositions to the motion for preliminary injunction and Plaintiff filed replies on August 30, 2023. (Docs. 42-43, 48-49). The Undersigned convened a hearing on the motion on September 7, 2023. (Doc. 51). Thereafter, the parties provided the Court with supplemental briefing. (Docs. 54-55, 60, 62).

On August 29 and October 3, 2023, District Defendants and Christian (respectively) moved separately to dismiss Plaintiff's FAC (Docs. 46, 65). Plaintiff opposed both motions (Docs. 56, 67) and the Defendants replied (Docs. 64, 69).

## Plaintiff's Motion for Preliminary Injunction – Legal Standard

A preliminary injunction is an extraordinary remedy, and a trial court's power to issue it should be exercised only after careful deliberation has persuaded it of the necessity for such relief. *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008); *see Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (a preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."). Courts consider, weigh, and balance four factors in deciding whether to grant a preliminary injunction: (1) the plaintiff's likelihood of success on the merits; (2) the likelihood of plaintiff suffering irreparable harm in the absence of preliminary relief; (3) whether the balance of equities tips in the plaintiff's favor; and (4) whether an injunction is in the public interest. *Garcia v. City of Los Angeles*, 11 F.4th 1113, 1118 (9th Cir. 2021) (citing *Winter*, 555 U.S. at 20). The latter two factors merge when the government is opposing injunctive relief. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Niken v. Holder*, 556 U.S. 418, 435 (2009)).

In the Ninth Circuit, "[l]ikelihood of success on the merits is the most important factor." *Apartment Ass'n of L.A. Cnty., Inc. v. City of Los Angeles*, 10 F.4th 905, 921 (9th Cir. 2021) (quoting *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018). This first factor is "especially important when a

1    plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir.

2    2023).  If a plaintiff in such a case shows he is likely to prevail on the merits, that showing usually

3    demonstrates he is suffering irreparable harm no matter how brief the violation.  *Id.* (citing *Planned*

4    *Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014) (abrogated on other grounds by

5    *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022))).  A likelihood of succeeding on the

6    merits also tips the public interest sharply in the plaintiff's favor because it is "always in the public

7    interest to prevent the violation of a party's constitutional rights."  *Id.* (citing *Riley's Am. Heritage*

8    *Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022) (quoting *Melendres v. Arpaio*, 695 F.3d 990,

9    1002 (9th Cir. 2013)).  However, even if the Court determines a plaintiff is likely to succeed on the

10   merits, the Court still needs to separately consider whether the plaintiff satisfied the remaining factors

11   of the preliminary injunction test.  *Dish Network Corp. v. FCC*, 653 F.3d 771, 777 (9th Cir. 2011).

12   **<u>Discussion</u>**

13   A. <u>Likelihood of Success on the Merits</u>

14          The Court first addresses Plaintiff's likelihood of success on his First and Fourteenth

15   Amendment claims.  The Court addresses this factor first because, generally, when "a plaintiff has

16   failed to show the likelihood of success on the merits, [a court] need not consider the remaining three

17   [factors]."  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citation and internal quotation

18   marks omitted).  Since standing is always "an indispensable part of the plaintiff's case" (*Lujan v.*

19   *Defenders of Wildlife*, 504 U.S. 555, 561 (1992)), the Undersigned first considers and resolves the

20   issue of standing.

21          I. Standing

22          Federal courts are courts of limited jurisdiction, possessing "only that power authorized by the

23   Constitution and statute."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

24   Under Article III, federal courts may hear only actual cases or controversies.  *DaimlerChrysler Corp.*

25   *v. Cuno*, 547 U.S. 332, 341 (2006); *see* U.S. Const. art. III, § 2, cl. 1.  The case or controversy

26   requirement demands that "[i]n every federal case, the party bringing the suit must establish standing

27   to prosecute the action."  *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (abrogated

28   on other grounds by *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)).

"[T]he irreducible constitutional minimum of standing consists of three elements."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan*, 504 U.S. at 560).  A plaintiff must show (1) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury was likely caused by the defendant; and (3) that the injury would likely be redressed by judicial relief.  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan*, 504 U.S. at 560-61).  "At the preliminary injunction stage, the plaintiff must make a clear showing of each element of standing."  *Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020).

Courts apply the requirements of standing "less stringently in the context of First Amendment claims."  *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010) (citing *Cal Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003) ("in the First Amendment-protected speech context, the Supreme Court has dispensed with rigid standing requirements")).  Thus, "[t]he Ninth Circuit has held on many occasions that First Amendment cases raise unique standing considerations, that tilt[ ] dramatically toward a finding of standing."  *Stavrianoudakis v. U.S. Dep't of Fish & Wildlife*, 435 F. Supp. 3d 1063, 1081 (E.D. Cal. 2020) (citing *inter alia Wolfson*, 616 F.3d at 1058) (internal quotations omitted).

1.   Injury in Fact

To escape the chilling effect of restrictions on speech, a plaintiff raising First Amendment claims "may establish an injury in fact without first suffering a direct injury from the challenge[d] restriction."  *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010); *Virginia v. Am. Booksellers Ass'n. Inc.*, 484 U.S. 383, 393 (1998) (self-censorship is a "harm that can be realized even without actual prosecution."); *Bland v. Fessler*, 88 F.3d 729, 736-37 (9th Cir. 1996) ("That one should not have to risk prosecution to challenge a statute is especially true in First Amendment cases…").  However, a plaintiff must still demonstrate he faces "a realistic danger of sustaining a direct injury as a result of [a] statute's operation or enforcement," otherwise "the alleged injury is too imaginary or speculative to support jurisdiction."  *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (*en banc*); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014).

In a pre-enforcement challenge to a "speech regulation," the Ninth Circuit has articulated three factors to review: (1) whether the plaintiff has articulated a concrete plan to violate the law in

1   question, (2) whether the enforcement authorities have communicated a specific warning or threat to

2   initiate proceedings, and (3) whether there is a "history of past prosecution or enforcement." *Tingley*

3   *v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022); *Lopez*, 630 F.3d at 785-86; *cf. Project Veritas v.*

4   *Schmidt*, 72 F.4th 1043, 1053 (9th Cir. 2023) ("plaintiffs can show injury in fact by establishing that

5   (1) they intend to violate the law, and (2) have shown a reasonable likelihood that the government will

6   enforce the statute against them.").  In addition, "[c]laims of future harm lack credibility when the

7   challenged speech restriction by its terms is not applicable to the plaintiffs, or the enforcing authority

8   has disavowed the applicability of the challenged law to the plaintiffs." *Lopez*, 630 F.3d at 788.

9   a. Cal. Educ. Code §§ 87732 & 87735 or BP 3050

10   District Defendants argue Plaintiff has not demonstrated any concrete plan to violate Cal.

11   Educ. Code §§ 87732 & 87735 or BP 3050.  (Doc. 43 at 12-13).  Specifically, District Defendants aver

12   the only plan Plaintiff has expressed "is what he intends to teach in upcoming semesters, including

13   instruction based on texts he contends contradict current academic norms." *Id*. at 12.  District

14   Defendants claim Plaintiff has failed to explain how this expression constitutes immoral or

15   unprofessional conduct, dishonesty, unsatisfactory performance, or evident unfitness for service in

16   violation of §§ 87732 & 87735.  *Id*.  Further, Plaintiff does not describe how his instruction would

17   involve, for example, 'verbal forms of aggression, threat, harassment, ridicule, or intimidation' under

18   [BP] 3050." *Id*. at 13-14.

19   Next, District Defendants assert that Plaintiff "points to no specific warning or threat to initiate

20   proceedings against him for violation of these standards, based on his speech as a professor of the

21   District" (*id*. at 12, 14) and that Plaintiff has not presented an applicable history of past prosecution or

22   enforcement of §§ 87732, 87735, BP 3050, or the DEIA regulations.  *Id*. at 13-14.  District Defendants

23   discount the District's investigation of a complaint against Plaintiff by another professor, because "he

24   was ultimately vindicated" and the matter resulted in no discipline against Plaintiff.  *Id*. at 12, 14.

25   Further, District Defendants characterize the District's enforcement of §§ 87732, 87735, and BP 3050

26   against Garrett as inapplicable to the "planned speech in which [Plaintiff] intends to engage [in]." *Id*.

27   at 13-14.

28

18

1    In contrast, Plaintiff contends he has "painstakingly detailed his 'concrete plan to violate' the

2    challenged regulations" beyond "planned classroom instruction." (Doc. 49 at 7). Plaintiff avers he

3    has not participated in committee votes, has not finalized any agreements with or endorsed any guest

4    speaker, is unable to act "as a whistleblower," has declined to appear in media, and refrained from

5    discussing "Cultural Marxism" or "protesting against the participation of males in female sports and

6    against drag queen story hours." *Id*.

7        Plaintiff's challenge to Cal. Educ. Code §§ 87732 and 87735 is intertwined with the District's

8    discipline and subsequent termination of Garrett. Whereas District Defendants argue Garrett was

9    disciplined and terminated for conduct dissimilar and unrelated to Plaintiff's proposed speech,

10   Plaintiff asserts much of Garrett's conduct that resulted in his termination involves the same political

11   speech Plaintiff seeks to espouse.

12       The record reflects Garrett was disciplined for what appears to be some expressions of "pure

13   political speech" which Plaintiff plans to engage in. For instance, the District's April 11, 2023,

14   "Statement of Charges" stated Garrett violated Cal. Educ. Code § 87732 for: (1) Garrett's May 19.

15   2019, Op-Ed suggesting "certain terms such as 'Cultural Marxism' weren't 'hate speech', (2) Garrett's

16   criticism of the Bakersfield curriculum committee and the "Cesar E. Chavez Leadership Certificate

17   and Landmarks in California courses," and (3) some of Garrett's participation in media, and social

18   media. *See* (Doc. 26-10 at 7, 12-13, 15-16, 19-20).

19       The record also demonstrates a substantial amount of Garrett's conduct allegedly went beyond

20   pure political speech. The "Statement of Charges" claimed Garrett violated Cal. Educ. Code §§ 87732

21   and 87735 for wasting college and District resources and diminishing the value of the District's

22   reporting system, attempting to violate campus COVID-19 policies, refusing to follow campus

23   procedures, engaging in physical intimidation, and threatening Defendant Corkins. *Id*. at 7-13, 17, 19.

24       The Undersigned finds Plaintiff has presented ample evidence of his intent to engage in speech

25   and conduct that Defendants could conclude is inconsistent with Cal. Educ. Code §§ 87732 and 87735.

26   As set forth above and at length in Plaintiff's declaration, Plaintiff has stated his intent to engage in

27   similar "political speech" that Garrett was, in part, punished for. Plaintiff has already been warned by

28   District Defendants that if he posts on social media, like Garrett had, "[t]he District will investigate

19

1  any further complaints of harassment and bullying and, if applicable, will take appropriate remedial

2  action including but not limited to any discipline determined to be appropriate."  (Doc. 8-6 at 10).

3  Plaintiff's "fear [of prosecution] is reasonable," based on his own experience and that of his fellow

4  professor.  *Italian Colors Rest v. Becerra*, 878 F.3d 1165, 1173 (9th Cir. 2018). *See Stavrianoudakis*,

5  435 F. Supp. 3d at 1083 ("A history of past prosecution of parties similarly situated to the plaintiffs

6  will also support a credible threat of enforcement") (citing *Lopez*, 630 F.3d at 786-87).  Accordingly,

7  Plaintiff has shown "injury in fact" as to Cal. Educ. Code §§ 87732 and 87735.

8        The Undersigned finds Plaintiff has also adequately demonstrated "injury in fact" as to BP

9  3050.  As set forth above, Plaintiff has expressed an intent to engage in speech that the District may

10  deem to be in violation of BP 3050.  *See* (Doc. 42-1 at 23) (the community does "not participate in or

11  accept, condone, or tolerate physical or verbal forms of aggression, threat, harassment, ridicule, or

12  intimidation.").  Indeed, Plaintiff already has been investigated for engaging in speech that appears to

13  be contrary to BP 3050.  *See* (Docs. 8 at ¶ 73-75; 8-6; 26-1 at 12).

14        District Defendants' argument that this past investigation should be disregarded because it

15  resulted in no discipline against Plaintiff is unpersuasive.  (Docs. 8-6 at 10; 43 at 12-13).

16  "[T]hreatened state action need not necessarily be a prosecution."  *Lopez*, 630 F.3d at 786.  Informal

17  measures, such as "'the threat of invoking legal sanctions and other means of coercion, persuasion,

18  and intimidation,' can violate the First Amendment."  *See White v. Lee*, 227 F.3d 1214, 1228 (9th Cir.

19  2020) (an investigation that did not culminate in an arrested chilled First Amendment activities); *see*

20  *also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (federal agency's investigation chilled

21  First Amendment rights even though materials were not banned or seized, and sanctions were not

22  ultimately pursued).  Here, Plaintiff claims he had to retain counsel to address the District's past

23  investigation of him.  (Doc. 8 at ¶ 74).  The Undersigned finds that a person of ordinary firmness

24  would be deterred from continuing to post on Facebook if such action required them to be investigated

25  and to retain counsel.  Thus, Plaintiff's fear of investigation is reasonable and Plaintiff has established

26  "injury in fact" as to BP 3050.

27  ///

28  ///

20

b. DEIA Regulations and the DEI Competencies and Criteria Recommendations

The Undersigned next addresses whether Plaintiff has shown "injury in fact" to challenge Defendants' implementation of the April 16, 2023, DEIA regulations.

Christian asserts Plaintiff cannot demonstrate an "injury in fact" because the DEIA regulations do not apply to him directly.  (Doc. 42 at 14).  Christian argues this case is similar to *Barke v. Banks*, 25 F.4th 714 (9th Cir. 2022).  (Doc. 42 at 14-15).  In *Barke*, plaintiffs, who were "elected members of local California government bodies, including city councils, school boards, and community college and special purpose districts," challenged Cal. Gov. Code § 3550.  *Id*. at 14 (citing 25 F.4th at 716-17). § 3550 states in part that "[a] public employer shall not deter or discourage public employees…from becoming or remaining members of an employee organization."  *Barke*, 25 F.4th at 716.  Christian asserts the *Barke* Court "held that because [§] 3550 did not apply to the plaintiff or 'the speech Plaintiffs allege they want to engage in,' they 'failed to demonstrate that they ha[d] suffered an injury in fact sufficient to establish their standing to pursue their pre-enforcement challenge.'"  (Doc. 42 at 14-15) (quoting *Barke*, 25 F.4th at 720-21).

Christian claims like *Barke*, the regulations here do not apply to Plaintiff.  *Id*. at 15.  Instead, Christian contends the regulations operate only upon community college districts "to consider diversity, equity, inclusion, and access in the employment processes, as implemented through district policy and collective bargaining."  *Id*. at 14-15.

In response, Plaintiff avers *Barke* is not similar to this case.  (Doc. 48 at 8).  Plaintiff contends the *Barke* plaintiffs "feared that the state would 'erroneously attribute' protected speech made in their individual capacities, to their employers, leading to charges under a provision barring their employers from deterring or discouraging union membership."  *Id*.  Plaintiff asserts the *Barke* court held plaintiffs' fear was unfounded as the state conceded it would not misattribute plaintiffs' individual speech to their employers.  *Id*.  Plaintiff argues, unlike *Barke*, the regulations at issue in this case that the state seeks to impose are directly applicable to faculty like Plaintiff.  *Id*.

The Undersigned finds *Barke* is not comparable to this action.  In *Barke*, the court looked to the "plain language" of Cal. Gov. Code § 3550 and determined it "does not regulate speech made by Plaintiffs in their individual capacities; the statute only impacts them to the extent their speech can be

1    attributed to their 'public employer[s].'" 25 F.4th at 719.  The *Barke* court determined § 3550 did

2    regulate the speech public employees engaged in pursuant to their official duties, and that "speech

3    [did] not implicate the employees' individual constitutional rights."  *Id.* (citing *Garcetti v. Ceballos*,

4    547 U.S. 410, 421-22 (2006)).  Thus, the *Barke* court held because § 3550 did not injure plaintiffs'

5    constitutionally protected individual interests, plaintiffs failed to demonstrate they had suffered an

6    injury in fact sufficient to establish standing to pursue a pre-enforcement challenge.  *Id.* at 719-21.

7          Here, the plain language of the DEIA regulations impose minimum qualifications on all

8    employees, dictates what faculty must teach, how they should teach, and how they will be evaluated.

9    Cal. Code Regs. tit. 5, §§ 53602(a-b), 53605(a).  The DEIA regulations clearly impose requirements

10   on Plaintiff's official duties as a faculty member of Bakersfield College.  Unlike *Barke*, the regulations

11   at issue here injure Plaintiff's constitutionally protected individual interest (addressed *infra*).  Thus,

12   because the regulations apply to Plaintiff, he possesses standing to challenge them.

13          District Defendants argue Plaintiff has not shown "'any concrete plan to violate' [the DEIA]

14   regulations, despite the many pages of [Plaintiff's] declaration criticizing them."  *Id.* at 16.  District

15   Defendants assert Plaintiff has only articulated why he disagrees with different portions of the

16   regulations and that he will not conform his speech to them.  *Id.*  District Defendants contend Plaintiff

17   has failed to provide "specific instances of how he will infringe the regulations somehow, and

18   certainly nothing specific that could possibly lead to some form of discipline."  *Id.*

19          In contrast, Plaintiff argues he "has also explained his refusal to express himself as the DEIA

20   regime expects."  *Id.*  Specifically, Plaintiff asserts his "plans" include not following DEI guidelines,

21   not introducing new employees to DEI principles, and that he does "not wish to 'seek[] opportunities

22   for growth to acknowledge and address the harm caused by internal biases and behavior[.]'"  *Id.* at 7-

23   8.

24          The Undersigned finds Plaintiff has articulated a concrete plan (to which he is firmly

25   committed) to violate the DEIA regulations.  Indeed, it appears Plaintiff not only will ignore DEIA

26   regulations but intends to criticize and challenge these regulations inside and outside the classroom.

27   Plaintiff's proposed actions would be in direct conflict with Cal. Code of Regs. tit. 5, § 53605's

28

22

1  requirement that faculty members teach, learn, and employ professional practices that reflect DEIA
2  and anti-racist principles.

3  Next, Defendants contend they have not communicated a specific warning or threat to initiate
4  proceedings against Plaintiff and that Christian is not a prosecuting authority. (Doc. 42 at 16).
5  However, as summarized in the standing analysis above, the record shows Plaintiff has established a
6  reasonable likelihood that the DEIA regulations will be enforced against him. *Thomas*, 220 F.3d at
7  1140 ("the threat of enforcement must at least be 'credible,' not simply 'imaginary or speculative.'").

8  Christian acknowledges the DEIA regulations, as adopted through the formal regulatory
9  process, are binding on districts.  (Doc. 42 at 8 n.2).  Similarly, District Defendants assert they "have
10  no choice but to follow the regulations."  (Doc. 43 at 16).  As such, it is not "imaginary or speculative"
11  (*Thomas*, 220 F.3d at 1140) to infer Plaintiff will be evaluated under the District's DEI competencies
12  and criteria for his employee evaluation, tenure review, and employment retention processes.  In light
13  of this, the Undersigned finds it is likely that at some point Plaintiff will face consequences if he does
14  not adhere to whatever competencies and criteria are imposed on him through the DEIA regulations.
15  *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 583 (2023) (accepting the Court of Appeals' conclusion
16  that plaintiff satisfied standing requirements through demonstration of "credible threat" state would
17  compel her to "create speech she does not believe or endorse").

18  District Defendants also contend Plaintiff lacks standing because he cannot show a history of
19  enforcement of the DEIA regulations.  (Doc. 43 at 13).  Because the record indicates the DEIA
20  regulations, adopted April 16, 2023, and the Chancellor's DEI Competencies and Criteria
21  Recommendations, adopted May 5, 2023, have no history of enforcement, this factor weighs against
22  finding Plaintiff has standing.  However, "the history of enforcement, carries little weight when the
23  challenged law is relatively new[,] and the record contains little information as to enforcement."
24  *Tingley*, 47 F.4th at 1069 (citation and internal quotation marks omitted).  Instead, "[t]he sparse
25  enforcement history weighs against standing but 'is not dispositive.'" *Id*. (citations omitted).
26  Accordingly, Plaintiff has shown "injury in fact" as to the DEIA regulations and the DEI
27  Competencies and Criteria Recommendations.  *See id*. (holding plaintiff established standing

28

23

1    "[b]ecause the first two factors are satisfied by the 'general factual allegations of injury'" and there

2    was a limited history of prosecution under the challenged statute because it was recently enacted).

3        2.   Traceability

4        A key component of Article III standing is traceability, *i.e.*, a causal connection between the

5    alleged injury and the defendant's actions.  *See Easter v. Am. W. Fin.*, 381 F.3d 948, 961-62 (9th Cir.

6    2004) (holding that plaintiffs who could not trace an injury to a particular defendant did not have

7    standing to sue that defendant).  In cases "where there are multiple defendants and multiple claims,"

8    the plaintiff must demonstrate Article III standing "as to each defendant and each claim."  *Reniger v.*

9    *Hyundai Motor Am.*, 122 F. Supp. 3d 888, 895 (N.D. Cal. 2015); *Friends of the Earth, Inc. v. Laidlaw*

10   *Envtl. Servs., Inc.*, 528 U.S. 167, 185 (2000) ("[A] plaintiff must demonstrate standing separately for

11   each form of relief sought.").  However, "a defendant need not be the injury's sole source or proximate

12   cause, as long as the link is not tenuous or abstract."  *O'Handley v. Padilla*, 579 F. Supp. 3d 1163,

13   1190 (N.D. Cal. 2022) (citing *Barnum Timber Co. v. EPA*, 633 F.3d 894, 901 (9th Cir. 2011)); *see*

14   *Maya v. Centex Corp.*, 658 F.3d 1050, 1070 (9th Cir. 2011) ("A causal chain does not fail simply

15   because it has several links, provided those links are not hypothetical or tenuous and remain

16   plausible.").

17       Christian claims Plaintiff cannot show a causal connection between his purported injuries and

18   the Board or the Chancellor's actions.  (Doc. 42 at 16-17).  Christian asserts the state's community

19   college districts are legally distinct entities from both the Board and the Chancellor.  *Id.* (citing *First*

20   *Interstate Bank v. State of California*, 197 Cal. App.3d 627, 633 (1987)).  Christian contends the

21   Chancellor and the Board cannot be held liable for any acts undertaken by a community college

22   district, the community college, or the college's employees.  *Id.* at 17.

23       Christian argues it is the District, not the Board or Chancellor, that employs, evaluates,

24   promotes, or disciplines district staff or college professors, including Plaintiff.  *See id.* at 16-17

25   (asserting Chancellor Christian is not a prosecuting authority).  Christian claims "[a]ll decisions

26   regarding employee hiring, employment practices, performance evaluation, and potential termination

27   are the responsibility of the district."  *Id.* at 17.  Christian avers the Board "merely sets minimum

28

24

1   hiring standards for personnel hired by each district" and "cannot and will not take any action against

2   [Plaintiff] concerning his speech." *Id*.

3         Plaintiff contends the DEIA regulations "directly concern his speech and silence, mandating

4   that he be evaluated based on his commitment to the state's ideology and that he incorporate that

5   ideology in his teaching." (Doc. 48 at 7). Plaintiff asserts whether the regulations operate upon the

6   district and not directly on faculty is irrelevant and he need not be the immediate target of a statute to

7   challenge it. *Id*.

8         Plaintiff further asserts it is immaterial that Christian will not be the one to take any action

9   against him regarding his speech. *Id*. at 8. Plaintiff argues Christian can be held liable under § 1983 if

10  she "caused" a deprivation of his rights. *Id*. at 8-9 (citing *Arnold v. IBM Corp.*, 637 F.2d 1350, 1355

11  (9th Cir. 1981) and *Falls v. Desantis*, No. 4:22cv166-MW/MJF, 2022 WL 19333278, at *4 (N.D. Fla.

12  July 8, 2022) (the "lack of authority to directly punish is hardly decisive")). Plaintiff contends the

13  DEIA regulations and the Chancellor's role in implementing and maintaining said regulations, impose

14  mandatory obligations on the District that play "[an ongoing], direct role in determining what

15  [Plaintiff] must and cannot say, and what he must and cannot teach." *Id*. at 9-10.

16        The Undersigned discounts Christian's reliance on *First Interstate Bank of California* and

17  considers that opinion largely inapplicable to this case. California community college districts are

18  separate political entities for some purposes. *Butt v. State of California*, 4 Cal. 4th 668, 681 (1992).

19  Because of this separation, the State may not be held liable for torts of local districts or its employees,

20  or a district's breach of contract. *Id*. (citing *First Interstate Bank of California*, 197 Cal. App.3d at

21  633-34, and *Johnson v. San Diego Unified School Dist.*, 217 Cal. App.3d 691, 698-700 (1990)).

22  "However, both federal and California decisions make clear that heightened scrutiny applies to State-

23  maintained discrimination whenever the disfavored class is suspect, or the disparate treatment has a

24  real and appreciable impact on a fundamental right or interest." *Id*. at 685-86. In these circumstances,

25  a suit against the State itself is appropriate. *See generally id*.

26        Here, Plaintiff alleges his First Amendment rights are being violated by the State's

27  implementation of the DEIA regulations. Thus, Plaintiff's alleged injury arises from and is fairly

28  traceable to, the State and Christian's actions.

3.   Redressability

Redressability considers "whether the injury that plaintiff alleges is likely to be redressed through [litigation]." *Sprint Communs. Co., L.P. v. APCC Servs.*, 554 U.S. 269, 287 (2008). "A plaintiff's burden to demonstrate redressability is 'relatively modest.'" *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) (quoting *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012)). A plaintiff need only "show that a favorable decision will likely redress his injury." *Mayfield v. U.S.*, 599 F.3d 965, 971 (9th Cir. 2010).

Plaintiff claims Defendants' adoption and implementation of the aforementioned statutes, policy, regulations, and guidelines have violated his First Amendment rights by chilling his speech and forcing him to advance a "political ideology" he rejects. (Doc. 26-1 at 7-8, 25). If the Court determines that the challenged statutes, policy, regulations and guidelines are unconstitutional, it is likely that Plaintiff's alleged injury would be redressed by a favorable decision. *See Wolfson*, 616 F.3d at 1056 ("These defendants have the power to discipline Wolfson and, if they are enjoined from enforcing the challenged provisions, Wolfson will have obtained redress in the form of freedom to engage in certain activities without fear of punishment."). Plaintiff has alleged sufficient facts to meet the redressability standing element.

Accordingly, the Undersigned finds Plaintiff has established standing to seek injunctive relief in this case.

II. *Monell* liability

District Defendants aver Plaintiff has not alleged sufficient facts to establish *Monell* liability. (Doc. 43 at 16-17) (citing *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658 (1978)). Pursuant to *Monell*, a "local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." 436 U.S. at 694. Instead, the local government "is subject to suit under § 1983 only 'if it is alleged to have caused a constitutional tort through a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers.'" *Gravelet-Blondin v. Shelton,* 728 F.3d 1086, 1096-97 (9th Cir. 2013) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)). A plaintiff seeking to establish *Monell* liability must demonstrate that the

1   government "had a deliberate policy, custom, or practice that was the moving force behind the

2   constitutional violation he suffered." *Galen v. Cnty of Los Angeles*, 477 F.3d 652, 667 (9th Cir. 2007).

3          District Defendants argue the District cannot be held liable under *Monell* for its compliance

4   with mandatory state law – "in this case California's new DEIA regulations applicable to community

5   colleges." (Doc. 43 at 16).  District Defendants claim, "when a municipality exercises no discretion

6   and merely complies with a mandatory state law, the constitutional violation was not caused by an

7   official policy of the municipality." *See Id.* at 16-17 (citing cases).

8          Plaintiff argues *Monell* does not apply because California community college districts are state

9   entities and not "municipalities." (Doc. 49 at 10-11).  Plaintiff alleges District Defendants are state

10  officials "who can be enjoined from enforcing state laws when sued in their official capacities." *Id.* at

11  11 (citing *Ex Parte Young*, 209 U.S. 123 (1908)).  Specifically, Plaintiff claims this Court can enjoin

12  District Defendants from formulating and implementing local DEIA policies, from evaluating Plaintiff

13  through DEIA standards, and from firing Plaintiff because of his speech and failure to adopt DEIA

14  principles through the Education Code. *Id.* (citing Cal. Code of Regs. tit. 5, §§ 53601(b), 53602,

15  53605).  Plaintiff also contends, "[e]ven if Defendants were municipal officers enforcing state law,

16  they would still be subject to [§] 1983 as they exercise discretion in employment decisions, and in

17  crafting local DEIA policies." *Id.* at 11 n.3 (citing *Evers v. Cnty. Of Custer*, 745 F.2d 1196, 1203 (9th

18  Cir. 1984)).

19         The Ninth Circuit has determined that community college districts in California are state

20  entities. *Mitchell v. Los Angeles Cnty. Coll. Dist.*, 861 F.2d 198, 201 (9th Cir. 1988).  Accord, *First

21  Interstate Bank*, 197 Cal. App.3d at 633 (noting that California community college districts "are

22  considered agencies of the state for the local operation of the state school system.").  "[T]he Supreme

23  Court has expressly declined to extend *Monell's* theory of municipal liability under § 1983 to state

24  entities." *Krainski v. State ex rel. Bd. of Regents*, 616 F.3d 963, 968 (9th Cir. 2010) (citing *Will v.

25  Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).  Here, *Monell* is inapplicable because District

26  Defendants are state officials, rather than municipal officials. *Cf. Jordan v. Plaff*, No. 2:23-cv-02482-

27  DOC (MAR), 2023 WL 4295843, at *3, 15 (C.D. Cal. Jun. 30, 2023) (applying *Monell* requirements

28

27

1 to municipal officials acting in their official capacity for injunctive or declaratory relief under § 1983).

2 Therefore, District Defendants' claim Plaintiff failed to allege *Monell* liability is without merit.

3      III. First Amendment Claims

4      Plaintiff avers that the Defendants violated his First Amendment rights by engaging in

5 viewpoint discrimination and compelled speech.  (Doc. 8 at 33-39).  The First Amendment applicable

6 to the States through the Fourteenth Amendment[4], provides "Congress shall make no law…abridging

7 the freedom of speech."  U.S. Const. amend. I.

8      While public employees' First Amendment rights may be limited to a certain degree, the

9 government may not abuse its position as an employer to stifle "the First Amendment rights [its

10 employees] would otherwise enjoy as citizens to comment on matters of public interest."  *Eng v.*

11 *Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009) (quoting *Pickering v. Bd of Educ.*, 391 U.S. 563, 568

12 (1968)); *cf. Garcetti*, 547 U.S. at 421 (public employees do not speak as citizens for First Amendment

13 purposes when they make statements pursuant to their official duties).

14      "The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that

15 the overwhelming majority of people might find distasteful or discomforting."  *Virginia v. Black*, 538

16 U.S. 343, 358 (2003) (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J.,

17 dissenting)); *see Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle

18 underlying the First Amendment, it is that the government may not prohibit the expression of an idea

19 simply because society finds the idea itself offensive or disagreeable.")); *see also McCullen v.*

20 *Coakley*, 573 U.S. 464, 476 (2014) ("[T]he First Amendment's purpose [is] to preserve an uninhibited

21 marketplace of ideas in which truth will ultimately prevail.") (quotation marks and citation omitted).

22      Nowhere is this free trade in ideas "more vital than in the community of American schools [of

23 higher learning]."  *Healy v. James*, 408 U.S. 169, 180 (1972) (internal citation and quotation marks

---

27     [4] Section 1 of the Fourteenth Amendment provides that "[n]o State shall…deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV. § 1.  "The term 'liberty' in the Fourteenth Amendment to the Constitution makes the First Amendment applicable to the States."  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 336 n.1 (1995).

28

1    omitted).  Teachers do not "shed their constitutional rights to freedom of speech or expression at the

2    schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

3         Instead, the First Amendment acquires a special significance in the university setting, where

4    the free and unfettered interplay of competing views is fundamental to our society.  *See Keyishian v.*

5    *Bd. Of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967) ("Our Nation is deeply

6    committed to safeguarding academic freedom, which is of transcendent value to all of us and not

7    merely to the teachers concerned.") (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)); *see also*

8    *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) ("To impose any strait jacket upon the

9    intellectual leaders in our colleges and universities would imperil the future of our Nation."); *Grutter*

10   *v. Bollinger*, 539 U.S. 306, 329 (2003) ("given the important purpose of public education and the

11   expansive freedoms of speech and thought associated with the university environment, universities

12   occupy a special niche in our constitutional tradition.").

13        In light of the First Amendment's special significance in the university setting, the Ninth

14   Circuit determined that First Amendment limitations for public employees in *Garcetti*, "cannot—apply

15   to teaching and academic writing that are performed pursuant to the official duties of a teacher and

16   professor."  *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014) (internal quotation marks omitted);

17   accord *Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021) ("Simply put, professors at public

18   universities retain First Amendment protections at least when engaged in core academic functions,

19   such as teaching and scholarship").

20        In place of *Garcetti*, the *Demers* court held that a public university professor's teaching and

21   academic writing is to be analyzed under the test set forth in *Pickering*.  *Demers*, 746 F.3d at 412.  The

22   *Pickering* test has two parts.  *Id.*  First, the employee must show that his or her speech addressed

23   "matters of public concern."  *Pickering*, 391 U.S. at 568; *Connick v. Myers*, 461 U.S. 138, 140 (1983).

24   Next, the employee's interest in commenting upon matters of public concern must outweigh the

25   interest of the State, as an employer, in promoting the efficiency of the public services it performs

26   through its employees.  *Id.*  "Under this inquiry, the burden shifts to the government to show that its

27   'legitimate administrative interests outweigh the employee's First Amendment rights.'"  *Hodge v.*

28

1    *Antelope Valley Cmty. College Dist.*, No. CV 12-780 PSG (Ex), 2014 WL 12776507, at *4 (C.D. Cal.

2    Feb. 14, 2014) (citing *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004)).

3          As applied in this case, there are three possibilities: (1) if Plaintiff's proposed speech does not

4    involve his official duties as a professor of Bakersfield College at all, Plaintiff was speaking as a

5    private citizen and the *Pickering* test applies; (2) if Plaintiff's proposed speech would constitute

6    teaching and academic writing performed within his official duties, the *Pickering* test applies; or (3) if

7    Plaintiff's proposed speech was pursuant to his official duties but did not constitute teaching and

8    academic writing, *Garcetti* applies and Plaintiff's speech is not protected.

9          Plaintiff asserts Defendants have chilled his ability to teach in the classroom, express his

10    objections to "DEI ideology," manage and post on RIFL's Facebook page, write editorials, appear in

11    media, hold events, invite guest speakers, and serve on the EODAC and screening committees.  (Doc.

12    26-2 at ¶¶ 38, 40-43, 47-48, 51, 53-55, 59-61, 67, 93, 101-03, 105).  Plaintiff claims much of his

13    "speech at issue here—posting on Facebook, writing editorials, inviting and sponsoring speakers, and

14    appearing in media—is speech [he] would make in his personal capacity."  (Doc. 26-1 at 20); *see*

15    (Doc. 26-8) (the District found Plaintiff's posts on RIFL's Facebook page were not actions he took in

16    his role as a KCCD employee).  Plaintiff asserts any other speech he made was pursuant to his official

17    duties as a professor and constitutes teaching and scholarship.  (Doc. 26-1 at 20).

18          The Undersigned agrees with Plaintiff that his proposed posts on social media, media

19    appearances, editorials, and events are speech he would make in his personal capacity.  *Hernandez v.*

20    *City of Phoenix*, 43 F.4th 966, 978 (9th Cir. 2022) ("publicly posting on social media suggests an

21    intent to communicate to the public or to advance a political or social point of view beyond the

22    employment context") (citations omitted); *Pickering*, 391 U.S. at 569-70 (finding a teacher's letters to

23    a local newspaper was speech beyond the employment context).  The Undersigned must determine if

24    Plaintiff's other forms of speech likewise qualify as teaching and academic writing.

25          While the *Demers* court established an exception to *Garcetti* for teaching and academic

26    writing, it did not define what constitutes such speech.  *Alozie v. Ariz. Bd. of Regents*, 431 F. Supp. 3d

27    1100, 1119 (D. Ariz. 2020); *see Demers*, 746 F.3d at 415 ("It may in some cases be difficult to

28

1  distinguish between what qualifies as speech 'related to scholarship or teaching' within the meaning of

2  *Garcetti*.").

3      Certainly, Plaintiff's decision on what to teach in the classroom and criticism of "DEI

4  ideology" would qualify as teaching and academic writing.  However, the Undersigned finds the same

5  cannot be said for the speech Plaintiff would make in the course of his work on screening committees

6  and the EODAC.  "The 'primary purpose' of Bakersfield College's [EODAC] 'is to actively

7  assist/facilitate' the school's 'cultural and institutional policies and practices that demonstrate a

8  commitment to greater diversity and inclusion.'"  (Doc. 26-1 at 10).  The purpose of screening

9  committees is hiring faculty.  (Doc. 26-2 at ¶ 61).  Neither activity involves "scholarship or teaching."

10  Thus, *Garcetti* applies and Plaintiff's speech in the course of his work on screening committees and

11  the EODAC is not protected.  *See Sullivan v. Univ. of Wash.*, 60 F.4th 574, 582 n. 6 (9th Cir. 2023)

12  ("*Demers* is inapplicable here because, in performing the official work of the Committee, the members

13  are not thereby engaged in "teaching and academic writing."); *see also Hong v. Grant*, 516 F. Supp. 2d

14  1158, 1168 (C.D. Cal. 2007) (professor's remarks during faculty meeting concerning another

15  professor's application for promotion and other comments made pursuant to his "professional

16  obligation to participate in departmental self-governance" not protected speech).  Accordingly, the

17  Undersigned will not recommend the Court grant Plaintiff's request to enjoin Defendants from

18  requiring DEIA compliance as a condition of serving on screening committees or the EODAC.

19      1.  Matter of Public Concern

20      Whether speech involves a matter of public concern is purely a question of law.  *Eng*, 552 F.3d

21  at 1070 (citing *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 648 (9th Cir. 2006)).  "This determination

22  is made in light of 'content, form, and context' of the expressive conduct 'as revealed by the whole

23  record.'"  *Alpha Energy Savers. Inc. v. Hansen*, 381 F.3d 917, 924 (9th Cir. 2004) (quoting *Connick*,

24  461 U.S. at 147-48).  "Speech involves matters of public concern when it can be fairly considered as

25  relating to any matter of political, social, or other concern to the community, or when it is a subject of

26  legitimate news interest; that is, a subject of general interest and of value and concern to the public."

27  *Lane v. Franks*, 573 U.S. 228, 241 (2014) (internal quotation marks omitted) (quoting *Snyder v.*

28  *Phelps*, 562 U.S. 443, 453 (2011)).  "On the other hand, speech that deals with individual personnel

1  disputes and grievances and that would be of no relevance to the public's evaluation of the

2  performance of governmental agencies is generally not of public concern." *Coszalter v. City of Salem*,

3  320 F.3d 968, 973 (9th Cir. 2003) (internal quotation marks); *McKinley v. City of Eloy*, 705 F.2d 1110,

4  1114 (9th Cir. 1983).

5        Neither Plaintiff nor Defendants dispute that Plaintiff's proposed speech regarding DEIA

6  pertains to matters of public concern.  (Docs. 43 at 19; 49 at 12; 57 at 45).  The Undersigned finds

7  Plaintiff's proposed speech regarding "Cultural Marxism" and his protest of the participation of males

8  in female sports and drag queen story hours are subjects of general interest, value, and concern to the

9  public.  *See Papineau v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) ("[T]he First Amendment protects

10 political demonstrations and protests—activities at the heart of what the Bill of Rights was designed to

11 safeguard.").  Likewise, Plaintiff's intent to speak on matters concerning Bakersfield College

12 academics, operations, and policies qualify as matters of public concern.  *See Moran v. Washington*,

13 147 F.3d 839, 849 (9th Cir. 1998) ("inefficiency in managing and operating government entities is a

14 matter of inherent public concern."); *Pickering*, 391 U.S. at 571 (school system funds are a matter of

15 legitimate public concern).[5]  Accordingly, the Undersigned concludes Plaintiff is likely to prevail in

16 satisfying the first step of the *Pickering* test.

17     2.  Balancing the Interests

18        The fact that Plaintiff's proposed speech touches on matters of public concern does not end the

19 Undersigned's inquiry.  Once a plaintiff shows that his or her statements were of public concern, the

20 burden shifts to the defendant to show that its interest in regulating the speech outweighs the plaintiff's

21 First Amendment rights.  *Bauer v. Sampson*, 261 F.3d 775, 784 (9th Cir. 2001).  The balancing

22 "requires full consideration of the government's interest in the effective and efficient fulfillment of its

23

24        [5] "There may be some instances in which speech about academic organization and governance
does not address matters of public concern." *Demers*, 746 F.3d at 416.  Speech that deals with
25 personnel disputes and internal power struggles within the workplace has no relevance to the public.
*Desrochers v. City of San Bernardino*, 572 F.3d 703, 709-10 (9th Cir. 2009).  Further, "when the
26 subject matter of a statement is only marginally related to issues of public concern, the fact that it was
made because of a grudge or other private interest or to co-workers rather than to the press may lead
27 the court to conclude that the statement does not substantially involve a matter of public concern."
*Johnson v. Multnomah Cty.*, 48 F.3d 420, 425 (9th Cir. 1995).  In this case, Garrett's alleged conduct
28 serves to highlight this distinction, as his purported internal criticisms of Bakersfield College and
personal attacks may not constitute matters of public concern.  *See* (Doc. 26-10 at 2, 4-6, 16-17).

1  responsibilities to the public." *Voight v. Savell*, 70 F.3d 1552, 1561 (9th Cir. 1995).  "This issue is one

2  of law and a determination is to be made by the court." *Cochran v. City of Los Angeles*, 222 F.3d

3  1195, 1200 (9th Cir. 2000) (citing *Connick*, 461 U.S. at 148 n. 7).

4        The Undersigned analyzes below the challenged Education Code, BP 3050, the DEIA

5  regulations, and the DEI Competencies and Criteria Recommendations in turn.

6                          a. Cal. Educ. Code §§ 87732, 87735, and BP 3050

7        The Undersigned notes District Defendants have offered no argument that their interest in

8  regulating Plaintiff's speech through Cal. Educ. Code §§ 87732, 87735, and BP 3050 outweighs

9  Plaintiff's First Amendment rights.  *See generally* (Doc. 43).  District Defendants primarily argue

10  Plaintiff lacks standing to challenge the Education Code and the Board's policy.  *Id*. at 11-14.

11  However, the Undersigned addressed these arguments above and held Plaintiff has demonstrated

12  standing to pursue a pre-enforcement challenge to the Education Codes and the Board's policy.

13  *Supra.* at 16-26.  District Defendants have failed to carry their burden under *Pickering*.  Accordingly,

14  the Undersigned concludes Plaintiff's interest in expressing himself in his personal capacity, and

15  through his "scholarship or teaching" overrides District Defendants' interest in regulating his speech

16  through Cal. Educ. Code §§ 87732, 87735, and BP 3050.

17                      b. DEIA regulations and the DEI Competencies and Criteria Recommendations

18        "The Free Speech Clause restricts government regulation of private speech; it does not regulate

19  government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009).  A government

20  entity has the right to speak for itself, is entitled to say what it wishes and to select the views it wants

21  to express.  *Id*. at 467-68 (quoting *Board of Regents of Univ. of Wis. System v. Southworth*, 529 U.S.

22  217, 229 (2000), *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995), and

23  *Rust v. Sullivan*, 500 U.S. 173, 194 (1991)) (internal quotations omitted).

24        Christian contends that "the regulations do not restrict [Plaintiff's] speech but rather express

25  the Board's own principles regarding diversity, equity, inclusion, and accessibility."  (Doc. 42 at 17-

26  18).  Christian argues the government, as the speaker, may use the regulations to affirm its "official

27  position to embrace diversity."  *Id*. at 18-19 (citing *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d

28  1003, 1014 (9th Cir. 2000)).  Further, Christian asserts the regulations do not implicate Plaintiff's First

1  Amendment rights because they are aspirational, rather than restrictive.  *Id.* (citing *Bair v.*

2  *Shippensburg Univ.*, 280 F. Supp. 2d 357, 370-71 (M.D. Pa. 2003)).

3        The Undersigned disagrees. Christian's characterization of the regulations as merely

4  aspirational guidelines for California's community colleges is contrary to the mandatory language of

5  the regulations.  Cal. Code of Regs. § 53602(a) requires faculty demonstrate (or progress toward)

6  proficiency in the locally-developed DEIA competencies, or those published by the Chancellor for

7  their evaluation, including tenure review.  For instance, § 53602(b) provides that "District employees

8  *must have* or establish proficiency in DEIA-related performance to teach, work, or lead within

9  California community colleges" (emphasis added).  Similarly, § 53605(a) provides that "Faculty

10  members *shall employ* teaching, learning, and professional practices that reflect DEIA and anti-racist

11  principles, and in particular, respect for, and acknowledgement of the diverse backgrounds of students

12  and colleagues to improve equitable student outcomes and course completion" (emphasis added).

13  Likewise, § 53605(c) provides that "[s]taff members *shall promote and incorporate* culturally

14  affirming DEIA and anti-racist principles to nurture and create a respectful, inclusive, and equitable

15  learning and work environment" (emphasis added).  Christian's characterization of these regulations

16  as merely "articulat[ing] the aspirational goal" of promoting DEIA (Doc. 42 at 16-17) is disingenuous

17  – by their plain language, the regulations *require* faculty members like Plaintiff to express a particular

18  message.

19        The Supreme Court "[has] held time and time again that freedom of speech 'includes both the

20  right to speak freely and the right to refrain from speaking at all.'"  *Janus v. AFSCME, Council 31*,

21  138 S. Ct. 2448, 2463 (2018) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)) (citations

22  omitted).  "[T]he First Amendment protects an individuals' right to speak his mind regardless of

23  whether the government considers his speech sensible and well intentioned or deeply misguided, and

24  likely to cause anguish or incalculable grief."  *303 Creative LLC*, 600 U.S. at 586 (internal quotation

25  marks and citations omitted).  Moreover, compelling individuals to mouth support for views they find

26  objectionable, like the government's preferred message, violates the "cardinal constitutional

27  command" that "'no official, high or petty, can prescribe what shall be orthodox in politics,

28

34

1  nationalism, religion, or other matters of opinion.'"  *Janus*, 138 S. Ct. at 2463 (quoting *W. Va. Bd. of*
2  *Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).

3          The principles behind DEIA regulations may be laudable to some, to many, and maybe to
4  most.  But as the District Defendants tacitly acknowledge, they involve "politically charged" and
5  "potentially polarizing" issues.  (Doc. 43 at 20).  For Plaintiff, his "conscience does not allow him to
6  believe in and practice the state's 'embracing diversity' ideology."  (Doc. 26-1 at 16).  Christian's
7  argument during the motion hearing that the challenged regulations do not compel Plaintiff to teach
8  DEIA concepts in the classroom, but rather, merely to demonstrate proficiency in DEIA competencies,
9  is untenable.  (Doc. 57 at 14-15).  The regulations clearly require faculty to "employ teaching,
10  learning, and professional practices that reflect DEIA and anti-racist principles."  Cal. Code of Regs. §
11  53605(a).  It is unclear how Plaintiff could demonstrate proficiency in DEIA principles, for purposes
12  of tenure review, if he is not required to advocate and promote these concepts in his classroom.[6]  In
13  short, Defendants are unable to reconcile how Plaintiff could be fairly evaluated in his "proficiency in
14  DEIA principles" were he to criticize and oppose DEIA concepts within the classroom.

15          Christian separately argues the regulations are constitutionally permissible non-discrimination
16  policies that "do[] not target speech or discriminate on the basis of its content, but instead serve to
17  remove access barriers imposed against groups that have historically been excluded.'"  (Doc. 42 at 17-
18  18) (quoting *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 801 (9th Cir. 2011)).

19          Less than a week after the hearing on Plaintiff's motion for preliminary injunction, the Ninth
20  Circuit issued an opinion in *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of*
21  *Educ.*, 82 F.4th 664 (9th Cir. 2023).  Therein, the Ninth Circuit held that "*Alpha Delta's* analysis
22  pertaining to the Free Speech Clause has…been abrogated by more recent Supreme Court authority,"
23  and that "*Alpha Delta* is no longer good law."  *Id*. at 686 n.8.  The Ninth Circuit acknowledged that
24  "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's
25  benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the

26

27

28  ──────────────
          [6] During oral argument, when asked by the Court whether Plaintiff's teaching of cultural
Marxism to his students could reflect DEIA proficiency, counsel for Christian responded, "I don't
know.  It would depend upon how he's doing that."  (Doc. 57 at 15).

1    regulated speech." *Id.* (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015) (citation omitted)).

2    Thus, that one or even the principal intention behind a regulation is to "remove access barriers" for

3    historically marginalized populations is not dispositive.  In other words, Defendants' "intent" behind

4    the DEIA regulations "is irrelevant in the Free Speech analysis."  *Id.*

5         Christian argues "even if [Plaintiff] could state a constitutional claim challenging the [DEIA]

6    regulations—which he cannot—his motion should still be denied, as the crucial public interest served

7    by the challenged regulations…outweighs the nominal infringement of speech [Plaintiff] alleges he

8    may experience as a result of the regulations."  (Doc. 42 at 22).  She further contends California has a

9    strong interest in ensuring nearly two million community college students have equal educational

10   opportunities and "ensuring that concepts of diversity, equity, inclusion, and accessibility are

11   promoted in all community colleges."  *Id.* at 22-23 (citing *Brown v. Board of Educ. of Topeka*, 347

12   U.S. 483, 493 (1954)).  Christian reiterates the regulations do not impose any "penalty" but serve the

13   important public interest of promoting rights that are embodied in the United States and California

14   Constitutions and the Americans with Disabilities Act.  *Id.* at 23-24.

15        In response, Plaintiff acknowledges California "may have an interest in eliminating

16   discriminatory conduct and providing for equal access to opportunities," but that "mandating an

17   official state ideology for faculty does not advance those interests."  (Doc. 48 at 13).  Plaintiff claims

18   the DEIA regulations and competencies and criteria do not advance any rights but impose a political

19   litmus test for faculty.  *Id.* at 14.  Further, Plaintiff asserts "[v]ague and unexplained assertions about

20   the importance of educational diversity interests cannot override fundamental rights" and "it is always

21   in the public interest to prevent the violation of a party's constitutional rights."  *Id.* (citing *Riley's Am.*

22   *Heritage Farms*, 32 F. 4th at 731) (citation omitted)).

23        California's goal of securing equal educational opportunities for nearly two million community

24   college students is unquestionably appropriate and, in many respects, required by law.  In particular,

25   public accommodation laws are an essential instrument "to vindicate the deprivation of personal

26   dignity that surely accompanies denials of equal access to public establishments."  *Heart of Atlanta*

27   *Motel, Inc. v. United States*, 379 U.S. 241, 250 (1964).  However, California's goal of promoting

28   diversity, equity, inclusion, and accessibility in public universities does not give it the authority to

36

1    invalidate protected expressions of speech.  *See Cal. Chamber of Com. v. Council for Educ. & Rsch.*

2    *On Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) ("[T]his court has consistently recognized the significant

3    public interest in upholding First Amendment principles.") (citations omitted).  *See also Keyishian*,

4    385 U.S. at 603 (declaring "academic freedom" a "special concern of the First Amendment, which

5    does not tolerate laws that cast a pall of orthodoxy over the classroom").

6            For the reasons set forth above, the Undersigned concludes Plaintiff is likely to prevail in

7    satisfying the second step of the *Pickering* test and that the State's interest in imposing the DEIA

8    regulations and the DEI Competencies and Criteria Recommendations do not outweigh Plaintiff's First

9    Amendment rights.

10           IV. Fourteenth Amendment Claim

11           Separately, Plaintiff challenges BP 3050 as impermissibly vague in violation of the Fourteenth

12   Amendment's Due Process Clause.  (Doc. 26 at 22-23).  The challenged policy "requires" that District

13   staff and faculty, among others, "conduct [themselves] with civility in all circumstances of [their]

14   professional lives" and "do not participate in or accept, condone, or tolerate physical or verbal forms

15   of aggression, threat, harassment, ridicule, or intimidation."  (Docs. 26-1 at 8; 42-1 at 23).

16           "A fundamental principle in our legal system is that laws which regulate persons or entities

17   must give fair notice of conduct that is forbidden or required."  *FCC v. Fox TV Stations Inc.*, 567 U.S.

18   239, 253 (2012) (citing *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)).  In evaluating

19   whether a "challenged provision" is unconstitutionally vague, a court must ask whether it "fails to

20   provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it

21   authorizes or encourages seriously discriminatory enforcement."  *Id*. at 254 (quoting *United States v.

22   Williams*, 553 U.S. 285, 304 (2008)); *Hernandez*, 43 F.4th at 982.  "'[W]here the guarantees of the

23   First Amendment are at stake the [Supreme] Court applies its vagueness analysis strictly' to avoid a

24   chilling effect on the exercise of those freedoms."  *Flores v. Bennett*, 635 F. Supp. 3d 1020, 1042

25   (E.D. Cal. 2022) (quoting *Bullfrog Films Inc. v. Wick*, 847 F.2d 502, 512 (9th Cir. 1998)).

26           District Defendants contend the challenged language in BP 3050 is clear and "is in fact more

27   concise than terminology that the Ninth Circuit has approved under a facial vagueness challenge."

28   (Doc. 43 at 14-15) (citing *Hernandez*, 43 F.4th at 981–83).  Plaintiff argues BP 3050's language is

1 nothing like the language approved in *Hernandez*.  (Doc. 49 at 13).  Plaintiff avers BP 3050's

2 language requires "wholly subjective judgments without statutory definitions, narrowing context or

3 settled legal meanings."  *Id*. (citations omitted).[7]

4    The Undersigned finds the term "verbal forms of aggression … harassment, ridicule or

5 intimidation" has a likelihood of being impermissibly vague.  The term lacks a commonly understood

6 meaning and creates a policy that is broader than the civility policies District Defendants allege are

7 similar.  *See Hernandez*, 43 F.4th at 973 ("Personal social media activity must not interfere with work

8 duties or the operation of the Department."); *see* (Doc. 55) (citing cases).  What may be considered

9 "verbal forms of aggression" can "[vary] from speaker to speaker, and listener to listener."  *Marshall*

10 *v. Amuso*, 571 F. Supp. 3d 412, 424 (E.D. Pa. 2021).  This ambiguity invites the District to engage in

11 viewpoint discrimination over what speech may constitute "verbal forms of aggression."  *See* (Doc.

12 26-1 at ¶¶ 16, 19, 21) (Plaintiff was investigated for reposting Bond's post on RIFL's Facebook page

13 and adding "Here's what one critical race theorist at BC sounds like.  Do you agree with this radical

14 SJW from BC's English Department? Thoughts?"); *compare* (Doc. 26-1 at ¶¶ 10-11) (Plaintiff alleges

15 "[n]one of the members of the Board of Trustees disavowed Corkins' call" that "RIFL faculty are 'in

16 that five percent we have to continue to cull.  Got them in my livestock operation and that's why we

17 put a rope on some of them and take them to the slaughterhouse'".).  The Undersigned finds the

18 "verbal forms of aggression" provision of BP 3050 is unconstitutionally vague.  *E.g. Doe v. Univ. of*

19 *Mich.*, 721 F. Supp. 852, 867 (E.D. Mich. 1989) (finding unconstitutionally vague college's anti-

20 harassment policy that subjected staff to discipline for "stigmatizing" speech that created an

21 "intimidating" and "demeaning" environment).

22    Accordingly, for the reasons stated above, the Undersigned finds Plaintiff has shown a

23 likelihood of success on the merits.

24 ///

25 ///

26

27

28

---

  [7] Pursuant to the Undersigned's request, Plaintiff and District Defendants submitted supplemental briefs on Plaintiff's vagueness claim; the Undersigned has reviewed and considered the cases cited therein.  *See* (Docs. 54-55).

B. The Remaining *Winter* factors

The remaining preliminary injunction factors include (1) the likelihood of plaintiff suffering irreparable harm in the absence of preliminary relief; (2) whether the balance of equities tips in the plaintiff's favor; and (3) whether an injunction is in the public interest.  *Winter*, 555 U.S. at 20.  These remaining factors are thoroughly intertwined with considerations already addressed above regarding the merits of Plaintiff's claim.  Absent an injunction, Plaintiff will suffer irreparable injury from an ongoing First Amendment violation.  Further, the Undersigned has concluded the balance of equities and the public interest tips in Plaintiff's favor.  Because Plaintiff has carried his burden as to all four factors, the Undersigned finds he is entitled to a preliminary injunction.

C. Security

Federal Rule of Civil Procedure 65 provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The Ninth Circuit has "recognized that Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*."  *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (internal quotation marks and citation omitted) (italics in original).  Therefore, notwithstanding the language of Rule 65(c), the district court has discretion to dispense with the filing of a bond altogether or to require only a nominal bond.  *See id.* ("The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct.").  Given that Defendants are not facing any monetary injury as a result of the issuance of the preliminary injunction, the Undersigned finds it appropriate to recommend graining the requested preliminary injunction without requiring security based on Plaintiff's showing that he is likely to prevail on his First and Fourteenth Amendment claims.

**Defendants' Motions to Dismiss**

Both District Defendants and Christian separately move to dismiss the FAC.  (Docs. 46, 65).  Specifically, Christian argues Plaintiff lacks standing, that the Board is entitled to express its ideals regarding DEIA, and Plaintiff fails to allege viewpoint discrimination or that Christian, through the

1   operation of state statute and regulations, is the cause of any compelled speech.  As the Undersigned

2   has substantially addressed and dismissed the same arguments above, they will not be repeated below.

3   However, in their motion to dismiss, District Defendants supplement arguments raised in opposition to

4   Plaintiff's motion for preliminary injunction and raise a new argument, addressed below.

5        District Defendants first assert that Plaintiff's causes of action in Counts I through III allege

6   viewpoint discrimination in violation of the First Amendment but fail to state a claim because the FAC

7   fails to allege that Plaintiff suffered any adverse employment action. (Doc. 46 at 13-15) (citing, *inter*

8   *alia, Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 (9th Cir. 2013)).  However, Plaintiff has not asserted a

9   First Amendment retaliation claim.  Indeed, Plaintiff's "complaint does not contain the word

10  'retaliation.'"  *See* (Docs. 8; 56 at 17).  *Dahlia* has no applicability here as this is not a First

11  Amendment retaliation case, and *Dahlia* expressly is limited to such cases.  *See Dahlia*, 735 F.3d at

12  1078.

13       Next, District Defendants expand upon their arguments concerning *Monell* liability which they

14  advance (and which largely are addressed by the Undersigned above) in opposition to Plaintiff's

15  motion for preliminary injunction.  They assert that even if they are state officials, rather than

16  municipal officers (as the Undersigned found above), *Monell's* requirements still apply.  (Doc. 46 at

17  23, n. 7).  District Defendants assert that "[o]nce the Eleventh Amendment immunity is gone or

18  bypassed, as it is for officials sued under *Ex Parte Young*, then *Monell* requirements must necessarily

19  apply for the agency in question to be liable."  (Doc. 64 at 12).  They further contend that "plaintiffs

20  suing officers of state agencies in their official capacities for prospective injunctive relief must satisfy

21  *Monell* standards, regardless of the form of the relief sought."  *Id*. (citing *Los Angeles Cnty., Cal. v.*

22  *Humphries*, 562 U.S. 29. 30-31 (2010)).  District Defendants cite several cases they characterize as

23  applying the *Monell* requirements in the context of *Ex Parte Young*.  *Id.* (citing cases).

24       The Undersigned finds District Defendants' claim Plaintiff must satisfy *Monell* standards

25  under *Humphries* is without merit.  The *Humphries* opinion did not involve suits against individuals in

26  their official capacity.  Instead, the *Humphries* Court clarified that "*Monell's* holding applies to § 1983

27  claims against municipalities for prospective relief as well as claims for damages."  *Humphries*, 562

28  U.S. at 33.  By their express language, *Monell* and *Humphries* apply only to suits against

40

municipalities.  *Monell* and *Humphries* do not apply to cases brought to enjoin state educational officials' enforcement of state statutes under *Ex Parte Young*.  *See Quern v. Jordan*, 440 U.S. 332, 337-38 (1979) (noting distinction in applications of *Monell* and *Ex Parte Young*); *Rounds v. Clements*, 495 Fed. App'x 939, 941 (10th Cir. 2012) ("[T]he 'policy or custom' standard isn't just a liability standard, it's a liability standard for suits against municipalities—entities not immune from suit under the Eleventh Amendment—and it has no applicability to state officers who are immune from suit for damages but susceptible to suit under *Ex Parte Young* for injunctive relief.").

        *Monell* simply does not apply to Plaintiff's claims against District Defendants. Notwithstanding *Monell's* inapplicability to this action, it is the case that, to maintain an official capacity suit against state officials, the plaintiff must allege that a policy or custom of the government entity of which the official is an agent was the "moving force" behind the violation claimed.  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001) (Idaho Department of Corrections administrators sued for injunctive relief were "liable in their official capacities only if policy or custom played a part in the violation of federal law.").  Additionally, *Ex Parte Young* requires "some connection" between the defendant and the enforcement of the alleged unconstitutional act.  209 U.S. at 157.  The "connection… 'must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit.'"  *Snoeck v. Brussa*, 153 F.3d 984, 986 (9th Cir. 1998) (quoting *Los Angeles County Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992)).

        Here, the Undersigned finds District Defendants must adopt or craft their own policies for evaluating Plaintiff's performance based on DEIA requirements.  District Defendants are required to evaluate Plaintiff based on DEIA requirements and exercise discretion in employment decisions. Thus, the Undersigned finds District Defendants have played a part in advancing a "policy" that interferes with Plaintiff's First Amendment rights.

        Finally, District Defendants argue the FAC should be dismissed because it charges Defendants for complying with state laws and "there can be no Section 1983 liability if a local governmental entity acts in reliance on a non-discretionary state law."  (Doc. 46 at 23-24; Doc. 64 at 13) (citing *Sandoval v. Cty. of Sonoma*, 912 F.3d 509, 517-18 (9th Cir. 2018)).  They further argue that Plaintiff's

1  failure to join the Board of Governors of the California Community Colleges as a necessary party is

2  fatal to his claims.  (Docs. 46 at 24-25; 64 at 13-14).  The Undersigned disagrees.

3          To begin with, District Defendants' mischaracterize the only Ninth Circuit case they cite

4  (*Sandoval*) in support of their argument that their mere implementation of state law-required DEIA

5  mandates shields them from liability.  In *Sandoval*, plaintiffs sued city and county officials under

6  Section 1983 for impounding their vehicles.  Defendants argued they could not be liable under Section

7  1983 because the impounds were mandated by state law.  912 F.3d at 517.  The Court disagreed and

8  concluded the impounds, in fact, were a product of the municipalities' impound policies, not state law.

9  *Id.*  Thus, the Court expressly declined to make a holding of the nature suggested by District

10 Defendants.  *See id.* at 518 ("We thus need not decide whether [the municipalities'] policies … could

11 have given rise to liability under *Monell* even if the statute had authorized the impoundment").[8]

12 Instead, binding authority refutes the notion that a subordinate agency's mere implementation of state

13 law excuses its engagement in unconstitutional behavior.  *See Wolfson*, 616 F.3d at 1056 ("These

14 defendants have the power to discipline Wolfson and, if they are enjoined from enforcing the

15 challenged provisions, Wolfson will have obtained redress in the form of freedom to engage in certain

16 activities without fear of punishment.").

17         The Undersigned rejects District Defendants' argument that the Board of Governors of the

18 California Community Colleges is a necessary party that must be joined.  Even if an absent party could

19 be deemed necessary to a suit, its absence is excusable so long as its interests are "adequately

20 represented in the suit" by another, nonconflicted named party.  *See Shermoen v. United States*, 982

21 F.2d 1312, 1318 (9th Cir.1992) (quoting *Makah Indian Tribe v. Verity*, 910 F.3d 555, 558 (9th Cir.

22 1990)). "In assessing whether an existing party can adequately represent the interests of the absent

23 party, courts consider the following three factors: (1) 'whether the interests of a present party to the

24 suit are such that it will undoubtedly make all of the absent party's arguments,' (2) 'whether the party

25 is capable of and willing to make such arguments,' and 'whether the absent party would offer any

26 necessary element to the proceedings that the present parties would neglect.'"  *Cal. Dump Truck*

27

28         ───────────────
        [8] That *Sandoval* was a *Monell* case stands as a separate reason why the opinion is not
        applicable here.  *See supra*.

                                                    42

1  *Owners Ass'n v. Nichols*, 924 F. Supp. 2d 1126, 1147 (E.D. Cal. 2012) (quoting *Shermoen*, 982 F.2d
2  at 1318).

3        District Defendants advance no reason either in their moving or reply papers why this Court
4  should not conclude that Christian as the Chancellor of the California Community Colleges would not
5  – and, indeed, has not – made all the arguments the absent Board of Governors could be expected to
6  make, given that their interests are aligned and not in conflict.  To the contrary, District Defendants
7  appear to concede this to be the case.  *See* (Doc. 46 at 25) (noting, "[a]lthough Sonya Christian,
8  Chancellor of the California Community Colleges, is named in this case," it is the Board of Governors
9  that is responsible for the challenged regulations).

10 **Conclusion and Recommendations**

11       The Undersigned acknowledges the "tension between the desire to safeguard expression, which
12 is essential to education, and the fact that sometimes this same expression can undermine effective
13 education,"[9] and has kept that tension in mind throughout consideration of the parties' briefs,
14 arguments, and the applicable authorities.  In conclusion, the Undersigned finds that the *Winter* factors
15 favor granting Plaintiff's request for preliminary injunction in part.  Further, as set forth above, the
16 Court concludes that Defendants' motions to dismiss should be denied.  Accordingly, the Undersigned
17 HEREBY RECOMMENDS:

18    1.  Plaintiff's motion for preliminary injunction (Doc. 26) be GRANTED IN PART;
19    2.  Defendants, their officers, agents, servants, employees, and all persons in active concert
20        participation with them who receive actual notice of the injunction be enjoined, pending final
21        judgment, from investigating, disciplining, or terminating Plaintiff by applying Cal. Educ.
22        Code §§ 87732 or 87735 and Kern Community College District Board Policy 3050, based on
23        the content or viewpoint of Plaintiff's proposed social and/or political speech, exercised in his
24        personal capacity and through his teaching and academic writing, but not exercised as a
25        condition of serving on screening committees or the EODAC;

26

27

28       [9] Erwin Chemerinsky, *Education, the First Amendment, and the Constitution*, 92:1 U. Cin. L.
   Rev. 12, 13 (2023).

3. Defendants, their officers, agents, servants, employees, and all persons in active concert participation with them who receive actual notice of the injunction, be enjoined, pending final judgment, from enforcing Cal. Code of Regs. tit. 5, §§ 51200, 51201, 53425, 53601, 53602, and 53605, and the customs, policies, and criteria in evaluating faculty performance against Plaintiff;

4. Defendants' motions to dismiss (Docs. 46, 65) be DENIED.

These findings and recommendations will be submitted to the United States district judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen days after being served with these findings and recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **November 13, 2023**

_____
UNITED STATES MAGISTRATE JUDGE

44