**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAYMON JOHNSON,<br><br>    Plaintiff,<br><br>  v.<br><br>STEVE WATKIN, et al.,<br><br>    Defendants. | No. 1:23-cv-00848-KES-CDB<br><br>**ORDER DECLINING TO ADOPT FINDINGS AND RECOMMENDATIONS AND DISMISSING ACTION FOR LACK OF STANDING**<br><br>Docs. 46, 65, 70 |

Plaintiff Daymon Johnson brings a pre-enforcement challenge seeking injunctive and declaratory relief to preclude officials of Bakersfield College and the Kern Community College District ("KCCD") from enforcing certain provisions of the California Education Code and KCCD Board Policy 3050 ("Policy 3050") and to preclude these officials and the California Community Colleges Chancellor from enforcing various provisions of the California Code of Regulations and the Chancellor's Diversity, Equity and Inclusion Competencies and Criteria Recommendations ("DEI Recommendations").

## I.    Introduction

In his first amended complaint ("FAC"), Johnson brings (i) an as-applied challenge against defendants Steve Watkin, Richard McCrow, Thomas Burke, Romeo Agbalog, John S. Corkins, Kay S. Meek, Kyle Carter, Christina Scrivner, Nan Gomez-Heitzeberg, and Yovani

Jimenez in their official capacities (the "District Defendants"),[1] claiming that the District Defendants will apply sections 87732 and 87735 of the California Education Code in a manner that will violate his First Amendment rights of free speech and petition; (ii) an as-applied challenge that the District Defendants will apply Policy 3050 in a manner that will violate his First Amendment rights of free speech and petition; (iii) a claim against the District Defendants asserting a facial challenge to Policy 3050 as impermissibly vague in violation of the First and Fourteenth Amendments; and (iv) claims against the District Defendants and defendant Sonya Christian, the California Community Colleges Chancellor, asserting both as-applied and facial challenges to sections 51200, 51201, 53425, 53601, 53602, and 53605 of title 5 of the California Code of Regulations, and the DEI Recommendations, claiming that they impose viewpoint discrimination and compelled speech in violation of his and others' First Amendment rights of free speech and petition.  Doc. 8 ("FAC") at ¶¶ 157–85.

Johnson moved the Court for a preliminary injunction prohibiting the District Defendants "from enforcing Cal. Educ. Codes §§ 87732 and 87735 and Kern Community College District Board Policy 3050 against Plaintiff Johnson on the basis of the content and viewpoint of his speech on political and social issues" and prohibiting all defendants "from enforcing Cal. Code of Regs., tit. 5, §§ 51200, 51201, 53425, 53601, 53602, and 53605, pending final judgment."[2]  Doc. 26 at 1.

The District Defendants moved to dismiss the FAC on the grounds that, as to the first three claims, Johnson lacks standing, fails to state a claim, and pleads insufficient facts to establish liability under *Monell v. Department of Social Services of the City of New York*, 436

---

[1] Defendants Watkin and McCrow are the President and Dean of Instruction, respectively, at Bakersfield College.  Defendant Burke is the KCCD Chancellor.  Defendants Agbalog, Corkins, Meek, Carter, Scriver, Gomez-Heitzeberg, and Jimenez are with the KCCD Board of Trustees.  The parties refer to these defendants collectively as the District Defendants.

[2] Johnson's motion for preliminary injunction does not distinguish which defendants he seeks to have enjoined as to which statutes, regulations, or Policy 3050.  Given that Johnson's FAC asserts claims as to the statutes and Policy 3050 only against the District Defendants and asserts his claims as to the regulations against all defendants, the Court assumes that to be the case as well for purposes of his motion for his preliminary injunction.

1    U.S. 658 (1978), and as to the last two claims, because the District Defendants cannot be faulted

2    for complying with state laws and Johnson failed to name an indispensable party.  Doc. 46.

3    Christian separately moved to dismiss the FAC, asserting that Johnson lacks standing and that

4    Johnson fails to state a plausible claim for relief against Christian.  Doc. 65 ("Christian MTD").

5        The motion for preliminary injunction and the motions to dismiss were referred to a

6    magistrate judge for findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(B) and

7    Local Rule 302.  Docs. 38, 66.  The magistrate judge issued findings and recommendations

8    recommending that both motions to dismiss be denied and that the preliminary injunction be

9    granted in part.  Doc. 70 ("F&R").  Specifically, the magistrate judge concluded that Johnson had

10   standing to bring these pre-enforcement claims and that the preliminary injunction should be

11   granted because "[Johnson] has shown a likelihood of success on the merits that the regulatory

12   scheme Defendants have put in place to advance [their interest in diversity] is contrary to the First

13   Amendment's guarantee of freedom of speech in the academic arena," "[Johnson's] interest in

14   expressing himself in his personal capacity, and through his 'scholarship or teaching' overrides

15   District Defendants' interest in regulating his speech through Cal. Educ. Code §§ 87732, 87735,

16   and [Policy] 3050," and the challenged provisions of Policy 3050 have "a likelihood of being

17   impermissibly vague."  *Id.* at 2, 33, 38.  The Court served the findings and recommendations on

18   Johnson, the District Defendants, and Christian.  All parties filed timely objections.  Docs. 71-74.

19   All parties also filed responses to the objections.  Docs. 76-80.

20       The Court has reviewed the entire file, including the findings and recommendations, the

21   parties' objections, and the responses to the objections.  Based on a de novo review of this matter

22   pursuant to 28 U.S.C. § 636(b)(1), the Court declines to adopt the findings and recommendations

23   because the Court finds that Johnson has not demonstrated that he has standing to bring this pre-

24   enforcement action.  Accordingly, the defendants' motions to dismiss shall be granted and this

25   case will be dismissed without prejudice.  Johnson's pending motion for preliminary injunction is

26   denied as moot.

27   **II.    Procedural History**

28       On June 1, 2023, Johnson filed his initial civil complaint.  Doc. 1.  He filed the FAC on

1    July 6, 2023.  FAC.  On July 20, 2023, Johnson filed his motion for preliminary injunction.  Doc.

2    26.  On August 18, 2023, Christian and the District Defendants filed oppositions to the motion,

3    Docs. 42-43, to which Johnson replied.  Docs. 48-49.  The District Defendants and Christian

4    separately moved to dismiss Johnson's complaint on August 29, 2023, and October 3, 2023,

5    respectively.  Docs. 46, 65.  Johnson opposed both motions, and the defendants replied to

6    Johnson's oppositions.  Docs. 56, 64, 67, 69.  On November 14, 2023, the magistrate judge issued

7    findings and recommendations recommending that Johnson's motion for preliminary injunction

8    be granted in part and that the motions to dismiss be denied.  Doc. 70.  All parties filed objections

9    to the findings and recommendations, Docs. 71-74, and responses to those objections.  Docs. 76-

10   80.  Following the assigned district judge's elevation, this case did not have an assigned district

11   judge.  Doc. 75.  The case was reassigned to the undersigned on March 14, 2024.  Doc. 83.[3]

12   **III.    Facts[4]**

13        Johnson asserts that he fears discipline for his speech or intended speech under two

14   provisions of the California Code of Education, a KCCD Board Policy, and several provisions of

15   title 5 of the California Code of Regulations.  This Order first reviews the statutes, Board Policy,

16   and regulations at issue, and then turns to the facts surrounding Johnson's claims.

17        **A.    Relevant Provisions**

18            **i.    Statutory Scheme**

19        Section 87732 of the California Education Code provides that "[n]o regular employee or

20   academic employee shall be dismissed except for one or more of the following causes:

21   (a) Immoral or unprofessional conduct; (b) Dishonesty; (c) Unsatisfactory performance;

22   (d) Evident unfitness for service; [or] . . . (f) Persistent violation of, or refusal to obey, the school

23   laws of the state or reasonable regulations prescribed for the government of the community

24   

25   [3] The Court recognizes that the initial motion was filed in July 2023 and apologizes to the parties for the delay, due to the Court's impacted docket, in resolving the pending motions.

26   

27   [4] For purposes of this order, which considers whether Johnson has standing to pursue his claims, the FAC's factual allegations are presumed to be true.  *See, e.g.*, *Murguia v. Langdon*, 61 F.4th 1096, 1106 (9th Cir. 2023) (citation omitted) (allegations in complaint assumed to be true for

28   purposes of motion to dismiss).

colleges by the board of governors or by the governing board of the community college district employing him or her."  Cal. Educ. Code § 87732.

Section 87735 of the California Education Code provides that a "permanent employee of the district" charged with "immoral conduct," or with "willful refusal to perform regular assignments without reasonable cause," may be immediately suspended from his or her duties and dismissed from employment thirty days later.  *Id.* § 87735.

### ii.    KCCD Board Policy 3050

Policy 3050, in relevant part, requires "that [the KCCD community] conduct [itself] with civility in all circumstances of [their] professional lives" and "not participate in or accept, condone, or tolerate physical or verbal forms of aggression, threat, harassment, ridicule, or intimidation."  Kern Comm. Coll. Dist., Kern Community College District Board Policy 3050 (2024), https://www.kccd.edu/board-trustees/_documents/board-policy/chapter-3/BP3050.pdf ("Policy 3050").[5]  Policy 3050 further states it values a spirit of free inquiry and free speech and "encourages the expression of a range of points of view, but [expects] all expressions of content to be conducted in a manner respectful of persons."  *Id.*

### iii.    Regulatory Scheme

California's Community Colleges system is comprised of seventy-three districts.  Christian MTD 8.  The Board of Governors of the California Community Colleges "sets policy and provides guidance" for its constituent districts, including KCCD.  *Id.* (citing Cal. Educ. Code § 70900).  "[T]he Board [of Governors'] primary purpose is to provide 'leadership and direction' while maintaining, 'to the maximum degree permissible, local authority and control in the administration' of local community colleges by their districts."  *Id.* at 10 (citing Cal. Educ. Code § 70901(a)).

Effective April 2023, the Board of Governors amended title 5 of the California Code of

---

[5] The FAC challenges Policy 3050 but does not provide its full text nor attach it as an exhibit. Because it forms the basis of certain of Johnson's claims, the entirety of Policy 3050 is incorporated into the FAC by reference.  *See Bafford v. Admin. Comm. Northrop Grumman Pension Plan*, 101 F.4th 641, 649-50 (9th Cir. 2024) (document is incorporated by reference into complaint if complaint refers extensively to document or document forms basis of plaintiff's claim).

1  Regulations to require districts to create local diversity, equity, inclusion, and accessibility
2  standards to be used in, among other contexts, the evaluation and tenure review of district
3  employees.  The FAC does not identify, or assert a claim regarding, any such local standards.
4  The FAC nonetheless requests a declaration that sections 51200, 51201, 53425, 53601, 53602,
5  and 53605 of the California Code of Regulations are facially unconstitutional.  *See* FAC Prayer
6  for Relief (B), (D).  Johnson's motion for preliminary injunction requests an order enjoining
7  defendants from enforcing these sections.

8      Section 51200 states that "[i]t is the intent of the Board of Governors that the statement on
9  Diversity, Equity, and Inclusion set forth in Section 51201 be the official position of the Board of
10  Governors and the California Community Colleges on their commitment to diversity and equity
11  in fulfilling the system's educational mission and that it should guide the administration of all
12  programs in the California Community Colleges, consistent with all applicable state and federal
13  laws and regulations."  Cal. Code Regs. § 51200.

14      The official position of the Board of Governors and the California Community Colleges,
15  as provided by section 51201 is as follows: "With the goal of ensuring the equal educational
16  opportunity of all students, the California Community Colleges embrace diversity among
17  students, faculty, staff and the communities we serve as an integral part of our history, a
18  recognition of the complexity of our present state, and a call to action for a better future."  *Id.*
19  § 51201(a).  It also provides that "[e]mbracing diversity means that we must intentionally practice
20  acceptance, anti-racism, and respect towards one another and understand that racism,
21  discrimination, and prejudices create and sustain privileges for some while creating and
22  sustaining disadvantages for others."  *Id.* § 51201(b).  It goes on to state that "[i]n order to
23  embrace diversity, we also acknowledge that institutional racism, discrimination, and biases exist
24  and that our goal is to eradicate these from our system," and declares that "[o]ur commitment to
25  diversity requires that we strive to eliminate those barriers to equity and that we act deliberately
26  to create a safe, inclusive, and anti-racist environment where individual and group differences are
27  valued and leveraged for our growth and understanding as an educational community."  *Id.*
28  § 51201(c).

6

Section 51201(d) provides that "[t]o advance our goals of diversity, equity, inclusion, and social justice for the success of students and employees, we must honor that each individual is unique and that our individual differences contribute to the ability of the colleges to prepare students on their educational journeys," which "requires that we develop and implement policies and procedures, encourage individual and systemic change, continually reflect on our efforts, and hold ourselves accountable for the results of our efforts in accomplishing our goals." *Id.* § 51201(d). "In service of these goals, the California Community Colleges are committed to fostering an anti-racist environment that offers equal opportunity for all." *Id.* Finally, it provides that "as a collective community of individual colleges, we are invested in cultivating and maintaining a climate where equity, anti-racism, and mutual respect are both intrinsic and explicit by valuing individuals and groups from all backgrounds, demographics, and experiences." *Id.* § 51201(e).

Section 53425 states that "all district employees shall demonstrate the ability to work with and serve individuals within a diverse community college campus environment as required by local policies regarding DEIA competencies." *Id.* § 53425. The regulations do not mandate what such "local policies regarding DEIA competencies" must include.

Section 53601 provides that "[t]he Chancellor shall adopt and publish guidance describing DEIA competencies and criteria." *Id.* § 53601(a). It also states that "[t]he DEIA competencies and criteria identified by the Chancellor shall be used as a reference for locally developed minimum standards in community college district performance evaluations of employees and faculty tenure reviews." *Id.* 53601(b).

Section 53602 requires that "[d]istrict governing boards shall adopt policies for the evaluation of employee performance, including tenure reviews, that requires demonstrated, or progress toward, proficiency in the locally-developed DEIA competencies or those published by the Chancellor pursuant to section 53601." *Id.* § 53602(a). It further provides that "[d]istrict employees must have or establish proficiency in DEIA-related performance to teach, work, or lead within California community colleges" and "[t]he evaluation of district employees must include consideration of an employee's demonstrated, or progress toward, proficiency in

7

diversity, equity, inclusion, and accessibility DEIA-related competencies that enable work with diverse communities, as required by section 53425." *Id.* § 53602(b).  Finally, section 53602(c) mandates districts to "(1) include DEIA competencies and criteria as a minimum standard for evaluating the performance of all employees; (2) ensure that evaluators have a consistent understanding of how to evaluate employees on DEIA competencies and criteria; (3) set clear expectations regarding employee performance related to DEIA principles, appropriately tailored to the employee's classification; (4) place significant emphasis on DEIA competencies in employee evaluation and tenure review processes to support employee growth, development, and career advancement; (5) ensure professional development opportunities support employee development of DEIA competencies that contribute to an inclusive campus and classroom culture and equitable student outcomes; (6) ensure an evaluation process that provides employees an opportunity to demonstrate their understanding of DEIA and anti-racist competencies; [and] (7) include proposed or active implementation goals to integrate DEIA principles as a part of the district's Equal Employment Opportunity Plan required by section 53003." *Id.* § 53602(c).

Lastly, section 53605 provides that "[f]aculty members shall employ teaching, learning, and professional practices that reflect DEIA and anti-racist principles, and in particular, respect for, and acknowledgement of the diverse backgrounds of students and colleagues to improve equitable student outcomes and course completion." *Id.* § 53605.

### iv.      Guidance Documents

Pursuant to section 53601(a), the Chancellor of the Board of Governors adopted and published the DEI Recommendations as guidance to be used by the districts "as *a reference* for locally developed minimum standards in community college district performance evaluations of employees and faculty tenure reviews."  *See* § 53601(a)-(b) (emphasis added); FAC ¶ 42; FAC Ex. A.  The DEI Recommendations set out guidance to districts.  *See generally* FAC Ex. A (describing itself as a "set of *sample* DEI competencies and criteria," noting that districts "are *strongly recommended* to use these DEI competencies and criteria as a baseline to develop DEI competencies and criteria," stating what the district's local process "*may include,*" and providing for every listed theme a "*recommended* description" of that theme) (emphases added).

8

1   The Chancellor's Office also issued a memorandum accompanying the DEI

2 Recommendations entitled "Guidance on Implementation of DEIA Evaluation and Tenure

3 Review Regulations" ("Guidance Memo") and a glossary of terms ("Glossary").  FAC ¶ 43 & Ex.

4 B; FAC ¶ 34 (citing *Diversity, Equity and Inclusion Glossary of Terms*, Cal. Cmty. Colls.

5 Chancellor's Off., https://perma.cc/T22V-V866).  Like the DEI Recommendations, the Guidance

6 Memo and the Glossary indicate they are guidance to the districts.  *See* FAC Ex. B ("[t]his

7 *guidance* is intended to assist community colleges in achieving these objectives"); *Diversity,*

8 *Equity and Inclusion Glossary of Terms*, Cal. Cmty. Colls. Chancellor's Off.,

9 https://perma.cc/T22V-V866 (last visited Sept. 20, 2024) (stating "purpose of . . . Glossary of

10 Terms is to serve as *a reference guide* of DEI terms") (emphasis added).[6]

11   **B.**  **Plaintiff's Factual Allegations**

12   Johnson is a full-time professor of history at Bakersfield College, a constituent campus of

13 KCCD.  FAC ¶ 15.  KCCD is a district of the California Community College system.  FAC ¶ 32.

14 Johnson has been employed at Bakersfield College since 1993 and states his primary duties

15 involve teaching various history classes to community college students and participating in shared

16 governance on campus.  FAC ¶ 59.

17   Johnson is the faculty lead of the Renegade Institute for Liberty ("RIFL"), which he

18 describes as a sanctioned organization within Bakersfield College comprised of faculty members

19 "dedicated to the pursuit of free speech, open inquiry and critical thinking."  FAC ¶ 60.  RIFL

20 "aims to promote and preserve freedom of thought and intellectual literacy through the open

21 discourse of diverse political ideas with an emphasis on American ideals and western historical

22 values."  FAC ¶ 60.  Johnson asserts RIFL "represents a minority position on campus,"

23 "stand[ing] in general opposition to [the outlook and ideals] espoused by many faculty members

24

---

25 [6] The FAC references the Glossary, citing to the referenced website.  It is not attached as an exhibit.  However, the Court may consider the entirety of the Glossary document because it was

26 incorporated by reference in the FAC.  *See Bafford*, F.4th at 649-50 (noting that a document is incorporated by reference into complaint if complaint refers extensively to document or document

27 forms basis of plaintiff's claim).  The Court utilizes the perma.cc link in the FAC to ensure that the Court is referencing the Glossary as it was at the time of the filing of the FAC, given that the

28 Glossary, by its language, anticipates periodic updates and amendments.

and members of the school administration." FAC ¶ 61.  That is, Johnson claims RIFL stands in opposition to the faculty members and school administration's "align[ment] with Section 51201(a)'s mandate to 'embrace diversity' by, among [other] things, 'intentionally practic[ing] . . . anti-racism.'" FAC ¶ 61 (citing § 51201(b)).

Johnson identifies four primary bases for his fear of future action by the defendants against him pursuant to the statutes, Board Policy, and regulations:  (1) KCCD's investigation of an administrative complaint in 2021 by another professor against Johnson, which KCCD ultimately determined did not warrant any action against Johnson; (2) Bakersfield College's termination of another professor, Matthew Garrett, in 2022; (3) a statement in December 2022 by the then-President of Bakersfield College, who is not a defendant in this action; and (4) a statement by defendant Corkins at a Board of Trustees meeting.  It is undisputed that Johnson has not faced any sanction or other action by KCCD or the defendants under the provisions he challenges, making this a pre-enforcement challenge to all provisions.

### i.  KCCD's Investigation of an Administrative Complaint Against Johnson

On August 22, 2019, Bakersfield College Professor Andrew Bond posted the following statement on his personal Facebook page: "Maybe Trump's comment about shithole countries was a statement of projection because honestly, the US is a fucking piece of shit nation.  Go ahead and quote me, conservatives.  This country has yet to live up to the ideals of its founding documents." FAC ¶ 70.  Around May 2021, Johnson reposted Bond's post on RIFL's Facebook page, with the comment, "Here's what one critical race theorists [sic] at BC sounds like. Do you agree with this radical SJW from BC's English Department? Thoughts?"  FAC ¶ 71.

On September 24, 2021, Bond filed an administrative complaint with KCCD against Johnson for harassment and bullying over Johnson's Facebook post and the resulting commentary.  FAC ¶ 73 & Ex. E, at 2.  Upon receipt of the complaint from Bond, KCCD had an outside investigator investigate Bond's allegations.  FAC Ex. E, at 2.  Johnson asserts that the investigation "necessitated his retention of counsel" and that he was not allowed to see a copy of the complaint.  FAC ¶ 74.  However, KCCD concluded that "there were no findings to support a

10

cause for discipline under the Education Code" against Johnson and that "no further action [would] be taken regarding [Bond's] complaint."  FAC Ex. E, at 10.  Under a section labeled "Actions Taken, if Any, in Prevention of Future Instances," the administrative determination noted that "[t]he District will investigate any further complaints of harassment and bullying and, if applicable, will take appropriate remedial action including but not limited to any discipline determined to be appropriate."  FAC Ex. E, at 9-10.

### ii.       Bakersfield College's Termination of Professor Garrett[7]

On November 21, 2022, Matthew Garrett, a now-former professor at Bakersfield College, was issued a 90-day notice pursuant to section 87734 of the California Education Code to correct his performance deficiencies involving "unprofessional conduct."[8]  FAC ¶ 79, Ex. F, at 2.  The notice provided specific examples of Garrett's offending conduct and provided that if he did not correct "these faults," he could be charged with "unprofessional conduct," "unsatisfactory performance," and violation of Policy 3050.  FAC Ex. F, at 2.  The notice set forth fifteen different examples of Garrett's alleged misconduct, many of which had several subpoints.  *See generally* FAC Ex. F.  On April 14, 2023, the then-president of Bakersfield College, Zav Dadabhoy, sent Garrett a notice of decision to terminate his employment pursuant to sections 87732 and 87735 of the California Education Code.[9]  FAC Ex. G.  Garrett's termination notice found that he made numerous "baseless" or "demonstrably false and misleading"

---

[7] Garrett's conduct and termination are relevant in this case as Johnson asserts that he wishes to engage in some of the same conduct and speech for which Garrett was terminated.

[8] Section 87734 of the California Education Code provides that "[t]he governing board of any community college district shall not act upon any charges of unprofessional conduct or unsatisfactory performance unless . . . at least 90 days prior to the date of the filing, the board or its authorized representative has given the employee against whom the charge is filed, written notice of the unprofessional conduct or unsatisfactory performance, specifying the nature thereof with specific instances of behavior and with particularity as to furnish the employee an opportunity to correct his or her faults and overcome the grounds for the charge."  Cal. Educ. Code § 87734.

[9] Though the 90-day notice to correct his performance deficiencies also stated that Garrett had violated Policy 3050, *see* FAC Ex. F, at 2, the decision to terminate Garrett does not find a violation of, or even cite to, Policy 3050.  *See generally* FAC Ex. G.

allegations against his colleagues and Bakersfield College, including, in some instances, repeating a "knowingly false and demonstrably false misrepresentation" after a third-party investigation determined it was unfounded.  *See generally* FAC Ex. G.  While certain of the statements by Garrett are arguably opinions, others are factual statements that were presumably provably true or false in Garrett's proceeding.[10]  Among other findings, the termination notice also found that Garrett knowingly violated campus COVID-19 policies in 2021 with respect to an event, and that he threatened and attempted to intimidate defendant Corkins by email.  FAC Ex. G.  The termination notice also alleges conduct by Garrett that may be protected speech, such as publicly criticizing certain courses offered by Bakersfield College, and writing an Op-Ed defending the actions of a group that vandalized the Bakersfield College campus and arguing that the term "Cultural Marxism" is not hate speech "but instead speech that challenges a dominant agenda on campus."  *Id.*

### iii.       Dadabhoy Statements

On December 8, 2022, Dadabhoy, then president of Bakersfield College, emailed the employees of Bakersfield College a holiday greeting.  FAC Ex C.  Within this email, Dadabhoy stated, "members of [Bakersfield College]'s communities of color, and LGBTQ community, have shared that many do not feel peace on our own campus."  FAC Ex. C.  Dadabhoy noted, "[w]hile there may be a small group promoting exclusion, that is not a value of this institution."  FAC Ex. C.  Dadabhoy declared section 51201 of title 5 of the California Code of Regulations "provides us with direction on diversity, equity, and inclusion," and quoted section 51201(b) in full.[11]  *Id.*  Dadabhoy asserted "[w]e must not allow the discontent or views of a few to supersede

---

[10] Johnson complains that KCCD's 90-day notice cites that Garrett's statements were "demonstrably false" but did not, in the letter or in its attachments, demonstrate the falsity of any of the statements.  FAC ¶ 81.  Johnson did not include the exhibits to the 90-day notice in his filing.  *See* FAC Ex. F.  The record before the Court is that Garrett was found to have repeatedly made "demonstrably false and misleading" allegations, and, in some instances, continued to repeat a "knowingly false and demonstrably false misrepresentation" after a third-party investigator found it to be unfounded.

[11] Section 51201(b) provides that "[e]mbracing diversity means that we must intentionally practice acceptance, anti-racism, and respect towards one another and understand that racism, discrimination, and prejudices create and sustain privileges for some while creating and

1    what we are required to provide at our college and the work that we have intentionally developed

2    to support all members of the community." *Id*.  It adds that "[t]his is a reminder that we are all

3    tasked with this work." *Id*.  Johnson perceived Dadabhoy's comments as "a political declaration

4    attacking RIFL."  FAC ¶¶ 62, 98.

5                    **iv.      Defendant Corkins' Comment**

6            At a Board of Trustees meeting on December 13, 2022, Defendant Corkins stated that

7    they've "got to get the bad actors out of the room" and added that such faculty and staff are in the

8    "five percent that we have to continue to cull."  FAC ¶¶ 3, 66.  Johnson believed that the five

9    percent Corkins was referring to included Johnson and others who share his political views.  FAC

10   ¶¶ 4, 6.

11   **IV.   <u>Legal Standard</u>**

12           The District Defendants and Christian separately move to dismiss the claims in the

13   amended complaint for lack of standing.  The Court has an independent obligation to ensure that

14   standing is established, as "perhaps the most important" jurisdictional doctrine.  *See FW/PBS, Inc.*

15   *v. City of Dallas*, 493 U.S. 215, 231 (1990) (citation omitted).  "[S]tanding is not dispensed in

16   gross."  *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (citing *Lewis v. Casey*, 518 U.S. 343,

17   358, n.6 (1996)).  "[A] plaintiff must demonstrate standing for each claim he seeks to press and

18   for each form of relief that is sought."  *Id.* (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332,

19   352 (2006)) (cleaned up).  "[E]ach element must be supported in the same way as any other

20   matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of

21   evidence required at the successive stages of the litigation."  *Susan B. Anthony List v. Driehaus*,

22   573 U.S. 149, 158 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

23           Before the Court are both a motion for preliminary injunction and defendants' motions to

24   dismiss.  The legal standard for standing is different in these two contexts.  "At the preliminary

25   injunction stage, the plaintiffs 'must make a clear showing of each element of standing.'"  *L.A.*

26   *All. for Hum. Rts. v. County of Los Angeles*, 14 F.4th 947, 956 (9th Cir. 2021) (quoting *Yazzie v.*

27   _____

28   sustaining disadvantages for others."  Cal. Code. Regs. tit. 5, § 51201(b).

1     *Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020)). Where there is a motion to dismiss for lack of

2     standing, the plaintiff need not make a "clear showing," but must still establish as an "irreducible

3     constitutional minimum" that they have "(1) suffered an injury in fact, (2) that it is fairly traceable

4     to the challenged conduct of the defendant, and (3) that it is likely to be redressed by a favorable

5     judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan*, 504 U.S. at

6     560). As addressed below, plaintiff fails to meet the lower standard for standing on a motion to

7     dismiss, necessitating dismissal of the complaint.

8       **V.**     **Discussion and Analysis**

9          **A.**     **Standing**

10       Standing is an indispensable part of Johnson's case. *See, e.g.*, *FW/PBS, Inc.*, 493 U.S. at

11     231. He must have standing to bring a motion for preliminary injunction and to avoid dismissal

12     of the FAC. For the reasons set out below, the Court grants the defendants' motions to dismiss

13     without prejudice as to all claims, for lack of standing.

14       To establish standing, Johnson must show "injury in fact, causation, and a likelihood that

15     a favorable decision will redress the plaintiff's alleged injury." *Lopez v. Candaele*, 630 F.3d 775,

16     785 (9th Cir. 2010) (quoting *Lujan*, 504 U.S. at 560-61). Here, the main disagreement is whether

17     Johnson has adequately alleged injury in fact.[12]

18       "[T]he requirements of ripeness and standing [are applied] less stringently in the context

19     of First Amendment claims." *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010) (citation

20     omitted).[13] Specifically, one need not await "consummation of threatened injury," but rather may

21     bring pre-enforcement challenges to statutes which arguably infringe upon First Amendment

22     rights in certain circumstances. *Id.* (citations omitted). However, the "mere existence of a

23

---

24     [12] Christian also argues Johnson fails to allege traceability as to her. Because Johnson has failed
25     to allege an injury in fact sufficient to create standing, the Court need not reach whether his
       alleged injury is traceable to defendant Christian.

26     [13] Because "[s]orting out where standing ends and ripeness begins is not an easy task,
27     constitutional ripeness is often treated under the rubric of standing because ripeness coincides
       squarely with standing's injury in fact prong." *Clark v. City of Seattle*, 899 F.3d 802, 809 (9th
28     Cir. 2018) (cleaned up).

proscriptive statute" is "insufficient to create a ripe controversy." *Id.* (citations omitted).  The

plaintiff still "must be subject to a genuine threat of imminent prosecution." *Safer Chemicals,*

*Healthy Families v. U.S. Env'l Prot. Agency*, 943 F.3d 397, 414 (9th Cir. 2019) (citation omitted).

Therefore, "any plaintiff may [not] bring a First Amendment claim 'by nakedly asserting that his

or her speech was chilled.'" *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1174 (9th Cir. 2022) (citing

*Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003); *Lopez*, 630 F.3d at

787).  To establish injury in fact, a plaintiff must have suffered "an invasion of a legally protected

interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or

hypothetical." *Clark*, 899 F.3d at 809 (citing *Lujan*, 504 U.S. at 560) (cleaned up).

The Ninth Circuit has looked to the following factors to determine whether a plaintiff has

sufficiently alleged an injury in fact to bring a pre-enforcement challenge: (1) whether the

plaintiff has articulated a concrete plan to violate the law in question, (2) whether the prosecuting

authorities have communicated a specific warning or threat to initiate proceedings against the

plaintiff, (3) the history of past prosecution or enforcement under the challenged statute, and (4)

whether the challenged law is applicable to the plaintiff.  *See, e.g.*, *Unified Data Servs., LLC v.*

*Fed. Trade Comm'n*, 39 F.4th at 1210 & n.8 (9th Cir. 2022) (citations omitted); *see also Tingley*

*v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022).  However, in *Peace Ranch, LLC v. Bonta*, 93

F.4th 482, 487 (9th Cir. 2024), the Ninth Circuit used the factors set out in *Susan B. Anthony List*

*v. Driehaus*, 573 U.S. 149 (2014), requiring that (1) a plaintiff allege "an intention to engage in a

course of conduct arguably affected with a constitutional interest," (2) the intended future conduct

must be "arguably . . . proscribed by [the challenged] statute," and (3) there must be a "credible

threat of enforcement."  573 U.S. at 159 (citing *Babbitt v. Farm Workers*, 442 U.S. 289, 298

(1979)); *Peace Ranch*, 93 F.4th at 487; *see also Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 59

(9th Cir. 2024).

In *Peace Ranch*, the court analyzed standing using the *Driehaus* formulation of the

factors, while "acknowledg[ing] that the Ninth Circuit has toggled between these two tests."

*Peace Ranch,* 93 F.4th at 487.  As the Ninth Circuit utilized the *Driehaus* formulation of the

factors in its most recent pre-enforcement cases, this Order also does so.  *See Peace Ranch*, 93

1    F.4th at 487; *Seattle Pac. Univ.*, 104 F.4th at 59.[14]

2       Because "standing is not dispensed in gross," *Davis*, 554 U.S. at 734 (citation omitted),

3 Johnson bears the burden to show injury in fact *as to each challenged statute, board policy, and*

4 *regulation*. He must establish as to each such provision that he intends to engage in speech

5 arguably affected by a constitutional interest, that the intended speech is arguably proscribed by

6 the challenged provision, and that the threat of future enforcement of that statute, board policy, or

7 regulation against him is substantial. *See Driehaus*, 573 U.S. at 159 (citation omitted).

8       As demonstrated below, the FAC does not contain sufficient details to allege injury in fact

9 to establish standing and bring this pre-enforcement claim as to any of the challenged provisions.

10                **i.**      **Cal. Educ. Code §§ 87732, 87735[15]**

11       To successfully assert that he has suffered an injury-in-fact to bring a pre-enforcement

12 challenge to the application of sections 87732 and 87735 of the California Education Code by the

13 District Defendants against him, Johnson must allege that he has an intent to engage in conduct

14 arguably affected with a constitutional interest, that the alleged intended conduct is arguably

15 proscribed by sections 87732 and 87735 of the California Education Code, and that there is a

16 substantial threat that those sections of the California Education Code will be enforced against

17 him. *Driehaus*, 573 U.S. at 159 (citation omitted).

18                **1.**      **Intent to Engage in Conduct Arguably Affected with a**

19                       **Constitutional Interest**

20       First, Johnson must allege "an intention to engage in a course of conduct" that is

21 "arguably affected with a constitutional interest." *Id*. To adequately allege his intention to

22

---

23 [14] The F&R and the parties' briefing analyzed standing using the Ninth Circuit's earlier
formulation of the factors. However, under either formulation the factors cover substantially the
24 same considerations, and the outcome would be the same. *See Unified Data Servs.*, 39 F.4th at
1210 n.9 (9th Cir. 2022) (stating Ninth Circuit's test is "a means of determining whether a
25 purported injury meets [*Driehaus'*s] 'credible threat' requirement"); *Peace Ranch*, 93 F.4th at
487 (stating the *Driehaus* test incorporates essence of the Ninth Circuit test).
26

27 [15] Johnson asserts his claim as to sections 87732 and 87735 of the California Education Code
only against the District Defendants. *See* FAC.
28

engage in a course of conduct, Johnson must plead the "specific" conduct in which he intends to engage. *Driehaus*, 573 U.S. at 161. He must allege a plan to engage in the course of conduct "with some degree of concrete detail," including "information about the 'when, to whom, where, or under what circumstances,'" that he plans to do so. *Unified Data Servs.*, 39 F.4th at 1210-11 (citing *Lopez*, 630 F.3d at 786-87). "Without these kinds of details, a court is left with mere 'some day' intentions which do not support a finding of the actual or imminent injury that our cases require." *Id.* (quoting *Lopez*, 630 F.3d at 787-88) (cleaned up).

In cases where plaintiffs would be unable to control or predict the when, to whom, where, and under what circumstances they plan to break the law, due to the inherently unpredictable nature of the intended conduct, the Ninth Circuit has held that such plaintiffs can show that they have a concrete plan to violate the law at issue when they already violated the law in the past. For example, in *Tingley*, a therapist was found to have adequately pleaded his intent to violate a law banning conversion therapy, where he did not specify when, to whom, where, or under what circumstances he planned to do so, given that he "[could not] control when clients will come to him for help changing their sexual orientation or gender identity," but where "his complaint describe[d] 'specific past instances' of working with minors in a way that would violate the law" and alleged he intended to continue doing so. 47 F.4th at 1068.

The FAC and the F&R rely primarily on Johnson's assertion that Johnson intends to engage in some of the same political speech as Garrett, who was terminated. The grounds on which Garrett was terminated included extensive conduct that Johnson does not state an intent to engage in, such as threatening and attempting to intimidate defendant Corkins, violating campus COVID-19 policies that were in effect in 2021, and making numerous "demonstrably false" allegations regarding his colleagues and the school, including, in some instances, repeating a "knowingly false and demonstrably false misrepresentation" after a third-party investigator found it to be unfounded. *See* FAC Ex. G.

Nonetheless, the F&R correctly notes that Garrett's notice of termination also cited certain arguably protected speech by Garrett: "(1) Garrett's May 19[,] 2019, Op-Ed suggesting 'certain terms such as "Cultural Marxism" weren't "hate speech,"'" (2) Garrett's criticism of the

17

1   Bakersfield curriculum committee and the 'Cesar E. Chavez Leadership Certificate and

2   Landmarks in California courses,' and (3) some of Garrett's participation in media, and social

3   media."  The F&R found that Johnson "has stated his intent to engage in similar 'political

4   speech.'"  F&R 19.  However, the F&R fails to evaluate whether Johnson has alleged his intent to

5   engage in similar conduct with a sufficient degree of detail.  As demonstrated below, with limited

6   exceptions, Johnson does not.

7        In the FAC, Johnson pleads that he "can identify 18 [historical] posts on RIFL's Facebook

8   page that reference the phrase [cultural Marxism]" and that "Professor Johnson posted 15 of these

9   himself."  FAC ¶ 101.  He alleges that he "cannot recommend books that have the term 'cultural

10  Marxism' in the title."  FAC ¶ 102.  However, neither of these allegations allege with the required

11  specificity an intent to engage in this conduct in the future.  Johnson's allegation regarding the

12  Facebook posts does not allege an intent to post about cultural Marxism again.  While Johnson's

13  allegation regarding book recommendations may cover the "what," regarding the conduct he

14  alleges he wishes to engage in, it fails to offer the other requisite details of the circumstances,

15  including to whom, when, where, or under what circumstances, and without these details, the

16  Court is left with mere "some day" intentions to act.  *Unified Data Servs.*, 39 F.4th at 1211 (citing

17  *Lopez*, 630 F.3d at 787-88).

18       Johnson mentions only one other instance of his intent to engage in speech related to

19  cultural Marxism in the FAC.  Johnson alleges that he "cancelled a RIFL community event"

20  where the guest speaker would have spoken on "cultural Marxism, academia, and its impact on

21  churches," because he feared he would have to "defend cultural Marxism as a speaker topic,"

22  which could lead to his discipline.  FAC ¶ 102.  Unlike his other vague allegations, this allegation

23  provides the necessary "when, to whom, where, or under what circumstances" specificity that the

24  other allegations lack.  *Lopez*, 630 F.3d at 786-87.  Any properly pleaded intended conduct must

25  also be arguably affected with a constitutional interest.  *Driehaus*, 573 U.S. at 159.  The Ninth

26  Circuit has instructed that this inquiry "does not require [the Court] to engage in a mini litigation

27  of the claims."  *Peace Ranch*, 93 F.4th at 488.  Rather, "standing in no way depends on the

28  merits" and the Court shall "take as true all material allegations in the complaint and construe the

18

complaint in favor of the plaintiff," as required at this point of the litigation.  *Id.* at 488 (cleaned up).  Under Johnson's theories, this conduct is arguably affected with a First Amendment interest.

Accordingly, the Court finds that this allegation satisfies the requirement that Johnson plead an intent to engage in conduct arguably affected with a constitutional interest.  However, for the reasons articulated in the analysis below, Johnson fails to allege that this conduct is arguably proscribed by the statutes, or that there is a substantial threat of enforcement of the statutes against him.

As for whether Johnson has alleged an intent to engage in similar conduct regarding the Curriculum Committee, Johnson alleged that, in the past, he "also wrote a letter to the Curriculum Committee for Public Comment regarding the same two history courses Professor Garrett criticized," and he is "reticent to engage in [that type of speech] again."  FAC ¶ 105.  However, as with many of the allegations regarding his intent to discuss cultural Marxism, this also does not assert the requisite level of detail.  Johnson has alleged to whom he would like to make this speech (the Curriculum Committee) but has failed to allege what the content would be (*i.e.*, regarding which classes and which aspects of those classes) or when he would make it, and the Court is again left with mere "some day" intentions.  *Unified Data Servs.*, 39 F.4th at 1211 (citing *Lopez*, 630 F.3d at 787-88).

Finally, the F&R finds that Johnson has alleged an intent to engage in actions similar to "some of Garrett's participation in media, and social media."  F&R 19.  Johnson alleges that he "was recently asked to appear on the same radio show as Professor Garrett, but he turned down the offer for fear of making a statement that Defendants would claim to be 'unprofessional' and grounds for termination" and "declines to give comments to national news organizations for the same reason."  FAC ¶ 111.  Again, these allegations lack the requisite specificity.  While his allegation regarding his declining to appear on the radio show comes closer to doing so than others, as it appears to allege the "to who," "when," and "where," it fails to address the most important part:  the "what," regarding what he plans to say.  His allegation that he does not give comments to national news organizations fails, too, for the same reasons as above.  It lacks detail as to what comments he would give.

In the FAC, Johnson also pleads that, because he fears termination like Garrett, he "refrains from expressing his political views and from freely participating in the intellectual life of the college;" he "has refrained from finalizing agreements with the speakers [for RIFL]" because they "would present viewpoints that Defendants have already condemned;" he has been "chill[ed] . . . from filing any internal complaints about school administrators, staff, or fellow faculty members;" he has "refrained from making [social media] posts or expressing opinions similar to Professor Garrett's;" he "refrain[s] from expressing viewpoints – similar to Garrett's – that students are being weaponized by the EODAC[16] to push DEI ideology agendas;" he "has stopped attending EODAC meetings to "avoid[] expressing . . . concerns" regarding "'reverse' racism and deceptive ways the [EODAC] was pushing affirmative action;" and he has "refrain[ed] from offering other viewpoints that he believes would not be well-received by Defendants;" including that he "does not wish to refer to transgender students by their preferred pronouns" and "protesting the participation of biological males in female sports competitions and the holding of 'drag queen story hours' at Bakersfield College's daycare facility." FAC ¶¶ 9, 97, 103-04, 107-10.

Some of Johnson's allegations of chilled speech do not meet the requisite level of detail required by Ninth Circuit precedent. Some of the allegations of chilled speech – for example that "he refrains from expressing his political views and from freely participating in the intellectual life of the college" or that he has been "chill[ed] . . . from filing any internal complaints about school administrators, staff, or fellow faculty members," – lack specificity in their entirety. They do not inform the Court what he wishes to say, when, where, to whom, or under what circumstances he would like to say it. In others of his examples, while he alleges what he plans to say, he fails to provide the when, where, or to whom. For example, an allegation that he refrains from "protesting the participation of biological males in female sports competitions and the holding of 'drag queen story hours' at Bakersfield College's daycare facility" lacks the required

---

[16] The EODAC is Bakersfield College's Equal Opportunity & Diversity Advisory Committee. *See* FAC ¶ 17.

specificity of to whom, where, or when he plans to make these protests.  Without these details, the Court is left with mere "some day" intentions, which cannot support a finding of injury in fact. *Unified Data Servs.*, 39 F.4th at 1211 (citing *Lopez*, 630 F.3d at 787-88).

Other allegations of chill are closer calls.  For instance, he alleged that he "has stopped attending EODAC meetings" as he fears termination if he voices his "concerns about 'reverse' racism and deceptive ways the committee was pushing affirmative action" and that he "has refrained from finalizing agreements with the speakers [for RIFL]."  FAC ¶ 109.  These allegations may meet the pleading requirements of alleging what, when, where, and to whom he intends to engage in such conduct, and they are arguably affected with a First Amendment interest.

Therefore, with regard to most of his alleged intended acts, Johnson has not pleaded the requisite level of detail required to state his intent to engage in a course of conduct arguably affected with a constitutional interest as to his claim regarding sections 87732 and 87735.  Rather, the Court is only left with mere "some day" intentions which the Ninth Circuit has held cannot support standing in a pre-enforcement context.  *See Unified Data Servs.*, 39 F.4th at 1211 (citing *Lopez*, 630 F.3d at 787-88).  However, his actions of cancelling and refraining from holding a RIFL event where the guest speaker would have spoken on "cultural Marxism [and] academia," ceasing attending and making certain comments at EODAC meetings, and refraining from finalizing agreements with RIFL speakers, arguably meet the requisite degree of specificity and are arguably affected with a constitutional interest, satisfying his burden on this element.  The Court next addresses whether Johnson has adequately pleaded that such conduct is arguably proscribed by the statutes and that there is a substantial threat the statutes will be enforced against him as to his intended conduct.

### 2. Intended Conduct Arguably Proscribed by §§ 87732, 87735

Johnson must sufficiently allege that the statutes arguably proscribe his intended conduct. He fails to do so.

Section 87732 of the California Education Code provides that "[n]o regular employee or academic employee shall be dismissed except for one or more of the following causes:

21

1    (a) Immoral or unprofessional conduct; (b) Dishonesty; (c) Unsatisfactory performance;

2    (d) Evident unfitness for service; [or] . . . (f) Persistent violation of, or refusal to obey, the school

3    laws of the state or reasonable regulations prescribed for the government of the community

4    colleges by the board of governors or by the governing board of the community college district

5    employing him or her."  Section 87735 of the California Education Code provides that a

6    "permanent employee of the district" charged with "immoral conduct" or with "willful refusal to

7    perform regular assignments without reasonable cause," may be immediately suspended from his

8    or her duties and dismissed thirty days later.

9         The F&R finds that Johnson's alleged intended conduct is "conduct that Defendants could

10   conclude is inconsistent with [sections 87732 and 87735 of the California Education Code],"

11   apparently because KCCD terminated Garrett under these provisions.  F&R 19.  However, as

12   addressed above, the full conduct for which Garrett was terminated is not comparable to the

13   conduct in which Johnson alleges an intent to engage.  KCCD's application of the statutes to

14   Garrett's termination does not establish that KCCD would consider Johnson's intended conduct

15   to violate sections 87732 and 87735.[17]  *See* Section V.A.i.3.

16        Johnson has not shown that sections 87732 and 87735 arguably apply to his speech.  *See*

17   *Lopez*, 630 F.3d at 790 (finding that plaintiff did not adequately allege the policy he challenged

18   applied to his speech and "declin[ing] to give the policy such an interpretation of [the court's]

19   own accord").  Similarly to *Lopez*, the Court here "[does] not see, nor does [Johnson] explain,

20   how the policy applies to him, given that his statements and proposed topics do not, on their face,

21   constitute" unprofessional conduct or any of the other grounds for discipline under sections 87732

22   and 87735.  *Id.*

23

24   ───────────────────

[17] Johnson alleges that he made a number of the Facebook posts that KCCD cited in Garrett's

25   termination notice as examples of Garrett's unprofessional conduct.  FAC ¶ 106.  Johnson does
     not indicate which specific posts are his.  Moreover, this allegation does not demonstrate that

26   Johnson's conduct is proscribed by the statutes.  As addressed above, Garrett's termination notice
     lists numerous other acts that Johnson has not established an intent to engage in.  Additionally,

27   KCCD has known at least since July 2023 that Johnson posted some of these posts, and there is
     no evidence in the record of any adverse action having been taken against Johnson for these posts

28   or for any other conduct.

Specifically, it does not appear arguable that merely recommending books with "cultural Marxism" in the title, inviting a speaker on behalf of RIFL to discuss cultural Marxism, writing letters to the Curriculum Committee criticizing courses, appearing on a radio show, expressing his political views and freely participating in the intellectual life of the college, filing valid internal complaints about school administrators, staff, or faculty members, expressing his views and concerns in EODAC meetings, expressing that he "does not wish to refer to transgender students by their preferred pronouns," "protesting the participation of biological males in female sports," and protesting "the holding of 'drag queen story hours' at Bakersfield College's daycare facility," without more details, could be considered "unprofessional conduct" or "evident unfitness for service," let alone, "immoral conduct" or "willful refusal to perform regular assignments without reasonable cause." §§ 87732, 87735. In fact, Johnson has admittedly participated before in a many of these purported intended acts when these statutes were also in effect. Johnson does not allege that he has faced any discipline, or even any warning of potential discipline, based on such prior conduct.

Particularly, given that KCCD does not appear to have considered Johnson's past conduct unprofessional or otherwise in violation of the statutes, Johnson fails to establish that the District Defendants would consider it to be so now. Indeed, the District Defendants have indicated that Johnson has not identified any speech or conduct he plans to engage in that KCCD could conclude is inconsistent with sections 87732 or 87735. Doc. 73 at 8.

### 3.     Substantial Threat of Enforcement

The F&R also found that Johnson's fear of prosecution is reasonable based on his and Garrett's prior experiences. F&R 20. Whether a plaintiff has shown a "substantial threat" of enforcement "often rises or falls with the enforcing authority's willingness to disavow enforcement." *See Peace Ranch*, 93 F.4th at 490 (citation omitted). "Of course, [the defendants'] disavowal must be more than a mere litigation position." *Lopez*, 630 F.3d at 788 (citation omitted). The District Defendants have stated that they cannot conclude that any of the speech or conduct in which Johnson has indicated he intends to engage would be inconsistent with sections 87732 or 87735. *See* Doc. 73 at 8. This acknowledgement by the District Defendants that

Johnson's conduct is not inconsistent with the statutes undermines Johnson's claim that he faces a substantial threat of enforcement.  The Court determines that the disavowal is not a "mere litigation position" because, as mentioned above, Johnson has historically participated in several of the allegedly intended acts and has never been subject to sanctions or threat of sanctions by the District Defendants.

Also relevant in assessing whether there is an objective substantial threat that a statute will be enforced against a plaintiff is (1) whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings against the plaintiff and (2) the history of past prosecution or enforcement under the challenged statute.  *See, e.g.*, *Unified Data Servs.*, 39 F.4th at 1210.  As noted, the F&R largely relies on the fact that Johnson was previously investigated regarding allegations of bullying and harassment, and on Garrett's termination, in concluding that Johnson faces a credible and substantial threat that sections 87732 and 87735 will be enforced against him based on his speech.  Neither consideration points toward a substantial threat of enforcement here as to Johnson.

First, Johnson cannot show that the District Defendants (or KCCD) have communicated a specific warning or threat to initiate proceedings against him.  In making its findings, the F&R correctly notes that "[t]hreatened state action need not necessarily be a prosecution," *Lopez*, 630 F.3d at 786, and informal measures, such as "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation," can suffice.  *See White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2020) (holding that an investigation that did not culminate in an arrest chilled First Amendment expression) (citation omitted).  One question is whether the government's acts "would chill or silence a person of ordinary firmness from future First Amendment activities." *Id.* (citation omitted).  And "general threats by officials to enforce those laws which they are charged to administer do not create the necessary injury in fact." *Lopez*, 630 F.3d at 787 (quoting *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 88 (1947)) (cleaned up).  Thus, mere "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* (quoting *Laird v. Tatum*, 408 U.S. 1, 13-

1   14 (1972)).

2   It is undisputed that there has not been an explicit threat to invoke sections 87732 and

3   87735 against Johnson.  Instead, Johnson seemingly asserts that the District Defendants have

4   credibly threatened action against him pursuant to sections 87732 and 87735 through Dadabhoy's

5   December 2022 email; defendant Corkins' comment at a Board of Trustees meeting on December

6   13, 2022, that "we've got to get the bad actors out of the room," and that such bad actors are in

7   the "five percent that we have to continue to cull;" and the fact that KCCD investigated Bond's

8   complaint against Johnson for harassment and bullying because of Johnson's social media post,

9   even though KCCD concluded that no further action was warranted on the complaint and found

10  no cause for any discipline against Johnson.  FAC ¶¶ 3-4, 62-67, 70-74.

11  To the extent Johnson asserts that "Dadabhoy's public call[] for compliance with Section

12  51201" was an explicit threat to enforce the statutes against Johnson, this argument falls short.

13  FAC ¶ 181.  First, the email does not mention Johnson or RIFL by name.  Nor does it identify any

14  specific statements or conduct that would lead to discipline under sections 87732 and 87735.

15  Dadabhoy's email does not mention sections 87732 and 87735 of the California Education Code.

16  Rather, it cites only section 51201 of title 5 of the California Code of Regulations, which, as

17  addressed below, is a prefatory section that is largely aspirational.  The email states that "[t]here

18  is no place at our institution for divisiveness or hateful rhetoric" and quotes section 51201(b) of

19  the California Code of Regulations.

20  Moreover, "implied threat[s] [do] not meet the standard necessary to show injury in fact."

21  *Lopez*, 630 F.3d at 789.  In *Lopez*, the Ninth Circuit found no credible threat of enforcement of

22  the school's sexual harassment policy where a professor wrote on a student's paper that the

23  student had agreed to abide by the Student Code of Conduct.  *Id.* at 788-92.  The Ninth Circuit

24  held that "on its face, [the professor's] comment does not indicate that [the student's] speech [in

25  his paper] . . . would constitute sexual harassment or otherwise violate the sexual harassment

26  policy." *Id.* at 789.  Therefore, the court found that "in the context in which this remark appeared,

27  [the professor's] comment is, at most, a 'general threat' to enforce the Student Code of Conduct,

28

rather than a 'direct threat of punishment.'" *Id.* (quoting *Mitchell*, 330 U.S. at 88).

This situation is like *Lopez*.  This email was a holiday greeting email to students.  It was not sent to Johnson in particular, but to the campus at large.  It does not name Johnson or RIFL, and it does not identify any particular speech or action.  Thus, as in *Lopez*, it is best read, at most, as a reminder of the diversity goals and affirmations that the State set out in section 51201 of title 5 of the California Code of Regulations.  It was certainly not a "direct threat of punishment" against Johnson.  *Id.*  An attempt to label this email communication as a threat *against Johnson* under sections 87732 and 87735 is too "attenuated."  *See id.* at 789-90.

The analysis of Corkins' statement is similar.  Corkins' communication at the public meeting was not on its face directed at Johnson.  It did not mention Johnson or RIFL by name and did not mention sections 87732 and 87735 or any challenged provision.  Therefore, the statement is, at most, an implied threat that is not specific to any individual.  It is too attenuated to support pre-enforcement standing as to Johnson under sections 87732 and 87735.[18]

Johnson alleges that KCCD's prior investigation of Bond's complaint against him, based on Johnson's social media post, chills his speech both because he was investigated and because defendants threatened him with enforcement of the education codes should he engage in similar speech in the future.  *See* FAC ¶¶ 7, 76.  However, KCCD's investigation found no violation by Johnson.  The investigation concluded that "there were no findings to support a cause for discipline under the Education Code" and that "no further action [would] be taken regarding this complaint."  FAC Ex. E, at 10.  Based on the outcome of the investigation, a reasonable person would not be chilled from engaging in similar speech in the future.  If anything, the outcome of the investigation confirmed that Johnson's ability to express his opinions is protected.  Johnson's mere "allegations of a subjective chill" will not help him to achieve the requisite injury in fact showing.  *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) (internal quotations omitted); *see also Lopez*, 630 F.3d at 792 ("[S]elf-censorship alone is insufficient to show injury.").  The F&R relies on

---

[18] Additionally, section 87734 of the California provides that before an employee can act upon any charge of unprofessional conduct or unsatisfactory performance, the district must provide him 90 days' notice and "an opportunity to correct his or her faults and overcome the grounds for the charge."  Cal. Educ. Code § 87734.  As noted, Johnson has never received any such notice.

1   Johnson's assertions that the investigation "necessitated his retention of counsel" and that he was

2   not allowed to see a copy of the complaint, FAC ¶ 74, but its conclusion that this established a

3   credible threat that the statutes would be enforced against Johnson in the future does not follow.

4   Moreover, the credible threat of enforcement analysis focuses on the actions of the *defendant*, not

5   the plaintiff or a third-party accuser, *see, e.g.*, *Peace Ranch*, 93 F.4th at 490; *Lopez*, 630 F.3d at

6   789, and Johnson's allegations do not establish any threat by the District Defendants.

7   Johnson further raises that KCCD noted in its findings that "[t]he District will investigate

8   any further complaints of harassment and bullying and, if applicable, will take appropriate

9   remedial action including but not limited to any discipline determined to be appropriate."  FAC

10   ¶ 76, Ex. E, at 10.  Johnson makes too much of this.  As already noted, "general threats by

11   officials to enforce those laws which they are charged to administer do not create the necessary

12   injury in fact."  *Lopez*, 630 F.3d at 787 (quoting *United Pub. Workers of Am. v. Mitchell*, 330

13   U.S. 75, 88 (1947)) (cleaned up).  Even more, in the context in which the statement exists – that

14   is, an administrative report finding no grounds for disciplining Johnson for his speech or actions –

15   the statement cannot reasonably be read as a threat to enforce sections 87732 and 87735 against

16   him for the same or similar conduct.  Thus, neither the investigation of Johnson overall nor the

17   statement that the district will investigate allegations of bullying and harassment, as it is required

18   to do by law, *see Swenson v. Potter*, 271 F.3d 1184, 1192 (9th Cir. 2001), suffices to show that

19   the District Defendants have "communicated a specific warning or threat to initiate proceedings"

20   based on sections 87732 and 87735.  *Unified Data Servs.*, 39 F.4th at 1210 (citation omitted).

21   As for the history of past enforcement, the F&R concludes that the history of past

22   enforcement of sections 87732 and 87735 against Garrett demonstrates that Johnson's fear of

23   prosecution is reasonable.  F&R 19-20.  Specifically, the F&R finds that "Garrett was disciplined

24   for what appears to be some expressions of 'pure political speech'" like "(1) Garrett's May 19[,]

25   2019 Op-Ed suggesting 'certain terms such as "Cultural Marxism" weren't "hate speech,"' (2)

26   Garrett's criticism of the Bakersfield curriculum committee and the 'Cesar E. Chavez Leadership

27   Certificate and Landmarks in California courses,' and (3) some of Garrett's participation in

28   media, and social media," and that Johnson "has stated his intent to engage in similar 'political

27

1    speech' that Garrett was, in part, punished for."  F&R 19.  For Garrett's termination under

2    sections 87732 and 87735 to support a credible threat of enforcement of these statutes against

3    Johnson, Johnson must be "similarly situated" to Garrett.  *Lopez*, 630 F.3d at 786-87.  That

4    KCCD terminated one of its professors under sections 87732 and 87735, based on that

5    individual's specific conduct, does not necessarily establish a credible threat of enforcement of

6    the statutes against Johnson.  *See Unified Data Servs.*, 39 F.4th at 1211 n.10.

7          Further examination reveals that Johnson is not similarly situated to Garrett.  Garrett's 35-

8    page termination notice includes numerous instances of conduct in which Johnson has not stated

9    any intent to engage, such as:  making numerous "demonstrably false and misleading" allegations

10   against his colleagues and the college, including instances of repeating a "knowingly false and

11   demonstrably false misrepresentation" after a third-party investigation determined it was

12   unfounded; knowingly violating campus COVID-19 policies in 2021 with respect to an event; and

13   threatening and attempting to intimidate a KCCD trustee by email.  *See* FAC Ex. G, at 11.  While

14   Johnson asserts generally that he intends to engage in certain of the other conduct, arguably

15   protected speech, referenced in Garrett's termination notice, Johnson does not allege that he

16   wishes to act in a manner comparable to the overall conduct described in Garrett's termination

17   notice.  Johnson and Garrett are not similarly situated for purposes of establishing a credible

18   threat of enforcement of sections 87732 and 87735 against Johnson.

19         Even considering the several actions that Johnson states he plans to engage in but does not

20   because he alleges Garrett was disciplined for similar conduct, they are distinguishable and do not

21   establish a reasonable likelihood of enforcement against Johnson at this juncture.  For example,

22   Johnson alleges he fears being sanctioned like Garrett because the term cultural Marxism was

23   used on 18 RIFL posts, 15 of which Johnson posted himself; that he has cancelled speakers for

24   RIFL events who would talk about cultural Marxism; and that he cannot recommend books with

25   cultural Marxism in the title.  However, while KCCD cited certain of RIFL's Facebook posts in

26   Garrett's termination notice, *see* FAC Ex. G, at 7, 11, 14-15, it is notable that KCCD did *not* cite

27   any posts containing the phrase "cultural Marxism" as examples of unprofessional conduct by

28   Garrett.  That such posts were not included in the termination notice, while other posts by Garrett

were included, undermines Johnson's claim that he faces a credible fear of enforcement if he were to use the term.  It also supports the District Defendants' position that Johnson is not similarly situated to Garrett, and that, rather, Garrett was terminated for engaging in "a pattern of conduct that interfered with and disrupted campus operations."  Doc. 73 at 15 (emphasis added).

The FAC essentially alleges that Johnson wishes to engage in speech and actions related to the phrase "cultural Marxism" and to use the term as he has done in the past.  Johnson acknowledges previously engaging in such speech by openly using the term "cultural Marxism" in social media posts and other contexts, and the FAC confirms that he has never faced any enforcement consequence for such conduct or for otherwise discussing cultural Marxism.  Therefore, the Court finds the Johnson and Garrett are not similarly situated as to this alleged intended conduct.

As for criticizing the curriculum committee and courses at KCCD, Johnson alleged that he "also wrote a letter to the Curriculum Committee for Public Comment regarding the same two history courses Professor Garrett criticized" and that he is "reticent to engage in [this type of speech] again" because it was cited in Garrett's termination notice.  FAC ¶ 105.  The fact that Johnson previously wrote such a letter to the Curriculum Committee without any negative consequence indicates that Johnson does not have a well-founded fear of enforcement if he were to write similar such letters in the future.

Additionally, Johnson's allegations regarding media appearances are not analogous to Garrett's and do not support a finding of a "substantial threat" of enforcement should Johnson make a media appearance.  The district's citation of Garrett's appearance on the radio show makes clear he was not disciplined for simply appearing on the show and stating his views, but rather, for "*repeating* . . . allegations on a radio station," that were found by a third-party investigator to have been "misleading or outright wrong," following previous complaints regarding such allegations.  FAC Ex. G, at 7 (emphasis added).  Again, Johnson does not allege that he plans to make demonstrably false claims, and he does not allege that he plans to repeat false claims on a radio show after an investigation had found the claims to be false.

In short, having "the same and similar views" as Garrett is not sufficient to make Johnson

1  "similarly situated" to him such that he can allege a credible fear of enforcement of sections

2  87732 and 87735 against him based on Garrett's termination.  FAC ¶¶ 162, 170.  Johnson does

3  not allege that he plans to engage in the same broad range of conduct for which Garrett was

4  terminated under the statutes.

5  Thus, Johnson has not alleged injury in fact as to sections 87732 and 87735 and does not

6  have standing to bring claims as to these statutes.[19]

7  ### ii.    Policy 3050[20]

8  Johnson challenges Policy 3050 under the First Amendment as applied to him, and under

9  the First and Fourteenth Amendments as impermissibly vague. As with his challenge to sections

10  87732 and 87735 of the California Education Code, to successfully assert that he has suffered an

11  injury in fact sufficient to sustain a pre-enforcement challenge to the application of Policy 3050

12  against him, Johnson must allege an intent to engage in conduct arguably affected with a

13  constitutional interest, that the alleged intended conduct is proscribed by Policy 3050, and that

14  there is a substantial threat that Policy 3050 will be enforced against him. *Driehaus*, 573 U.S. at

15  159 (citation omitted).  Johnson can bring a facial challenge to Policy 3050 only if he has

16  standing to challenge it himself. *Lopez*, 630 F.3d at 785-86 ("Even when plaintiffs bring an

17  overbreadth challenge to a speech restriction, i.e., when plaintiffs challenge the constitutionality

18  of a restriction on the ground that it may unconstitutionally chill the First Amendment rights of

19  parties not before the court, they must still satisfy 'the rigid constitutional requirement that

20  plaintiffs must demonstrate an injury in fact to invoke a federal court's jurisdiction.'" (quoting

21  *Dream Palace v. County of Maricopa*, 384 F.3d 990, 999 (9th Cir. 2004))).

22

23

24  ───────────────

[19] To the extent Johnson argues that he will be terminated or disciplined under the statutes for

25  failure to comply with the regulations, *see* FAC ¶¶ 119, 156, as addressed below, Johnson has not

26  adequately alleged a fear of enforcement of the regulations against him for any alleged intended acts.  Thus, he cannot allege a reasonable fear of being terminated under the statutes for non-compliance with the regulations.

27

28  [20] Johnson asserts his claims as to Policy 3050 only against the District Defendants.  *See* FAC.

1          **1.      Intent to Engage in Conduct Arguably Affected with a**
2                            **Constitutional Interest**

3          The F&R concluded that Johnson "has expressed an intent to engage in speech that the

4   District may deem to be in violation of Policy 3050," noting that Johnson "already has been

5   investigated for engaging in speech that appears to be contrary to Policy 3050." [21]   F&R 20.

6   However, as addressed above, in that earlier investigation KCCD determined that Johnson had

7   not committed any violation.  Based on that favorable result, Johnson cannot rely on the prior

8   investigation to establish that he faces a credible threat of enforcement for similar future conduct.

9   In the FAC, Johnson appears to base his challenge to Policy 3050 primarily on Garrett's

10  termination.  Garrett's 90-day notice to correct deficiencies stated Garrett could be charged with

11  "unprofessional conduct," "unsatisfactory performance," and "violations of [Policy] 3050."  *See*

12  FAC ¶ 79-80.  Johnson identifies eight of the actions listed in Garrett's 90-day notice, FAC ¶ 80,

13  seemingly indicating that those actions are similar to ones he wishes to engage in but does not for

14  fear of reprimand.[22]  FAC ¶ 170.  However, of those listed actions, the only ones that Johnson

15  arguably states an intent to engage in are using the phrase cultural Marxism, commenting on

16  Bakersfield College courses to the curriculum committee, participating on a radio show, and

17  engaging in social media activities.  As discussed above, of these allegations, Johnson states with

18  sufficient specificity his intent with respect to holding a RIFL event where the guest speaker

19  would have spoken on "cultural Marxism [and] academia" and refraining from finalizing

20  agreements with RIFL speakers.  Such conduct is arguably affected with a constitutional interest,

21  satisfying his burden on this element.  Accordingly, the Court addresses below whether such

22  intended conduct is arguably proscribed by Policy 3050 and whether there is a "substantial threat"

23  ────────────────

24  [21] Moreover, Johnson does not allege he intends to act in the same ways that he did that led to the investigation – that is, sharing fellow professors' posts and adding commentary to them.

25  [22] While the 90-day notice to correct deficiencies states it offers "specific examples" "to illustrate
26  some specific instances of [Garrett's] behavior as to provide [Garrett] with an opportunity to
    correct these faults and overcome the grounds for charges based on unprofessional conduct,
27  unsatisfactory performance and violation of KCCD Board Policy 3050," it does not provide detail
    as to which examples would constitute a violation of BP 3050.
28

1   that the statutes will be enforced against him.  As for making comments to the curriculum

2   committee, participating on a radio show, and engaging in social media activities, such

3   allegations have already been addressed above, and Johnson fails to allege them with sufficient

4   specificity to support an injury in fact.  *See* Section V.A.i.1.

5       Similarly, other conduct Johnson arguably alleges in his FAC that he wishes to engage in

6   but cannot for fear of enforcement of Policy 3050 against him (*see* FAC ¶¶ 9, 97, 104, 107, 110)

7   has already been addressed above and fails to meet the specificity standard.  *See* Section V.A.i.1.

8   The only other alleged conduct in the FAC that Johnson states he fears would violate Policy 3050

9   is Johnson's allegation that he has stopped attending EODAC meetings to avoid expressing

10  certain views and opinions.  As noted above, this allegation meets the requisite specificity and is

11  affected with a constitutional interest.[23]  *See* Section V.A.i.1.  However, as discussed below,

12  Johnson has failed to show that such conduct is arguably proscribed by Policy 3050 or that there

13  is a substantial threat of enforcement of Policy 3050 against him.

14      **2.      Intended Conduct Arguably Proscribed by Policy 3050**

15      Policy 3050 is KCCD's "Institutional Code of Ethics."  Policy 3050.  It is based on two

16  fundamental principles: "recognition of the dignity of all persons" and "a commitment to

17  fulfilling our obligations to others using fair and honest means."  *Id.*  It requires "that [the KCCD

18  community] conduct [itself] with civility in all circumstances of [their] professional lives" and

19  "not participate in or accept, condone, or tolerate physical or verbal forms of aggression, threat,

20  harassment, ridicule, or intimidation."  *Id.*  Policy 3050 states it values a spirit of free inquiry and

21  free speech and "encourages the expression of a range of points of view, but [expects] all

22  expressions of content to be conducted in a manner respectful of persons."  *Id.*

23      **a.      Claimed Violation of Policy 3050**

24      Johnson does not identify specific speech that he intends to give that he reasonably fears

25  District Defendants would construe as a "verbal form[] of aggression, threat, harassment, ridicule,

---

[23] To the extent Johnson argues that expressing his views, which he claims to be incompatible with the regulations, would violate Policy 3050, *see* FAC ¶¶ 168, 170, these allegations lack the requisite specificity.  Regardless, whether such conduct could be construed as a violation of Policy 3050 is analyzed below.

or intimidation."  Johnson appears to base his challenge to Policy 3050 generally on Garrett's termination but, as addressed above, Johnson largely fails to identify specific statements he intends to make.  The FAC fails to show generally that using the phrase cultural Marxism, commenting on Bakersfield College courses to the curriculum committee, participating on a radio show, expressing his political views at EODAC meetings and elsewhere, filing internal complaints about school administrators, staff, or fellow faculty members, and engaging in social media activities, without more, would be construed by the District Defendants as a "verbal form of aggression, threat, harassment, ridicule, or intimidation" or as otherwise violating Policy 3050. The FAC notes that KCCD cited Policy 3050 in its 90-day notice to Garrett.  FAC ¶¶ 79-80 & Ex. F at 1.  But while the Notice of Decision to Terminate found that Garrett violated sections 87732 and 87735 of the California Education Code, it did not find that Garrett violated Policy 3050.  *See* FAC Ex. G.  If KCCD did not ultimately find Policy 3050 prohibited Garrett's conduct, there is little basis to conclude the District Defendants would find Policy 3050 prohibits Johnson's intended conduct.

Similarly, KCCD's prior investigation of the third-party complaint against Johnson, which found no violation by Johnson, does not seem to have considered Policy 3050.  *See* FAC Ex. E, at 10 ("Because there were no findings to support a cause for discipline *under the Education Code*, the District concludes that no further action will be taken regarding this complaint.") (emphasis added).  The fact that the prior complaint against Johnson did not result in any violation – or apparently even consideration – under Policy 3050 undercuts Johnson's allegation that his intended First Amendment speech would be proscribed by Policy 3050.

Johnson essentially asserts that he would like to say things he has previously said and act in ways he has previously acted.  He has not shown that this was considered in the past to be a violation of Policy 3050, and he identifies no credible reason to believe it would be now.  Thus, Johnson has not adequately alleged that his intended conduct would arguably violate Policy 3050.

### b.      Vagueness

As to Johnson's vagueness claim regarding Policy 3050, the Ninth Circuit instructs that "vagueness allegations must be taken as true for the purpose of determining standing."  *Isaacson*

33

1    *v. Mayes*, 84 F.4th 1089, 1099 (9th Cir. 2023).  Therefore, the Court must assume that "civility,"

2    "verbal form of aggression, harassment, ridicule, or intimidation," and expression that is

3    "conducted in a manner respectful of persons" is vague for purposes of standing, FAC ¶ 175, and

4    therefore that any properly pleaded conduct is arguably proscribed by it.  However, as noted

5    below, Johnson does not demonstrate a substantial threat of enforcement and therefore has not

6    adequately alleged standing to bring a vagueness challenge as to Policy 3050.

### 3.    Substantial Threat of Enforcement

8         Johnson fails to allege a substantial threat of enforcement of Policy 3050 against him.  As

9    a threshold matter, it is unclear that Policy 3050 can be enforced against anyone – it appears to be

10   an aspirational policy without any enforcement or disciplinary mechanism.  *See* Policy 3050.

11   Additionally, as noted above, whether there is a substantial threat of enforcement "often rises or

12   falls with the enforcing authority's willingness to disavow enforcement."  *See Peace Ranch*, 93

13   F.4th at 490 (citation omitted).  The District Defendants state that they cannot conclude that the

14   speech or conduct in which Johnson intends to engage would violate Policy 3050.  Doc 73 at 8.

15   Johnson also fails to allege that there has been a threat of enforcement against him or that the

16   history of enforcement of Policy 3050 affirms that a credible threat exists.

17        As addressed above, KCCD's prior investigation of a third-party complaint against

18   Johnson, and its finding of no violation by Johnson, does not establish that Johnson faces a

19   substantial threat of future enforcement for similar conduct.  Rather, KCCD's finding that

20   Johnson did not commit any violation undermines his argument on standing.  The prior

21   investigation found that Johnson did not violate any requirements, let alone Policy 3050.  That

22   history does not support a finding that Johnson faces a substantial threat that Policy 3050 will be

23   enforced against him in the future for similar speech.

24        The F&R also relies on Garrett's termination as evidence that Johnson faces a substantial

25   threat of enforcement of Policy 3050 against him.  However, although the 90-day notice to

26   Garrett referred to his alleged violation of Policy 3050, KCCD's termination notice to Garrett

27   omitted any reference to Policy 3050 and found only that he had violated California Education

28

Code sections 87732 and 87735.[24]  *Compare* FAC Ex. F (emphasis added) *with* FAC Ex. G.  The fact that KCCD did not base its termination of Garrett on a violation of Policy 3050 further supports the conclusion that Johnson has failed to show a substantial threat that Policy 3050 would be enforced against him.  *Lopez*, 630 F.3d at 786-87.  Additionally, Johnson has not alleged that Policy 3050 has been enforced against anyone else, and the record appears to reflect that it was not enforced even against Garrett.  This weighs in favor of finding that there is no credible threat of enforcement of Policy 3050 against Johnson.

Furthermore, for the same reasons analyzed above regarding sections 87732 and 87735 of the California Education Code, neither Dadabhoy's email nor Corkins' comment can be construed as a threat to enforce Policy 3050 against Johnson – that is, neither mentions Policy 3050, Johnson, or RIFL, nor do they indicate any specific questionable conduct or make any specific threat.

Thus, Johnson has not sufficiently alleged an injury in fact as to Policy 3050, and he does not have standing to bring this claim.

### iii.    Cal. Code of Regs., tit. 5, §§ 51200, 51201, 53425, 53601, 53602, and 53605

Johnson brings a facial and as applied claim that sections 51200, 51201, 53425, 53601, 53602, and 53605 of the California Code of Regulations, and the Chancellor's DEI Recommendations issued pursuant to section 53601, violate the First Amendment by discriminating against viewpoint and by compelling speech.  Again, to successfully assert that he has suffered an injury in fact sufficient to sustain a pre-enforcement challenge to the application of these regulations and the DEI Recommendations, Johnson must allege, as to each of them, an intent to engage in conduct arguably affected with a constitutional interest, that the alleged intended conduct is proscribed by the regulations or the DEI Recommendations, and that there is a substantial threat that the regulations or DEI Recommendations will be enforced against him.  *Driehaus*, 573 U.S. at 159 (citation omitted).  Johnson may bring a facial challenge to the

---

[24] The 90-day notice to correct deficiencies listed examples of Garrett's conduct but did not allege which specific examples would constitute a violation of Policy 3050.

regulations and the DEI Recommendations only if he has standing to challenge them himself. *Lopez*, 630 F.3d at 785-86 ("Even when plaintiffs bring an overbreadth challenge to a speech restriction, i.e., when plaintiffs challenge the constitutionality of a restriction on the ground that it may unconstitutionally chill the First Amendment rights of parties not before the court, they must still satisfy 'the rigid constitutional requirement that plaintiffs must demonstrate an injury in fact to invoke a federal court's jurisdiction.'") (quoting *Dream Palace*, 384 F.3d at 999).

### 1.     Intent to Engage in Conduct Arguably Affected with a Constitutional Interest

Johnson claims that sections 51200, 51201, 53425, 53601, 53602, and 53605 and the DEI Recommendations both chill and compel his speech.  A large portion of the FAC is dedicated to examples of conduct he claims to refrain from engaging in for fear of violating the regulations, or conduct he wishes not to engage in but alleges the regulations compel.  FAC ¶¶ 97-154.

Regarding the regulations and DEI Recommendations' alleged chilling of speech, Johnson pleads that he "refrains from expressing his political views and from freely participating in the intellectual life of the college;" "he cancelled a RIFL community event [where the speaker would have discussed] cultural Marxism" to avoid "having to defend cultural Marxism as a speaker topic;" he "cannot recommend books that have the term 'Cultural Marxism' in the title;" he "has refrained from finalizing agreements with the speakers [for RIFL];" he has been "chill[ed] . . . from filing any internal complaints about school administrators, staff, or fellow faculty members;" he is "reticent" to write letters to the Curriculum Committee for Public Comment criticizing courses; he has "refrained from making [social media] posts or expressing opinions similar to Professor Garrett's;" he "refrain[s] from expressing viewpoints – similar to Garrett's – that students are being weaponized by the EODAC to push DEI ideology agendas;" he "has stopped attending EODAC meetings" to "avoid expressing . . . concerns" regarding "'reverse' racism and deceptive ways the [EODAC] was pushing affirmative action;" he has "refrain[ed] from offering other viewpoints that he believes would not be well-received by Defendants;" including that he "does not wish to refer to transgender students by their preferred pronouns" and "protesting the participation of biological males in female sports competitions and the holding of

1  'drag queen story hours' at Bakersfield College's daycare facility;" he has turned down an offer

2  to appear on a radio show and to give comment to national news organizations; and "can no

3  longer serve on screening committees without completing the mandatory DEIA training which he

4  cannot successfully complete [given that he] refuses to affirm the DEIA political ideals."[25]

5  FAC ¶¶ 97, 102-05, 107-12.

6      As noted above, some of Johnson's allegations of chilled speech do not meet the requisite

7  level of detail required by Ninth Circuit precedent, *see infra* Section V.A.i.1, and the Court is left

8  with mere "some day" intentions, which cannot support a finding of injury in fact.  *Unified Data*

9  *Servs.*, 39 F.4th at 1211 (citing *Lopez*, 630 F.3d at 787-88).  However, several of Johnson's

10  allegations of chill appear to meet the pleading requirements of alleging the what, when, where,

11  and to whom, as to his intended speech.  For instance, he alleged that he "has stopped attending

12  EODAC meetings," "he cancelled a RIFL community event [where the speaker would have

13  discussed] cultural Marxism" to avoid "having to defend cultural Marxism as a speaker topic;"

14  and "has refrained from finalizing agreements with the speakers [for RIFL]."

15      Johnson also alleges that "the DEIA requirements" compel him to speak a certain

16  message.  FAC ¶ 114.  It is not entirely clear from Johnson's complaint the exact content Johnson

17  believes he must speak per the regulations.  *See* FAC ¶¶ 114-19.  Johnson further alleges that "he

18  does not wish to" do or say what, he claims, the DEI Recommendations would require him to do

19  or say.  *See* FAC ¶¶ 120-148.  Johnson alleges that "[a]lmost everything [he] teaches violates the

20  new DEIA requirements — not just by failing to advance the DEIA and anti-racist ideologies, but

21  also by criticizing them" and proceeds to explain the courses and content he "is set to teach."

22  FAC ¶¶ 148–53.  It is somewhat unclear if Johnson is alleging that he will teach these courses as

23  _____

24  [25] It is not entirely clear that Johnson alleges that each of these intended conducts would violate
   the regulations.  Many of the allegations state that Johnson fears engaging in the conduct for fear

25  of termination given Garrett's termination, without mention of whether such conduct would
   violate the regulations.  The regulations had not yet been enacted, nor had the DEI

26  Recommendations been issued, at the time of Garrett's termination.  Garrett's termination notice
   was based solely on violations of sections 87732 and 87735 of the California Education Code.

27  FAC, Ex. G.  However, construing the FAC liberally, the Court assumes that Johnson asserts that
   such conduct would also violate the regulations.

28

1   he has designed them, or if he will refrain from doing so, based on the text of the complaint.

2   Regardless, the Court construes the complaint in the light most favorable to him and finds that

3   either way, under his theories, he has alleged intended conduct affected with a constitutional

4   interest.

5         Finally, Johnson alleges that his "conscience does not allow him to believe in and practice

6   the 'antiracism' ideology as required by Cal. Code of Regs. tit. 5, § 51201, et seq," and proceeds

7   to allege things he does not wish to do, based on the definition of "antiracist" as defined by the

8   "Diversity, Equity and Inclusion Glossary of Terms," including "challeng[ing] the values,

9   structures, policies, and behaviors that . . . allegedly perpetuate systemic racism" or "constantly

10   identify, challenge, upend, and replace existing policies."  FAC ¶ 154.  Again, because Johnson is

11   alleging that he will not do these things, he has alleged an intent to engage in a course of conduct

12   arguably affected with a constitutional interest.

13         Setting aside whether the regulations or DEI Recommendations would compel Johnson to

14   make any speech,[26] Johnson has adequately alleged his intention to engage in a course of conduct

15   arguably affected with a constitutional interest.  Reading the FAC in the light most favorable to

16   the plaintiff as the court must at this stage, Johnson has at least pleaded with enough specificity

17   his intent to *not speak* "a political ideology that he opposes and which contravenes his

18   conscience."  *See* FAC ¶¶ 118, 120.  Specifically, he has alleged adequately that he will *not* speak

19   or do the allegedly required actions.[27]  Under Johnson's theory of the case, this alleged

20   compulsion of speech arguably affects a constitutional interest.  *See Peace Ranch*, 93 F.4th at

21   488.

22

23

---

24   [26] Whether the conduct Johnson alleges he intends to engage in is arguably proscribed by the

25   regulations he challenges is addressed in the next section.

26   [27] As it does not add to the analysis, the Court does not list every alleged provision of the DEI

27   Recommendations that Johnson alleges he does not wish to follow.  Among other examples,
  Johnson alleges that he "does not wish to '[a]rticulate[] the importance and impact of DEI and
  anti-racism'" or "[a]dvocate[] for and advance[] DEI and anti-racist goals and initiatives."  FAC

28   ¶¶ 125–26.

### 2. Intended Conduct Arguably Proscribed by the Regulations

To allege that he has suffered an injury in fact, Johnson must also adequately allege that making the speech he alleges he wishes to make or refusing to make the speech he alleges he is required to make is arguably proscribed by the regulations. *Driehaus*, 573 U.S. at 159 (citation omitted).

### a. Sections 51200 and 51201

Section 51200 provides:

> It is the intent of the Board of Governors that the statement on Diversity, Equity, and Inclusion set forth in Section 51201 be the official position of the Board of Governors and the California Community Colleges on their commitment to diversity and equity in fulfilling the system's educational mission and that it should guide the administration of all programs in the California Community Colleges, consistent with all applicable state and federal laws and regulations.

Cal. Code Regs. tit. 5, § 51200.

As previewed by section 51200, section 51201 is the "statement on Diversity, Equity, and Inclusion" and states the "official position" of the Board of Governors and the California Community Colleges regarding "their commitment to diversity and equity." *Id.* For example, section 51201 provides that the "California Community Colleges embrace diversity" meaning "that we must intentionally practice acceptance, anti-racism, and respect towards one another and understand that racism, discrimination, and prejudices create and sustain privileges for some while creating and sustaining disadvantages for others," that "we also acknowledge that institutional racism, discrimination, and biases exist and that our goal is to eradicate these from our system," that "the California Community Colleges are committed to fostering an anti-racist environment that offers equal opportunity for all," and that "[a]s a collective community of individual colleges, we are invested in cultivating and maintaining a climate where equity, anti-racism, and mutual respect are both intrinsic and explicit." *Id.* § 51201.

First, the government is allowed to state its official position that diversity is a desirable goal. Many of the regulations, including sections 51200 and 51201, set out general statements

1    about the desirability of diversity in the California Community Colleges system.  As in *Downs v.*

2    *Los Angeles Unified School District*, 228 F.3d 1003, 1013 (9th Cir. 2000), the relevant sections

3    here establish the government's official position that schools should work in furtherance of

4    diversity, but do not restrict colleges or faculty in achieving those goals.  Under such a situation,

5    governmental bodies "may decide not only to talk about . . . awareness and tolerance in general,

6    but also to advocate such tolerance if it so decides."  *Id.* at 1014.

7         Second, a challenge to section 51200 or 51201 is premature.  The language of sections

8    51200 and 51201 can fairly be read as a preamble, as the language is "precatory" and inoperative

9    in nature.  *See Webster v. Reproductive Health Servs.*, 492 U.S. 490, 506 (1989) (finding that

10   federal courts are unable to decide "abstract propositions," including the constitutionality of

11   statutory preambles, until they are "applied to restrict the activities of [plaintiffs] in some concrete

12   way") (quoting *Tyler v. Judges of Court of Registration*, 179 U.S. 405, 409 (1900)); *see also*

13   *Cath. League for Religious & C.R. v. City and County of San Francisco*, 624 F.3d 1043, 1075-76

14   (9th Cir. 2010) (en banc) (Graber, J., concurring in part) ("This hortatory resolution is like

15   precatory text in a statute's preamble, which plaintiffs lack standing to challenge unless the text

16   applies to them 'in some concrete way.'") (quoting *Webster*, 492 U.S. at 506).  The language

17   imposes no substantive restrictions or requirements on conduct, but rather reads more as a "value

18   judgment" on the state's position on diversity initiatives.  *Webster*, 492 U.S. at 505-06.  Thus, in

19   the absence of language being "applied to restrict the activities of [Johnson] in some concrete

20   way," the Court is "not empowered to decide . . . the constitutionality of the . . . preamble."  *Id.* at

21   506-07 (cleaned up).

22        Therefore, Johnson cannot bring challenges to sections 51200 or 51201 at this time.

23                        **b.    Section 53425**

24   Section 53425 provides:

25            In addition to the category-specific qualifications required by this
            chapter, all district employees shall demonstrate the ability to work
26            with and serve individuals within a diverse community college
            campus environment as required by local policies regarding DEIA
27            competencies.

28

40

1  Cal. Code Regs. tit. 5, § 53425.

2        On the face of the allegations, nothing Johnson purports to do would violate section

3  53425.  Indeed, on this record, it would be impossible to so find because any such local policies

4  implemented by KCCD are not before the Court.  By its plain language, section 53425 requires

5  Johnson to "demonstrate the ability to work with and serve individuals within a diverse

6  community college campus environment *as required by local policies regarding DEIA*

7  *competencies*."  *Id.* (emphasis added).  Given that the FAC does not identify any local policies

8  regarding DEIA competencies, the Court cannot determine if any of Johnson's alleged intended

9  conduct would arguably violate them, and therefore, as with sections 51200 and 51201, Johnson's

10  challenge to section 53425 is simply premature.

11                  **c.**       <u>**Section 53601 and the DEI Recommendations**</u>

12        Section 53601 provides:

13
14      (a) The Chancellor shall adopt and publish guidance describing DEIA competencies and criteria in collaboration with system stakeholder groups. The DEIA guidance shall be maintained to
15  include current and emerging evidence-based practices developed within the California Community Colleges, or described in DEIA-
16  related scholarship.

17      (b) The DEIA competencies and criteria identified by the Chancellor shall be used as a reference for locally developed minimum standards
18  in community college district performance evaluations of employees and faculty tenure reviews.
19

20  *Id.* § 53601.

21        Section 53601 requires the Chancellor to adopt and publish guidance regarding "DEIA

22  competencies and criteria" and provides that that guidance "shall be used *as a reference for*

23  *locally developed minimum standards* in community college district performance evaluations of

24  employees and faculty tenure reviews."  *Id.* (emphasis added).  As with section 53425, Johnson's

25  challenge to section 53601 is premature.  While, consistent with this regulation, Johnson may in

26  the future be evaluated based on locally developed minimum standards, the record does not

27  include any such local policies, and Johnson does not challenge any local policies that may exist.

28  None of Johnson's intended future conduct violates section 53601 on its face.

Johnson also challenges the DEI Recommendations.  The FAC claims that his intended future conduct would violate the DEI Recommendations.  *See, e.g.*, Complaint ¶¶ 120-47.  However, the DEI Recommendations have not been and will not be adopted through the formal regulatory process and are therefore not binding on districts or their faculty.  Cal. Cmty. Colls. Chancellor's Off., Procedures and Standing Orders of the Board of Governors 22 (Dec. 2022), https://www.cccco.edu/-/media/CCCCO-Website/docs/procedures-standing-orders/december-2022-procedures-standing-ordersv2-a11y.pdf?la=en&hash=FF692A0AE8ACC8FE6BB2A4D75018302005A8A4D6 ("Neither the Board nor the Chancellor may administer or enforce any regulation . . . unless that regulation is adopted in accordance with the provisions of this Chapter.")).  By section 53601's plain language, the DEI Recommendations are mere *guidance* and are to be used as a *reference*.  Additionally, the DEI Recommendations acknowledge that they are only guidance.  *See generally* FAC, Ex. A (describing DEI Recommendations as a "set of *sample* DEI competencies and criteria," noting that districts "are *strongly recommended* to use these DEI competencies and criteria as a baseline to develop DEI competencies and criteria," stating what the district's local process "*may include*," and providing for every listed theme a "*recommended* description" of that theme) (emphasis added).  Therefore, even if local district policies were enacted, it is entirely unclear whether, or how, any of the DEI Recommendations would ever be applied to Johnson.

While Johnson's intended conduct might be contrary to the intended goals of the DEI Recommendations, Johnson cannot bring a pre-enforcement challenge to non-binding and non-enforceable *guidance* that may never be applied to him.  That "threat" is entirely too "hypothetical" and cannot justify pre-enforcement standing.  *Clark*, 899 F.3d at 809.  Therefore, Johnson has failed to sufficiently allege standing to challenge section 53601 or the DEI Recommendations.

### d. Section 53602

Section 53602 provides:

> (a) District governing boards shall adopt policies for the evaluation of employee performance, including tenure reviews, that requires

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

demonstrated, or progress toward, proficiency in the locally-developed DEIA competencies or those published by the Chancellor pursuant to section 53601.

(b) The evaluation of district employees must include consideration of an employee's demonstrated, or progress toward, proficiency in diversity, equity, inclusion, and accessibility DEIA-related competencies that enable work with diverse communities, as required by section 53425. District employees must have or establish proficiency in DEIA-related performance to teach, work, or lead within California community colleges.

(c) To advance DEIA principles in community college employment, districts shall:

> (1) include DEIA competencies and criteria as a minimum standard for evaluating the performance of all employees;
> (2) ensure that evaluators have a consistent understanding of how to evaluate employees on DEIA competencies and criteria;
> (3) set clear expectations regarding employee performance related to DEIA principles, appropriately tailored to the employee's classification;
> (4) place significant emphasis on DEIA competencies in employee evaluation and tenure review processes to support employee growth, development, and career advancement;
> (5) ensure professional development opportunities support employee development of DEIA competencies that contribute to an inclusive campus and classroom culture and equitable student outcomes;
> (6) ensure an evaluation process that provides employees an opportunity to demonstrate their understanding of DEIA and anti-racist competencies;
> (7) include proposed or active implementation goals to integrate DEIA principles as a part of the district's Equal Employment Opportunity Plan required by section 53003.

Cal. Code Regs. tit. 5, § 53602.

Like his challenges to sections 53425 and 53601, Johnson's challenge to section 53602 is premature. Section 53602 requires the districts to "adopt policies for the evaluation of employee performance . . . requir[ing] demonstrated, or progress toward, proficiency in the locally-developed DEIA competencies or those published by the Chancellor pursuant to section 53601." *Id.* Section 53602 further requires that such policies include consideration of an employee's

43

ability to work with and serve diverse populations pursuant to the local policies regarding DEIA competencies.  *Id.*  The record before the Court does not include any such policies, and section 53602 does not directly apply to Johnson's intended future conduct.  Johnson cannot yet bring a challenge to section 53602.

### e.       Section 53605

Finally, section 53605 provides:

> (a) Faculty members shall employ teaching, learning, and professional practices that reflect DEIA and anti-racist principles, and in particular, respect for, and acknowledgement of the diverse backgrounds of students and colleagues to improve equitable student outcomes and course completion.
>
> (b) Educational and other Administrators shall include DEIA and anti-racist principles into existing policies and practices, funding allocations, decision-making, planning, and program review processes. These processes shall take into account the experience and performance of students and colleagues of diverse backgrounds, and work to close equity gaps in student outcomes and hiring.
>
> (c) Staff members shall promote and incorporate culturally affirming DEIA and anti-racist principles to nurture and create a respectful, inclusive, and equitable learning and work environment. In conducting their duties, staff members shall respect and acknowledge the diversity of students and colleagues.

*Id.* § 53605.

Unlike the preceding regulations, section 53605 arguably imposes an obligation upon faculty members, including Johnson ("Faculty members *shall* employ . . . practices that reflect DEIA and anti-racist principles . . . .").  *Id.*  Subsections (a) and (c) are directed at "faculty members" and "staff members," respectively.

It is not clear that any of Johnson's intended conduct would violate section 53605. Applicable to this section, Johnson alleges that "[a]lmost everything [he] teaches violates the new DEIA requirements — not just by failing to advance the DEIA and anti-racist ideologies, but also by criticizing them."  Section 53605 requires faculty to *employ practices* that reflect DEIA and anti-racist principles, but on its face, it does not require Johnson to advance, or refrain from speaking, any particular message or to refrain from teaching the things he states he intends to

1   teach.  There is no evidence before the Court that the District Defendants would interpret it to

2   require any such speech or conduct, and the Court declines to give section 53605 such an

3   interpretation of its own accord.  *See Lopez*, 630 F.3d at 790.  Thus, Johnson's has not adequately

4   alleged that his intended conduct is arguably proscribed by this regulation.

5        Johnson's other alleged intended conduct fairs the same.  Johnson alleges that he "refrains

6   from expressing his political views and from freely participating in the intellectual life of the

7   college;" he "cannot recommend books that have the term 'Cultural Marxism' in the title;" he will

8   not speak "a political ideology that he opposes and which contravenes his conscience;" that his

9   "conscience does not allow him to believe in and practice the 'antiracism' ideology" set forth in

10   the Glossary; and that he will not comply with the DEI Recommendations.  However, Johnson

11   does not establish that the District Defendants have interpreted or would interpret section 53605

12   to prohibit non-compliance with the DEI Recommendations.  Additionally, as previously noted,

13   the Glossary and the DEI Recommendations are reference documents and are not binding on

14   KCCD or Johnson.  Johnson cannot base his challenge on a definition or provision within a

15   document that may or may not be applied to him.

16        Regardless, Johnson has also failed to establish a substantial prospective threat of

17   enforcement against him under this section or any other section.

18           **3.**      **Substantial Threat of Enforcement**

19        Johnson has failed to adequately allege a substantial threat of enforcement of the

20   regulations or the DEI Recommendations against him.  Johnson fails to allege that there has been

21   a specific threat of enforcement of them against him or that the history of their enforcement

22   establishes a credible threat that they would be enforced against him.  Moreover, the regulations

23   and the DEI Recommendations largely do not directly apply to Johnson's conduct, no local

24   policies implementing the regulations or recommendations are before the Court, and none of the

25   challenged regulations or recommendations contain an enforcement mechanism.  Finally,

26   defendant Christian has disavowed any intent to take action against Johnson for his intended

27   speech.

28

1    Johnson does not allege that defendants have explicitly threatened to enforce the

2    regulations or the DEI Recommendations against him.  To the extent Johnson asserts that

3    Dadabhoy's holiday email referencing section 51201 was an explicit threat to enforce the

4    regulations against Johnson, this argument falls short.  The email does not mention Johnson or

5    RIFL by name, and it quotes only section 51201, without mentioning any other challenged

6    regulation, and notes that section 51201 "provides us with direction on diversity, equity, and

7    inclusion."  FAC Ex. C.  This does not meet the "standard necessary to show injury in fact."

8    *Lopez*, 630 F.3d at 789.

9    The record demonstrates that the regulations have no history of enforcement.  Though the

10   history of enforcement carries less weight when, as here, the challenged provision "is relatively

11   new[,] and the record contains little information as to enforcement," *Tingley*, 47 F.4th at 1069,

12   this factor still weighs in favor of finding that there is no credible threat of enforcement.  Johnson

13   alleges that he has a credible and substantial fear that the regulations will be enforced against him

14   because defendants "have investigated, disciplined, and terminated faculty for expressing views

15   that are incompatible with anti-racism and Defendants' vision of 'embracing diversity.'"  FAC ¶

16   181.  However, Johnson bases this allegation on Garrett's termination, and, as addressed above,

17   Garrett's termination is insufficient to support a credible threat of enforcement against Johnson.

18   Garrett's termination was also based solely on violations of sections 87732 and 87735 of the

19   California Education Code, not the regulations or the DEI Recommendations, and it cannot

20   support an alleged fear of threat of enforcement of either the regulations or the DEI

21   Recommendations against Johnson.

22   Additionally, as noted, some of the regulations are merely aspirational, and the

23   government is permitted to state its position on diversity.  *See* Section V.A.iii.2.  Sections 51200

24   and 51201 do exactly this, as do many parts of the other challenged sections, and a pre-

25   enforcement challenge is not appropriate to such regulations.  Some provisions of the regulations

26   rise above mere aspirational language and require action by the District Defendants.  For

27   example, the district governing board shall create "locally developed minimum standards," using

28   the DEI Recommendations as a reference, and "policies" to be used in performance evaluations

46

1    and faculty tenure reviews.  §§ 53425, 53601, 53602.

2          However, the record before the Court does not include any such "locally developed

3    minimum standards" or any local policies governing evaluations.  The F&R notes that the

4    regulations are "binding on districts" since they have been adopted through the formal regulatory

5    process so "it is not 'imaginary or speculative' . . . to infer Plaintiff will be evaluated under the

6    District's DEI competencies and criteria for his employee evaluation, tenure review, and

7    employment retention processes."  F&R 23 (quoting *Thomas v. Anchorage Equal Rts. Com'n*,

8    220 F.3d 1134, 1140 (9th Cir. 2000)).  The F&R therefore finds that "it is likely that at some

9    point Plaintiff will face consequences if he does not adhere to *whatever competencies and criteria*

10   *are imposed on him through the DEIA regulations."  Id.* (emphasis added).  But the Court cannot

11   find that Johnson will face consequences for failing to adhere to "locally developed minimum

12   standards" or local policies on faculty evaluations when the record does include any such local

13   standards or policies or what they require.

14         On this record, the threat of any enforcement of such standards or policies is "imaginary

15   or speculative," and cannot support a finding of injury in fact.  *See Thomas*, 220 F.3d at 1140

16   (quoting *Babbitt*, 442 U.S. at 298).  Similarly, in *Clark*, the Ninth Circuit found that the plaintiffs'

17   alleged injury was too speculative to support a finding of injury in fact.  899 F.3d at 810-11.

18   There, the plaintiffs challenged an ordinance which would require a party acting as representative

19   of for-hire drivers to negotiate and enter into an agreement on their behalf.  *Id.* at 806.  Plaintiffs

20   argued they were "poised to suffer a violation" of a subsection of the National Labor Relations

21   Act, but the Ninth Circuit found that a violation of the subsection, by its plain language, required

22   a contract or agreement.  *Id.* at 810.  However, because a driver representative had not yet been

23   chosen, no contract or agreement was imminent, and therefore, it was speculative whether the

24   ordinance would cause a violation.  *Id.* at 811 ("It is speculative whether Local 117, another

25   entity, or no entity at all, will become the [exclusive driver representative] for Uber and Lyft's

26   drivers.  With no [exclusive driver representative] in sight to reach an agreement with either Uber

27   or Lyft, the Drivers' assertion of a[n] . . . injury is wholly speculative.").

28         Regardless of the conduct or speech he alleges he plans to engage in, Johnson similarly

1    fails to allege a credible threat that the regulations will be enforced against him through locally

2    developed standards and policies, because the local standards and policies against which his

3    actions or speech may be judged are not before the Court.  Without any allegations in the FAC as

4    to what the locally developed standards and policies state, or what they require of faculty,

5    Johnson's assertion that the defendants will implement the regulations and the DEI

6    Recommendations in a way that will impose a First Amendment injury upon him is wholly

7    speculative.  Johnson alleges that "Bakersfield College maintains customs, policies, and practices

8    that are in compliance with" the DEI Recommendations.  FAC ¶ 58.  However, he fails to identify

9    any such customs, policies, or practices, and none of his claims address any such customs,

10   policies, or practices.[28]

11          Finally, defendant Christian maintains that "[t]he regulations at issue do not apply to

12   Johnson directly [but rather to the] districts," and she has disavowed any intention or ability to

13   take action against Johnson because of the speech at issue in this case: "Chancellor Christian

14   cannot and will not take any action against Johnson concerning his speech."  Christian MTD 18.

15   The Court does not find her disavowal to be merely a litigation position given that Christian states

16   not only that she *will not* take action, but that she *cannot* take action against Johnson, as she is not

17   a prosecuting authority of the section under state law.  Cal. Educ. Code § 70902(b)(4) (mandating

18   that community college districts are responsible for the employment and assignation of faculty);

19   Cal. Code Regs. tit. 5, § 53602 (establishing that the district, not the Chancellor, is responsible for

20   employee evaluations).

21          Thus, Johnson has failed to sufficiently allege an injury in fact as to the regulations or the

22   DEI Recommendations, and he has therefore failed to establish standing as to these claims.

23          **VI.    Conclusion and Order**

24          Ultimately, Johnson has not adequately alleged that he faces an injury that is "actual or

25   

26   [28] Additionally, Johnson does not bring a challenge to any Bakersfield College policy.  He
     challenges the regulations, which require KCCD to implement local standards and policies.  He

27   does not explain how such alleged Bakersfield College "customs, policies, or practices" relate to
     his claims in this case.

28

imminent," and he has therefore failed to invoke this Court's federal jurisdiction. *Lujan*, 504 U.S. at 560). As Johnson has failed to establish standing, his complaint must be dismissed without prejudice. *See Barke v. Banks*, 25 F.4th 714, 721 (9th Cir. 2022) ("[D]ismissals for lack of Article III jurisdiction must be entered without prejudice because a court that lacks jurisdiction is powerless to reach the merits.") (internal quotations and citations omitted)).

To the extent Johnson might be able to plead—with additional facts not currently before the Court—that he has standing to challenge sections 87732 and 87735 of the California Education Code, Policy 3050, or section 53605 of title 5 of the California Code of Regulations, Johnson may file a second amended complaint within 45 days.

For the reasons explained above:

1. Defendants' motions to dismiss (Docs. 46, 65) are hereby granted.

2. Johnson's first amended complaint (Doc. 8) is dismissed without prejudice.

3. Johnson's motion for preliminary injunction (Doc. 26), and any other pending motion, is denied as moot.

4. Johnson may file a second amended complaint within 45 days of the entry of this order.

IT IS SO ORDERED.

Dated:   September 22, 2024

_____
UNITED STATES DISTRICT JUDGE